UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO.:

MATILDE SANTANA, an individual,

    Plaintiff,

v.

TELEMUNDO NETWORK GROUP LLC, a Delaware limited liability company; NBCUNIVERSAL MEDIA, LLC, a Delaware limited liability company; and COMCAST CORPORATION, a Pennsylvania corporation,

    Defendants.
_____/

## **COMPLAINT**

Plaintiff, MATILDE SANTANA ("Ms. Santana"), an individual, hereby sues Defendants, TELEMUNDO NETWORK GROUP LLC ("Telemundo"), a Delaware limited liability company, NBCUNIVERSAL MEDIA, LLC ("NBCUniversal"), a Delaware limited liability company, and COMCAST CORPORATION ("Comcast"), a Pennsylvania corporation, and alleges:

### **Jurisdiction, Venue, and Parties**

1. This is an action for damages exceeding $75,000.00, exclusive of interest and costs, brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Florida Civil Rights Act, Florida Statutes § 760.01, *et seq.*

2. This Court has federal question jurisdiction under 28 U.S.C. § 1331, and diversity of citizenship jurisdiction under 28 U.S.C. § 1332.

3. Ms. Santana is an individual residing and domiciled in the State of Florida.

4. Defendant, Telemundo, is a Delaware limited liability company whose principal place of business is located in the State of Florida.

5. Defendant, NBCUniversal, is a Delaware limited liability company whose principal place of business is located in the State of New York.

6. Defendant, Comcast, is a Pennsylvania corporation whose principal place of business is located in the State of Pennsylvania.

7. Venue is proper in this District because all the unlawful acts, or at least a substantial amount of them, giving rise to Ms. Santana's claim occurred there. *See* 28 U.S.C. § 1391; 42 U.S.C. § 2000e-5(f)(3).

## General Allegations

Background

8. Ms. Santana began working as an employee for Telemundo's predecessor entity sometime at or around August 2000.

9. Telemundo, a broadcast station, acquired the predecessor entity sometime in February 2018, at which time Ms. Santana began working as an account executive for Telemundo, where she focuses on television advertising sales.

10. At the time of acquisition, Ms. Santana enjoyed the largest customer book of business compared to Telemundo's other account executives, which she earned through hard work, diligence, and dedication.

11. Ms. Santana's annual compensation is paid on a 65/35 plan, such that 65% of her total compensation is paid as a yearly salary and the other 35% is paid based on her account productivity, which is expressed as the percentage of annual budget goal achieved.

12. During all times material, Telemundo was Ms. Santana's "employer" as that term is defined under Title VII.

13. All of Telemundo's human resources services are performed by NBCUniversal, whose name appears on Telemundo's employees' email addresses, while Comcast authored and issued Telemundo's employee handbook and controls Telemundo's internal policies, specifically with respect to compliance with Title VII.

14. Upon information and belief, NBCUniversal is a parent company of Telemundo and maintained a significant degree of control over Telemundo's employees, including the terms and conditions of employment of such employees.

15. As such, Telemundo and NBCUniversal were a "single employing enterprise," or, alternatively, "joint employers," or, alternatively, NBCUniversal acted as Telemundo's "agent" with respect to Telemundo's employees.

16. Accordingly, during all times material, NBCUniversal was Ms. Santana's "employer" as that term is defined under Title VII.

17. Upon information and belief, Comcast is a parent company of Telemundo and maintained a significant degree of control over Telemundo's employees, including the terms and conditions of employment of such employees.

18. As such, Telemundo and Comcast were a "single employing enterprise," or, alternatively, "joint employers," or, alternatively, Comcast acted as Telemundo's "agent" with respect to Telemundo's employees.

19. Accordingly, during all times material, Comcast was Ms. Santana's "employer" as that term is defined under Title VII.

Mr. Soto

20.   Anibal Soto, another of Defendant's employees, began working as Ms. Santana's manager on or about October 1, 2014, and continued working as her manager following the acquisition.

21.   Beginning immediately after October 1, 2014, and throughout his tenure as Ms. Santana's superior, Mr. Soto made a number of sexual advances, comments, and jokes toward Ms. Santana and Defendant's other employees.

