**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**MATILDE SANTANA,**

      **Plaintiff,**

**v.**                          **CASE NO. 6:20-CV-1157-ORL-78LRH**

**TELEMUNDO NETWORK GROUP LLC,
NBCUNIVERSAL MEDIA, LLC, and
COMCAST CORPORATION,**

      **Defendants.**

_____/

## <u>DEFENDANTS' MOTION TO DISMISS FOR WITNESS INTIMIDATION</u>

Pursuant to Rule 41(b) of the Federal Rules of Civil Procedure and the Court's inherent power to assess sanctions, Defendants, Telemundo Network Group LLC ("Telemundo"), NBCUniversal Media, LLC ("NBCUniversal"), and Comcast Corporation ("Comcast") (collectively referred to as "Defendants"), hereby file this motion seeking the sanction of dismissal of Plaintiff's Amended Complaint, with prejudice.

Defendants do not file this motion lightly, but are compelled to do so based on the undisputed evidence of Plaintiff's misconduct and to protect the manifest interests of justice in this action. As set forth in this motion, Defendants confirmed, through the depositions of Plaintiff and her husband (Dominick Cicale), that Mr. Cicale, with Plaintiff's prior knowledge, formed and implemented a plan to intimidate and influence the testimony of Luis Roldan (the former Telemundo general manager against whom Plaintiff made a number of allegations in the Amended Complaint (Dkt. No. 1 at ¶¶ 30-38) and whom both Plaintiff and Defendants identified in their initial disclosures as a witness on October 9, 2020).  Specifically, with knowledge that Mr. Roldan would be an adverse witness in this

action to his wife, Plaintiff's husband sent Mr. Roldan's wife a text message and an e-mail with a cropped photograph[1] of Mr. Roldan and a female employee at an event. When asked in his deposition[2] why he sent this text message, Mr. Cicale replied: "Because I felt maybe hell has no fury as a woman scorned, that she might give us impeachment material, come to trial, testify, and give us information against her former husband or current husband." (Cicale 156:17-21).[3] Plaintiff's counsel in this action, Jeremy Slusher, who also is her and her husband's current counsel in the personal injury action, was aware of Mr. Cicale's conduct by June 12, 2021. (Dill 36:7-39:17; DX K).[4]

This conduct is a clear attempt to intimidate and influence the testimony of a witness in violation of federal law. See 18 U.S.C. § 1512(b) ("Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to (1) influence, delay, or prevent the testimony of any person in an official proceeding; [or] (2) cause or induce any person to (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding; . . . ."); see also id. § 1512(d) ("Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from (1)

---

[1] Mr. Cicale admitted that he cropped a photograph, which depicted other people, in order to make it look like Mr. Roldan was having an affair. (Cicale 160:23-25, 161:1-14, 162:20-25)

[2] Dominick Cicale's deposition transcript (cited as "Cicale"), with copies of the exhibits (cited as CX), is attached hereto as Exhibit "A."

[3] Mr. Roldan was also scheduled to testify against Mr. Cicale and Plaintiff in a personal injury action. At the time of these actions to intimidate Mr. Roldan, Mr. Cicale knew that Mr. Roldan would testify adversely to Plaintiff in both lawsuits. (Cicale 157:9-17, 160:12-16, 164:2-7, 174:24-25, 175:1-3).

[4] John Dill's deposition transcript (cited as "Dill"), with copies of the exhibits (cited as DX), is attached hereto as Exhibit "B."

attending or testifying in an official proceeding . . . ."); McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1040 (11th Cir. 2000) ("Section 1512(b) not only makes it a crime to attempt to deter testimony by force, intimidation, or threat, as does § 1985(2), but also makes it a crime to try to deter such testimony through sheer persuasion without the use of physical or economic threat, as long as one does so with a corrupt purpose."); cf. United States v. Sumrall, No. CIV-16-582-R, 2017 WL 1288895, at *5 (W.D. Okla. Apr. 6, 2017) ("On the other hand, a person could violate the statute with non-violent conduct in many ways. A defendant attempting to dissuade a designated witness from testifying could threaten to blast a car horn outside the witness's home at odd hours of the night. He could threaten to litter the witness's yard with offensive signage or even to ostracize a person from a social club or group of friends. He might even stoop to threatening to expose a witness's extramarital affair. . . .  So though not a violent felony under the ACCA, the conduct would still be grounds for conviction under Oklahoma's witness-intimidation statute because all involve a defendant (1) willfully (2) threatening (3) a person with (4) mental harm (5) through fear with (6) the intent to prevent the person from testifying.").

This bad faith conduct and attempt to manipulate the justice system cannot be tolerated.  As a result, Plaintiff's Amended Complaint must be dismissed, as a sanction, in order to protect the interests of justice in this case.  The grounds for this motion are set forth in further detail below.

## **MEMORANDUM OF LAW**

### I.    **Procedural Background**

On June 30, 2020, Plaintiff filed her Complaint (Dkt. No. 1) alleging two claims of hostile work environment based on sex and two claims of retaliation.  Defendants moved

to dismiss the Complaint, which the Court granted, in part, on February 22, 2021. (See Order (Dkt. No. 29)).