22.   To illustrate:

   a.   Sometime in November 2017, when Ms. Santana asked permission to take a trip to visit a client in Miami, Mr. Soto responded, "as long as you sleep over the night before and we share a room."

   b.   Sometime in early 2018, Ms. Santana witnessed Mr. Soto advise another female employee that she needed, "better lipstick to match her shoes."

   c.   Sometime in February 2018, while in the traffic manager's office, Mr. Soto informed Ms. Santana that when he was seventeen years old, he sexually desired his teacher, and described how "hard" she made him.

   d.   Sometime in August 2018, Mr. Soto approached Ms. Santana at her desk and informed her that the curly hair on his head had been pulled from his pubic area, and then pantomimed doing so.

   e.   Sometime in October 2018, while outside Mr. Soto's office, he told Ms. Santana, "can you come in or do I need to come in you?" and then grabbed her waist.

23.   During his tenure as Ms. Santana's manager, Mr. Soto has also made direct comments to Ms. Santana about her breasts and rear that are too numerous to count.

24. On one occasion, while in the car, Mr. Soto placed his hands between Ms. Santana's legs and grabbed her inner thigh.

25. On another occasion, while in the office, Mr. Soto rubbed Ms. Santana's shoulders and told her he needed to stop because he was "getting hard."

26. At no time did Ms. Santana grant Mr. Soto permission to touch her or speak to her sexually, and she continually refused his sexual advances.

27. Mr. Soto's inappropriate behavior made Ms. Santana nervous around the workplace when Mr. Soto was around.

28. Mr. Soto's inappropriate behavior was not limited to Ms. Santana. Mr. Soto repeatedly asked his female subordinates on dates.

29. Ms. Santana feared reporting these instances to NBCUniversal's human resources representative(s), who had historically disclosed confidential communications made by other reporting employees, who were then punished.

Mr. Roldan

30. Since 2018, Luis Roldan served as Telemundo's general manager and Mr. Soto's superior.

31. Mr. Roldan continuously encouraged Mr. Soto's inappropriate treatment toward Defendant's female employees, including Ms. Santana.

32. For example, on or about August 16, 2019, while in Ms. Santana's presence, Mr. Roldan asked Mr. Soto, "tu amiguita esta aqui hoy?" (translated: is your little friend here today), to which Mr. Soto responded, "yes, [Ms. Santana] is at her desk.

33. Mr. Roldan also participated in sexually inappropriate conduct toward Defendant's female employees.

34. While at a work event, Mr. Roldan touched another female employee who reported to Ms. Santana that she felt uncomfortable.

35. Female employees have noted that complaints regarding Mr. Roldan are ignored or excused by NBCUniversal's human resources representative(s).

36. On or about August 26, 2019, Mr. Roldan introduced one of the station's on-screen talents to the new sales manager, Normand Levy, as the most "beautiful" and "sexy" woman of the station.

37. Mr. Roldan also expressed a clear bias toward Defendant's female employees who would join him for late-night drinks or engage in sexually suggestive activity, as he has awarded them promotions and favorable redistribution of accounts.

Personal Loans

38. Throughout 2018, Mr. Soto continually asked Ms. Santana to provide him with substantial personal loans, to which she agreed out of fear of harm.

39. Notably, Mr. Soto never paid the majority of these loans back.

40. Moreover, Ms. Santana had valid reasons to fear Mr. Soto, as, in addition to his aggressive personality, he also informed her sometime in September 2018 that he would increase another employee's sales budget in retaliation for lodging a complaint against him.

Ms. Santana's Performance

41. Ms. Santana consistently met, and often exceeded, her sales goals for almost two decades working for Telemundo and its predecessor.

42. Sometime in early 2018, however, Mr. Soto re-assigned several of Ms. Santana's accounts, including one of her largest accounts, to other account executives and against the clients' wishes.