On March 1, 2021, Plaintiff filed her Amended Complaint (Dkt. No. 31) again raising the same four claims as she previously pled. Defendants moved to dismiss the retaliation claims on March 25, 2021 (see Defendants' Motion to Dismiss (Dkt. No. 35)), which the Court granted on August 5, 2021, dismissing the retaliation claims without prejudice, but without further leave to amend (see Order (Dkt. No. 40)). Therefore, only Plaintiff's claims for hostile work environment based on sex remain pending in this action.

## II.    Factual Background

### A.    Plaintiff Identified Luis Roldan as a Witness in this Action.

In her Amended Complaint, Plaintiff alleges that Anibal Soto ("Mr. Soto"), "made a number of sexual advances, comments, and jokes toward [Plaintiff] and Defendant's [sic] other employees." (Am. Compl. ¶¶ 21-28). Additionally, Plaintiff alleges that Luis Roldan ("Mr. Roldan"), who she claims "served as Telemundo's general manager and Mr. Soto's superior" since 2018, "encouraged Mr. Soto's inappropriate treatment toward Defendant's [sic] female employees, including [Plaintiff.]" (Id. ¶¶ 30, 31).

Among her allegations concerning to Mr. Roldan, Plaintiff claims that: (i) "Mr. Roldan . . . participated in sexually inappropriate conduct toward Defendant's [sic] female employees"; (ii) "Mr. Roldan touched another female employee who reported to Ms. Santana that she felt uncomfortable" (iii) "[f]emale employees have noted that complaints regarding Mr. Roldan are ignored or excused by NBCUniversal's human resources representative(s)"; (iv) Mr. Roldan introduced an on-screen talent to a Telemundo sales manager "as the most 'beautiful' and 'sexy' woman of the station"; and (v) "Mr. Roldan

also expressed a clear bias toward Defendant's [sic] female employees who would join him for late-night drinks or engage in sexually suggestive activity[.]" (Id. ¶¶ 33-37).

### B. Mr. Roldan Was Deposed and Identified as a Witness in Plaintiff's Personal Injury Action.

On April 21, 2017, Plaintiff and her husband, Dominick Cicale (a/k/a Dominick Russo), filed a personal injury action against Colstar Transportation Services, Inc. ("Colstar") in connection with an automobile accident they suffered on December 10, 2016 (hereinafter, the "Colstar case"). (Pl. 108:9-15; 109:10-22; PX26[5]; Cicale 6:12-16). Mr. Cicale, who operates over a dozen businesses under Plaintiff's name since his release from prison in 2013,[6] admits to having been a member of an organized crime family and convicted of racketeering activity, including (i) first-degree murder; (ii) accessory to after the fact of first-degree murder; (iii) "multiple murders"; "(iv) "multiple attempted murders"; (v) "organized crime, RICO"; (vi) "loan sharking"; and (vii) "a lot more,"[7] frequently goes by the alias Dominick Russo, a name provided by the witness protection program, in an attempt to disassociate himself from his extensive criminal past. (Cicale 10:17-20:2; 46:10-19) ("So if anybody would look up the company, they would not see my real name, Dominick Cicale. . . . Because if they would run a Google search, I come up all over Google with my real name and the identity of my past comes out.")).

---

[5] Plaintiff's deposition transcript (cited as "Pl."), with copies of the exhibits (cited as PX), is attached hereto as Exhibit "C."

[6] Throughout his deposition, Plaintiff's husband testified that he has a blanket "agreement with [his] wife" where he "could use her funds to basically invest, go get involved in ventures, and the agreement was she would have to be on all the companies to ensure her investment." (Cicale 33:10-34:2).

[7] Cicale was not sure whether his guilty plea and subsequent conviction included racketeering activity for witness intimidation. (Cicale 19:5-6).

In the Colstar case, Plaintiff and her husband, at the time represented by John W. Dill ("Mr. Dill"), deposed Mr. Roldan. (Cicale 158:7-15, 164:2-7).  During this deposition, Mr. Roldan "testified that [Plaintiff] did not appear injured to him[.]" (DX K).[8]  As a result of this deposition, Plaintiff's husband knew that Mr. Roldan "had nothing good to say about [Plaintiff]." (Cicale 164:2-7). Colstar identified Mr. Roldan on its trial witness list in that action. (Cicale 164:9-11).

### C.    Plaintiff and Her Husband Engaged In Witness Intimidation.

On Friday, June 11, 2021, the parties in the Colstar case selected a jury and defense counsel read the list of potential defense witnesses, which included Mr. Roldan. (Dill 7:21-8:4; DX K). Immediately after Mr. Roldan was identified by Colstar on its witness list in that action, Plaintiff's husband admits to have begun taking what he described as "a precaution" by tracking down Mr. Roldan's wife's personal phone number and personal email address, and manipulating a picture of Mr. Roldan with a female coworker (Heidi

---

[8] Exhibit K to Mr. Dill's deposition transcript is a memorandum prepared by Mr. Dill on or about June 15, 2021 regarding the events that led to Mr. Dill's withdrawal from representation of Plaintiff and her husband in the Colstar case. (Dill 66:22-69:9). Mr. Dill withdrew as counsel to Plaintiff and her husband when they refused to execute the settlement agreement reached in the Colstar case after Plaintiff's husband's conduct came to light. (Dill 7:24-8:10). Colstar is seeking to enforce the settlement agreement, and Plaintiff and her husband, now represented by counsel in this case, are opposing that motion. (Colstar's Motion to Enforce is attached hereto as Exhibit "E"; Dill 25:5-19).  As a result of the allegations, including Plaintiff's deposition of John Dill in the personal injury action on September 23, 2021, the attorney-client privileged has been waived. Therefore, Defendants cite to these public records as they further support the relief requested in this motion.  Despite Plaintiff's knowledge of the waiver of the attorney-client privilege, her counsel (the same counsel as the personal injury action) continued to assert the privilege improperly in Plaintiff's deposition on September 22, 2021, and Mr. Cicale's deposition on September 23, 2021. (Pl. 227:18-24; Cicale 161;16-21, 23-25; 162:1-2).