43. Due to these re-assignments, Ms. Santana lost over $525,000.00 in business.

44. Mr. Soto re-assigned these clients in retaliation for Ms. Santana rebuffing his sexual advances.

45. To make matters worse, Mr. Soto refused to adjust Ms. Santana's sales budget to reflect her lost account.

46. As a result, Ms. Santana was unable to meet her anticipated sales budget in the second and third quarters of 2018.

47. Similarly, Defendants failed and/or refused to adjust the sales budgets for the account executives receiving Ms. Santana's assigned work. As a result, Telemundo's account executives' performance figures for the second and third quarters of 2018 were terribly askew.

Taking Leave

48. Sometime in October 2018, Ms. Santana took leave under the Family and Medical Leave Act ("FMLA") leave because of a scheduled spinal surgery resulting from an accident at a work related event.

49. During her time away, Ms. Santana was paid through a combination of short-term disability insurance, which was part of her compensation package, and long-term disability insurance that she paid for.

50. While on leave, Mr. Soto had been tasked with managing Ms. Santana's accounts.

51. Mr. Soto, however, chronically neglected Ms. Santana's customers, including not returning their phone calls and emails, not running their ad campaigns, and rampant billing errors.

52. Desperate for a response, several of Ms. Santana's customers reached out to her while on leave, after which Ms. Santana, while limited, took steps to preserve her hard-earned relationships and ensure her clients received service.

7

53. After making these efforts, Mr. Soto began continually contacting Ms. Santana, demanding she stay "in the loop" with her clients, even though she was on medical leave and he was neglecting her clients.

54. Ms. Santana advised Mr. Soto that she was in too much pain to manage her clients while on leave, to which he responded, "go to bed and take your laptop and spread your legs like you know how to do."

55. Out of fear of repercussion, Ms. Santana was forced to work while on medical leave, including participation in email and phone communications and processing client orders.

56. In response to Defendant's conduct during Ms. Santana's leave, on December 3, 2018, the undersigned issued Telemundo and NBCUniversal a cease and desist letter, informing them that they have failed to control its employees (namely, Mr. Soto) in violation of FMLA.

57. On April 11, 2019, the undersigned issued another letter to Telemundo and NBCUniversal, informing that, among other things, that their treatment of Ms. Santana, and the purposeful neglect of her clients during her medical leave, was fueled by discrimination on the basis of her sex and retaliation for her rebuffing Mr. Soto's continuous sexual advances.

The "Investigation"

58. Following receipt of the April 11, 2019 letter, Telemundo launched a purported investigation into Ms. Santana's allegations.

59. Patti Lewis, a representative from the Golf Channel, headed the investigation.

60. As admitted by Telemundo, however, the Golf Channel is its sister company as, both of which are controlled by their parent company, NBCUniversal.

61. As such, Telemundo had not selected an independent and neutral third party to investigate.

62. Several of Defendant's employees supported Ms. Santana's claims of discrimination, but their claims were ignored for purposes of reaching a determination.

63. Defendants purportedly maintain a policy assuring discretion and the protection of anonymity in connection with such investigations. Employees, however, openly discussed the investigation in the office.

64. Moreover, employees' accounts did not remain confidential and those providing information in support of Ms. Santana's claims suffered from retaliatory conduct as a result, including budget adjustments and sudden warnings for alleged underperformance.

65. Meanwhile, following its flawed investigation, Telemundo somehow concluded that no discrimination occurred.

Return to Work

66. Ms. Santana returned to work for Defendants on or about June 25, 2019.

67. Prior to Ms. Santana's return, she requested a reasonable accommodation, specifically, that she work from home and attend client visits and meetings when necessary.

68. Defendants denied Ms. Santana's request for a reasonable accommodation.

69. Ms. Santana's return to work was unnecessarily delayed by Defendants, who repeatedly requested additional information despite receiving medical documentation allowing her to resume her work activities.

70. Defendants further suggested to Ms. Santana that she may not want to return at all, insinuating that workers making these types of allegations tend to not be dedicated to their jobs.

71. Ms. Santana, however, was very dedicated to her clients and her career.

72. Unfortunately, upon her return to Defendants' office, Ms. Santana was met with hostility, as the other employees had been instructed to limit interactions with her.

73. Similarly, during office meetings, Mr. Roldan would intentionally skip over Ms. Santana during the question and answer period.