Rodriguez, who had also been identified as a defense witness in the Colstar case). (Cicale 157:7-14; CX25; CX26).

That same day (June 11, 2021), after the jury was sworn in, "Mr. Cicale approached [Mr. Dill] stating that Mr. Roldan and Ms. Rodriguez were 'having an affair.'" (Dill 33:2-20, 70:20-71:21; DX K). Mr. Dill "informed [Mr. Cicale] that [he] did not believe they would actually be called in the trial, but that in any event extramarital affairs are not impeachable evidence of a collateral witness." (Dill 52:17-53:20; DX K). Mr. Dill believed that "the matter was dropped," but quickly "came to find out that it was only beginning." (DX K).

The following day, Saturday, June 12, 2021, at 9:14 a.m., Plaintiff's husband sent Mr. Dill a text message containing the cropped photograph[9] of Mr. Roldan standing next to Ms. Rodriguez, with text under the photo stating: "That's Luis and Heidi" and "Trying to get his wife to go to the trial." (Cicale 9:20-23; 160:23-161:5; CX25, CX26; DX K, DX M). Mr. Dill immediately responded: "No. We don't need to [expletive] around. This is all collateral." (Dill 36:7-39:17; DX K, DX M). Mr. Dill assumed Mr. Cicale "was either kidding or that any thoughts of involving Mr. Roldan's wife had been put to bed" because he did not have any further conversations with Plaintiff's husband regarding this matter. (DX K). Neither Plaintiff nor her husband informed Mr. Dill in these communications that Plaintiff's husband had already sent the text message and email message to Mr. Roldan's wife. (Dill 36:7-39:17; DX K).

---

[9] Mr. Cicale claims he found this photograph on Facebook, despite testifying that he did not have a Facebook account. (Cicale 9:20-23, 160:23-161:25). He admits that he manipulated the photograph to make it appear as though "Mr. Roldan was having an affair with the person depicted in [the] photo[.]" (Cicale 160:12-162:25).

Indeed, unbeknownst to Mr. Dill, at 9:06 a.m. on June 12, 2021 (prior to contacting Mr. Dill), Plaintiff's husband texted Mr. Roldan's wife the same photo he had shown Mr. Dill, with the words: "Good morning. So sorry but we need to talk." (Cicale 155:21-164:11; CX25; CX26; Dill 37:3-4; DX K). Mr. Roldan's wife immediately responded by asking: "Who is this?" (Cicale 155:21-164:11; CX25; CX26). Additionally, at 9:10 a.m. on June 12, 2021 (again, before contacting Mr. Dill), Plaintiff's husband followed up his text message to Mr. Roldan's wife with an email to her personal email address, forwarding the same cropped picture he had sent her a few minutes before. (Id.).

It is undisputed that Mr. Roldan's wife was not a witness in the Colstar case or in this case (Dill 53:21-22), and Plaintiff's husband admits that he only reached out to Mr. Roldan's wife for the first time earlier this year (i.e., 2021), after having received Colstar's witness list, after the jury in the Colstar case was impaneled, and immediately "before the trial was to begin in [his] personal injury action[.]" (Cicale 157:9-11; Dill 33:2-20).

Significantly, Plaintiff's husband engaged in these acts of intimidation and harassment with the clear understanding that "Mr. Roldan was going to be a witness in this action" (against Defendants), in addition to being a witness in the Colstar case. (Cicale 174:24-175:3). In fact, not only was Mr. Roldan referenced 15 times in Plaintiff's Amended Complaint, Plaintiff identified Roldan as a witness in her initial disclosures, Plaintiff and her husband knew that Defendants identified Mr. Roldan as a witness in this action in their initial disclosures served on October 9, 2020, and Plaintiff referenced Mr. Roldan in her Answers to Interrogatories served on April 14, 2021. (PX 28, PX59, PX60).

At 4:10 p.m. on June 12, 2021, Mr. Dill received a phone call from Colstar's counsel who informed Mr. Dill that there was "a major problem." (Dill 36:7-39:17; DX K). Colstar's

counsel informed Mr. Dill of the text message sent by Plaintiff's husband to Mr. Roldan's wife (Id.). He further explained to Mr. Dill that Mr. Roldan and Ms. Rodriguez (who was in the cropped photo) perceived the message as a threat and an attempt to intimidate them into not testifying at trial.  (Id.) Colstar's counsel also relayed that Mr. Roldan feared for his life due to Plaintiff's husband's conduct, as well as his admitted criminal convictions and previous associations with organized crime. (Dill 52:17-53:20; DX K). Additionally, Colstar's counsel informed Mr. Dill that Mr. Roldan was going to be contacting law enforcement about Mr. Cicale's conduct. (Dill  33:21-35:16; DX K). Colstar's counsel also informed Mr. Dill that, because of  Mr. Cicale's behavior, Mr. Roldan (and Ms. Rodriguez) refused to appear as a witness in the Colstar case, which clearly prejudiced Colstar. (Dill 36:7-39:17; DX K).