74. In addition, Ms. Santana's access card had purportedly gone "missing" despite her leaving it in her desk prior to taking medical leave.

75. Unreasonably, it took Defendants six weeks to get Ms. Santana a new access card, during which time she had to wait outside the building each morning until another employee let her in.

76. Nonetheless, Ms. Santana continued reporting to work every day and managed to increase her account productivity from 40% (during the time Mr. Soto looked over her accounts) to 80%.

77. Despite her strong performance, Defendants made several last-minute adjustments to Ms. Santana's performance statistics to reduce her productivity to 79%.

78. As a result of falling under the 80% productivity threshold, Defendants issued Ms. Santana a warning letter regarding her performance.

79. The adjustments to, and reassignments of, Ms. Santana's accounts, which came about as a result of her cease and desist letters and continued refusal to submit to Mr. Soto's sexual demands and remain silent regarding the hostile work environment, has negatively affected her compensation, as she has not received the total compensation to which she was entitled upon returning to work.

80. Moreover, the sexually harassing and intimidating behavior from Mr. Soto continued as he refused to communicate with Ms. Santana via email, insisting upon intruding into her personal space, requiring her to come to his private office to obtain information necessary to do

her job, and even making inappropriate contact with Ms. Santana's person (*to wit*, reaching over Ms. Santana to pick up a pen in a manner that allowed his leg to lift her skirt and expose her thigh).

Pre-Suit Charge

81. On October 28, 2019, Ms. Santana filed a Charge of Discrimination ("Charge") with Equal Employment Opportunity Commission ("Commission"), a copy of which is attached hereto as **Exhibit "A."**

82. The Charge was assigned to an investigator for the Equal Employment Opportunity Commission ("EEOC").

83. On May 14, 2020, Ms. Santana issued a Request for Notice of Right to Sue.

84. The EEOC issued a Notice of Right to Sue on May 20, 2020, a copy of which is attached hereto as **Exhibit "B."**

85. Less than ninety (90) days have passed since the Notice of Right to Sue was issued.

86. All conditions precedent to the institution of this action have either occurred, been performed, been waived, or would be futile.

87. Ms. Santana has retained the undersigned counsel to represent her in this action and agreed to pay a reasonable fee for their services rendered, which fee Ms. Santana is entitled to recover pursuant to 42 U.S.C. § 2000e-5(k).

## COUNT I
### Sexual Discrimination in Violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.*, for Hostile Environment Sexual Harassment

88. Ms. Santana re-alleges paragraphs 1 through 87.

89. Defendants engaged in unlawful employment practices in violation of 42 U.S.C. § 2000e-2(a)(1), by discriminating against Ms. Santana because of her sex.

90. Defendants' unlawful employment practices were intentional and done with malice or reckless indifference to Ms. Santana's rights under Title VII.

91. As a female, Ms. Santana is a member of a protected class.

92. Ms. Santana has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature.

93. Ms. Santana was harassed based on her female gender, as Defendants' male employees were treated differently.

94. The harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.

95. Defendants are liable under the theory of *respondeat superior* for Mr. Soto's and Mr. Roldan's harassing and discriminatory behavior, as Defendants were made aware of the harassment and failed to take prompt remedial action.

### COUNT II
### Sexual Discrimination in Violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.*, for Retaliation

96. Ms. Santana re-alleges paragraphs 1 through 87.

97. Defendants engaged in unlawful employment practices in violation of 42 U.S.C. § 2000e-3(a), by discriminating against Ms. Santana for engaging in protected activity or expression.

98. Defendants' unlawful employment practices were intentional and done with malice or reckless indifference to Ms. Santana's rights under Title VII.

99. Ms. Santana engaged in a protected activity or expression, namely: 1) opposing Defendants' sexually discriminatory practices; 2) accusing Defendants of sexual discrimination and participating in an investigation into same; and 3) filing a charge against Defendants with the EEOC.

100. Ms. Santana received an adverse employment action, that being the loss of several accounts, deprival of compensation entitlements, refusal to accommodate her while on medical leave, and being treated with hostility upon her return from medical leave.