While Plaintiff admits having been aware of her husband's contact with Mr. Roldan's wife, she testified she did not know why he sent these communications. (Pl. 224:6-22). However, as Mr. Dill's records demonstrate, Plaintiff was fully aware that her husband intended on communicating with Mr. Roldan's wife before he sent the messages. (Dill 37:23-25; DX K) ("[Plaintiff] confronted [her Husband] by stating 'I thought you said you were talking to John [Dill] about this?'")).  Additionally, she was certainly aware of the messages when she and her husband met with Mr. Dill to discuss them in the evening of June 12, 2021.  (Id.).  Notwithstanding, on September 22, 2021, Plaintiff testified that she "ha[d] no idea" what her husband had said to Mr. Roldan's wife. (Pl. 224:6-22). Nevertheless, she recalled that Mr. Dill described her husband's conduct as witness intimidation, and testified that she could not remember if she disagreed with Mr. Dill's assessment of the situation.  (Pl. 227:2-10).

Plaintiff's husband also testified to not having any social media (generally) and not having a Facebook account (specifically), but then inexplicably testified that *he* likely obtained the picture from "their Facebook page[.]" (Cicale 160:23-161:5).

### D.   The Colstar Case Did Not Proceed to Trial.

On June 12, 2021, Colstar's counsel informed Mr. Dill that his client "wanted to immediately file a motion to strike the pleadings" and the trial would not proceed on Monday, despite the jury having already been sworn in. (Dill 31:15-34:7; DX K). Upon receiving the text message from counsel for Colstar, Mr. Dill confronted Plaintiff's husband and asked him "what the [expletive] were you thinking?" to which he responded "I know I [expletive] up. This guy just makes me angry. He is a scumbag." (Dill 36:7-39:17; DX K). Mr. Dill informed Plaintiff's husband that he "likely had criminal exposure for witness tampering, and certainly faced having his case involuntarily dismissed with the attorney's fees and costs." (Dill 31:15-34:7; DX K). Mr. Dill also informed Plaintiff that "[i]t was likely that her case also would never again be viable due to the inappropriate and potentially criminal actions of [her Husband]." (Id.). During this conversation, Plaintiff's husband conceded:  "'ok fine! I [expletive] up. Why don't I just put a bullet in my brain!!!'" (DX K).  Plaintiff instructed Mr. Dill to pursue settlement discussions for the personal injury action. (Id.).  Mr. Dill "cautioned both clients that a settlement would not prevent Mr. Roldan from contacting the police **nor prevent the issue from affecting Mrs. Santana's federal case, to which she replied in an exasperated voice that the federal lawsuit was also Mr. Cicale's idea**." (DX K) (emphasis added).  Ultimately, the state court was notified that a settlement had been reached between the parties. (Notice of Settlement,

Ex. D).[10]    However, thereafter, Plaintiff and her husband refused to execute the settlement agreement, asserting that there was no agreement, and Colstar has moved to enforce the settlement agreement, which is currently pending in state court.  (Motion to Enforce, Ex. E).[11]

### E.   Plaintiff's Counsel in This Case (Jeremy Slusher) Has Been Aware of Plaintiff's Husband's Witness Intimidation Since At Least June 12, 2021.

Plaintiff's counsel in this case (Jeremy Slusher) was aware of the settlement negotiations regarding the personal injury case.  (DX K). Mr. Slusher has represented Plaintiff's husband since at least September 18, 2018 (well before this lawsuit was filed), and Plaintiff's husband described his relationship with Mr. Slusher as that of a consultant: "If I need consulting, he will – I'll ask him his opinion, his legal advice." (Cicale 85:1-8; 121:24-123:17). (Id.).

During his deposition in this case, as part of his explanation for why he sent the messages to Mr. Roldan's wife, Plaintiff's husband claimed that he was helping Mr. Dill find information for purposes of impeachment. (Cicale 163:9-19). Mr. Dill expressly rejected that notion, having testified that Plaintiff's husband was "obviously not investigating or getting impeachment material[,]" and that Mr. Slusher only provided Plaintiff's husband with this explanation after the fact.  (Dill 33:4-36:12; 47:4-15, 70:6-73:17; DX K).  Plaintiff's husband told Mr. Dill "that Mr. Slusher felt '[texting and emailing

---

[10] A copy of the Joint Notice of Settlement in the Colstar case is attached hereto as Exhibit "D." The Court may take judicial notice of facts found in that Notice because they "are not subject to dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned[.]" Taylor v. Sec'y, Fla. Dep't of Corr., No. 8:12-CV-1347-36MAP, 2015 WL 1538114, at *6 (M.D. Fla. April 7, 2015).

[11] A copy of the Motion to Enforce Settlement in the Colstar case is attached hereto as Exhibit "E." The Court may take judicial notice of facts found in that Motion.

Mr. Roldan's wife] wasn't that big of a deal' and that he should simply tell the judge that he 'was working to get impeachment material.'" (Id.). According to his contemporaneous notes, Mr. Dill also heard "Mr. Slusher say 'well why can't Dominic just say that he was investigating potential impeachment?'"  (Id.).  Mr. Dill also heard Mr. Slusher say that Plaintiff's husband "had not sent a picture of a gun, so how could the text be considered witness intimidation?" (Dill 36:7-39:17; DX K).