101. There is a causal link between the protected activity and adverse employment action, as Defendants were aware of the protected activity at the time they took an adverse employment action, which took place shortly after learning of the protected activity.

### COUNT III
### Sexual Discrimination in Violation of the Florida Civil Rights Act, Florida Statutes § 760.01, *et. seq.*, for Hostile Environment Sexual Harassment

102. Ms. Santana re-alleges paragraphs 1 through 87.

103. Defendants engaged in unlawful employment practices in violation of Florida Statutes § 760.10(1)(a), by discriminating against Ms. Santana because of her sex.

104. Defendants' unlawful employment practices were intentional and done with malice or reckless indifference to Ms. Santana's rights under the Florida Civil Rights Act.

105. As a female, Ms. Santana is a member of a protected class.

106. Ms. Santana has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature.

107. Ms. Santana was harassed based on her female gender, as Defendants' male employees were treated differently.

108. The harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.

109. Defendants are liable under the theory of *respondeat superior* for Mr. Soto's and Mr. Roldan's harassing and discriminatory behavior, as Defendants were made aware of the harassment and failed to take prompt remedial action.

## COUNT IV
### Sexual Discrimination in Violation of the Florida Civil Rights Act, Florida Statutes $ 760.01, *et. seq.*, for Retaliation

110. Ms. Santana re-alleges paragraphs 1 through 87.

111. Defendants engaged in unlawful employment practices in violation of Florida Statutes § 760.10(7), by discriminating against Ms. Santana for engaging in protected activity or expression.

112. Defendants' unlawful employment practices were intentional and done with malice or reckless indifference to Ms. Santana's rights under the Florida Civil Rights Act.

113. Ms. Santana engaged in a protected activity or expression, namely: 1) opposing Defendants' sexually discriminatory practices; 2) accusing Defendants of sexual discrimination and participating in an investigation into same; and 3) filing a charge against Defendants with the EEOC.

114. Ms. Santana received an adverse employment action, that being the loss of several accounts, deprival of compensation entitlements, refusal to accommodate her while on medical leave, and being treated with hostility upon her return from medical leave.

115. There is a causal link between the protected activity and adverse employment action, as Defendants were aware of the protected activity at the time they took an adverse employment action, which took place shortly after learning of the protected activity.

### PRAYER FOR RELIEF

Wherefore, Ms. Santana respectfully requests that this Court:

1. Enter a permanent injunction against Defendants and their officers, agents, successors, employees, representatives, and any and all other persons acting in concert with Defendants, prohibiting them from engaging in the unlawful employment practices described herein

against its employees, and instituting the use of appropriate education, training, and development of effective complaint procedures;

2. Order Defendants to provide Ms. Santana back pay, including interest, payable by Defendants, and other affirmative relief necessary to eradicate the effects of Defendants' unlawful employment practices;

3. Order Defendants to provide Ms. Santana with compensation for past and future pecuniary losses resulting from the unlawful employment practices described herein;

4. Order Defendants to provide Ms. Santana with compensation for past and future non-pecuniary losses, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and humiliation;

5. Order Defendants to pay Ms. Santana punitive damages for its malicious and/or reckless conduct;

6. Award Ms. Santana reasonable attorneys' fees and all expenses and costs of this action, payable by Defendants;

7. Include pre-judgment interest in its damages calculation; and

8. Enter any such other and further legal and equitable relief the Court deems necessary, just, and proper.

**Complaint**
*Matilde Santana v. Telemundo Network Group LLC, et. al.*
Case No.:_____

Dated, this 30th day of June, 2020.

Respectfully submitted,

*/s/Mahra Sarofsky*
Jeremy E. Slusher, Esq.
Florida Bar No. 145769
jes@slusherandrosenblum.com
Mahra Sarofsky, Esq.
Florida Bar No. 33637
mcs@slusherandrosenblum.com
**SLUSHER & ROSENBLUM P.A.**
444 W. Railroad Avenue, Suite 470
West Palm Beach, FL 33401
Telephone:   (561) 814-2020
Facsimile:   (561) 557-4598
*Attorneys for Plaintiff, Matilde Santana*