According to Mr. Dill, he also heard Mahra Sarofsky (another attorney representing Plaintiff in this case) say that Plaintiff's husband "could simply take the stand before the judge and tell the court that he had no ill intent, and that he only wanted to speak to Mrs. Roldan as part of his investigation." (Dill 72:5-73:17; DX K). At that point, Mr. Dill noted that "these attorneys were either misinformed about the circumstances or had no idea of their ethical obligations before the tribunal," which is why he "asked them both if they were familiar with the case of Nix v. Whiteside, which prohibits an attorney from knowingly allowing a client to present false testimony," to which Mr. Dill recalls Mr. Slusher stating "well I'm not really sure what Dominic's motivations were in sending the text." (Id.). Mr. Dill then directly asked Plaintiff's Husband why he sent the text, with Mr. Slusher and Ms. Sarofsky on speaker, to which he recalls him replying: "because I wanted her to know that her husband is a scumbag and maybe he would think twice about coming to court." (Id.).

Mr. Dill responded that he "knew the truth of [Plaintiff's Husband's] intentions," so he "could not represent him if he were to testify falsely before the tribunal." (Id.). When asked how he knew what Plaintiff's husband's real intentions were, Mr. Dill testified that it was because Plaintiff's husband told him, and his intentions were not to gather

impeachment materials. (Dill 70:16-72:4; DX K). Mr. Dill described Plaintiff's husband as being "[o]utraged" when confronted, and "storm[ing] out, again calling Mr. Slusher on speaker phone with his cell and amazingly stating 'I DID NOTHING WRONG.'" (DX). Mr. Dill "quoted Jules Blackmon and stated 'Yes you did. Yes. You. Did.'" (Id.).

On June 15, 2021, upon learning that Plaintiff and her husband were seeking to renege from the settlement in the personal injury action, Mr. Dill moved the court to withdraw as counsel for Plaintiff and her husband. (Motion Ex. F).[12] On June 23, 2021, Mr. Slusher filed a notice, improperly styled as one for a "limited appearance," on behalf of Plaintiff and her husband in their personal injury action against Colstar, which is impermissible under Rule 2.505(e) of the Florida Rules of Judicial Administration. (Motion Ex. G).[13]

### F.   Roldan *Was* Intimidated and Refused to Appear for His Deposition.

On Friday, September 24, 2021, after the close of business, Plaintiff's counsel (Mr. Slusher) served Mr. Roldan with a notice to appear for his deposition in this action on September 27, 2021, at 10:00 a.m. (Notice of Deposition, Ex. H).[14] As detailed above, by the time he noticed Mr. Roldan's deposition, Mr. Slusher had known for several months that Plaintiff's husband had engaged in unlawful witness intimidation. Notwithstanding, Plaintiff's counsel proceeded with noticing and attempting to take Mr. Roldan's deposition on September 27, 2021.

---

[12] A copy of Mr. Dill's Motion to Withdraw is attached hereto as Exhibit "F." The Court may take judicial notice of facts founds in that Notice.

[13] A copy of Mr. Slusher's Notice of Appearance is attached hereto as Exhibit "G." The Court may also take judicial notice of facts founds in that Notice.

[14] A copy of Plaintiff's Notice taking Mr. Roldan's Deposition is attached hereto as Exhibit "H."

However, as counsel for Colstar had informed Mr. Dill would happen, Mr. Roldan did not appear for the deposition scheduled on September 27, 2021, out of fear for his own safety and that of his family. (Dill 36:7-39:17; DX K). Mr. Roldan expressed through his counsel that he does not intend on testifying at any deposition or at trial as a result of Plaintiff's husband's conduct because he was well aware of Plaintiff's husband's extensive criminal convictions as well as Mr. Cicale's attempts to contact his wife with a fabricated photograph. (Id.).[15]   Thus, in addition to being unlawful, Mr. Cicale's intimidation and harassment was also successful in accomplishing his intent – to influence, hinder, prevent, and dissuade Mr. Roldan from testifying in an official proceeding.

## III.   **LEGAL ARGUMENT**

Under Rule 41(b) of the Federal Rules of Civil Procedure, this Court can dismiss an action for a plaintiff's failure to comply with a court order or with the federal rules of civil procedure.  Fed. R. Civ. P. 41(b). "Dismissal under Rule 41(b) is appropriate where there is a clear record of 'willful' contempt and an implicit or explicit finding that lesser sanctions would not suffice." Gratton v. Great Am. Commc'ns, 178 F.3d 1373, 1374 (11th Cir.1999) (citation omitted).

Additionally, as the United States Supreme Court has recognized, the authority to sanction parties for bad faith litigation misconduct derives not only from the Federal Rules of Civil Procedure and the United States Code, but also from the Court's inherent power to effectively manage its affairs by punishing and deterring abuses of the judicial process.

---

[15] This is also evident from the fact that, prior to Plaintiff's husband having contact Mr. Roldan's wife, Mr. Roldan appeared and was deposed by Plaintiff and her husband's attorney in the Colstar action.

See Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991). "The inherent power to sanction encompasses the power to dismiss an action, which is appropriately exercised particularly where a party 'commits perjury or . . . doctors evidence' that 'relates to the pivotal or linchpin issue in the case.'" Quiroz v. Superior Building Maint., Inc., 2008 U.S. Dist. LEXIS 61534 (S.D. Fla. 2008) (citing Qantum Comms. Corp. v. Star, Broadcasting, Inc., 473 F. Supp. 2d 1249, 1269 (S.D. Fla. 2007)). "While the other sanction mechanisms only reach certain individuals or conduct, 'the inherent power extends to a full range of litigation abuses' and 'must continue to exist to fill in the interstices.'" Peer v. Lewis, 606 F.3d 1306, 1314 (11th Cir. 2010) (holding that attorney who acted in bad faith could support award of sanctions under court's inherent power, despite not meriting Rule 11 sanctions or sanctions for unreasonable and vexatious litigation). Indeed, the inherent power of a court "'can be invoked even if procedural rules exist which sanction the same conduct,' for these rules are not substitutes for the inherent power." Id. (citing Glatter v. Mroz (In re Mroz), 65 F.3d 1567, 1575 (11th Cir.1995). The Eleventh Circuit has explained, "[t]he key to unlocking a court's inherent power is a finding of bad faith." Byrne v. Nezhat, 261 F.3d 1075, 1106 (11th Cir. 2001).

## A. Plaintiff and Her Husband Engaged in Bad Faith Litigation Misconduct by Intimidating and Harassing Mr. Roldan, Warranting Dismissal.

Courts in the Eleventh Circuit can clearly sanction "bad faith acts preceding and during litigation." Kreager v. Solomon & Flanagan, P.A., 775 F.2d 1541, 1543 (11th Cir. 1985); see also Rodriguez v. Marble Care Int'l, Inc., No. 10-23223, 2012 WL 1949360 at *9 (S.D. Fla. Mar. 5, 2012). This ability to sanction can be based upon a rule of civil procedure, the Court's inherent power, or both. See Porton v. SP One, Ltd., No. 6:15-CV-566-ORL, 2015 WL 1648893, at *5 (M.D. Fla. Apr.13, 2015) (grounding dismissal of

plaintiff's complaint upon Rule 41(b), Rule 11, and the court's inherent power, having found that "Plaintiff filed [his] complaint to harass and intimidate Defendants and their counsel . . . to harass Defendants and Defendants' employees and to cause Defendants monetary hardship in the course of litigation, [and] to harass and intimidate potential witnesses in [his] case.").

The Court's inherent authority to sanction parties is frequently applied when a party attempts to tamper with the testimony of a material witness. See Lanier v. Graves, No. 02-20100-CIV, 2006 WL 680547 (S.D. Fla. Mar. 13, 2006) (finding, as an alternative basis for judgment in favor of the defendant, that plaintiff's complaint should be dismissed with prejudice "as a sanction for Plaintiff's misconduct by tampering with a witness"); see also, Young v. Office of the United States Senate Sergeant at Arms, 217 F.R.D. 61 (D.D.C. 2003) (holding that former employee's attempts to tamper with two co-workers as potential witnesses by influencing their testimony in support of her claims warranted dismissal). Notably, even in cases where the witness intimidation and/or solicitation of perjury warranting sanctions may be in violation of federal or state criminal statutes (including, but not limited to, solicitation to commit perjury (§§ 837.02 and 777.04, Fla. Stat.), witness tampering (§ 918.22, Fla. Stat.), and endeavoring to influence witness in federal court (18 U.S.C.A. §§ 1503 and 1512), the Court's authority to issue sanctions "is not predicated upon a determination of criminal guilt of violating of these statutes but instead upon the Court's inherent power." In re Brican Am. LLC Equip. Lease Litig., 977 F. Supp. 2d 1287, 1293 (S.D. Fla. 2013).  The preponderance of the evidence standard applies to this determination.  Ramirez v. T&H Lemont, Inc., 845 F.3d 772, 779 (7th Cir. 2016) (concluding that the preponderance of the evidence standard applies to a dismissal

as a sanction because "[r]egardless of whether the litigation misconduct at issue is characterized by fraud, bad faith, fault, or quasi-criminal misconduct, the case remains a civil suit between private litigants, and what is at stake for [plaintiff] is the loss of the opportunity to win money damages from his former employer.").

Additionally, courts in the Eleventh Circuit have sanctioned parties even when a non-party engaged in the witness intimidation. See Smart v. City of Miami Beach, Fla., 933 F. Supp. 2d 1366, 1380 (S.D. Fla. 2013), aff'd, 567 F. App'x 820 (11th Cir. 2014). In Smart, the court granted a new trial based on allegations of witness tampering by the plaintiff and her mother. Id. at 1370. Specifically, in a sexual harassment case, the plaintiff in Smart, through a third person, threatened to make allegations of unwelcome sexual harassment against a witness if he did not testify favorably for the plaintiff. Id. The plaintiff's mother also instructed the third person who communicated the threat to avoid service of a subpoena and to testify that he only spoke about training with the plaintiff. Id. Plaintiff's mother admitted the witness tampering, but asserted she acted upon her own volition and not at the behest of the plaintiff. Id. However, the court found that both the plaintiff **and** her mother had engaged in witness tampering. Id. It concluded that sanctions were warranted based on the conduct of the plaintiff's mother, even if she acted upon her own volition and the plaintiff was not involved. Id. at 1380; see also Young, 217 F.R.D. at 61 (dismissing the action as a sanction even though the plaintiff's husband, and not the plaintiff, had offered a witness a bribe).

Like in Smart, the evidence here overwhelmingly demonstrates that Plaintiff and her husband engaged in severe and bad faith litigation misconduct warranting the dismissal of this action, with prejudice. Indeed, it is undisputed that, despite their attorney's explicit

17

instructions to the contrary, Plaintiff's husband contacted Mr. Roldan's wife with a doctored picture showing Mr. Roldan with another woman, with the intent of making it seem as though "Mr. Roldan was having an affair with the person depicted in [the] photo" to dissuade him from testifying. (Cicale 160:12-162:25; Dill 33:2-20, 70:20-71:21; DX K). Plaintiff's husband did so despite knowing that Mr. Roldan would be called as an adverse witness in this action. (Cicale 164:2-7) (admitting that he knew that Mr. Roldan "had nothing good to say about [Plaintiff]" when he engaged in this conduct and had taken this "precaution," as he termed it, when he heard Mr. Roldan would be called as a witness in the personal injury action).

Plaintiff's husband then brazenly admitted his corrupt motive to John Dill on June 12, 2021, with Mr. Slusher present by telephone, and in his deposition, when Defendants' counsel asked Plaintiff why he sent these messages. (Cicale 162:20-25). Plaintiff was aware that her husband had formed a plan to contact Mr. Roldan's wife before he reached out to her, was aware of the specific messages he sent, and had knowledge of his June 12, 2021 admissions regarding his motive, as well as during his deposition in this case (Plaintiff was present on both occasions).  (Dill 37:23-25; DX K)  ("She confronted him by stating "I thought you said you were talking to John about this?'").  By June 12, 2021, Plaintiff was also aware that Mr. Dill believed her husband's conduct was witness intimidation and she does not recall if she disagreed with him as to that assessment. (Pl. 227:2-9).  Both Plaintiff and her attorneys have been aware of Plaintiff's husband's unlawful conduct for months. Therefore, the fact that Plaintiff's husband, not Plaintiff herself, engaged in the unlawful witness intimidation and harassment does not change

the outcome.  Dismissal is the only sanction that will protect the sanctity of the judicial system.

Moreover, the allegations in the Amended Complaint, alone, show that Plaintiff considered Mr. Roldan to be a material witness in this case.  (Am. Compl. ¶¶ 21-28). Plaintiff also identified Roldan as a witness and included assertions about Roldan in her interrogatory answers.  (PX 28, PX 59).  If this case were to proceed to trial, given the focus of Plaintiff's questions during the depositions, during which Plaintiff's counsel referenced Mr. Roldan over 136 times, there can be no dispute that Plaintiff's husband's intimidation and harassment of Mr. Roldan would affect Defendants' ability to present their case.  In addition, when Plaintiff's husband engaged in this illegal conduct, he knew that Defendants had identified Mr. Roldan as a material witness in their initial disclosures. At a minimum, he supervised the alleged harasser, and Plaintiff attempts to put Mr. Roldan's conduct at issue in this action.

Furthermore, the witness intimidation and harassment of Mr. Roldan was successful and will impact Defendants' ability to present their case if this action were to proceed to trial. As Colstar's counsel informed Mr. Dill, Mr. Roldan took the messages as a threat and attempt to intimidate him into not testifying. (Dill 52:17-53:20; DX K).  At a very minimum, Mr. Dill and Colstar's counsel agreed that, even if the messages to Mr. Roldan's wife were not threatening, "it made no difference, as Mr. Roldan could have concluded that he should not testify upon pain of having the infidelity revealed further." (DX K).

Here, the overwhelming evidence, including the admissions of Plaintiff's husband, establishes that Plaintiff and her husband have acted in bad faith by intimidating and harassing Mr. Roldan in violation of federal law.  As the Seventh Circuit has recognized,

"witness tampering is among the most grave abuses of the judicial process, and as such it warrants a substantial sanction."  Ramirez, 845 F.3d at 782.  There is no sanction short of dismissal that will preserve the sanctity of the judicial system or prevent manifest injustice in this action. Therefore, Defendants respectfully request that the Court sanction Plaintiff for witness tampering by dismissing Plaintiff's Amended Complaint with prejudice.

**B. Plaintiff's Husband Acted Prior to Seeking The Advice of His Former Counsel.**

Not surprisingly, during their deposition in this case several months after Plaintiff's husband's texted and emailed Mr. Roldan's wife, both Plaintiff and her husband falsely testified that Plaintiff's husband only reached out to Mr. Roldan's wife at the direction of Mr. Dill, because he was "trying to get impeachment material and to have her come to the trial[.]"

| | |
|---|---|
| 6 | BY MS. DYSON: |
| 7 | Q.   And why is it that you cropped this picture? |
| 8 | MS. SAROFSKY:  Object to form. |
| 9 | THE WITNESS:  At that time, maybe to show her, |
| 10 | like, look at them two together.  I -- you know, |
| 11 | again, I sent it to her.  We were trying to get |
| 12 | impeachment material and to have her come to the |
| 13 | trial, and that's what I had texted my attorney |
| 14 | after doing so. |

(Cicale 161:6-14).

| | |
|---|---|
| 10 | Q.   Do you disagree with it now? |
| 11 | A.   I really don't have thoughts on that.  I don't |
| 12 | think so.  He was helping John Dill prepare for trial. |
| 13 | Q.   Who was helping John Dill prepare for trial? |
| 14 | A.   John Dill asked Dominick to help him prepare |
| 15 | and get evidence. |

(Pl. 227:6-14). While not surprising, it is clear that this testimony is false given that: (i) Plaintiff's husband only informed Mr. Dill of his intent to contact Mr. Roldan's wife *after* he

had already done so; and (ii) the fact that Mr. Dill specifically told Plaintiff's husband (via text message) not to reach out to Mr. Roldan's wife (Dill 36:7-39:17; DX K):



It is abundantly clear that Plaintiff's husband acted prior to speaking to Mr. Dill about reaching out to Mr. Roldan's wife and, regardless, Mr. Dill advised Plaintiff's husband against such action (of course, unknowingly doing so after it was too late). It is also clear that Plaintiff's husband only testified to "trying to get impeachment material" after his current counsel (Mr. Slusher) suggested such an explanation for his reaching out to Mr. Roldan's wife. (DX).

For those reasons, the Court should exercise its inherent power and dismiss Plaintiff's Amended Complaint with prejudice.

### C. Dismissal Of This Action With Prejudice Is The Only Appropriate Sanction Where Any Lesser Sanction Would Be Inadequate.

In determining the propriety of dismissal as a sanction for bad faith conduct, "the inquiry will focus primarily on the conduct and motive of a party, rather than on the validity of the case." Rothenberg v. Security Management Co., Inc., 736 F.2d 1470, 1472 (11th Cir. 1984) (internal citations omitted). The sanction of "[d]ismissal is appropriate where: a party has sentiently set in motion some unconscionable scheme calculated to interfere

21

with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." Vargas v. Peltz, 901 F. Supp. 1572, 1579 (S.D. Fla. 1995).

As the court in Quiroz addressed, the sanction for witness tampering should be severe. No. 06-21594-CIV, 2008 WL 3540599, at *8 (S.D. Fla. Aug. 12, 2008) ("The fact that the wrongdoing was so 'closely intertwined' with the merits of the case underscores the severity of the sanction that must be imposed in order to 'calibrate the scales' in response to Mr. Quiroz's interference with these proceedings."). As that court found, "monetary sanctions fail to address the severity of [the] acts of witness tampering and perjury, which threaten the public's trust in our system of justice and disparage the core values for which it stands." Id. (citing Young, 217 F.R.D. at 71 ("[S]eeking to obtain or manufacture false testimony 'strikes at the heart of the judicial system.'").

Here, like in Quiroz, there is an absence of any non-monetary sanction short of dismissal that would be an appropriate response to Plaintiff and her husband's acts of tampering, intimidation, and harassment of Mr. Roldan. Plaintiff and her husband have demonstrated an utter disregard for the right of witnesses to be free from threats and intimidation, and dismissal with prejudice is clearly appropriate and warranted based upon the behavior described above, particularly where it is the only award that will obtain the goal of sanctions—"not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." Nat'l Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 643 (1976).

Under such circumstances, "[p]ermitting this lawsuit to proceed would be an open invitation to abuse the judicial process. . . . [because] . . . [l]itigants would infer they have everything to gain, and nothing to lose[.]" <u>Vargas v. Peltz</u>, 901 F. Supp. 1572, 1582 (S.D. Fla. 1995). Accordingly, because monetary sanctions would be inadequate, and because allowing Plaintiff's claims to proceed would prejudice Defendants, Defendants respectfully request that this Court sanction Plaintiff by dismissing her Amended Complaint with prejudice.

## CONCLUSION

Accordingly, because there is overwhelming evidence that Plaintiff and her husband engaged in severe and bad faith litigation misconduct, and because that abusive and egregious litigation misconduct is an affront to this Court and the judicial process, Defendants respectfully request that this Court sanction Plaintiff by dismissing her Amended Complaint, with prejudice. Additionally, Defendants request that the Court provide all other relief deemed appropriate and just, including an award of Defendants' attorneys' fees in connection with defending against Plaintiff's claims and in connection with the preparation of this Motion.

## LOCAL RULE 3.01(g) CERTIFICATION

Pursuant to Local Rule 3.01(g), the undersigned hereby certifies that counsel for Defendants has conferred, by phone, with counsel for Plaintiff regarding the relief sought in this Motion and Counsel for Plaintiff opposes the relief requested herein.

Dated this 20th day of October, 2021.

Respectfully submitted,

**GRAYROBINSON, P.A.**
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida  33131
Telephone: (305) 416-6880
Facsimile:  (305) 416-6887

By:   _Marlene Quintana_
          Marlene Quintana, B.C.S.
          Florida Bar No. 88358
          marlene.quintana@gray-robinson.com
          Gregory Hearing
          Florida Bar No. 817790
          gregory.hearing@gray-robinson.com
          Sacha Dyson
          Florida Bar No. 509191
          sacha.dyson@gray-robinson.com
          Fabian A. Ruiz
          Florida Bar No. 117928
          fabian.ruiz@gray-robinson.com
          Kevin Sullivan
          Florida Bar No. 1003812
          kevin.sullivan@gray-robinson.com
          401 East Jackson Street, Suite 2700
          Post Office Box 3324 (33601-3324)
          Tampa, Florida 33602
          Telephone:   (813) 273-5000
          Facsimile:  (813) 273- 5145

          Ryan Waters
          Florida Bar No. 73619
          ryan.waters@universalorlando.com
          1000 Universal Studios Plaza, Suite 100
          Orlando, FL 32819
          Telephone:  (407) 224-2449
          *Attorneys for Defendants*

#45668528 v1