# EXHIBIT A

## Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
CASE NO.: 6:20-CV-1157-ORL-78LRH

MATILDE SANTANA,

    PLAINTIFF,

vs.

TELEMUNDO NETWORK GROUP LLC, NBCUNIVERSAL MEDIA, LLC,
and COMCAST CORPORATION,

    DEFENDANTS.

---------------/

DEPOSITION OF DOMINICK CICALE

DATE:   September 23, 2021
TIME:   9:27 a.m. to 1:08 p.m.
PLACE:  GrayRobinson, P.A.
    301 E. Pine Street, Suite 1400
    Orlando, Florida 32801

Examination of the witness taken before:
DEBORAH LONDOS

## Page 2

1            APPEARANCES
2
3   COUNSEL FOR PLAINTIFF:
4   MAHRA SAROFSKY, ESQUIRE
    Slusher & Rosenblum, P.A.
5   444 W. Railroad Avenue
    Suite 470
6   West Palm Beach, Florida 33401
    (561) 814-2020
7   mxs@slusherandrosenblum.com
8   COUNSEL FOR DEFENDANTS:
9   SACHA DYSON, ESQUIRE
    MARLENE QUINTANA, ESQUIRE (via videoconference)
10  GrayRobinson, P.A.
    401 E. Jackson Street, Suite 2700
11  Tampa, Florida 33602
    (813) 273-5000
12  sacha.dyson@gray-robinson.com
13  ALSO PRESENT:
14    RYAN WATERS, IN-HOUSE COUNSEL FOR NBCUNIVERSAL
    VIA VIDEOCONFERENCE
15
16    MATILDE SANTANA
17
18
19
20
21
22
23
24
25

## Page 3

1          INDEX
2  WITNESS
3  Called by the DEFENDANTS
4  DOMINICK CICALE
5    DIRECT EXAMINATION BY MS. DYSON.............. 5
6
7        EXHIBITS
8  Exhibit 1 DEPOSITION DOMINICK CICALE    41
9  Exhibit 2 SUNBIZ ALKALINE PET WATER    44
10  Exhibit 3 SUNBIZ ATMOSPHERIC WATER    50
11  Exhibit 4 SUNBIZ AURUM ENTERPRISES UNITED   55
12  Exhibit 5 SUNBIZ CAPSULE CARE    58
13  Exhibit 6 SUNBIZ CICALE FILES    65
14  Exhibit 7 SUNBIZ D.C. CONCEPTS CONSTRUCTION
       & DESIGN    71
15
16  Exhibit 8 2016 TAX RETURN D.C. CONCEPTS
       CONSTRUCTION & DESIGN    78
17
18  Exhibit 9 2017 TAX RETURN D.C CONCEPTS
       CONSTRUCTION & DESIGN    82
19
20  Exhibit 10 2018 TAX RETURN D.C CONCEPTS
       CONSTRUCTION & DESIGN    83
21
22  Exhibit 11 SUNBIZ D.C. CONCEPTS DEVELOPMENT  88
23  Exhibit 12 SUNBIZ D.C. CONCEPTS, LLC    91
24  Exhibit 13 SUNBIZ DC VIDEO COM    93
25  Exhibit 14 SUNBIZ FIRST OPTION SERVICES   93

## Page 4

1         I N D E X
2  Exhibit 15 SUNBIZ PRICE RIGHT LAND DEVELOPMENT 97
3  Exhibit 16 SUNBIZ SIERRA LEONE WATERGEN   99
4  Exhibit 17 SUNBIZ SL WATERGEN PLLC    103
5  Exhibit 18 VETTED LEGAL DETAIL SUNBIZ    109
6  Exhibit 19 VETTED LEGAL ARTICLES OF
       ORGANIZATION    114
7
8  Exhibit 20 SUNBIZ VETTED LEGAL CONSULTANTS  118
9  Exhibit 21 SUNBIZ PATIENT PRIORITY FIRST   121
10  Exhibit 22 CONSTRUCTION FINANCIAL OFFICER
       LICENSEE DETAILS    127
11
12  Exhibit 23 NOTICE OF TAX LIEN    134
13  Exhibit 24 2016 STR8 HEAT TAX RETURN   136
14  Exhibit 25 PHOTOGRAPH    155
15  Exhibit 26 PHOTOGRAPH    159
16  Exhibit 27 SUBPOENA DUCES TECUM    164
17
18
19    S T I P U L A T I O N S
20    It is hereby stipulated and agreed by and
21  between the counsel for the respective parties and the
22  deponent that the reading and signing of the deposition
23  transcript be reserved.
24
25

Page 5

PROCEEDINGS

1
2  THE COURT REPORTER:  Do you solemnly swear or
3  affirm that the testimony you give in this matter
4  will be the truth, the whole truth, and nothing but
5  the truth?
6  THE WITNESS:  Yes, I do.
7  DOMINICK CICALE, called as a witness by the
8  Defendants, having been first duly sworn, testified as
9  follows:
10  DIRECT EXAMINATION
11  BY MS. DYSON:
12  Q.  Good morning.  Can you please state your full
13  name for the record?
14  A.  Good morning.  Dominick Peter Cicale.
15  Q.  Cicale is how you say it?
16  A.  Yes.
17  Q.  Okay.  I want to make sure that I'm saying it
18  correctly today.
19  Good morning, Mr. Cicale.  My name is Sacha
20  Dyson.  I represent the defendants in a lawsuit that has
21  been brought by Matilde Santana.  Do you know who
22  Ms. Santana is?
23  A.  Yes, I do.
24  Q.  Okay.  And who is she?
25  A.  She is my wife.

Page 6

1  Q.  And how long have you been married?
2  A.  We've been married since 2015, March 17th of
3  2015.
4  Q.  Have you ever been deposed before?
5  A.  Yes, I have.
6  Q.  How many times?
7  A.  I'm really not sure, quite a few.
8  Q.  In how many different actions?
9  A.  Again, I'm really not sure.
10  Q.  More than one?
11  A.  More than one action, I'm pretty sure, yes.
12  Q.  Okay.  So the last deposition you had, when
13  was it?
14  A.  It was with Colstar.  The accident injury
15  case.  Might have been about a few years ago or a year
16  ago.  A year or two ago.
17  Q.  And how many times were you deposed in that
18  case?
19  A.  Best of my recollection, I think it was twice.
20  Q.  In what other actions have you been deposed?
21  A.  I'm not sure.  I'm really not sure right now.
22  Q.  Have you been involved in other actions?
23  A.  I have been involved in other actions, yes.
24  Q.  Other actions in which you've been the
25  plaintiff?

Page 7

1  A.  I think so.  I'm not sure with that.
2  Q.  You're not sure because you're not sure you
3  have a recollection or you're not sure whether you were
4  the plaintiff?
5  A.  I'm not -- at this point, I'm not sure with my
6  recollection.
7  Q.  So do you have any recollection of filing any
8  other lawsuit in which you are seeking damages other
9  than the Colstar action?
10  A.  There was another lawsuit.  Yes, I had another
11  accident injury case.
12  Q.  And were you deposed in that case?
13  A.  No, I was not.  To the best of my
14  recollection, I was not.
15  Q.  Okay.  And the Colstar case that you say is
16  a -- called it the accident injury case, is that -- are
17  you a plaintiff in that action?  Are you seeking
18  damages?
19  A.  Yes.
20  Q.  And is your wife also a plaintiff in the
21  action?
22  A.  Yes.
23  Q.  Okay.  So let me go over the ground rules for
24  today's deposition.  To the extent that you can, use
25  first and last names for the record.  Madam Court

Page 8

1  Reporter will be taking down every word that we're
2  saying today, and so in order to ensure we have an
3  accurate record and we know who you are talking about,
4  first and last names are helpful.  To speak as clearly
5  as you can.  I think you're doing fine so far.
6  A.  Thank you.
7  Q.  There is a little AC noise in here, but that
8  way we help make a clear record.  Additionally, the
9  court reporter can't take down head nods or head shakes,
10  so you need to verbalize your answers the best you can.
11  A.  Understand.
12  Q.  If you forget, then I'll be here to remind you
13  of that just so that we have a clear record of what your
14  answers are.  We need to try to speak one at a time,
15  again, to make a clear record.  If you don't understand
16  a question I've asked, ask me to rephrase, I'll be glad
17  to do that or repeat it.  I'm glad to do that as well.
18  We could take a break at any time.  I
19  understand that you are here represented by counsel, and
20  your counsel can assert objections, will assert
21  objections from time to time.  Unless she instructs you
22  not to answer that question, you should go ahead and
23  answer the question.  And if you do answer the question,
24  I'm going to assume you've heard it, understood the
25  question, and are providing the best recollection.

2 (Pages 5 to 8)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 9

1     A.  Okay.
2     Q.  Do you understand these ground rules?
3     A.  Yes, I do.
4     Q.  Is there anything about your physical or
5  mental condition that prevents you from providing
6  accurate and reliable testimony?
7     A.  No, there's not.
8     Q.  Are you currently taking any medications?
9     A.  No, I am not.
10    Q.  Have you been prescribed medications that you
11  should be taking this morning that you haven't taken?
12    A.  No, I haven't.
13    Q.  Have you been known by any other names?
14    A.  Yes.
15    Q.  And what are those names?
16    A.  Dominick Russo.
17    Q.  Are there any other names that you have gone
18  by?
19    A.  No.
20    Q.  Do you have social media accounts?
21    A.  No, I do not.
22    Q.  No Facebook account, no Instagram account?
23    A.  No, ma'am.
24    Q.  Have you ever been arrested?
25    A.  Yes, I have.

Page 10

1     Q.  And when were you arrested?
2        MS. SAROFSKY:  Object to form.  You can
3  answer.
4        THE WITNESS:  I was arrested on multi
5  occasions, multiple occasions.
6  BY MS. DYSON:
7     Q.  Okay.  Do you recall the years?
8     A.  In my younger years.  No, there was a bunch of
9  times I was arrested, charges were dropped or dismissed
10  and then I know I was arrested in 1988, 1991, and 2005.
11    Q.  When you say your younger years, are you
12  talking before you became an adult?
13    A.  I would say in my teens, early 20s.  It's
14  whatever you consider becoming an adult.
15    Q.  How old are you now, sir?
16    A.  I'm 54 years old.
17    Q.  And in 1988, what were you arrested for?
18        MS. SAROFSKY:  Object to form.
19        THE WITNESS:  I was originally arrested for
20  accessory to after the fact of first-degree murder.
21  BY MS. DYSON:
22    Q.  And were you convicted?
23    A.  I pled guilty.  If I may, also, those charges
24  were -- there was more charges added after the initial
25  arrest, and then I wound up pleading guilty on the case

Page 11

1  to manslaughter.
2     Q.  What were the additional charges that were
3  added?
4     A.  First-degree murder and accessory to after the
5  fact of first-degree murder.
6     Q.  And you pled guilty to manslaughter?
7     A.  Yes, I have.  I did.
8     Q.  And who was it that you were convicted of the
9  crime of manslaughter against?
10        MS. SAROFSKY:  Object to form.
11        THE WITNESS:  George Kehoe.
12  BY MS. DYSON:
13    Q.  And what involvement did you have with
14  Mr. Kehoe?
15        MS. SAROFSKY:  Object to form.
16        THE WITNESS:  Mr. Kehoe was trying to kill me.
17  He was a drug dealer.  He accused me of robbing him
18  at one point or my friends robbing him from New
19  York, and wind up was I wound up killing Mr. Kehoe
20  after finding out his trying to attempt to
21  assassinate me in a car.
22  BY MS. DYSON:
23    Q.  Were you a drug dealer at the time?
24        MS. SAROFSKY:  Object to form.
25        THE WITNESS:  At that time, no, I wasn't

Page 12

1  dealing drugs, but prior, yes, I was a drug dealer.
2  BY MS. DYSON:
3     Q.  Did you know Mr. Kehoe because you were
4  dealing drugs?
5     A.  No, I knew Mr. Kehoe because he was dealing
6  drugs.
7     Q.  Were you buying drugs from him?
8     A.  Yes, I was.
9        MS. SAROFSKY:  Object to form.  I'm sorry.
10        THE WITNESS:  I'm sorry.
11  BY MS. DYSON:
12    Q.  And were you -- how long were you sentenced to
13  for manslaughter?
14    A.  I was sentenced to seven years in state
15  prison, Florida State prison.
16    Q.  At the time of that arrest, were you involved
17  in organized crime?
18        MS. SAROFSKY:  Object to form.
19        THE WITNESS:  No, ma'am, I wasn't.
20  BY MS. DYSON:
21    Q.  Has there been any time in which you've been
22  involved in organized crime?
23        MS. SAROFSKY:  Object to form.
24        THE WITNESS:  Yes, ma'am.
25  BY MS. DYSON:

3 (Pages 9 to 12)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 13

```
 1        Q.  So it was after that arrest that you became
 2   involved in organized crime?
 3            MS. SAROFSKY:  Object to form.
 4            THE WITNESS:  It was later on in life, yes.
 5   BY MS. DYSON:
 6        Q.  And where is it that you served that
 7   seven-year sentence?
 8            MS. SAROFSKY:  Object to form.
 9            THE WITNESS:  Hillsborough County.  It was --
10   Riverview, Florida.
11   BY MS. DYSON:
12        Q.  So you were convicted in Florida?
13        A.  Yes, ma'am.
14        Q.  And you said in 1991 you were arrested?
15        A.  Yes, ma'am.
16        Q.  So did you not serve seven years in prison?
17        A.  No, ma'am, that's what I was sentenced to,
18   seven years.
19        Q.  Okay.
20        A.  I was released early for good behavior,
21   work-related good behavior.
22        Q.  So how long did you wind up serving of the
23   seven-year sentence?
24            MS. SAROFSKY:  Object to form.
25            THE WITNESS:  Approximately 17 months total.
```

Page 14

```
 1   BY MS. DYSON:
 2        Q.  And so in 1991 you were arrested?
 3        A.  Yes, ma'am.
 4        Q.  And what were you arrested for?
 5            MS. SAROFSKY:  Object to form.
 6            THE WITNESS:  Conspiracy to distribute
 7   cocaine, possession, and conspiracy to distribute
 8   cocaine.
 9   BY MS. DYSON:
10        Q.  In the 1988 action, did you testify?
11            MS. SAROFSKY:  Object to form.
12            THE WITNESS:  No, ma'am.
13   BY MS. DYSON:
14        Q.  Was there any trial or anything like that?
15            MS. SAROFSKY:  Object to form.
16            THE WITNESS:  No, ma'am.
17   BY MS. DYSON:
18        Q.  In 1991, where were you arrested?
19            MS. SAROFSKY:  Object to form.
20            THE WITNESS:  In the state of Florida.
21   BY MS. DYSON:
22        Q.  So was this shortly after you were released
23   from prison after serving your sentence for the 1988
24   manslaughter?
25            MS. SAROFSKY:  Object to form.
```

Page 15

```
 1            THE WITNESS:  Yes, ma'am.  It was four months
 2   after my release.
 3   BY MS. DYSON:
 4        Q.  What happened with respect to the charge?
 5        A.  I went to trial on that case.
 6        Q.  And what was the verdict?
 7        A.  I was found not guilty on the possession count
 8   and guilty on the conspiracy count.
 9        Q.  And were you sentenced to prison?
10            MS. SAROFSKY:  Object to form.
11            THE WITNESS:  Yes, I was.
12   BY MS. DYSON:
13        Q.  And how many years?
14            MS. SAROFSKY:  Object to form.
15            THE WITNESS:  About ten years in federal
16   custody.
17   BY MS. DYSON:
18        Q.  So it was the second arrest on federal
19   charges?
20        A.  Yes, ma'am.
21        Q.  The first arrest was on state charges?
22        A.  Yes, ma'am, that's correct.
23        Q.  And so by 1991, were you a drug dealer?
24            MS. SAROFSKY:  Object to form.
25            THE WITNESS:  No, I was not a drug dealer.
```

Page 16

```
 1   BY MS. DYSON:
 2        Q.  Were you involved in organized crime by 1991?
 3        A.  No, ma'am, I wasn't.
 4        Q.  Who were you convicted of conspiring with to
 5   distribute cocaine?
 6            MS. SAROFSKY:  Object to form.
 7            THE WITNESS:  Robert Sini.  There was a CI in
 8   the case and the detective, DEA detective.
 9   BY MS. DYSON:
10        Q.  Was Robert Sini someone you knew?
11        A.  Briefly.
12        Q.  And of the ten years that you were sentenced
13   to serve in federal custody, you must not have served --
14   did you serve ten years?
15            MS. SAROFSKY:  Object to form.
16            THE WITNESS:  I served approximately almost
17   nine years.
18   BY MS. DYSON:
19        Q.  And where were you -- where did you serve the
20   sentence?
21        A.  Originally I was in MCC Miami, then from
22   there, I went to Lewisburg, Pennsylvania Penitentiary.
23   From there, I was shipped to Talladega, Alabama FCI, and
24   from Talladega, Alabama I was shipped Farrington, New
25   Jersey FCI.  From Farrington, New Jersey, Cumberland,
```

4  (Pages 13 to 16)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 17

1   Maryland FCI. Schuylkill, Pennsylvania FCO, and then
2   Estell, South Carolina FCI.
3       Q.   After serving nine years in federal custody,
4   did you return to Florida?
5       A.   No, I did not.
6       Q.   So the next arrest that you said was in 2005.
7   What were you arrested for in 2005?
8           MS. SAROFSKY:   Object to form.
9           THE WITNESS:   Organized crime, RICO.
10  BY MS. DYSON:
11      Q.   And when you say "organized crime," what
12  specifically are you talking about?
13          MS. SAROFSKY:   Object to form.
14          THE WITNESS:   The Mafia.
15  BY MS. DYSON:
16      Q.   What about the Mafia?
17      A.   Could you elaborate on that question?
18      Q.   Sure.  What were you charged with?
19      A.   Murder, first-degree -- no.  Murder was one of
20  the charges.
21      Q.   What were the other charges?
22      A.   To the best of my recollection, I really
23  don't -- can't be accurate with that one in the initial
24  arrest with the counselor.
25      Q.   What were you later -- were you convicted?

Page 18

1       A.   No, ma'am, I pled guilty.
2       Q.   Was a judgment entered against you?
3       A.   I became a cooperating witness for the federal
4   government.
5       Q.   Were you sentenced to time in prison?
6       A.   Yes, I was.
7       Q.   And how much?
8       A.   Ten years in federal custody.
9       Q.   And in -- when you mentioned RICO, you're
10  talking about racketeering, correct?
11      A.   Yes, ma'am, that's correct.
12      Q.   Other than murder, what were the other
13  predicate acts that you were charged with?
14      A.   I'm really not sure in the beginning what the
15  original indictment was.  I know it was murder or
16  conspiracy to commit murder.  Again, I'm really not
17  accurate, but I know what I wound up pleading out to
18  based on my cooperation.
19      Q.   And what was it that you pled to based on your
20  corporation?
21          MS. SAROFSKY:   Object to form.
22          THE WITNESS:   Multiple murders, multiple
23  attempted murders.
24          MS. SAROFSKY:   Object -- sorry.
25          THE WITNESS:   Gambling, loan sharking.

Page 19

1   BY MS. DYSON:
2       Q.   Any other actions?
3       A.   I'm sure there was a lot more.  I pled out to
4   everything I ever committed in my past life.
5       Q.   Does that include witness intimidation?
6       A.   I'm not sure about that.
7           MS. SAROFSKY:   Object to form.
8           THE WITNESS:   And to the best of my
9   recollection, no, there was never any witness
10  intimidation.
11  BY MS. DYSON:
12      Q.   And who were the individuals that you pled
13  guilty to murdering?
14          MS. SAROFSKY:   Object to form.
15          THE WITNESS:   Randy Pizollo, Frank Santoro,
16  that's it.
17  BY MS. DYSON:
18      Q.   And who were the individuals that you pled
19  guilty to attempting to murder?
20          MS. SAROFSKY:   Object to form.
21          THE WITNESS:   Michael Mancuso, Patrick
22  DiFilipo, Joseph Bonelli.  And there was a group of
23  guys known as the "Albanians."  There was about
24  seven Albanians, Sal Vitale.
25  BY MS. DYSON:

Page 20

1       Q.   How did you know these individuals?
2       A.   Through organized crime.
3       Q.   Were they also -- were all of these
4   individuals also involved in organized crime?
5       A.   Yes, ma'am.
6       Q.   And so you said you were sentenced to ten
7   years in federal custody?
8       A.   Yes, ma'am, that's correct.
9       Q.   And did you serve that sentence?
10      A.   Yes, ma'am, I served a sentence.
11      Q.   What sentence did you serve?
12          MS. SAROFSKY:   Object to form.
13          THE WITNESS:   I wound up completing almost
14  nine years, a little less than nine years.
15  BY MS. DYSON:
16      Q.   So when is it that you were released from
17  federal custody?
18          MS. SAROFSKY:   Object to form.
19          THE WITNESS:   I was released to a halfway
20  house.  To the best of my recollection, it was July
21  of 2013.
22  BY MS. DYSON:
23      Q.   And where was that halfway house?
24      A.   In Orlando.
25      Q.   Not the specific location but...

5 (Pages 17 to 20)

Page 21

A. In Orlando, Florida.
Q. So you were back in Florida by the time you were done serving your sentence?
A. Yes, ma'am.
Q. And you said you were released from a halfway house. Were you employed at that point in time?
A. No, ma'am, I wasn't.
Q. And you told me at the beginning that you met you -- well, you married your wife on March 17, 2015. How soon after being released from federal custody did you meet your wife?
A. I met my wife in September of 2013.
Q. And after being released from federal custody, did you have to serve a time of supervised release?
A. Yes, ma'am.
Q. When you were released from federal custody on the 1991 charges, did you also have to serve a period of supervised release?
MS. SAROFSKY: Object to form.
THE WITNESS: Yes, ma'am.
BY MS. DYSON:
Q. And how long of a period of time was that on the 1991 charges?
A. To the best of my recollection, it was four years.

Page 22

Q. So when you're arrested in 2005, were you arrested for violating that supervised release?
MS. SAROFSKY: Object to form.
THE WITNESS: Could you repeat that question?
BY MS. DYSON:
Q. Sure. When you are arrested in 2005, were you arrested or charged for violating your supervised release from the 1991 charges?
A. No, ma'am.
MS. SAROFSKY: Object to form.
THE WITNESS: No, ma'am, I had -- I did not violate because I completed my supervised released.
BY MS. DYSON:
Q. And then on the 2005 charges for murder and attempted murder that you served supervised release for, how long a period of time?
A. Five years.
Q. And was that supervised release served in Florida?
A. Yes, ma'am, it was.
Q. And were any conditions on your supervised release imposed related to your owning or operating businesses?
MS. SAROFSKY: Object to form.
THE WITNESS: No, ma'am, there was not.

Page 23

BY MS. DYSON:
Q. In the convictions for the 2005 offenses, were you ordered to pay restitution?
MS. SAROFSKY: Object to form.
THE WITNESS: Yes, ma'am, I was, and I'm not sure if it was restitution, but it was a fine, some type of funeral expenses.
BY MS. DYSON:
Q. And did you pay those?
A. Yes, ma'am.
Q. Do you have any civil judgments against you?
MS. SAROFSKY: Object to form.
THE WITNESS: No, ma'am, not that I am aware of.
BY MS. DYSON:
Q. And have you been arrested or charged with a crime since 2000 -- since that incidence in 2005?
MS. SAROFSKY: Object to form.
THE WITNESS: No, ma'am, I have not.
BY MS. DYSON:
Q. Okay. So just those three arrests, '98 -- 1988, '91 and 2005; is that correct?
MS. SAROFSKY: Object to form.
THE WITNESS: Just those arrests were the arrests that I was convicted and did time on, yes.

Page 24

BY MS. DYSON:
Q. Okay. And were there other arrests from 1998 to present that you weren't convicted on?
MS. SAROFSKY: Object to form.
THE WITNESS: There was a bunch of arrests, as I said before, prior in my younger years.
BY MS. DYSON:
Q. Right. That would be prior to 1998, right?
A. Yes, ma'am, that's correct.
Q. Okay. I'm talking about between 1998 and --
A. You mean, '88.
Q. Sorry. 1988 and 2021, have there been other arrests that you have not been convicted of?
A. No, ma'am, there hasn't.
MS. SAROFSKY: Object to form.
BY MS. DYSON:
Q. During that period of time, have you been threatened with arrest?
MS. SAROFSKY: Object to form.
THE WITNESS: No, ma'am, I have not.
BY MS. DYSON:
Q. Were you arrested in New Jersey for making terroristic threats?
MS. SAROFSKY: Object to form.
THE WITNESS: No. To the best of my

Page 25

```
 1        knowledge, recollection, no.  Unless you show
 2        something that could refresh my memory.  I don't
 3        recall.
 4    BY MS. DYSON:
 5        Q.  And when you were arrested in 2005 for the
 6    murders and attempted murders, was the Government
 7    pursuing the death penalty?
 8        MS. SAROFSKY:  Object to form.
 9        THE WITNESS:  Yes, they were.
10    BY MS. DYSON:
11        Q.  And as part of your plea of guilty, was the
12    death penalty taken off the table?
13        MS. SAROFSKY:  Object to form.
14        THE WITNESS:  Yes, it was.
15    BY MS. DYSON:
16        Q.  Where you charged with other individuals in
17    the 2005 indictment?
18        MS. SAROFSKY:  Object to form.
19        THE WITNESS:  Yes, I was.
20    BY MS. DYSON:
21        Q.  And how many other individuals?
22        A.  On the original indictment, it was Vincent
23    Basciano and Anthony Aiello.  To the best of my
24    recollection, it was only the three of us on the
25    original indictment.
```

Page 26

```
 1        Q.  And any superseding indictment, did it add
 2    other individuals?
 3        MS. SAROFSKY:  Object to form.
 4        THE WITNESS:  Yes, there were superseding
 5    indictments, but I'm really not sure if anybody was
 6    added at that time.
 7    BY MS. DYSON:
 8        Q.  By the --
 9        A.  Before my corporation.
10        MS. SAROFSKY:  Object to form.
11    BY MS. DYSON:
12        Q.  And after your cooperation, what additional
13    individuals were added?
14        MS. SAROFSKY:  Object to form.
15        THE WITNESS:  After my cooperation, there was
16    a lot of other indictments that came down, and
17    there was many arrests after that because of my
18    cooperation.
19    BY MS. DYSON:
20        Q.  The other two individuals that you were
21    indicted with in 2005, were you also involved in
22    organized crime with them?
23        MS. SAROFSKY:  Object to form.
24        THE WITNESS:  Yes, ma'am.
25    BY MS. DYSON:
```

Page 27

```
 1        Q.  Were any of them indicted for witness
 2    intimidation?
 3        MS. SAROFSKY:  Object to form.
 4        THE WITNESS:  I have no idea what they were
 5    indicted for other than the original charges of
 6    murder.
 7    BY MS. DYSON:
 8        Q.  Were any of the individuals who you identified
 9    as the individuals you murdered or attempted to murder
10    involved in providing testimony against you?
11        MS. SAROFSKY:  Object to form.
12        THE WITNESS:  Could you repeat that question,
13    please?
14    BY MS. DYSON:
15        Q.  Sure.  Were any of the individuals that you
16    pled guilty to murdering or attempting to murder, did
17    they provide testimony against you at any point in time?
18        MS. SAROFSKY:  Object to form.
19        THE WITNESS:  To the best of my recollection,
20    no, they have not -- no, they did not.
21    BY MS. DYSON:
22        Q.  So based on these arrests and convictions, are
23    you a convicted felon?
24        MS. SAROFSKY:  Object to form.
25        THE WITNESS:  Yes, ma'am.
```

Page 28

```
 1    BY MS. DYSON:
 2        Q.  Have your rights been restored?
 3        MS. SAROFSKY:  Object to form.
 4        THE WITNESS:  I have not applied for my rights
 5    to be restored.
 6    BY MS. DYSON:
 7        Q.  Has the fact that you've been a convicted
 8    felon limited your ability to operate certain
 9    businesses?
10        MS. SAROFSKY:  Object to form.
11        THE WITNESS:  To the best of my knowledge, I
12    would say yes.
13    BY MS. DYSON:
14        Q.  And what types of businesses?
15        A.  Retail --
16        MS. SAROFSKY:  Object to form.
17        THE WITNESS:  A gun shop.
18    BY MS. DYSON:
19        Q.  Anything else?
20        A.  I have -- I would have to look into that.
21        Q.  And the supervised release related to the 2005
22    charges and indictment, you have served that supervised
23    release?
24        A.  Yes, ma'am.
25        Q.  Are you currently on any form of probation or
```

7 (Pages 25 to 28)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 29

1  supervised release?
2      A.  No, ma'am.  I completed all my obligations
3  with the Court.
4      Q.  In preparing for your deposition today, did
5  you discuss your deposition with anyone other than your
6  counsel?
7          MS. SAROFSKY:  Object to form.  I also object
8      to the extent that it may indicate spousal
9      privilege.  You can answer to the extent you are
10     able without revealing any privileged
11     communications between you and your attorney or
12     your spouse.
13         MS. DYSON:  Well, I don't think it reveals any
14     communication to say whether he spoke to his wife.
15         MS. SAROFSKY:  Okay.  Just preserving.
16         MS. DYSON:  So if your instruction is you're
17     instructing him not to answer whether he spoke to
18     his wife, I think that's --
19         MS. SAROFSKY:  That's not what I said.  I said
20     he can answer as long as he doesn't reveal
21     information exchanged in confidence with his wife
22     or his attorney.
23  BY MS. DYSON:
24     Q.  Okay.  Who did you speak with to prepare for
25  your deposition?

Page 30

1      A.  In what regard?
2      Q.  In any regard.
3      A.  I really don't know the depth of this
4  question, so I cannot feel -- I don't know how to answer
5  it.
6      Q.  Well, who did you speak to about your
7  deposition?
8      A.  Speak to in what regard?
9      Q.  In any way in which you mentioned your
10  deposition?
11         MS. SAROFSKY:  Object to form.
12         THE WITNESS:  Again, I can't answer that.  I
13     don't know how -- what you are getting -- what you
14     are actually insinuating.
15  BY MS. DYSON:
16     Q.  I'm not insinuating anything.  I'm asking you
17  who you spoke to about your deposition.
18         MS. SAROFSKY:  Object to form.
19         THE WITNESS:  So in what context?
20  BY MS. DYSON:
21     Q.  In any way in which you mentioned the word
22  deposition.
23         MS. SAROFSKY:  Object to form.
24         THE WITNESS:  I mentioned to people today I
25     would be out of pocket, that I have a deposition.

Page 31

1  BY MS. DYSON:
2      Q.  And who were those people?
3          MS. SAROFSKY:  Object to form.
4          THE WITNESS:  Yehuda Caploon [phonetic], Mark
5      Egan -- Mark Egan.  And that -- I'm pretty sure
6      that would be it.
7  BY MS. DYSON:
8      Q.  Is there anyone else that you mentioned that
9  you were coming to a deposition today?
10     A.  No, not that I know.  Not that I'm aware of.
11     Q.  And who is Yehuda Caploon?
12         MS. SAROFSKY:  Object to form.
13         THE WITNESS:  A dear friend of mine, long-time
14     friend.
15  BY MS. DYSON:
16     Q.  And who is Mark Egan?
17         MS. SAROFSKY:  Object to form.
18         THE WITNESS:  My business partner and friend.
19  BY MS. DYSON:
20     Q.  And what business is he a business partner?
21     A.  Patient --
22         MS. SAROFSKY:  Object to form.
23         THE WITNESS:  Patient Priority First.
24  BY MS. DYSON:
25     Q.  And what does that company do?

Page 32

1          MS. SAROFSKY:  Object to form.
2          THE WITNESS:  Medical supply company.
3  BY THE WITNESS:
4      Q.  And what medical supplies does it supply?
5      A.  Masks, gowns, gloves, boot covers, bouffants.
6      Q.  And how long have you operated that business?
7      A.  Approximately a few years.
8      Q.  And other than Mark Egan, do you have any
9  other business partners in that business?
10         MS. SAROFSKY:  Object to form.
11         THE WITNESS:  I'm not sure who's on that
12     corporation.  I would have to check.
13  BY MS. DYSON:
14     Q.  And do you operate out of a location?
15         MS. SAROFSKY:  Object to form.
16         THE WITNESS:  Yes.  The location that the mail
17     gets forwarded to is 501 North Orlando Avenue,
18     Suite 313-311, Winter Park, Florida 32789.
19  BY MS. DYSON:
20     Q.  Is your wife involved in that business?
21     A.  I'm really not sure if I still have her on
22  that company or not.  I would have to look at the Sunbiz
23  registration.
24     Q.  Does she have any role in that business?
25         MS. SAROFSKY:  Object to form.

8 (Pages 29 to 32)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 33

1     THE WITNESS: I'm sure at one time she was on
2   that company.
3   BY MS. DYSON:
4     Q. What do you mean she was on that company?
5     MS. SAROFSKY: Object to form.
6     THE WITNESS: All my -- mostly all the
7   companies that are -- that I have involvement with
8   or that I run and operate are owned by my wife.
9   BY MS. DYSON:
10    Q. And why are they owned by your wife?
11    MS. SAROFSKY: Object to form.
12    THE WITNESS: My wife entrusted me to operate
13  investments for her, to utilize her funds, so she
14  could make money as an additional income.
15  BY MS. DYSON:
16    Q. Why is it you are not on those business as
17  well as her?
18    MS. SAROFSKY: Object to form.
19    THE WITNESS: I don't have to be.
20  BY MS. DYSON:
21    Q. Okay. That doesn't answer --
22    A. It's her money.
23    Q. I'm sorry?
24    A. The agreement I have with my wife, I could use
25  her funds to basically invest, go get involved in

Page 34

1   ventures, and the agreement was she would have to be on
2   all the companies to ensure her investment.
3     Q. And so does she receive compensation from
4   those investments?
5     MS. SAROFSKY: Object to form.
6     THE WITNESS: Sometimes she does. Sometimes
7   she doesn't. It depends on the business.
8   BY MS. DYSON:
9     Q. In the last three years, has she received
10  compensation from any of the businesses?
11    MS. SAROFSKY: Object to form.
12    THE WITNESS: As far as timeframe, I would
13  have to check. I would have to look at the
14  records.
15  BY MS. DYSON:
16    Q. And what records would you need to look at?
17    A. That would be the tax returns.
18    Q. Personal tax returns or tax returns for the
19  business?
20    MS. SAROFSKY: Object to form.
21    THE WITNESS: I think it would be business and
22  personal. I'm really not sure. I would have to
23  ask the accountant.
24  BY MS. DYSON:
25    Q. So sitting here, you don't have a recollection

Page 35

1   of whether she received compensation in the last three
2   years from any of those businesses?
3     MS. SAROFSKY: Object to form.
4     THE WITNESS: I'm not sure the date when she
5   received compensation, as far as a bonus check or
6   pay from those businesses, but I know she has
7   received within the last three years reimbursements
8   for her investment dollars that the companies at
9   certain times paid back some investment dollars
10  that she put into it.
11  BY MS. DYSON:
12    Q. Did she receive profit sharing from those
13  companies in the last three years?
14    MS. SAROFSKY: Object to form.
15    THE WITNESS: Best of my recollection, again,
16  as far as timeframe, I don't know. I would have to
17  go through records and find out when she received
18  her bonuses or pay in the years. So right now, I
19  can't tell you which year she received it.
20  BY MS. DYSON:
21    Q. Well, when you say that she received
22  reimbursement for investments, did she receive more than
23  the money that she put into it?
24    MS. SAROFSKY: Object to form.
25    THE WITNESS: No, she's still owed money on

Page 36

1   certain companies. She's constantly investing into
2   the companies. If they have to pay bills for --
3   that are outstanding for the company and the
4   company does not have the funds in the account,
5   she'll write a check into the business.
6   BY MS. DYSON:
7     Q. Does she write that check or do you write that
8   check for her?
9     MS. SAROFSKY: Object to form.
10    THE WITNESS: I write out the check.
11  BY MS. DYSON:
12    Q. And you said it's an investment and
13  investments usually make you money, correct?
14    MS. SAROFSKY: Object to form.
15    THE WITNESS: As you said, usually, yes.
16  BY MS. DYSON:
17    Q. And so have any of these investments been
18  profitable?
19    A. Yes, they have.
20    MS. SAROFSKY: Object to form.
21  BY MS. DYSON:
22    Q. And so your wife has received profit off of
23  her investments, correct?
24    MS. SAROFSKY: Object to form.
25    A. Yes, I stated that prior.

9 (Pages 33 to 36)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 37

1    Q.  And does your wife provide any services to any
2  of these companies that you run as her investments?
3        MS. SAROFSKY:  Object to form.
4        THE WITNESS:  No.
5  BY MS. DYSON:
6    Q.  How long has Mark Egan been your business
7  partner?
8        MS. SAROFSKY:  Object to form.
9        THE WITNESS:  Approximately, two or three
10       years.
11 BY MS. DYSON:
12   Q.  And other then telling him that you were going
13 to be here at a deposition, did you have any other
14 conversation with him about the deposition?
15       MS. SAROFSKY:  Object to form.
16       THE WITNESS:  No.
17 BY MS. DYSON:
18   Q.  Did you talk to your wife about her deposition
19 yesterday?
20       MS. SAROFSKY:  Object to form.  Also object to
21       the extent that it may seek information protected
22       by spousal privilege.  You may answer to the extent
23       that you do not reveal confidential -- the content
24       of confidential communications between you and your
25       wife.

Page 38

1        MS. DYSON:  Again, it doesn't seek any
2        privileged communication.  It's whether he had a
3        conversation with his wife.
4        MS. SAROFSKY:  As I said, I instructed my
5        client that he can answer to the extent that he
6        does so without revealing the content of any
7        confidential communications with his wife.
8        MS. DYSON:  Well, I think you are coaching him
9        on what to say.
10       MS. SAROFSKY:  I don't see how that is
11       coaching.
12       MS. DYSON:  So it's an inappropriate objection
13       because the objection does not call for him to
14       reveal any privilege to communication.
15       MS. SAROFSKY:  You're asking about whether or
16       not -- you're asking if he spoke to his wife.
17       MS. DYSON:  Yes or no is the answer to that
18       question.
19       MS. SAROFSKY:  You can answer yes or no.
20       THE WITNESS:  Yes.
21 BY MS. DYSON:
22   Q.  And how many times did you speak to your wife
23 about your deposition today?
24       MS. SAROFSKY:  Object to form.
25       THE WITNESS:  About my deposition?

Page 39

1  BY MS. DYSON:
2    Q.  Yes.
3    A.  She knew I had a deposition.  There was
4  nothing to discuss.
5    Q.  So it was one time that you spoke to her about
6  your deposition?
7        MS. SAROFSKY:  Object to form.
8        THE WITNESS:  Again, there was nothing to
9        discuss.  She knew I had a deposition.  She was
10       attending.
11 BY MS. DYSON:
12   Q.  So how many times did you talk to her about
13 your deposition?
14       MS. SAROFSKY:  Object to form.
15       THE WITNESS:  Again, there was nothing to
16       discuss.  She knew I had a deposition.
17 BY MS. DYSON:
18   Q.  Well, that's not answering my question.  My
19 question calls for you to answer with a number.  How
20 many times did you talk to her about your deposition?
21   A.  Again, there was no discussion about my
22 deposition.
23   Q.  So you had no discussions with her, is that
24 what you're telling me?
25       MS. SAROFSKY:  Object to form.

Page 40

1        THE WITNESS:  I'm telling you I had no
2        discussions about my deposition.  She was aware I
3        had a deposition and she's here right now.
4  BY MS. DYSON:
5    Q.  Was there anyone else other than Mr. Egan and
6  Ms. Caploon --
7        MS. SAROFSKY:  Mister.
8  BY MS. DYSON:
9    Q.  It's Mister?
10   A.  Yes, ma'am.
11   Q.  Mr. Caploon that you had a conversation about
12 your deposition?
13       MS. SAROFSKY:  Object to form.
14       THE WITNESS:  Ma'am, you're misstating because
15       it wasn't a conversation.  It was just I have a
16       deposition today, I'm out-of-pocket.  Okay.  That
17       was it, so that's not a conversation.
18 BY MS. DYSON:
19   Q.  Is there anyone else that you talked to about
20 your deposition?
21   A.  Actually, another person, Tamara Santana, my
22 wife's daughter was aware I had a deposition today.
23   Q.  And why is she aware you had a deposition?
24       MS. SAROFSKY:  Object to form.
25       THE WITNESS:  Because she lives across the

Page 41

```
1        street from us and to inform her I would not be
2        around if she needed me today.
3    BY MS. DYSON:
4        Q.  Is there anyone else?
5        A.  No, ma'am.
6        Q.  Other than the documents provided to you by
7    your counsel, did you review any documents prior to the
8    deposition?
9        MS. SAROFSKY:  Object to form.
10       THE WITNESS:  No ma'am.
11   BY MS. DYSON:
12       Q.  Now, you mentioned early on that you were
13   deposed in the Colstar action; is that correct?
14       A.  Yes, ma'am.
15       Q.  Let me show you what's been marked as Exhibit
16   1 to your deposition.
17       (Defendants' Exhibit 1 marked for identification.)
18       MS. SAROFSKY:  Take some time to look through.
19       THE WITNESS:  (Witness reviewed document.)
20   Okay.
21   BY MS. DYSON:
22       Q.  Do you recognize this document?
23       A.  No, I don't recognize it, but I see it in
24   front of me.  I see it has my name for -- that it was a
25   deposition, my deposition.
```

Page 42

```
1        Q.  Have you ever reviewed your deposition taken
2    in the Colstar action?
3        MS. SAROFSKY:  Object to form.
4        THE WITNESS:  Yes, I had reviewed a deposition
5    once prior.
6    BY MS. DYSON:
7        Q.  Is this a true and correct copy of the
8    deposition that you gave on February 19, 2020?
9        MS. SAROFSKY:  Object to form.
10       THE WITNESS:  I'm sure it is.
11   BY MS. DYSON:
12       Q.  Did you testify in this deposition on
13   February 19, of 2020 under oath?
14       MS. SAROFSKY:  Object to form.
15       THE WITNESS:  Yes, ma'am.
16   BY MS. DYSON:
17       Q.  Is the testimony that you gave accurate?
18       MS. SAROFSKY:  Object to form.
19       THE WITNESS:  To the best of my ability and
20   knowledge, yes, it was.
21   BY MS. DYSON:
22       Q.  Is there anything that you need to revise or
23   change about this deposition to make it accurate?
24       MS. SAROFSKY:  Object to form.
25       THE WITNESS:  To the best of my recollection,
```

Page 43

```
1        it's as accurate as I felt it was.
2    BY MS. DYSON:
3        Q.  What does that mean, as accurate as you felt
4    it was?
5        MS. SAROFSKY:  Object to form.
6        THE WITNESS:  To the best of my recollection.
7    BY MS. DYSON:
8        Q.  So there's no revision, change, modification
9    that you would need to make to make the testimony in
10   this deposition that you gave on February 19, 2020,
11   accurate, correct?
12       MS. SAROFSKY:  Object to form.
13       THE WITNESS:  Again, this deposition was to
14   the best of my recollection.
15   BY MS. DYSON:
16       Q.  And I'm asking you, sitting here today, is
17   there something that you believe you need to change in
18   this deposition to make it accurate?
19       MS. SAROFSKY:  Object to form.
20       THE WITNESS:  Again, I did not read through
21   this entire deposition and go over every word, but
22   it was -- this deposition was -- with the response
23   of the best of my recollection.
24   BY MS. DYSON:
25       Q.  Did you complete an errata sheet to this
```

Page 44

```
1    deposition?
2        MS. SAROFSKY:  Object to form.
3        THE WITNESS:  Could you explain, please?
4    BY MS. DYSON:
5        Q.  Sure.  Did you read through the deposition and
6    provide a sheet providing corrections to this
7    deposition?
8        A.  No, ma'am, not to the best of my recollection,
9    I did not.
10       Q.  I'm going to show you what is marked as
11   Exhibit 2 to your deposition.  This will be Exhibit 2 to
12   yesterday's deposition.  Do you recognize this document?
13       (Defendants' Exhibit 2 marked for identification.)
14       A.  Yes, ma'am, I do.
15       Q.  What is it?
16       A.  It is a company that was opened up and the
17   file date was 12/5/2019.
18       Q.  And what does the company do?
19       A.  The company does nothing.  It's a shell
20   company.
21       Q.  What is a shell company for?
22       A.  We were getting ready to -- we were in talks
23   about doing alkaline water for pets, so we decided to
24   open the company for if we were going to move forward,
25   we already had a company establish.
```

11 (Pages 41 to 44)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 45

1    Q.  Who is "we"?
2    A.  Myself and Tony Wright.
3    Q.  Who is Tony Wright?
4    A.  Tony Wright is a gentleman who used to be an
5  executive with Bank of America, and he's a friend of
6  mine.
7    Q.  And is he still one of your business partners?
8    A.  Yes, he is.
9    Q.  And you see in this document that he -- that
10  his address is listed as 50024 Crest Drive?
11    A.  Correct.
12    Q.  Do you know who owns that property?
13    A.  Yes, I do.
14    Q.  And who is that?
15    A.  My wife.
16    Q.  And so did he reside in the property owned by
17  your wife?
18    A.  No, ma'am.
19      MS. SAROFSKY:  Object to form.
20      THE WITNESS:  No, ma'am, he did not.
21  BY MS. DYSON:
22    Q.  Do you know why his address is listed as that?
23    A.  Yes, ma'am.
24    Q.  And why is that?
25    A.  When I filed for the registration, I didn't

Page 46

1  have his address, so I just put that in there for a
2  temporary basis, and if we were going to move forward
3  with the company and start it up, then his proper
4  address would be inserted and that would be removed.
5    Q.  On the Articles of Incorporation, it lists the
6  registered agent.  Do you see that?
7    A.  Yes, ma'am, I do.
8      MS. SAROFSKY:  Object to form.
9  BY MS. DYSON:
10    Q.  And it lists Dominick Russo.  Who is that?
11      MS. SAROFSKY:  Object to form.
12      THE WITNESS:  Myself.
13  BY MS. DYSON:
14    Q.  And why are you using the name Dominick Russo
15  on December 5, 2019?
16      MS. SAROFSKY:  Object to form.
17      THE WITNESS:  So if anybody would look up the
18  company, they would not see my real name, Dominick
19  Cicale.
20  BY MS. DYSON:
21    Q.  And why is that?
22      MS. SAROFSKY:  Object to form.
23      THE WITNESS:  Because if they would run a
24  Google search, I come up all over Google with my
25  real name and the identity of my past comes out.

Page 47

1  BY MS. DYSON:
2    Q.  And why wouldn't you want the identity of your
3  past come out?
4      MS. SAROFSKY:  Object to form.
5      THE WITNESS:  Because it could put myself, my
6  family, and whoever is around me at risk.
7  BY MS. DYSON:
8    Q.  But there are companies in which you do use
9  your real name, correct?
10      MS. SAROFSKY:  Object to form.
11      THE WITNESS:  Yes, ma'am, there are.
12  BY MS. DYSON:
13    Q.  And why is that sometimes you use your legal
14  name and sometimes you use a fictitious name?
15      MS. SAROFSKY:  Object to form.
16      THE WITNESS:  I can't answer that.  I don't
17  know.
18  BY MS. DYSON:
19    Q.  Well, you're the one that did it, correct?
20    A.  Again, my response is I can't answer that.  I
21  really don't know why I did.
22    Q.  Do you know if it's permissible for a
23  registered agent in Florida to use a fictitious name?
24      MS. SAROFSKY:  Object to form.
25      THE WITNESS:  I have no idea but I have an

Page 48

1  affidavit stating -- for a dual name.  Same name.
2  BY MS. DYSON:
3    Q.  And did the U.S. Marshal Service approve you
4  using --
5      MS. SAROFSKY:  Object to form.
6    Q.  -- the name of Dominick Russo as a registered
7  agent for a corporation?
8      MS. SAROFSKY:  Object to form.
9      THE WITNESS:  I don't know about the U.S.
10  Marshal Service, but the Assistant -- the former
11  Assistant Acting Attorney General approved that
12  name when they put me in the county jail.
13  BY MS. DYSON:
14    Q.  And when was that?
15    A.  That was in 2006.  They gave me Dominick
16  Russo.
17    Q.  On the Articles of Incorporation, Exhibit 2,
18  it lists your wife, Matilde Santana as the vice
19  president, correct?
20      MS. SAROFSKY:  Object to form.
21  BY MS. DYSON:
22    Q.  It's on the last page of the document.
23      MS. SAROFSKY:  She's referencing the Articles.
24      THE WITNESS:  Oh, I didn't see this.
25      MS. SAROFSKY:  Everything is printed

1ed1556e-144b-432d-9d78-0daf17239fe6

| Page 49 |
| --- |

1  double-sided, so.
2  THE WITNESS: Okay. It's on this page. Yes,
3  I see that.
4  BY MS. DYSON:
5  Q. And what was her role with respect to Alkaline
6  Pet Water, Inc.?
7  MS. SAROFSKY: Object to form.
8  THE WITNESS: If the company was moving
9  forward, to put in an investment. She would have
10  been the one putting up the money.
11  BY MS. DYSON:
12  Q. Did she put up money, as you put it, for
13  Alkaline Pet Water, Inc.?
14  MS. SAROFSKY: Object to form.
15  THE WITNESS: To the best of my recollection,
16  the only money that came out of her pocket was to
17  register the company. The company never made an
18  acquisition to buy water generating machines.
19  BY MS. DYSON:
20  Q. So did Ms. Santana receive any compensation as
21  a result of a Alkaline Pet Water, Inc.?
22  MS. SAROFSKY: Object to form.
23  THE WITNESS: No, ma'am.
24  BY MS. DYSON:
25  Q. Did Ms. Santana provide any services related

| Page 50 |
| --- |

1  to Alkaline Pet Water, Inc.?
2  MS. SAROFSKY: Object to form.
3  THE WITNESS: No, ma'am.
4  BY MS. DYSON:
5  Q. I'm going to show you what's marked as Exhibit
6  3 to your deposition. This as Exhibit 3 from yesterday.
7  (Defendants' Exhibit 3 marked for identification.)
8  MS. SAROFSKY: If you could just identify it
9  for the record just to make it a little bit easier.
10  This is -- this is meant --
11  MS. DYSON: I'm going to ask him to identify
12  the document.
13  BY MS. DYSON:
14  Q. Do you recognize this document, sir?
15  A. Yes, ma'am.
16  Q. What is it?
17  A. This is another shell company, Atmospheric
18  Water LLC.
19  Q. What do you mean by "shell company"?
20  A. To the best of my recollection, I don't think
21  we opened up any bank accounts or made any investment to
22  the company. We wanted just to secure the name.
23  Q. What was the purpose of the company?
24  MS. SAROFSKY: Object to form.
25  THE WITNESS: Purpose of the company would

| Page 51 |
| --- |

1  have been to acquire atmospheric water generating
2  machines to further sell or make bottled water, and
3  we just wanted to lock down the name, Atmospheric
4  Water.
5  BY MS. DYSON:
6  Q. And what happened with respect to this
7  company?
8  MS. SAROFSKY: Object to form.
9  THE WITNESS: I never extended or submitted
10  for -- to reissue -- to reinstate company.
11  BY MS. DYSON:
12  Q. Did you acquire the machines that you are
13  talking about?
14  A. I had --
15  MS. SAROFSKY: Object to form.
16  THE WITNESS: I had acquired machines but not
17  with this company using this name.
18  BY MS. DYSON:
19  Q. Why did you acquire them with a different
20  company?
21  MS. SAROFSKY: Object to form.
22  THE WITNESS: Creating a business, starting a
23  business.
24  BY MS. DYSON:
25  Q. But why weren't you using this name?

| Page 52 |
| --- |

1  MS. SAROFSKY: Object to form.
2  THE WITNESS: We decided not to -- again, the
3  name is still open. We still have rights to the
4  name. If we want to proceed forward using the
5  name, we will. If not, it's just going to sit
6  there in limbo.
7  BY MS. DYSON:
8  Q. Who is "we"?
9  MS. SAROFSKY: Object to form.
10  THE WITNESS: Whatever parties get involved
11  with me.
12  BY MS. DYSON:
13  Q. Who -- what do you mean whichever parties get
14  involved?
15  MS. SAROFSKY: Object to form.
16  THE WITNESS: The other lady who is on here,
17  Tatiana Cerruto.
18  BY MS. DYSON:
19  Q. Who is Tatiana Cerruto.
20  MS. SAROFSKY: Object to form.
21  THE WITNESS: Someone I had met and we
22  actually -- that I saw her name with this and I
23  decided not to do business with her.
24  BY MS. DYSON:
25  Q. And why not?

Page 53

1      MS. SAROFSKY: Object to form.
2      THE WITNESS: I did not like her work ethics.
3  So this company -- we will never move forward with
4  this company or this name.
5  BY MS. DYSON:
6      Q. How did you meet her?
7      MS. SAROFSKY: Object to form.
8      THE WITNESS: Through a colleague of mine.
9  BY MS. DYSON:
10     Q. And who is the colleague?
11     MS. SAROFSKY: Object to form.
12     THE WITNESS: Gilberto.
13 BY MS. DYSON:
14     Q. Gilberto?
15     A. I don't know his last name. I know it but I
16 can't pronounce it.
17     Q. So is Ms. Cerruto someone that you had done
18 business with before?
19     MS. SAROFSKY: Object to form.
20     THE WITNESS: No, ma'am, I never did business
21 with her, a business transaction.
22 BY MS. DYSON:
23     Q. And if this was just a shell company that
24 didn't do anything, how did you know about her work
25 ethic?

Page 54

1      MS. SAROFSKY: Object to form.
2      THE WITNESS: Moving forward trying to get the
3  company started. I just didn't like the way she
4  was doing things.
5  BY MS. DYSON:
6      Q. What is it that you did not like about them?
7      MS. SAROFSKY: Object to form.
8      THE WITNESS: There was a -- I just didn't
9  like it. I didn't feel comfortable moving forward
10 with her. I didn't trust her.
11 BY MS. DYSON:
12     Q. So this company, did your wife put any money
13 into this company?
14     MS. SAROFSKY: Object to form.
15     THE WITNESS: Best of my recollection, only
16 opening up the company.
17 BY MS. DYSON:
18     Q. And did she provide any services -- did your
19 wife provide any services to this company?
20     MS. SAROFSKY: Object to form.
21     THE WITNESS: No, ma'am, just as an investor.
22 BY MS. DYSON:
23     Q. Did your wife take any action to manage this
24 LLC?
25     MS. SAROFSKY: Object to form.

Page 55

1      THE WITNESS: Again, my wife -- the agreement
2  I have with her, she trusts me. I could utilize
3  her funds, and as long as her name is on the
4  corporation where the funds are going, she's
5  perfectly fine with it, that secures her
6  investment.
7  BY MS. DYSON:
8      Q. Did your wife take any action other than that
9  agreement to manage this company?
10     MS. SAROFSKY: Object to form.
11     THE WITNESS: Again, I don't know what you're
12 insinuating or asking, and I can't speak for my
13 wife.
14 BY MS. DYSON:
15     Q. I'm asking whether you have any knowledge of
16 your wife taking any action to manage this company?
17     MS. SAROFSKY: Object to form.
18     THE WITNESS: Again, this company wasn't even
19 a company, didn't even have a bank account, so I
20 don't how -- I'm the one that filed all the
21 paperwork.
22 BY MS. DYSON:
23     Q. I will show you what is marked as Exhibit 4.
24     (Defendants' Exhibit 4 marked for identification.)
25     MS. SAROFSKY: Also the same as yesterday?

Page 56

1      MS. DYSON: The same as yesterday.
2  BY MS. DYSON:
3      Q. Do you recognize this document, sir?
4      A. Yes, I do.
5      Q. What is it?
6      A. It's another company that I opened with the
7  same individual and my wife looking to invest in gold
8  and diamonds.
9      Q. And what happened with respect to this
10 company?
11     MS. SAROFSKY: Object to form.
12     THE WITNESS: Nothing at all happened. I
13 withdrew from dealing with that individual. It is
14 the same woman.
15 BY MS. DYSON:
16     Q. That's Ms. Cerruto who is listed on the
17 Articles of Organization?
18     A. Yes, ma'am, that's correct, and if you see the
19 date that the two companies were filed, they were filed
20 on the same date. It was done that same day.
21     Q. And when is it that you withdrew from your
22 relationship with Ms. Cerruto?
23     A. Maybe a few weeks or a month after getting
24 more involved with her through conversation.
25     Q. Did your wife take any action to manage this

14 (Pages 53 to 56)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 57

```
 1      LLC?
 2          MS. SAROFSKY:  Object to form.
 3          THE WITNESS:  No, I'm pretty sure my wife
 4      never even met Ms. Cerruto.
 5   BY MS. DYSON:
 6      Q.  Did your wife invest any monies in this
 7   company that is Exhibit 4?
 8          MS. SAROFSKY:  Object to form.
 9          THE WITNESS:  The only monies that I invested
10      for my wife was to open the companies and that was
11      it.
12   BY MS. DYSON:
13      Q.  Are you the one who completed the Articles of
14   Incorporation?
15          MS. SAROFSKY:  Object to form.
16          THE WITNESS:  Yes, ma'am.
17   BY MS. DYSON:
18      Q.  Did your wife receive any compensation as a
19   result of this company?
20          MS. SAROFSKY:  Object to form.
21          THE WITNESS:  No, ma'am.
22   BY MS. DYSON:
23      Q.  Were you paid any compensation by your wife
24   for your role in creating this company?
25          MS. SAROFSKY:  Object to form.
```

Page 58

```
 1          THE WITNESS:  No, ma'am.  There wasn't any
 2      bank accounts opened for this company.  It was just
 3      a shell.
 4   BY MS. DYSON:
 5      Q.  I'm going to show you what is marked as
 6   Exhibit 5.  It's Exhibit 5 from yesterday.
 7      (Defendants' Exhibit 5 marked for identification.)
 8   BY MS. DYSON:
 9      Q.  Do you recognize this document, sir?
10      A.  Yes, I do.
11      Q.  What is it?
12      A.  This is a company that I opened up back in
13   12/6/2016.
14      Q.  Did you create the documents that are
15   identified in Exhibit 5?
16      A.  Yes, ma'am, I did.
17      Q.  Who is Zidna Lebron?
18      A.  Let me -- could you repeat that, please?
19      Q.  Who is Zidna Lebron?
20      A.  My wife's daughter-in-law.
21      Q.  And what was the purpose of Capsule Care LLC?
22          MS. SAROFSKY:  Object to form.
23          THE WITNESS:  Capsule Care was getting
24      involved in the pharmaceutical business.
25   BY MS. DYSON:
```

Page 59

```
 1      Q.  What does that mean, "getting involved in the
 2   pharmaceutical business"?
 3          MS. SAROFSKY:  Object to form.
 4          THE WITNESS:  Opening up a pharmaceutical
 5      company and medical supplies.
 6   BY MS. DYSON:
 7      Q.  And did it?
 8      A.  Capsule Care is doing business.
 9      Q.  And what business is it doing?
10      A.  PPE, medical supplies, masks, gloves.
11      Q.  Is it different than the Patient Priority
12   First that you identified earlier?
13      A.  Yes, it is.  It's --
14          MS. SAROFSKY:  Object to form.
15          THE WITNESS:  It's a smaller company.  It's a
16      sister company.
17   BY MS. DYSON:
18      Q.  And did you change the registered agent from
19   Zidna Lebron to Dominick Russo?
20          MS. SAROFSKY:  Object to form.
21          THE WITNESS:  Yes, ma'am, and originally when
22      this company was opened, to the best of my
23      recollection, it was Tony Wright on the company as
24      well.  The company wound up losing money, remained
25      dormant, and then when the pandemic struck, Patient
```

Page 60

```
 1      Priority was handling all the big accounts and I
 2      set this up to do all retail marketing, and we
 3      changed out the titles and members on this company.
 4   BY MS. DYSON:
 5      Q.  When you said Tony Wright was involved in this
 6      company, the Articles of Incorporation don't identify
 7      him.
 8      A.  They didn't identify him back in 2016?
 9      Q.  They are attached to the document.
10      A.  Oh, okay, then I was mistaken, but he had an
11   investment in Capsule Care.  And again, I think you are
12   mistaken.  If you pull of the original Articles of
13   Incorporation, I'm pretty sure Tony Wright was on here
14   at some point in time.
15      Q.  You see the Articles of Organization are
16   attached to it?
17      A.  All of them them from 2016, 2017, 2018, 2019,
18   2020, and 2021?
19      Q.  Sir, the original Articles of Incorporation,
20   which, as you said, Mr. Wright was on are attached.
21      A.  Okay.  Then I might have been mistaken because
22   at some point, I'm pretty sure Mr. Wright was on here,
23   because each annual report for each year I'm sure is
24   different, could be different.
25      Q.  He's not currently on that company, correct?
```

Page 61

```
1        A.  Currently, no, ma'am, he's not.
2        Q.  Is Capsule Care an ongoing concern?
3            MS. SAROFSKY:  Object to form.
4            THE WITNESS:  Could you elaborate on ongoing
5    concern?
6    BY MS. DYSON:
7        Q.  Does it still do business today?
8            MS. SAROFSKY:  Object to form.
9            THE WITNESS:  Yes, ma'am.
10   BY MS. DYSON:
11       Q.  And has your wife invested money in that
12   company?
13           MS. SAROFSKY:  Object to form.
14           THE WITNESS:  Yes, ma'am, she has.
15   BY MS. DYSON:
16       Q.  And has she received compensation as a result
17   of that investment?
18           MS. SAROFSKY:  Object to form.
19           THE WITNESS:  I'd have to look at the records?
20   I'm really not sure.  If anything, she received
21   funds back on her investment, but I'm pretty sure
22   she hasn't received any profit sharing on that
23   company because that company has not made any
24   money.
25   BY MS. DYSON:
```

Page 62

```
1        Q.  And she wasn't the only investor.  Mr. Wright
2    also invested funds in this company?
3            MS. SAROFSKY:  Object to form.
4            THE WITNESS:  In the beginning, I know
5    Mr. Wright lost money as well as my wife with
6    securing a location for a compounding pharmacy that
7    never opened and whatever other investments there
8    were made but we lost money.
9    BY MS. DYSON:
10       Q.  But he invested money in this company?
11       A.  Yes, he paid half of the bills that were owed
12   as far as the rent and getting out of the lease of the
13   building.  He incurred those losses as well.
14       Q.  Currently, one of the authorized members is
15   Alejandro Sanchez, correct?
16       A.  Yes, ma'am.
17       Q.  And who is that?
18       A.  A friend of mine and my wife's former GM at
19   Telemundo.
20       Q.  When did he become involved?
21           MS. SAROFSKY:  Object to form.
22           THE WITNESS:  To the best of my recollection,
23   when I decided to make it a retail company and I
24   contacted him to come in to do the marketing,
25   website, and also if he could generate any sales
```

Page 63

```
1    through any of the contacts he may have managed
2    through his tenure with Telemundo.
3    BY MS. DYSON:
4        Q.  And what year was that that you decided to
5    take it to retail?
6            MS. SAROFSKY:  Object to form.
7            THE WITNESS:  It had to be within the last two
8    years.
9    BY MS. DYSON:
10       Q.  And has Mr. Sanchez received compensation as a
11   result of the services that he provided to Capsule Care?
12           MS. SAROFSKY:  Object to form.
13           THE WITNESS:  No, ma'am.  Again, the company
14   has not made any money.
15   BY MS. DYSON:
16       Q.  Has Mr. Sanchez invested any money in this
17   company?
18           MS. SAROFSKY:  Object to form.
19           THE WITNESS:  To my knowledge, no.  It might
20   have had some personal expenses, but to my
21   knowledge, he did not put any money into the bank
22   account.
23   BY MS. DYSON:
24       Q.  How long has Alejandro Sanchez been your
25   personal friend?
```

Page 64

```
1        A.  Ever since I met him at Telemundo when he
2    became the GM.
3        Q.  Who is Eric Link?
4        A.  Eric Link is friend of mine who owns an
5    insurance company.
6        Q.  And why is he listed as an authorized member?
7        A.  He was brought in as a partner to help
8    generate sales and help run the business as far as the
9    sales, keeping track of inventory, and products, and
10   utilize whatever connections he has with his insurance
11   clients, may be cross-reference to make sales and build
12   a business.
13       Q.  Did you ask your wife to help you make sales
14   for this business?
15           MS. SAROFSKY:  Object to form.
16           THE WITNESS:  I really don't ask my wife to do
17   anything other than to invest.
18   BY MS. DYSON:
19       Q.  And did your wife provide any services to
20   Capsule Care LLC?
21       A.  Yes.
22       Q.  And what services were those?
23       A.  An investor.  She invested money.
24       Q.  Did your wife take any other action to manage
25   Capsule Care LLC?
```

16 (Pages 61 to 64)

Page 65

1      MS. SAROFSKY:  Object to form.
2      THE WITNESS:  Again, all my wife does is
3   invest money, and I'm the one behind the scenes
4   with everything.
5   BY MS. DYSON:
6      Q.  And the Articles of Organization that are
7   dated December 6, 2016, did you create those documents
8   and submit them to the State?
9      THE WITNESS:  Yes, ma'am, I did.
10      MS. SAROFSKY:  Object to form.
11   BY MS. DYSON:
12      Q.  I'll show you what's marked as Exhibit 6.  Do
13   you recognize this document?
14   (Defendants' Exhibit 6 marked for identification.)
15      A.  Yes, ma'am.
16      Q.  And what is it?
17      A.  It's another company, Cicale Files.
18      Q.  And what does this company do?
19      A.  This company was opened to -- at the time, I
20   was starting e-books, graphic novels.
21      Q.  And this company was formed before you were
22   married, correct?
23      MS. SAROFSKY:  Object to form.
24      THE WITNESS:  It looks that way, yes, ma'am.
25   BY MS. DYSON:

Page 66

1      Q.  And did you actually create e-books or get
2   involved in e-books?
3      A.  Yes, ma'am.
4      MS. SAROFSKY:  Object to form.
5   BY MS. DYSON:
6      Q.  And who is Lieber, Ed or Ed Lieber?
7      A.  That was the gentleman who has a blog called
8   Cosa Nostra News, and he was the co-writer on one of my
9   e-books.
10      Q.  Did he invest in this company?
11      MS. SAROFSKY:  Object to form.
12      THE WITNESS:  No, ma'am, just his time, to the
13   best of my knowledge.
14   BY MS. DYSON:
15      Q.  How many e-books did you publish?
16      MS. SAROFSKY:  Object to form.
17      THE WITNESS:  With Ed, we wrote one e-book.
18   BY MS. DYSON:
19      Q.  And did you sell it?
20      MS. SAROFSKY:  Object to form.
21      THE WITNESS:  It's currently still on Amazon.
22   BY MS. DYSON:
23      Q.  And did your wife invest funds in this
24   company?
25      A.  Yes, she did.

Page 67

1      Q.  And did your wife provide any services to this
2   company?
3      MS. SAROFSKY:  Object to form.
4      THE WITNESS:  Just an investor.
5   BY MS. DYSON:
6      Q.  Did this company make any money?
7      MS. SAROFSKY:  Object to form.
8      THE WITNESS:  No, on sales compared to what
9   was invested, we lost money.
10   BY MS. DYSON:
11      Q.  So did your wife receive any compensation as a
12   result of this company?
13      MS. SAROFSKY:  Object to form.
14      THE WITNESS:  Best of my recollection, no.
15   She's still owed money.
16   BY MS. DYSON:
17      Q.  Is the company still an ongoing concern?
18      MS. SAROFSKY:  Object to form.
19      THE WITNESS:  The company obviously is on the
20   registry shut down.
21   BY MS. DYSON:
22      Q.  Did your wife take any action to manage this
23   LLC?
24      MS. SAROFSKY:  Object to form.
25      THE WITNESS:  No, again, my wife doesn't get

Page 68

1   involved in any of the business I open.  She trusts
2   me to handle everything.
3   BY MS. DYSON:
4      Q.  Did you create this document that's the
5   Electronic Articles of Organization and submit it to the
6   State?
7      MS. SAROFSKY:  Object to form.
8      THE WITNESS:  Yes, ma'am.
9   BY MS. DYSON:
10      Q.  Did you report your role in these companies to
11   your probation officer as part of your supervised
12   release?
13      MS. SAROFSKY:  Object to form.
14      THE WITNESS:  I'm not sure if they were aware
15   that I put out an e-book, but I know my federal
16   prosecutors were.
17   BY MS. DYSON:
18      Q.  What about the other companies that you've
19   been involved in, did you report those to your probation
20   officer?
21      MS. SAROFSKY:  Object to form.
22      THE WITNESS:  Did not have to.
23   BY MS. DYSON:
24      Q.  And why is it that you didn't have to?
25      MS. SAROFSKY:  Object to form.

17 (Pages 65 to 68)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 69

1      THE WITNESS: I don't know.  You have to ask
2    them.
3  BY MS. DYSON:
4      Q.  Did the probation officer tell you you didn't
5  have to report your involvement in these companies?
6      MS. SAROFSKY:  Object to form.
7      THE WITNESS:  Again, you have to ask them.  I
8  was never -- wasn't a crime to open up a company.
9  BY MS. DYSON:
10     Q.  But you did have to report what work you were
11  doing, correct?
12     MS. SAROFSKY:  Object to form.
13     THE WITNESS:  I reported the job I was at,
14  yes.
15  BY MS. DYSON:
16     Q.  And what job was that?
17     MS. SAROFSKY:  Object to form.
18     THE WITNESS:  Working in Miami.  Overseeing a
19  construction project for my wife.
20  BY MS. DYSON:
21     Q.  When you say "for your wife," what does that
22  mean?
23     MS. SAROFSKY:  Object to form.
24     THE WITNESS:  One of the investments.  One of
25  the investments that she made.  I'm sure you'll go

Page 70

1  through it when it comes up.
2  BY MS. DYSON:
3      Q.  So it's for one of the companies?
4      A.  Yes, ma'am.
5      Q.  And that's all you reported to your probation
6  officer?
7      MS. SAROFSKY:  Object to form.
8      THE WITNESS:  No, that was my job everyday.
9  Well, at that time.
10  BY MS. DYSON:
11     Q.  Is that the only job that you held during the
12  five years you were on supervised release?
13     MS. SAROFSKY:  Object to form.
14     THE WITNESS:  No, ma'am.
15  BY MS. DYSON:
16     Q.  Did you report any other jobs to your
17  probation officer?
18     MS. SAROFSKY:  Object to form.
19     THE WITNESS:  No, that job was reported to
20  because I had to travel outside of my jurisdiction
21  and the requirements were I had to notify my
22  probation when I left in the morning, and the
23  requirements, they wanted me to return at
24  nighttime.  So every single day for approximately
25  two years, I was traveling back and forth four to

Page 71

1  five days a week from Orlando to Miami.
2  BY MS. DYSON:
3      Q.  I'll show you what is marked as Exhibit 7.
4  This is 7 to yesterday's deposition.
5      (Defendants' Exhibit 7 marked for identification.)
6      MS. SAROFSKY:  Off the record for a second.
7      (Off the record.)
8  BY MS. DYSON:
9      Q.  Do you recognize this document, sir?
10     A.  Yes, ma'am, I do.
11     Q.  And what is it?
12     A.  This is D.C. Concepts Construction & Design,
13  the company that we were just referencing to where I was
14  traveling back and forth to Miami everyday for
15  approximately two years.
16     Q.  And what is the purpose of this company?
17     MS. SAROFSKY:  Object to form.
18     THE WITNESS:  Construction work from
19  infrastructure to consulting to just everything,
20  everything dealing with construction.
21  BY MS. DYSON:
22     Q.  Are you a licensed general contractor?
23     MS. SAROFSKY:  Object to form.
24     THE WITNESS:  No, ma'am, I am not.
25  BY MS. DYSON:

Page 72

1      Q.  Are you not able to be because you are a
2  convicted felon?
3      MS. SAROFSKY:  Object to form.
4      THE WITNESS:  I'm not sure, and I think, best
5  of my knowledge is, I can apply for a license
6  because I have individual friends of mine that are
7  in the business that were convicted felons and they
8  have their GC license.
9  BY MS. DYSON:
10     Q.  Have you sought to apply for your general
11  contractors license?
12     A.  No, ma'am.  We did not need to apply because I
13  have qualifiers, friends of mine who qualify.  Qualified
14  actually the company for infrastructure and plumbing,
15  and then also if I need a GC, I have friends that will
16  qualify or we sub the work out.  We'll get the work and
17  just sub it out to them.
18     Q.  Is this still on active company that it's
19  listed in Exhibit 7?
20     MS. SAROFSKY:  Object to form.
21     THE WITNESS:  Yes, ma'am, it is.
22  BY MS. DYSON:
23     Q.  And the project you said you were working on
24  in Miami, what was that?
25     MS. SAROFSKY:  Object to form.

18 (Pages 69 to 72)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 73

1    THE WITNESS:  It was a -- going to be a
2  development of 702 homes in Dade County.  It was on
3  187-acre parcel of property within the city limits.
4  BY MS. DYSON:
5    Q.  And did you complete that project?
6    MS. SAROFSKY:  Object to form.
7    THE WITNESS:  The developer wound up selling
8  the project out while we were doing the underground
9  work putting in the water, sewer, drainage, and we
10  were maybe about on the first, I would say,
11  90-something homes.  He wound up selling the
12  project out to Lennar, a building company.
13  BY MS. DYSON:
14    Q.  Was that the only project that the company,
15  D.C. Concepts Construction & Design had?
16    MS. SAROFSKY:  Object to form.
17    THE WITNESS:  No, ma'am, but that was the only
18  massive project D.C. Concepts Construction & Design
19  had.
20  BY MS. DYSON:
21    Q.  Does it currently have any projects?
22    MS. SAROFSKY:  Object to form.
23    THE WITNESS:  There's minor projects that are
24  right now on hold, but nothing as big as that
25  project.

Page 74

1  BY MS. DYSON:
2    Q.  Why are they right now on hold?
3    MS. SAROFSKY:  Object to form.
4    THE WITNESS:  We are in litigation on the
5  properties.
6  BY MS. DYSON:
7    Q.  Who is "we"?
8    MS. SAROFSKY:  Object to form.
9    THE WITNESS:  The company.
10  BY MS. DYSON:
11    Q.  And at the time that this company was formed,
12  you weren't married to your wife, correct?
13    MS. SAROFSKY:  Object to form.
14    THE WITNESS:  No, ma'am.
15  BY MS. DYSON:
16    Q.  It's correct that you weren't married to her?
17    A.  No.
18    MS. SAROFSKY:  Object to form.
19  BY MS. DYSON:
20    Q.  That's not correct, you were married?
21    A.  No, I wasn't married.
22    Q.  Okay.  The Articles of Organization for this
23  company list you and your legal name as the person
24  authorized to manage the LLC along with your wife, do
25  you see that?

Page 75

1    MS. SAROFSKY:  Object to form.
2    THE WITNESS:  Yes, ma'am.
3  BY MS. DYSON:
4    Q.  And why is it that you are listed on these
5  Articles as authorized to manage this company?
6    MS. SAROFSKY:  Object to form.
7    THE WITNESS:  I decided just to recently
8  change it, but through the prior years, if you were
9  to pull up the entire reports, it was always
10  changed around, Dominick Russo, and then I was
11  taken off the company just for precautionary
12  measures in the beginning.  To the best of my
13  recollection, on that first job somebody ran my
14  real name and it came up, my history, so I think I
15  took myself off.  So I always played around with
16  it, but now I'm at a point where, I guess, I wanted
17  to be on the company.
18  BY MS. DYSON:
19    Q.  Well, this was back in 2014 that you put your
20  name on the company.
21    A.  No, ma'am, you're correct with that.  You need
22  to pull up the proper files.
23    Q.  Well, I do.  The Articles of Organization, are
24  you saying that that's not the correct filing?
25    MS. SAROFSKY:  Object to form.

Page 76

1    THE WITNESS:  Again, this wasn't the filing of
2  the 2014.
3  BY MS. DYSON:
4    Q.  Do you not see the date, July 3, 2014, on the
5  Articles of Organization?
6    A.  Okay.  Then I don't -- I would have to go on
7  Sunbiz and I could go over all the files individually.
8    Q.  Well, do you dispute the electronic Articles
9  of Organization that were filed with the Secretary of
10  State of July 3, 2014?
11    MS. SAROFSKY:  Object to form.
12    THE WITNESS:  Okay.  Then you know what,
13  you're correct.  I apologize.  It -- right after
14  that, that's when I took myself off if you -- on I
15  think it might have been 12/8/2014, I think I was
16  taken off, but you didn't print that out, so I
17  can't tell you the current.
18  BY MS. DYSON:
19    Q.  I'm not asking current.  I'm asking back in --
20    A.  But I'm telling you, yes, in the beginning and
21  I answered you that I had taken myself off because
22  somebody put -- they ran my name, they saw my past, and
23  it almost cost me the entire job.
24    Q.  So someone that you are going to contract with
25  didn't want to do business because of your past?

19 (Pages 73 to 76)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 77

1        MS. SAROFSKY: Object to form.
2  BY MS. DYSON:
3        Q.  Is that correct?
4        A.  Best of my knowledge, that's the way they
5  felt, yes.
6        Q.  These electronic Articles or Organization from
7  July 3, 2014, did you create this document and submit it
8  to the Secretary of State?
9        MS. SAROFSKY: Object to form.
10       THE WITNESS: Yes, ma'am.
11  BY MS. DYSON:
12       Q.  And your wife is currently the only authorized
13  person for this company, correct?
14       MS. SAROFSKY: Object to form.
15       THE WITNESS: Currently as to date, as of
16  3/24/21, yes, that is correct.
17  BY MS. DYSON:
18       Q.  And what action has your wife taken to manage
19  this business?
20       MS. SAROFSKY: Object to form.
21       THE WITNESS: My wife came in only as an
22  investor.
23  BY MS. DYSON:
24       Q.  These documents list the address that we've
25  been going though.  It's the address of 501 North

Page 78

1  Orlando Avenue, Suite 313-311.  Do you see that?
2        A.  Yes, ma'am.
3        Q.  Do you know what that address is?
4        MS. SAROFSKY: Object to form.
5        THE WITNESS: Yes, I do.
6  BY MS. DYSON:
7        Q.  And what is it?
8        A.  That's our mailing address.
9        Q.  Is there any physical location that's at that
10  address?
11       MS. SAROFSKY: Object to form.
12       THE WITNESS: Yes, there's a physical
13  location.
14  BY MS. DYSON:
15       Q.  Is there anything other than a mailbox?
16       MS. SAROFSKY: Object to form.
17       THE WITNESS: No, it's a physical mailbox.
18       MS. DYSON: We can take a break.
19       MS. SAROFSKY: Thank you.
20       (Recess.)
21  BY MS. SAROFSKY:
22       Q.  I'm going to show you what is marked as
23  Exhibit 8.  This is Exhibit 9 from yesterday.
24       (Defendants' Exhibit 8 marked for identification.)
25       Q.  Do you recognize this document?

Page 79

1        A.  Yes, ma'am, I do.
2        Q.  What is it?
3        A.  Tax return from 20 -- 2016.
4        Q.  Did you verify the information in this tax
5  return is correct?
6        A.  Well, the accountant is the one who put it
7  together, but yes, it should have been correct.
8        Q.  The accountant completed it but you would have
9  signed it, correct?
10       MS. SAROFSKY: Object to form.
11       THE WITNESS: I would not have signed.
12  BY MS. DYSON:
13       Q.  Did you review it before it was submitted?
14       A.  Yes, ma'am.
15       Q.  And you would have told the tax preparer to
16  correct it if it had been incorrect, correct?
17       MS. SAROFSKY: Object to form.
18       THE WITNESS: I'm not sure, but he prepared
19  it.  He was a licensed tax preparer, so who am I to
20  tell him what is correct, what is not correct and
21  how to do my taxes.
22  BY MS. DYSON:
23       Q.  So this is the construction company that you
24  told me you had the project in Miami as well as other
25  small projects; is that accurate?

Page 80

1        MS. SAROFSKY: Object to form.
2        THE WITNESS: Yes, ma'am.
3  BY MS. DYSON:
4        Q.  If you go to the Bates number on the bottom
5  it's 951.
6        A.  Which page?
7        Q.  951 is on the bottom, the last three digits.
8        A.  Got it.
9        Q.  On here it says, "Employee advances."  Do you
10  know what that is in reference to?
11       A.  No, ma'am, I don't.
12       Q.  Were there employee advances given from this
13  company to anyone?
14       A.  Best of my recollection, I don't know how
15  he -- I don't know.  I didn't write this report, the
16  licensed CPA did.
17       Q.  It says, "Receivable affiliate."  Do you see
18  that under "Employee advances"?
19       A.  Yes, I do.
20       Q.  And what is that in reference to?
21       A.  Again, I have no idea.  This came from a
22  licensed CPA, so he would know.
23       Q.  And at the bottom it says, "Loan to
24  stockholder."  Do you see that?
25       A.  Yes, ma'am.

20 (Pages 77 to 80)

Page 81

1       Q.  And do you know what that is in reference to?
2       A.  Again, I have no idea.
3       Q.  Do you know who the stockholder was for D.C.
4   Concepts & Construction?
5           MS. SAROFSKY:  Object to form.
6           THE WITNESS:  Again, I have no idea who he is
7   referencing to.
8   BY MS. DYSON:
9       Q.  Do you know who the stockholders were for D.C.
10  Concepts & Construction?
11          MS. SAROFSKY:  Object to form.
12          THE WITNESS:  Other than the owner of the
13  company, I don't know who he referenced to as
14  stockholder.
15  BY MS. DYSON:
16      Q.  And who was the owner of the company?
17      A.  At that time, I think -- from what it says on
18  the back, Matilde Santana.
19      Q.  If you go to page 955.  This lists the
20  compensation to the officers.  Do you see that?
21      A.  Yes, ma'am.
22      Q.  And it shows that Matilde Santana received
23  $44,000 as compensation to the officers?
24      A.  Okay.
25      Q.  Is that accurate?

Page 82

1           MS. SAROFSKY:  Object to form.
2           THE WITNESS:  Again, I don't know the
3   compensation she received.  This is what he filed,
4   so I'm sure it has to be correct.  His license is
5   on the line.
6   BY MS. DYSON:
7       Q.  I'm going to show you what was marked as
8   Exhibit 9, which was Exhibit 10 yesterday.
9       (Defendants' exhibit 9 marked for identification.)
10      Q.  Do you recognize this document?
11      A.  Yes.
12      Q.  And what is it?
13      A.  2017 tax return for D.C. Concepts Construction
14  & Design LLC.
15      Q.  Have you reviewed this document before?
16      A.  I'm sure I have, yes.
17      Q.  If you turn to the Bates No. 942.
18      A.  Okay.
19      Q.  And do you see on it says, "Current
20  liabilities cash overdraft"?
21      A.  Correct, yes.
22      Q.  Do you know what that is?
23      A.  I have no idea what that means.
24      Q.  If you go to Bates No. 943.
25      A.  Yes, ma'am.

Page 83

1       Q.  This lists the shareholder for this K1
2   document.  Do you see that?
3       A.  Yes, ma'am.
4       Q.  And who is that that is listed as shareholder?
5           MS. SAROFSKY:  Object to form.
6           THE WITNESS:  Matilde Santana.
7   BY MS. DYSON:
8       Q.  And it lists the business income of $16,000?
9           MS. SAROFSKY:  Object to form.
10  BY MS. DYSON:
11      Q.  Do you see that?
12      A.  Yes, ma'am.
13      Q.  And is that compensation that Ms. Santana
14  received?
15          MS. SAROFSKY:  Object to form.
16          THE WITNESS:  I'm not sure if she ever
17  received that or if the funds ever came out of the
18  account or remained in the account or was passed
19  over o the following year, so I can't answer that.
20  I don't know.
21  BY MS. DYSON:
22      Q.  I'm showing you what's marked as Exhibit 10.
23  This would be Exhibit 11.
24      (Defendants' Exhibit 10 marked for identification.)
25      Q.  Do you recognize this document?

Page 84

1       A.  Yes, ma'am.
2       Q.  And what is this?
3       A.  2018 tax return for D.C. Concepts Construction
4   & Design LLC.
5       Q.  Between 2017 and 2018, there was a
6   substantial increase in the gross receipts for this
7   company; is that correct?
8           MS. SAROFSKY:  Object to form.
9           THE WITNESS:  Yes, ma'am.
10  BY MS. DYSON:
11      Q.  And why is that?
12          MS. SAROFSKY:  Object to form.
13          THE WITNESS:  Well, we might have gotten paid.
14  BY MS. DYSON:
15      Q.  Do you know?
16      A.  We might have gotten paid.  Not off the top of
17  my head, I can't answer it, you know.
18      Q.  Paid for what?
19      A.  Paid for work that was performed.
20      Q.  Was this just the Miami project or are these
21  other projects?
22          MS. SAROFSKY:  Object to form.
23          THE WITNESS:  I would refer it more so to the
24  Miami project.
25  BY MS. DYSON:

21 (Pages 81 to 84)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 85

1      Q.  Do you see on the bottom of this document that
2   is Exhibit 10 is the name of Herb Slusher?
3      A.  Yes, ma'am.
4      Q.  Who is Herb Slusher?
5      A.  My accountant.
6      Q.  Is he related to Jeremy Slusher?
7         MS. SAROFSKY:  Object to form.
8         THE WITNESS:  Yes, he is.
9   BY MS. DYSON:
10      Q.  Is Jeremy Slusher one of your business
11   partners?
12         MS. SAROFSKY:  Object to form.
13         THE WITNESS:  No, ma'am, he is not.
14   BY MS. DYSON:
15      Q.  Did you switch accountants between 2017 and
16   2018?
17      A.  Yes, I had to.
18         MS. SAROFSKY:  Object to form.
19   BY MS. DYSON:
20      Q.  Why did you have to?
21         MS. SAROFSKY:  Object to form.
22         THE WITNESS:  My previous accountant passed
23   away.
24   BY MS. DYSON:
25      Q.  If you could turn to page 932.  On this

Page 86

1   statement it has auto expense.  Do you see that?
2         MS. SAROFSKY:  Object to form.
3         THE WITNESS:  Yes, I do.
4   BY MS. DYSON:
5      Q.  What is that for?
6      A.  Auto expense for the company.
7      Q.  For what automobile?
8         MS. SAROFSKY:  Object to form.
9         THE WITNESS:  I'm not sure which automobile.
10   It was probably a lease. Whichever automobile was
11   under the company's name.
12   BY MS. DYSON:
13      Q.  And how many cars are under the company's
14   name?
15         MS. SAROFSKY:  Object to form.
16         THE WITNESS:  There was one car -- at that
17   time there was one -- I'm pretty sure one vehicle,
18   might have been two, but I'm not -- but for the
19   payments, there was only -- I'm pretty sure one,
20   one or two.  I'm really not sure.
21   BY MS. DYSON:
22      Q.  Did your wife use either of these vehicles?
23         MS. SAROFSKY:  Object to form.
24         THE WITNESS:  No, ma'am, she did not.
25   BY MS. DYSON:

Page 87

1      Q.  It lists on here subcontractors.  Do you see
2   that?
3      A.  Yes, ma'am.
4      Q.  And who were the subcontractors?
5         MS. SAROFSKY:  Object to form.
6         THE WITNESS:  There's many subcontractors.
7   BY MS. DYSON:
8      Q.  And what type of services do the
9   subcontractors perform?
10         MS. SAROFSKY:  Object to form.
11         THE WITNESS:  From A to Z.  From doing labor
12   work, to electricians, to plumbing, to sheet
13   rockers, tile guys.  It could be many, many
14   different trades as far as subcontractors.
15   BY MS. DYSON:
16      Q.  Was your wife ever a subcontractor of the
17   company?
18         MS. SAROFSKY:  Object to form.
19         THE WITNESS:  No.  No, ma'am.
20   BY MS. DYSON:
21      Q.  When it says "Loans receivable" under
22   Statement 3, what is that in reference to?
23         MS. SAROFSKY:  Object to form.
24         THE WITNESS:  Where is that?
25   BY MS. DYSON:

Page 88

1      Q.  Under Statement 3 on that same page, the
2   bottom.
3      A.  I have no idea.  You would have to ask the
4   accountant.
5      Q.  I'll show you what is marked as Exhibit 11.
6   (Defendants' Exhibit 11 marked for identification.)
7         MS. DYSON:  This was Exhibit 12.
8   BY MS. DYSON:
9      Q.  Do you recognize this document?
10      A.  Yes, I do.
11      Q.  What is it?
12      A.  This is a company registration for D.C.
13   Concepts Development LLC.
14      Q.  Is this related to the D.C. Concepts
15   Construction & Design?
16      A.  No, ma'am.  This was not opened by myself nor
17   my wife.
18      Q.  Who opened this company?
19      A.  Tricia Bailey.
20      Q.  Your wife's name is on this company, correct?
21      A.  That's correct.
22      Q.  So you didn't open this company, you didn't
23   create these documents?
24         MS. SAROFSKY:  Object to form.
25         THE WITNESS:  No, ma'am.

22  (Pages 85 to 88)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 89

```
1    BY MS. DYSON:
2        Q.   Did you have any involvement in this company?
3            MS. SAROFSKY:  Object to form.
4            THE WITNESS:  This company is, I would say, is
5        just a shell.  I have no knowledge of if a bank
6        account was opened, if it wasn't.
7    BY MS. DYSON:
8        Q.   Did your wife invest in this company?
9            MS. SAROFSKY:  Object to form.
10           THE WITNESS:  In this company, no, she --
11       there wasn't a penny put into this company.
12   BY MS. DYSON:
13       Q.   Do know why --
14       A.   From my wife.
15       Q.   -- her name is listed as a managing member of
16   this company?
17           MS. SAROFSKY:  Object to form.
18           THE WITNESS:  Yes, I do.
19   BY MS. DYSON:
20       Q.   And why is that?
21       A.   I was getting ready -- I had an agreement with
22   Ms. Bailey that D.C. Concepts Construction & Design
23   would develop a project and the agreement was she was to
24   buy out a piece of property that my wife already owned,
25   acquired a property next door, and I would handle the
```

Page 90

```
1    entire build out of the property.  So I guess she opened
2    this up for her own -- for herself or to move everything
3    over.  I don't know her intentions for opening up this
4    corporation, but that was the arrangement originally.
5        Q.   Do you know if it is still an active company?
6            MS. SAROFSKY:  Object to form.
7            THE WITNESS:  Status says active on the
8        paperwork you handed me.
9    BY MS. DYSON:
10       Q.   Right.  But do you know if it's an active
11   company?
12       A.   I have no idea.  I'm not in contact with
13   Ms. Bailey.
14       Q.   Are you in litigation with Ms. Bailey?
15           MS. SAROFSKY:  Object to form.
16           THE WITNESS:  D.C. Concepts Construction &
17       Design is in litigation with Ms. Bailey.
18   BY MS. DYSON:
19       Q.   And why is that?  What's the litigation about?
20           MS. SAROFSKY:  Object to form.
21           THE WITNESS:  Ms. Bailey breached the
22       contract.
23   BY MS. DYSON:
24       Q.   Is your wife involved in that lawsuit?
25           MS. SAROFSKY:  Object to form.
```

Page 91

```
1            THE WITNESS:  Yes, ma'am.
2    BY MS. DYSON:
3        Q.   And is that an ongoing litigation?
4            MS. SAROFSKY:  Object to form.
5            THE WITNESS:  Yes, ma'am.
6    BY MS. DYSON:
7        Q.   And has DC Concepts & Design and your wife
8    been sued in that litigation?
9            MS. SAROFSKY:  Object to form.
10           THE WITNESS:  No, ma'am.  I think D.C.
11   Concepts Construction & Design and my wife sued
12   Ms. Bailey for breach of contract.
13   BY MS. DYSON:
14       Q.   I'm going to show you what's marked as Exhibit
15   12.
16       (Defendants' Exhibit 12 marked for identification.)
17           MS. SAROFSKY:  And did we use this one
18       yesterday?
19           MS. DYSON:  We did.  You know what, we didn't.
20       So that's why I have copies.
21   BY MS. DYSON:
22       Q.   Do you recognize this document?
23       A.   Yes, ma'am.
24       Q.   What is it?
25       A.   It's a registration of D.C. Concepts Limited
```

Page 92

```
1    Liability Company.
2        Q.   What is this company?
3        A.   This is another -- it's a sister company of
4    D.C. Concepts Construction & Design LLC.
5        Q.   And what's the purpose of this company?
6            MS. SAROFSKY:  Object to form.
7            THE WITNESS:  This company was opened with the
8        intentions of putting properties under this
9        company's umbrella.
10   BY MS. DYSON:
11       Q.   Did that occur?
12       A.   I don't think so, no, ma'am.
13       Q.   Has your wife invested money into this
14   company?
15       A.   Yes, she has.
16       Q.   And has she received any compensation from
17   this company?
18       A.   Best of my knowledge, no, I think it is
19   just -- right now it's a shell.  I don't think anything
20   was going through this company.
21       Q.   Has your wife provided services to this
22   company?
23       A.   No, ma'am, other than investor.
24       Q.   And the Articles of Organization, do you see
25   that on the second and third page of this document?
```

23 (Pages 89 to 92)

Page 93

1      A. Yes, ma'am.
2      Q. Did you create the Articles of Organization
3  and submit it to the Department of State?
4      A. Yes, ma'am, I did.
5      Q. Has your wife taken any action to manage this
6  LLC?
7          MS. SAROFSKY: Object to form.
8          THE WITNESS: No, ma'am.
9  BY MS. DYSON:
10     Q. Okay. I'm going to show you what's marked as
11 Exhibit 13.
12     (Defendants' Exhibit 13 marked for identification.)
13         MS. DYSON: This is 13 from yesterday.
14 BY MS. DYSON:
15     Q. Do you recognize this document?
16     A. I recognize the document, but I have no
17 involvement with this document.
18     Q. What is this company?
19     A. Something before I met my wife she had.
20     Q. It says --
21     A. It's DC Video Com, the name of it.
22     Q. And you've had no involvement with the
23 company?
24     A. No, ma'am.
25     Q. Okay. I'm going show you what's marked as

Page 94

1  Exhibit 14 to your deposition.
2      (Defendants' Exhibit 14 marked for identification.)
3          MS. DYSON: This is 14 from yesterday.
4  BY MS. DYSON:
5      Q. Do you recognize this document?
6      A. Yes, ma'am.
7      Q. And what is it?
8      A. This is a registration of a company
9  corporation called First Options Services LLC.
10     Q. And what does that company do?
11         MS. SAROFSKY: Object to form.
12         THE WITNESS: This company is a plumbing and
13 restoration company.
14 BY MS. DYSON:
15     Q. And is it an active company?
16     A. Yes, ma'am, it is.
17     Q. And is it connected with D.C. Concepts &
18 Design or does it do something else?
19     A. No, ma'am, it does something else.
20     Q. When you said -- you said it was plumbing.
21     A. Plumbing work for insurance companies and
22 restoration, water damage, dry outs.
23     Q. And who is Michael Lane?
24     A. A friend of mine.
25         MS. SAROFSKY: Object to form.

Page 95

1          THE WITNESS: And friend of mine and my
2  partner.
3  BY MS. DYSON:
4      Q. And does that mean -- when you say "partner,"
5  does that mean he is provided money as an investment
6  into this business?
7      A. Yes, ma'am, he is.
8          MS. SAROFSKY: Object to form.
9  BY MS. DYSON:
10     Q. And who is Julian Grenald?
11         MS. SAROFSKY: Object to form.
12         THE WITNESS: Friend of mine and a business
13 partner.
14 BY MS. DYSON:
15     Q. Is he also an investor in the First Options
16 Services LLC?
17         MS. SAROFSKY: Object to form.
18         THE WITNESS: Yes, ma'am.
19 BY MS. DYSON:
20     Q. And the Articles of Organization are dated
21 August 15, 2018. Did you create and submit this to the
22 Secretary of State?
23         MS. SAROFSKY: Object to form.
24         THE WITNESS: No, ma'am, I did not.
25 BY MS. DYSON:

Page 96

1      Q. Were you involved in creating this company?
2          MS. SAROFSKY: Object to form.
3          THE WITNESS: Involved in putting everything
4  down, no, Michael Lane did, Michael.
5  BY MS. DYSON:
6      Q. So what is your role with respect to this
7  company?
8          MS. SAROFSKY: Object to form.
9          THE WITNESS: Just as an advisor for my wife's
10 interest in the company.
11 BY MS. DYSON:
12     Q. Did your wife provide any services to this
13 company?
14     A. Only as an investor.
15     Q. Does your wife receive any compensation or has
16 your wife received any compensation from First Options
17 Services LLC?
18         MS. SAROFSKY: Object to form.
19         THE WITNESS: No, ma'am, she's actually owed
20 quite a bit of money on this company.
21 BY MS. DYSON:
22     Q. Has your wife taken any action to manage First
23 Options Services LLC?
24         MS. SAROFSKY: Object to form.
25         THE WITNESS: No, ma'am. I'm in control of

Page 97

1    that.
2    BY MS. DYSON:
3         Q.  I'll show you what's marked as Exhibit 15.
4    This was Exhibit 17.
5         (Defendants' Exhibit 15 marked for identification.)
6    BY MS. DYSON:
7         Q.  Do you recognize this document?
8         A.  Yes, ma'am.
9         Q.  And what is it?
10        A.  It is a company -- corporation that was opened
11   up, Priced Right Land Development LLC.
12        Q.  Is it a company you opened up?
13        A.  Yes, ma'am, that's correct.
14        MS. SAROFSKY:  Object to form.
15   BY MS. DYSON:
16        Q.  And what does Priced Right Land Development
17   LLC do?
18        A.  Company was formulated to do all
19   infrastructure work for construction projects.
20        Q.  Is it related to D.C. Concepts & Design?
21        MS. SAROFSKY:  Object to form.
22        THE WITNESS:  At one time it was.
23        MS. SAROFSKY:  Can I ask you to take a break
24   for a second?
25        MS. DYSON:  Sure.

Page 98

1         (Recess.)
2    BY MS. DYSON:
3         Q.  Who is Zidna Lebron?
4         MS. SAROFSKY:  Object to form.
5         THE WITNESS:  That's my wife's
6    daughter-in-law.
7    BY MS. DYSON:
8         Q.  And what role does she have in this company?
9         MS. SAROFSKY:  Object to form.
10        THE WITNESS:  No role at all.
11   BY MS. DYSON:
12        Q.  Did she reside in Florida?
13        MS. SAROFSKY:  Object to form.
14        THE WITNESS:  They used to reside in Florida,
15   yes, in the past.
16   BY MS. DYSON:
17        Q.  When is it that she last resided in Florida?
18        MS. SAROFSKY:  Object to form.
19        THE WITNESS:  I think they left Florida around
20   2017.
21   BY MS. DYSON:
22        Q.  And the Articles of Organization that are
23   dated August 29, 2016, for this company, did you create
24   those Articles of Organization and submit them to the
25   Secretary of State?

Page 99

1         MS. SAROFSKY:  Object to form.
2         THE WITNESS:  Yes, ma'am.
3    BY MS. DYSON:
4         Q.  Has your wife provided any services to this
5    company?
6         MS. SAROFSKY:  Object to form.
7         THE WITNESS:  No, ma'am.
8    BY MS. DYSON:
9         Q.  Has your wife taken any action to manage this
10   company?
11        MS. SAROFSKY:  Object to form.
12        THE WITNESS:  No, ma'am.
13   BY MS. DYSON:
14        Q.  Has your wife received any compensation for
15   Priced Right Land Development LLC?
16        MS. SAROFSKY:  Object to form.
17        THE WITNESS:  No, ma'am.
18   BY MS. DYSON:
19        Q.  I'll show you what's marked as Exhibit 16.
20        (Defendants' Exhibit 16 marked for rectification.)
21        MS. SAROFSKY:  Did we use that yesterday?
22        MS. DYSON:  Yes, we did.
23   BY MS. DYSON:
24        Q.  Do you recognize this document?
25        A.  Yes, ma'am.

Page 100

1         Q.  And what is it?
2         A.  It's a company that was opened in 6/3/2019,
3    Sierra Leone Watergen LLC.
4         Q.  And what does it do?
5         MS. SAROFSKY:  Object to form.
6         THE WITNESS:  The company is currently closed.
7    BY MS. DYSON:
8         Q.  What did it do?
9         A.  It was --
10        MS. SAROFSKY:  Object to form.  Sorry.
11        THE WITNESS:  -- supplying water machines to
12   Sierra Leone Africa.
13   BY MS. DYSON:
14        Q.  And did it actually supply those machines to
15   Sierra Leone Africa?
16        MS. SAROFSKY:  Object to form.
17        THE WITNESS:  We supplied one machine.
18   BY MS. DYSON:
19        Q.  And why did it cease operations?
20        MS. SAROFSKY:  Object to form.
21        THE WITNESS:  They failed to pay their part
22   for the machine, Africa, the vice president of the
23   country.
24   BY MS. DYSON:
25        Q.  Did you make any other efforts to sell the

25 (Pages 97 to 100)

1ed1556e-144b-432d-9d78-0daf17239fe6

## Page 101

1    machine anyplace else --
2         MS. SAROFSKY: Object to form.
3    BY MS. DYSON:
4         Q. -- in the world as part of this company?
5         A. No, ma'am, that machine was left at the Saint
6    Joseph's Girls School in Africa.
7         Q. Is that part of the contract that you had to
8    sell that machine?
9         MS. SAROFSKY: Object to form.
10        THE WITNESS: That's where the president of
11   Africa, his wife went to school, and that's where
12   they requested that machine be displayed and placed
13   with the understanding they would acquire a couple
14   hundred machines to supply their entire country
15   with water generating machines, which did not
16   happen, and they didn't even pay for that machine.
17   BY MS. DYSON:
18        Q. Were you involved in a lawsuit related to
19   that?
20        MS. SAROFSKY: Object to form.
21        THE WITNESS: No, ma'am, there was no lawsuit.
22   We just wound up writing -- gifting it to them and
23   walking away since they didn't live up to their
24   obligations.
25   BY MS. DYSON:

## Page 102

1         Q. Did you create the electronic Articles of
2    Organization on June 3, 2019, for this company?
3         MS. SAROFSKY: Object to form.
4         THE WITNESS: Yes, ma'am, I did.
5    BY MS. DYSON:
6         Q. And did you submit those Articles of
7    Incorporation to the Secretary of State?
8         MS. SAROFSKY: Object to form.
9         THE WITNESS: Yes, ma'am, I did.
10   BY MS. DYSON:
11        Q. And did your wife provide any services related
12   to Sierra Leon Watergen LLC?
13        MS. SAROFSKY: Object to form.
14        THE WITNESS: Only invested money into the
15   company.
16   BY MS. DYSON:
17        Q. Did she take any action to manage this LLC?
18        MS. SAROFSKY: Object to form.
19        THE WITNESS: No, ma'am, she did not.
20   BY MS. DYSON:
21        Q. Did she receive -- did your wife receive any
22   compensation from Sierra Leone Watergen LLC?
23        MS. SAROFSKY: Object to form.
24        THE WITNESS: No, ma'am, she did not.
25   BY MS. DYSON:

## Page 103

1         Q. I'll show you what's marked as Exhibit 17,
2    which was 19 yesterday.
3         (Defendants' Exhibit 17 marked for identification.)
4         Q. Do you recognize this document?
5         A. Yes, ma'am.
6         Q. What is this?
7         A. This is another company from 4/26/2019, SL
8    Watergen PLLC.
9         Q. And what is this company?
10        MS. SAROFSKY: Object to form.
11        THE WITNESS: Just a shell. We've never
12   formulated to anything.
13   BY MS. DYSON:
14        Q. Is it related to the Sierra Leon Watergen LLC?
15        MS. SAROFSKY: Object to form.
16        THE WITNESS: Yes, through -- it wasn't
17   related, no.
18   BY MS. DYSON:
19        Q. So the "SL" didn't stand for Sierra Leon?
20        A. No, it did, but it wasn't related to that
21   company.
22        Q. And why was this company form?
23        MS. SAROFSKY: Object to form.
24        THE WITNESS: We were looking to do other
25   businesses with some business individuals in Sierra

## Page 104

1    Leon. One group was related with the Tony Blair
2    Project in Sierra Leone. So we were trying to do
3    business with them, so we figured we'd open up a
4    different company.
5    BY MS. DYSON:
6         Q. Who is "we"?
7         MS. SAROFSKY: Object to form.
8         THE WITNESS: Myself and Michael.
9    BY MS. DYSON:
10        Q. Michael who?
11        A. Boxted.
12        Q. And who is Michael Boxted?
13        MS. SAROFSKY: Object to form.
14        THE WITNESS: A friend of mine in the UK, and
15   his real name is Michael Anderson also. He goes
16   under -- by Boxted as well.
17   BY MS. DYSON:
18        Q. Is there a reason he uses Michael Boxted?
19        A. That's in --
20        MS. SAROFSKY: Object to form.
21        THE WITNESS: That was the name he asked me to
22   put on the documentation, that's what I did.
23   BY MS. DYSON:
24        Q. And did he invest money in this company?
25        MS. SAROFSKY: Object to form.

26 (Pages 101 to 104)

Page 105

1    THE WITNESS: No, this was just a shell. This
2    wasn't a company. It was never formulated.
3  BY MS. DYSON:
4    Q. Did your wife invest money in this company?
5      MS. SAROFSKY: Object to form.
6      THE WITNESS: Only for the filing fees.
7  BY MS. DYSON:
8    Q. Did your wife provided any services to SL
9  Watergen PLLC?
10     MS. SAROFSKY: Object to form.
11     THE WITNESS: No, ma'am.
12 BY MS. DYSON:
13   Q. Did your wife take any action to manage this
14 LLC?
15     MS. SAROFSKY: Object to form.
16     THE WITNESS: No, ma'am.
17 BY MS. DYSON:
18   Q. Did you create the electronic Articles of
19 Organization dated April 26, 2019, and submit it to the
20 Secretary of State?
21     MS. SAROFSKY: Object to form.
22     THE WITNESS: Yes, ma'am.
23 BY MS. DYSON:
24   Q. And why was this company dissolved?
25     MS. SAROFSKY: Object to form.

Page 106

1      THE WITNESS: At that time, Watergen USA was
2  having a problem with the main company and Watergen
3  out of Israel and they didn't want anybody using
4  the Watergen name, so they asked me if I would
5  dissolve the company, which I did.
6  BY MS. DYSON:
7    Q. What is Watergen USA?
8    A. Watergen USA was another offset of Watergen --
9  the Watergen brand, which was branded and created out of
10 Israel.
11   Q. Do you have any involvement in Watergen USA?
12     MS. SAROFSKY: Object to form.
13     THE WITNESS: No, ma'am, not any longer.
14 BY MS. DYSON:
15   Q. You said not any longer?
16   A. Correct.
17   Q. So did you have involvement with Watergen?
18   A. I had involvement as far as regions that they
19 were giving me. One of them was Sierra Leon, and the
20 other was Pakistan.
21   Q. So did you have a contract with Watergen USA?
22     MS. SAROFSKY: Object to form.
23     THE WITNESS: I'm pretty sure I did, and if it
24 wasn't written, it was verbal, but I'm pretty sure
25 we had a written contract.

Page 107

1  BY MS. DYSON:
2    Q. When you said "we," who are you referring to?
3      MS. SAROFSKY: Object to form.
4      THE WITNESS: The companies.
5  BY MS. DYSON:
6    Q. Which company would have had a contract with
7  Watergen USA?
8      MS. SAROFSKY: Object to form.
9      THE WITNESS: Any companies that were dealing
10 in Sierra Leone and any companies we created that
11 were dealing in Pakistan. So it would be the --
12 that had the Watergen name.
13 BY MS. DYSON:
14   Q. Did Watergen send a letter demanding that you
15 cease and desist using the Watergen name?
16     MS. SAROFSKY: Object to form.
17     THE WITNESS: Yes, the parent company did send
18 a cease and desist letter.
19 BY MS. DYSON:
20   Q. If you have a contract with them, why would
21 they send you a cease and desist letter?
22     MS. SAROFSKY: Object to from.
23     THE WITNESS: I had a contract with Watergen
24 USA, which was a subsidiary of the main Watergen
25 company, and they were having internal disputes.

Page 108

1  BY MS. DYSON:
2    Q. And is the contract that you have with
3  Watergen USA still active?
4      MS. SAROFSKY: Object to form.
5      THE WITNESS: Watergen USA is not controlled
6  by the entity by the individuals that I had
7  relationships with. They opened up a different
8  company, so to answer your question, no, I don't
9  deal with Watergen at all.
10 BY MS. DYSON:
11   Q. And when did you cease your involvement with
12 Watergen?
13     MS. SAROFSKY: Object to form.
14     THE WITNESS: When my friends, colleagues
15 disassociated themselves with Watergen USA.
16 BY MS. DYSON:
17   Q. And when was that?
18     MS. SAROFSKY: Object to form.
19     THE WITNESS: A year or two ago,
20 approximately. I'm not sure of the exact date.
21 BY MS. DYSON:
22   Q. Who are the friends and colleagues that you
23 are referring to?
24   A. Yehuda Caploon and Ed Russo.
25   Q. They were the individuals that you contracted

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 109

1    with with Watergen USA?
2         MS. SAROFSKY:  Object to form.
3         THE WITNESS:  Yes.
4    BY MS. DYSON:
5         Q.  I'll show you what's marked as Exhibit 18.
6    (Defendants' Exhibit 18 marked for identification.)
7         MS. SAROFSKY:  Did we use that yesterday?
8         MS. DYSON:  Yes, that was 20.
9    BY MS. DYSON:
10        Q.  Before we go to 20, let me ask you.  On the SL
11   Watergen PLLC company, is your wife owed any money from
12   that company?
13        MS. SAROFSKY:  Object to form.
14        THE WITNESS:  I think it's just the filing
15   fees.
16        Q.  The Sierra Leone Watergen LLC company, is your
17   wife owed any money from that company?
18        MS. SAROFSKY:  Object to form.
19        THE WITNESS:  Yes.
20   BY MS. DYSON:
21        Q.  How much?
22        A.  I'm really not sure.  It could be six figures.
23        Q.  And would that be related to the cost of the
24   machine?
25

Page 110

1         MS. SAROFSKY:  Object to form.
2         THE WITNESS:  Yes, ma'am.
3    BY MS. DYSON:
4         Q.  Is that with a -- the Priced Right Land
5    Development LLC, is your wife owed any money on that
6    company?
7         MS. SAROFSKY:  Object to form.
8         THE WITNESS:  Just the filing fees and
9    incidentals.
10   BY MS. DYSON:
11        Q.  What is incidentals?
12        A.  Maybe cell phones or business cards,
13   nothing --
14        Q.  And how much is that that she is owed on the
15   Priced Right Land Development LLC?
16        A.  Maybe a couple hundred dollars, thousand
17   dollars.
18        Q.  And is that an investment loss of?
19        MS. SAROFSKY:  Object to form.
20        THE WITNESS:  No loss has been claimed.
21   BY MS. DYSON:
22        Q.  First Option Services LLC, is your wife owed
23   any money on that company?
24        MS. SAROFSKY:  Object to form.
25        THE WITNESS:  Yes, it's an ongoing -- it's an

Page 111

1    open company.  It's operational.
2    BY MS. DYSON:
3         Q.  And how much money is she owed on that
4    company?
5         A.  She invested approximately about $30,000 to
6    date, maybe a little bit more.
7         Q.  And that's because the company has not been
8    profitable, is that why she's owed money?
9         MS. SAROFSKY:  Object to form.
10        THE WITNESS:  The company is in the black
11   right now but nothing has been taken out of the
12   account.  We are just building, growing the
13   company.
14   BY MS. DYSON:
15        Q.  The D.C. Concepts Limited Liability Company,
16   is your wife owed money on that company?
17        MS. SAROFSKY:  Object to form.
18        THE WITNESS:  I'm not sure.  I would have to
19   look at the records, and find out but she -- the
20   company didn't make any money, so it would be the
21   filing fees.
22   BY MS. DYSON:
23        Q.  And D.C. Concepts Development, that's the
24   company that you told me was opened by Trisha
25   Bailey-Archie?

Page 112

1         A.  Yes, ma'am.
2         Q.  And did your wife invest any money in that
3    company?
4         MS. SAROFSKY:  Object to form.
5         THE WITNESS:  In that company, no, ma'am, she
6    did not put a penny into that company.  That's
7    Trish Bailey's company.
8    BY MS. DYSON:
9         Q.  So she's not owed any money on that company,
10   correct?
11        MS. SAROFSKY:  Object to form.
12        THE WITNESS:  That's correct.
13   BY MS. DYSON:
14        Q.  The D.C. Concepts Construction Design, is your
15   wife owed any money on that company?
16        MS. SAROFSKY:  Object to form.
17        THE WITNESS:  There's monies that were put in,
18   but I don't know if she's owed or not.  I'd have to
19   find out through the accountant.
20   BY MS. DYSON:
21        Q.  That company has been profitable, though,
22   correct?
23        MS. SAROFSKY:  Object to form.
24        THE WITNESS:  Yes.
25   BY MS. DYSON:

28  (Pages 109 to 112)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 113

1    Q.  Cicale Files LLC, is she owed any money on
2    that company?
3        MS. SAROFSKY:  Object to form.
4        THE WITNESS:  I'm not sure if she is or she
5    isn't.
6    BY MS. DYSON:
7        Q.  Capsule Care LLC, is your wife owed any money
8    on that company?
9        MS. SAROFSKY:  Object to form.
10       THE WITNESS:  I'm pretty sure she is.  I'm not
11   that sure, though.
12   BY MS. DYSON:
13       Q.  You don't know?
14       THE WITNESS:  No, I'm sure she is owed money
15   from the company, but it's -- you know, I don't
16   know the exact amount.
17   BY MS. DYSON:
18       Q.  Has that company been profitable?
19       MS. SAROFSKY:  Object to form.
20       THE WITNESS:  No.
21   BY MS. DYSON:
22       Q.  The Aurum Enterprises United, is she owed any
23   money on the company?
24       MS. SAROFSKY:  Object to form.
25       THE WITNESS:  Just the filing fees.

Page 114

1    BY MS. DYSON:
2        Q.  The Atmospheric Water LLC, is she owed any
3    money on that company?
4        MS. SAROFSKY:  Object to form.
5        THE WITNESS:  Just the filing fees.
6    BY MS. DYSON:
7        Q.  And Alkaline Pet Water, is she owned any money
8    on the company?
9        MS. SAROFSKY:  Object to form.
10       THE WITNESS:  Just the filing fees.
11   BY MS. DYSON:
12       Q.  And going to Exhibit 20, do you recognize this
13   document?
14       A.  I have 18.
15       Q.  Oh, it's 18, sorry.  It's Exhibit 20 from
16   yesterday.
17       MS. SAROFSKY:  Thank you.  Sorry.  I got very
18   confused.
19       THE WITNESS:  Yes, I do.
20   BY MS. DYSON:
21       Q.  I'm going to give you Exhibit 19 as well.
22   (Defendants' Exhibit 19 marked for identification.)
23       Q.  So you have 18 and 19 in front of you,
24   correct?
25       A.  Yes, ma'am.

Page 115

1        Q.  Do you recognize these documents?
2        A.  Yes, ma'am.
3        Q.  And what is Vetted Legal LLC?
4        MS. SAROFSKY:  Object to form.
5        THE WITNESS:  Vetted Legal was a company that
6    I formulated with the agreement with Attorney John
7    Dill to bring in business for his law firm.
8    BY MS. DYSON:
9        Q.  And what were you going to do to bring
10   business for his law firm?
11       MS. SAROFSKY:  Object to form.
12       THE WITNESS:  I was going to take my wife's
13   money and invest in advertisement for a 25 percent
14   percentage of all the cases that came in as a
15   partner.
16   BY MS. DYSON:
17       Q.  And so has your wife invested in Vetted Legal
18   LLC?
19       MS. SAROFSKY:  Object to form.
20       THE WITNESS:  Other than opening up the
21   company, no, she has not.
22   BY MS. DYSON:
23       Q.  Is Vetted Legal LLC still an ongoing active
24   company?
25       MS. SAROFSKY:  Object to form.

Page 116

1        THE WITNESS:  It's a shell.  Nothing has been
2    completed or done to move forward.
3    BY MS. DYSON:
4        Q.  Has your wife provided any services to Vetted
5    Legal LLC?
6        MS. SAROFSKY:  Object to form.
7        THE WITNESS:  No, ma'am.  The only services
8    she provided was putting up the money to open the
9    company.
10   BY MS. DYSON:
11       Q.  So you were going to advertise for John Dill's
12   law firm?
13       A.  Yes, ma'am.
14       MS. SAROFSKY:  Object to form.
15       THE WITNESS:  Yes, ma'am, that's correct.
16   BY MS. DYSON:
17       Q.  Did you create any of these advertisements?
18       MS. SAROFSKY:  Object to form.
19       THE WITNESS:  No, we did not.  We discussed
20   going back and forth on what we would do to
21   advertise and some of the pictures, him and I.
22   BY MS. DYSON:
23       Q.  But John Dill is not a member of this company,
24   correct?
25       MS. SAROFSKY:  Object to form.

29  (Pages 113 to 116)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 117

```
1          THE WITNESS:  No, he is not a member of this
2     company.
3  BY MS. DYSON:
4     Q.   And the Articles -- electronic Articles of
5  Organization from May 3, 2021, did you create those?
6          MS. SAROFSKY:  Object to form.
7          THE WITNESS:  Yes, ma'am.
8  BY MS. DYSON:
9     Q.   And did you submit these Articles of
10 Organization to the Secretary of State?
11         MS. SAROFSKY:  Object to form.
12         THE WITNESS:  Yes, ma'am.
13 BY MS. DYSON:
14    Q.   And has Ms. Santana provided any services to
15 Vetted Legal LLC?
16         MS. SAROFSKY:  Object to form.
17         THE WITNESS:  No, ma'am.
18 BY MS. DYSON:
19    Q.   And has Ms. Santana received any compensation
20 from Vetted Legal LLC?
21         MS. SAROFSKY:  Object to form.
22         THE WITNESS:  No, ma'am.
23 BY MS. DYSON:
24    Q.   And has Ms. Santana taken any action to manage
25 Vetted Legal LLC?
```

Page 118

```
1          MS. SAROFSKY:  Object to form.
2          THE WITNESS:  No, ma'am.
3  BY MS. DYSON:
4     Q.   Did not write down -- looks at one exhibit
5  from yesterday.
6          MS. DYSON:  You would've have written down
7     which exhibit that was from yesterday, it would
8     have been what exhibit from yesterday?  The -- did
9     not write it down?
10         MS. SAROFSKY:  I believe it probably would
11    have been 22.
12         MS. DYSON:  I didn't write it down.
13         MS. SAROFSKY:  I didn't bring with me either
14    and I left that pad behind, so.
15         MS. DYSON:  This will be marked as Exhibit 20
16    to this deposition.
17 (Defendants' Exhibit 20 marked for identification.)
18 BY MS. DYSON:
19    Q.   Do you recognize Exhibit 20, sir?
20    A.   Yes, ma'am.
21    Q.   And what is it?
22    A.   Vetted Legal Consultants LLC.
23    Q.   And what is this company?
24         MS. SAROFSKY:  Object to form.
25         THE WITNESS:  Same thing as prior.  We -- I
```

Page 119

```
1     secured some names on Sunbiz.  I wanted to lock
2     them down.  John Dill agreed to it and that's it,
3     and we -- when we were getting ready to move
4     forward, we would choose which name we would use,
5     which company.
6  BY MS. DYSON:
7     Q.   And when is it that you were going to get
8  ready to move forward?
9          MS. SAROFSKY:  Object to form.
10         THE WITNESS:  When we formulated everything,
11    our plan and to move forward.  More than likely it
12    was going to happen after the accident and injury
13    case.
14 BY MS. DYSON:
15    Q.   And why is that?
16         MS. SAROFSKY:  Object to form.
17         THE WITNESS:  Because he was getting ready for
18    trial.  I was busy helping him, assisting him with
19    the trial.
20 BY MS. DYSON:
21    Q.   So Vetted Legal Consultants LLC had the same
22 purpose as Vetted Legal LLC?
23         MS. SAROFSKY:  Object to form.
24         THE WITNESS:  Yes.
25 BY MS. DYSON:
```

Page 120

```
1     Q.   And is it still an active company?
2          MS. SAROFSKY:  Object to form.
3          THE WITNESS:  Yes, ma'am.
4  BY MS. DYSON:
5     Q.   And did your wife invest any money in Vetted
6  Legal Consultants LLC?
7          MS. SAROFSKY:  Object to form.
8          THE WITNESS:  Just opening up the filing fees.
9  BY MS. DYSON:
10    Q.   Did your wife provide any services to Vetted
11 Legal Consultants LLC?
12         MS. SAROFSKY:  Object to form.
13         THE WITNESS:  No, ma'am.
14 BY MS. DYSON:
15    Q.   Did your wife take any action to manage this
16 LLC?
17         MS. SAROFSKY:  Object to form.
18         THE WITNESS:  No, ma'am.
19 BY MS. DYSON:
20    Q.   And did you create the documents that are
21 electronic Articles of Organization that are dated
22 April 30, 2021?
23         MS. SAROFSKY:  Object to form.
24         THE WITNESS:  Yes, ma'am.
25 BY MS. DYSON:
```

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 121

1    Q. And did you submit them to the Secretary of
2  State?
3        MS. SAROFSKY: Object to form.
4        THE WITNESS: Yes, ma'am.
5  BY MS. DYSON:
6    Q. And both with Vetted Legal and Vetted Legal
7  Consultants LLC, the only person authorized to manage
8  the LLC was your wife, correct?
9        MS. SAROFSKY: Object to form.
10        THE WITNESS: Yes, ma'am.
11  BY MS. DYSON:
12    Q. I'll show you what is marked as Exhibit 21.
13    (Defendants' Exhibit 21 marked for identification.)
14    Q. Do you recognize this document?
15    A. Yes, ma'am.
16    Q. And what is it?
17    A. It's a corporation that was opened up, Patient
18  Priority First Inc.
19    Q. And this is the company that you mentioned
20  earlier today, correct?
21    A. Yes, ma'am, that's correct.
22    Q. Is this still on active company?
23    A. Yes, ma'am, it is.
24    Q. And the electronic Articles of Incorporation
25  dated September 18, 2018, did you create that document

Page 122

1  and submit it to the Secretary of State?
2    A. No, I did not.
3        MS. SAROFSKY: Object to form.
4  BY MS. DYSON:
5    Q. And who did?
6    A. Jeremy Slusher, my attorney.
7    Q. Was Mr. Slusher your attorney at that time?
8        MS. SAROFSKY: Object to form.
9        THE WITNESS: Yes, ma'am, he was.
10  BY MS. DYSON:
11    Q. And in what capacity was he your attorney?
12        MS. SAROFSKY: Object to form. I also object
13    to the extent that it seeks any confidential
14    communications between you and your counsel. You
15    can answer to the extent it's not necessary for you
16    to reveal such communications.
17        THE WITNESS: What's --
18  BY MS. DYSON:
19    Q. What capacity was he your attorney on
20  September 18, 2018?
21    A. For this, to open up the corporation.
22    Q. Is he the attorney for Patient Priority First
23  Inc.?
24        MS. SAROFSKY: Object to form.
25        THE WITNESS: No, he consults. If I need

Page 123

1  consulting, he will -- I'll ask him his opinion,
2    his legal advice.
3  BY MS. DYSON:
4    Q. So in what capacity was he representing you on
5  September 8, 2018?
6        MS. SAROFSKY: Object to form.
7        THE WITNESS: As a registered agent for the
8    company.
9  BY MS. DYSON:
10    Q. Is that the only capacity in which he was
11  acting as your attorney on September 18, 2018.
12        MS. SAROFSKY: Object to form. Also object to
13    the extent that it seeks confidential
14    communications between attorney and client. You
15    can answer to the extent possible without revealing
16    such communications.
17        THE WITNESS: Yes.
18  BY MS. DYSON:
19    Q. Now, the original Articles of Incorporation
20  only listed one incorporator, correct?
21        MS. SAROFSKY: Object to form.
22        THE WITNESS: Yes.
23  BY MS. DYSON:
24    Q. And who was that?
25        MS. SAROFSKY: Object to form.

Page 124

1        THE WITNESS: I'm not sure. Would it be here
2    in -- Matilde Santana.
3  BY MS. DYSON:
4    Q. Yes. (Cross talk.)
5    A. Is that it? For --
6    Q. (Cross talk) address of the incorporator is?
7  Do you see where it says that?
8    A. Yes, I do, Matilde Santana. Thank you.
9    Q. And there was only one officer or director of
10  the corporation; is that correct?
11        MS. SAROFSKY: Object to form.
12        THE WITNESS: No. Officer?
13  BY MS. DYSON:
14    Q. Yes, it says the initial officer and directors
15  of the corporation are?
16    A. Yes, I'm sorry, Matilde Santana.
17    Q. Other than providing investment money, did
18  Ms. Santana have any other role in this company?
19        MS. SAROFSKY: Object to form.
20        THE WITNESS: No.
21  BY MS. DYSON:
22    Q. And is Ms. Santana owed any money for Patient
23  Priority First Inc.?
24        MS. SAROFSKY: Object to form.
25        THE WITNESS: I'm not sure. I don't think she

31 (Pages 121 to 124)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 125

1      is.
2    BY MS. DYSON:
3          Q.   Was it a profitable company?
4          MS. SAROFSKY:  Object to form.
5          THE WITNESS:  Yes, it made money.
6    BY MS. DYSON:
7          Q.   The current annual report shows more than one
8    officer or director of the company, correct?
9          MS. SAROFSKY:  Object to form.
10         THE WITNESS:  Yes, I changed it around.
11   BY MS. DYSON:
12         Q.   And who was it that you added?
13         MS. SAROFSKY:  Object to form.
14         THE WITNESS:  I'm not sure if I did it or
15   Mr. Slusher did it, but Mark Egan was added, Linda
16   Cicale, and Kay Egan.
17   BY MS. DYSON:
18         Q.   Who is Linda Cicale?
19         A.   My mother.
20         Q.   Does she reside in Florida?
21         A.   No, she does not.
22         Q.   Does she have an active role in this company?
23         A.   No, she does not.
24         MS. SAROFSKY:  Object to form.
25         THE WITNESS:  No, she does not.

Page 126

1    BY MS. DYSON:
2          Q.   Why was she listed as a director?
3          MS. SAROFSKY:  Object to form.
4          THE WITNESS:  Because I wanted to place her
5    there as a director.
6    BY MS. DYSON:
7          Q.   Why?
8          MS. SAROFSKY:  Object to form.
9          THE WITNESS:  Because I wanted to.
10   BY MS. DYSON:
11         Q.   You don't have any other reason other than you
12   wanted to do it?
13         MS. SAROFSKY:  Object to form.
14         THE WITNESS:  Correct.
15   BY MS. DYSON:
16         Q.   Does she receive any compensation from the
17   company?
18         MS. SAROFSKY:  Object to form.
19         THE WITNESS:  No, she did not.
20   BY MS. DYSON:
21         Q.   Who is Kay Mitchell Egan?
22         MS. SAROFSKY:  Object to form.
23         THE WITNESS:  That's Mark Egan's wife.
24   BY MS. DYSON:
25         Q.   And did Mark Egan invest in this company?

Page 127

1          MS. SAROFSKY:  Object to form.
2          THE WITNESS:  He only invested time into the
3    company.
4    BY MS. DYSON:
5          Q.   And what about Kay Mitchell Egan, has she
6    invested in the company?
7          MS. SAROFSKY:  Object to form.
8          THE WITNESS:  No, ma'am.
9    BY MS. DYSON:
10         Q.   Were you aware your wife was licensed as a
11   Construction Financial Officer?
12         MS. SAROFSKY:  Object to form.
13         THE WITNESS:  Yes, I am.
14   BY MS. DYSON:
15         Q.   I'll show you what's marked as Exhibit 22.
16   This is 24 from yesterday.
17         (Defendants Exhibit 22 marked for identification.)
18         Q.   And when is it that your wife became a
19   Construction Financial Officer?
20         MS. SAROFSKY:  Object to form.
21         THE WITNESS:  5/14/2018.  I applied for it
22   with Julian Grenald, who is my partner in First
23   Options and the qualifier of D.C. Concepts
24   Construction & Design LLC to have a license.
25   BY MS. DYSON:

Page 128

1          Q.   What does that mean "qualifier"?
2          A.   He is qualifying the company that I have the
3    extent and knowledge to do underground work, plumbing
4    work under his license.  He put his license on the line
5    based on my knowledge of construction work in the
6    plumbing field and underground utilities.
7          Q.   And how is that related to this license for a
8    Construction Financial Officer?
9          MS. SAROFSKY:  Object to form.
10         THE WITNESS:  That's basically -- that's her
11   title, that's what she did, financials.  She
12   invested into the company.
13         MS. SAROFSKY:  Object to form.
14   BY MS. DYSON:
15         Q.   But she's licensed through the State of
16   Florida as a Construction Financial Officer, correct?
17         MS. SAROFSKY:  Object to form.
18         THE WITNESS:  She's registered as that and
19   he -- because he qualified her.
20         MS. SAROFSKY:  Object to form.  Can we go off
21   the record for a second?
22         MS. DYSON:  Sure.
23   BY MS. DYSON:
24         Q.   So what is it that you did to have your wife
25   hold the license type of Construction Financial Officer?

32  (Pages 125 to 128)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 129

```
1        MS. SAROFSKY:  Object to form.
2        THE WITNESS:  I guaranteed that any jobs --
3    basically bonding whatever jobs we did.
4    BY MS. DYSON:
5        Q.  How is it that you guaranteed that in her
6    name?
7        MS. SAROFSKY:  Object to form.
8        THE WITNESS:  I guaranteed it.
9    BY MS. DYSON:
10       Q.  Did you sign a document?
11       A.  Yes, I did.
12       MS. SAROFSKY:  Object to form.
13   BY MS. DYSON:
14       Q.  You signed her name to that document?
15       MS. SAROFSKY:  Object to form.
16       THE WITNESS:  You know what, I'm not sure
17   unless you show me the document and show me the
18   signature.
19   BY MS. DYSON:
20       Q.  And you did this in order for what purpose?
21       MS. SAROFSKY:  Object to form.
22       THE WITNESS:  We form -- so we would be
23   licensed under Florida and be able to do
24   underground utility work and we would qualify under
25   Julian Grenald's license.
```

Page 130

```
1    BY MS. DYSON:
2        Q.  And why is it that you didn't do it in your
3    name?
4        MS. SAROFSKY:  Object to form.
5        THE WITNESS:  As a qualifier, it's easier,
6    just like I take on construction jobs and utilize
7    other people's GC licenses, same thing.  It's much
8    easier.
9    BY MS. DYSON:
10       Q.  But why didn't you sign the documents in your
11   name as a Construction Financial Officer?
12       MS. SAROFSKY:  Object to form.
13       THE WITNESS:  The company is in my wife's
14   name.
15   BY MS. DYSON:
16       Q.  So that's why you did not do it?
17       MS. SAROFSKY:  Object to form.
18       THE WITNESS:  I don't know.  Unless you show
19   me who -- the signature, then I could answer the
20   question.
21   BY MS. DYSON:
22       Q.  So if it has your wife's signature on it, you
23   have signed her name, correct?
24       MS. SAROFSKY:  Object to form.
25       THE WITNESS:  Again, show me the document and
```

Page 131

```
1    I can answer it properly.
2    BY MS. DYSON:
3        Q.  Do you have any recollection of what you did
4    with respect to this?
5        A.  Again, show me the document --
6        MS. SAROFSKY:  Object to form.
7        THE WITNESS:  -- and I can answer it.
8    BY MS. DYSON:
9        Q.  That's not what I've asked you.  I asked do
10   you have a recollection of signing the documents related
11   to the Construction Financial Officer?
12       MS. SAROFSKY:  Object to form.
13       THE WITNESS:  Again, I'm not going to change,
14   my answer, so.
15   BY MS. DYSON:
16       Q.  You haven't answered the question.  Do you
17   have a recollection or not?
18       MS. SAROFSKY:  Object to form.
19       THE WITNESS:  You're not going to tell me how
20   to answer my questions.  I'm answering it the way I
21   want to answer it, and I just answered it that way.
22   BY MS. DYSON:
23       Q.  Oh, I understand that you're answering the
24   questions the way you want to answer them, but they're
25   not answering the questions.  My question is simple.  Do
```

Page 132

```
1    you have a recollection or not?
2        MS. SAROFSKY:  Objection.
3        THE WITNESS:  And my answer is simple.  Show
4    me the documentation so I could answer it properly.
5    If not, then let's move on.
6    BY MS. DYSON:
7        Q.  Do you have a recollection or do you not have
8    a recollection?
9        MS. SAROFSKY:  Object to form.
10       THE WITNESS:  And again, show me the documents
11   and then maybe I could recollect on who signed the
12   document, how it was signed, whose name it was in.
13   Other than that, I can't answer the question.
14   That's it.  That's my answer.
15       MS. DYSON:  Object to form.
16   BY MS. DYSON:
17       Q.  My question is, do you have a recollection?
18   And I'm not sure why you're smiling at this, but do you
19   have a recollection of signing the document or not?
20       MS. SAROFSKY:  Object to form.
21       THE WITNESS:  I would like, if you have the
22   document, please provide it so I could answer it
23   properly.  If not, that's my recollection.
24       MS. DYSON:  Counsel, would you like to
25   instruct your client to answer the question?
```

33 (Pages 129 to 132)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 133

```
1        MS. SAROFSKY: Truthfully, I agree with him
2    that it's not a question that can be answered
3    because you're referencing did he sign a form. We
4    don't even know if a form exists.
5        MS. DYSON: Does he have a recollection or
6    not?
7        MS. SAROFSKY: If you don't -- if you remember
8    signing a form, you can say you did. If you don't,
9    you can say you don't.
10       THE WITNESS: I don't even know if a signature
11   was required.
12       MS. SAROFSKY: I don't know.
13       THE WITNESS: So how am I supposed to answer
14   it? I'm telling you I don't even know if a -- if
15   there was. Please provide it, and I'll answer it.
16   BY MS. DYSON:
17       Q. Do you have the documentation?
18       A. Again --
19       MS. SAROFSKY: Objective to form.
20       THE WITNESS: -- I just answered the question.
21   And if you want, we'll go back and forth all day
22   with this and I'm going to stay with my position.
23   You can stay with yours, and just waste everybody's
24   time.
25   BY MS. DYSON:
```

Page 134

```
1        Q. My question is, do you have the documentation
2    in your possession?
3        A. And my answer is --
4        MS. SAROFSKY: Object to form.
5        THE WITNESS: -- I don't know. If you have
6    the documentation, please show, me because I'm --
7    there might be a possibility a signature wasn't
8    even required to put down Construction Financial
9    Officer.
10   BY MS. DYSON:
11       Q. Is there a reason that your wife would have no
12   idea that you submitted a document that has her as the
13   Construction Financial Officer?
14       MS. SAROFSKY: Objection to form.
15       THE WITNESS: My wife has no idea of any of
16   the companies I open, I get involved with, the
17   business I do. As long as she's on documentation
18   that could secure her investment, that's all she
19   cares about. There's a level of trust with that.
20   BY MS. DYSON:
21       Q. Okay. Let me show you what's marked as
22   Exhibit 23.
23       A. Thank you.
24   (Defendants Exhibit 23 marked for identification.)
25       Q. Do you recognize Exhibit 23?
```

Page 135

```
1        A. You gave me two files. Two -- are these the
2    same?
3        Q. Yeah, I had an extra copy.
4        A. I see it, yes.
5        Q. And what is this document?
6        MS. SAROFSKY: Object to form.
7        THE WITNESS: It says, "Notice of Federal Tax
8    Lien."
9    BY MS. DYSON:
10       Q. Are you aware that you have a federal tax lien
11   against you in the amount of $406,000?
12       MS. SAROFSKY: Object to form.
13       THE WITNESS: I have no tax lien against me.
14   This is inaccurate.
15   BY MS. DYSON:
16       Q. Have you satisfied this tax lien?
17       A. Again, this was prior -- this was back in --
18   looks like 2004.
19       MS. SAROFSKY: Object to form.
20       THE WITNESS: February. I -- what 2002 tax
21   period. Date of assessment 2006. I was
22   incarcerated.
23   BY MS. DYSON:
24       Q. Have you satisfied this tax lien?
25       A. I have no tax lien.
```

Page 136

```
1        MS. SAROFSKY: Object to form.
2    BY MS. DYSON:
3        Q. So you dispute this public record that is
4    filed in the Rockland County Clerk's Office?
5        MS. SAROFSKY: Object to form.
6        THE WITNESS: I have no tax lien.
7    BY MS. DYSON:
8        Q. Do you dispute this document, sir?
9        MS. SAROFSKY: Object to form, asked and
10   answered.
11       THE WITNESS: I have no tax lien.
12   BY MS. DYSON:
13       Q. Did you pay a tax lien, a tax amount of
14   $406,211.29?
15       MS. SAROFSKY: Object to form.
16       THE WITNESS: I have no tax lien.
17   BY MS. DYSON:
18       Q. And so that tax lien doesn't explain why
19   you're hiding your identity and involvement in all these
20   companies?
21       MS. SAROFSKY: Object to form.
22       THE WITNESS: I have no tax lien.
23   BY MS. DYSON:
24       Q. I'll show you what's marked as Exhibit 24 to
25   your deposition.
```

34 (Pages 133 to 136)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 137

1    (Defendants' Exhibit 24 marked for identification.)
2         MS. SAROFSKY:  And what's that?
3         MS. DYSON:  It's Exhibit 23 from yesterday.
4    BY MS. DYSON:
5         Q.  Do you recognize this document, sir?
6         A.  Yes, I do.
7         Q.  And what is it?
8         A.  Tax return, business tax return, 2016 for STR8
9    Heat LLC.
10        Q.  And what is STR8 Heat LLC?
11        A.  It was a company that was created with my
12   wife's son and I selling sneakers.
13        Q.  And did your wife have any involvement in this
14   company?
15        MS. SAROFSKY:  Object to form.
16        THE WITNESS:  I'm not sure.  If you show me
17   the Articles of Incorporation, I could answer that
18   better.
19   BY MS. DYSON:
20        Q.  You said selling sneakers?
21        A.  Yes.
22        Q.  Is there a reason that this tax form provides
23   that the principal business is air and heating?
24        MS. SAROFSKY:  Object to form.
25        THE WITNESS:  I have no idea.  That's, I

Page 138

1    guess, what the accountant put on there, but it
2    was -- maybe because of "heat" he assumed it was
3    that, but it was to sell sneakers and we did not
4    make money.  We lost money.
5    BY MS. DYSON:
6         Q.  And who is "we" that lost money?
7         A.  Actually, myself or my wife.
8         Q.  And how much money did your wife loose?
9         A.  Whatever --
10        MS. SAROFSKY:  Object to form.
11        THE WITNESS:  Whatever is in the tax return,
12   and I'm not sure unless you show me the Articles of
13   Incorporation.  I'm not sure who lost money, that
14   was 2016 and I have no recollection of who the
15   primary principles were on the corporation.
16   BY MS. DYSON:
17        Q.  It was either you or your wife invested in it?
18        MS. SAROFSKY:  Object to form.
19        THE WITNESS:  Yes.
20   BY MS. DYSON:
21        Q.  What is your wife's son's name?
22        MS. SAROFSKY:  Object to form.
23        THE WITNESS:  Giovanni Santana.
24   BY MS. DYSON:
25        Q.  Are you still involved in organized crimes?

Page 139

1         MS. SAROFSKY:  Object to form.
2         THE WITNESS:  No, ma'am, I'm not.
3    BY MS. DYSON:
4         Q.  And when was it that you were last involved in
5    organized crime?
6         MS. SAROFSKY:  Object to form.
7         THE WITNESS:  The day I cooperated with the
8    Federal government, so that was some time in 2006
9    my affiliation with organized crime ended.
10   BY MS. DYSON:
11        Q.  And do you do business with any of the
12   business partners we reviewed today who are involved in
13   organized crime?
14        MS. SAROFSKY:  Object to form.
15        THE WITNESS:  To the best of my knowledge,
16   nobody is involved in organized crime.
17   BY MS. DYSON:
18        Q.  And the business partners that you have, you
19   talked about Alex Sanchez being one of them.  Was Anibal
20   Soto one of your business partners?
21        MS. SAROFSKY:  Object to form.
22        THE WITNESS:  I don't know if he was on the
23   corporation, but I know his son had opened up a
24   corporation and he had me go partners with his son.
25   So I'm not sure if his involvement was on paper,

Page 140

1    but there was an interest in there when I was
2    dealing with his son.
3    BY MS. DYSON:
4         Q.  And what corporation was that?
5         A.  Higher Trust -- I think it was Higher Trust
6    Construction.
7         Q.  And are you still involved in that company?
8         A.  No, ma'am.  And it was my wife who was the
9    investor, and I was the one who took care of everything
10   else.  All she did was invest.
11        Q.  And what is the name of the son that you are
12   referencing?
13        A.  Stephen Soto.
14        Q.  When is it that you ceased being involved in
15   the Higher Trust Construction Company?
16        MS. SAROFSKY:  Object to form.
17        THE WITNESS:  When I found out he was robbing
18   from us.
19   BY MS. DYSON:
20        Q.  When was that?
21        A.  I really don't recall.  If you show me the
22   Articles of Incorporation, I could guesstimate the date
23   approximately.  It was approximately probably about a
24   year afterwards, a year and a half after the company was
25   opened, maybe sooner.  I'm really not sure.

35 (Pages 137 to 140)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 141

1    Q.  And did you report his son to the police?
2    A.  No, I did not.
3    Q.  Any of the companies that we've gone through
4    today, do any of them have employees?
5         MS. SAROFSKY:  Object to form.
6         THE WITNESS:  Yes, First Options.
7    BY MS. DYSON:
8    Q.  Any other companies that have employees?
9    A.  D.C. Contractors uses subcontractors when we
10   do work, and at this time, there are no employees.
11        MS. SAROFSKY:  Object to form.  Sorry, that I
12   was slow on that one.
13        THE WITNESS:  That's all right.
14   BY MS. DYSON:
15   Q.  How many employees does First Options have?
16   A.  Two.
17   Q.  And what is it that they do?
18   A.  One manages the accounts and day-to-day
19   operations, getting business with the insurance
20   companies, and scheduling.  And the other gentleman is
21   the worker.  He goes out and performs all the services
22   in the field.
23   Q.  And are they both full-time employees?
24        MS. SAROFSKY:  Object to form.
25        THE WITNESS:  Yes, ma'am.

Page 142

1         BY MS. DYSON:
2    Q.  And how long have you had them as full-time
3    employees?
4         MS. SAROFSKY:  Object to form.
5         THE WITNESS:  Approximately a year, a little
6    over one year.
7    BY MS. DYSON:
8    Q.  And for the companies that we've talked about
9    today, have you traveled for business to Dubai?
10        MS. SAROFSKY:  Object to form.
11        THE WITNESS:  Business in Dubai or --
12   probably, yes.
13   BY MS. DYSON:
14   Q.  And what business do you have in Dubai?
15        MS. SAROFSKY:  Object to form.
16        THE WITNESS:  All my overseas travels had to
17   do with the Watergen project, making atmospheric
18   water with the machines we had.
19   BY MS. DYSON:
20   Q.  And when is it that you traveled to Dubai for
21   business?
22        MS. SAROFSKY:  Object to form.
23        THE WITNESS:  I would say before the pandemic.
24   BY MS. DYSON:
25   Q.  And did your wife go on these business trips

Page 143

1    with you?
2         MS. SAROFSKY:  Object to form.
3         THE WITNESS:  She went on maybe one or two
4    with the authorization from her surgeon that it was
5    okay for her to travel at that time.
6    BY MS. DYSON:
7    Q.  And where did she travel with you?
8         MS. SAROFSKY:  Object to form.
9         THE WITNESS:  Relating to specifically with
10   the travels, where?  Like, what are you insinuating
11   as far as business or leisure?
12   BY MS. DYSON:
13   Q.  No.  No.  Well, I'm not insinuating anything.
14   My question was, where did she travel with you for
15   business?
16   A.  Okay.  She traveled to Pakistan for business.
17   I'm not sure if Dubai was business.
18   Q.  And what did she do on these business trips?
19        MS. SAROFSKY:  Object to form.
20        THE WITNESS:  Just accompanied me, to be with
21   me, spend some time with me in my free time --
22   during my free time.
23   BY MS. DYSON:
24   Q.  Did you travel to Sierra Leone too?
25        MS. SAROFSKY:  Object to form.

Page 144

1         THE WITNESS:  Yes, I did.
2    BY MS. DYSON:
3    Q.  Did your wife travel with you?
4    A.  No, she did not.
5    Q.  You mentioned that your business partners with
6    the son of Anibal Soto.  How did that relationship come
7    about?
8         MS. SAROFSKY:  Object to form.
9         THE WITNESS:  Through Anibal Soto.
10   BY MS. DYSON:
11   Q.  Are you friends with Anibal Soto?
12        MS. SAROFSKY:  Object to form.
13        THE WITNESS:  At one time I was friends with
14   him, yes.
15   BY MS. DYSON:
16   Q.  When did you become friends with him?
17        MS. SAROFSKY:  Object to form.
18        THE WITNESS:  When he started working for
19   Telemundo.
20   BY MS. DYSON:
21   Q.  Do you remember what year that was?
22        MS. SAROFSKY:  Object to form.
23        THE WITNESS:  No, ma'am, I do not.
24   BY MS. DYSON:
25   Q.  And how is it that you met him?

36 (Pages 141 to 144)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 145

1        MS. SAROFSKY: Object to form.
2        THE WITNESS: Probably through one of the
3    events for my wife, one of the engagements that
4    everybody got together.
5    BY MS. DYSON:
6        Q.   And did you socialize with him as a friend?
7        MS. SAROFSKY: Object to form.
8        THE WITNESS: Yes, I did.
9    BY MS. DYSON:
10       Q.   And how often?
11       MS. SAROFSKY: Object to form.
12       THE WITNESS: At one time, pretty frequently.
13   BY MS. DYSON:
14       Q.   And what is pretty frequently?
15       A.   Three to four days a week, evenings a week.
16       Q.   What is it that you would do?
17       A.   Eat, drink, talk, hang out, discuss business,
18   different ventures he wanted me to get involved in to
19   invest in for himself.
20       Q.   And did there come a time that you stopped
21   socializing with him three to four days a week?
22       A.   Yes, ma'am.
23       Q.   And when was that?
24       A.   When I found out that he was disrespectful to
25   my wife.

Page 146

1        Q.   And when was that?
2        A.   While my wife was recovering, I walked into
3    the house. She was in the kitchen. I heard
4    something -- somebody say on the phone, "Just put it
5    between your legs -- go into bed, put it in between your
6    legs," and that was all I heard, and as I walked in, my
7    wife noticed I walked in the house. She hung up the
8    phone and she started crying. I asked her what was that
9    about. She didn't want to tell me. I got angry with
10   her because of what I thought I heard to see if it was
11   correct, and then she broke down and told me what
12   happened.
13       Q.   So you don't know who was speaking when you
14   heard those words?
15       A.   No.
16       Q.   And was it after your wife's first surgery or
17   the second surgery?
18       A.   I'm not sure which surgery it was.
19       Q.   And before that time, did you invite Mr. Soto
20   to family gatherings?
21       A.   All the time.
22       Q.   Did you invite him to your house for
23   Thanksgiving?
24       MS. SAROFSKY: Object to form.
25       THE WITNESS: Probably so, yes.

Page 147

1    BY MS. DYSON:
2        Q.   Did you communicate with him other than verbal
3    communication, any electronic communication with him?
4        MS. SAROFSKY: Object to form.
5        THE WITNESS: Yes.
6    BY MS. DYSON:
7        Q.   And what type of electronic communication did
8    you have with him?
9        A.   Text messaging, maybe e-mail.
10       Q.   And after that -- that phone interaction that
11   you described with whatever your wife told you about --
12       MS. SAROFSKY: Object to form.
13       Q.   -- did you have any further communications
14   with Mr. Soto?
15       MS. SAROFSKY: Object to form.
16       THE WITNESS: No, I did not. To the best of
17   my -- I'm not sure, maybe. I'm not sure. I don't
18   think so.
19   BY MS. DYSON:
20       Q.   And did you invite him to the house after your
21   wife had had a surgery?
22       MS. SAROFSKY: Object to form.
23       THE WITNESS: I'm not sure if I did or didn't.
24   BY MS. DYSON:
25

Page 148

1        Q.   Did you go to Orlando Magic games with him?
2        A.   He went to Orlando Magic games with me.
3        Q.   Did Mr. Soto ask you for a loan?
4        MS. SAROFSKY: Object to form.
5        THE WITNESS: Mr. Soto asked me for money, to
6    borrow money at times.
7    BY MS. DYSON:
8        Q.   And was that during the period of time that
9    you were friends with him?
10       MS. SAROFSKY: Object to form.
11       THE WITNESS: Yes, ma'am.
12   BY MS. DYSON:
13       Q.   And did you give him the money?
14       MS. SAROFSKY: Object to form.
15       THE WITNESS: With my wife's approval, yes, I
16   did, because it was coming out of her account.
17   BY MS. DYSON:
18       Q.   And how often did you give him money?
19       MS. SAROFSKY: Object to form.
20       THE WITNESS: Any time he asked, I don't think
21   I ever denied him or nor -- you know, my wife never
22   told me no, not to, so any time he asked, he -- he
23   got the money.
24   BY MS. DYSON:
25       Q.   How much money did you give him?

37 (Pages 145 to 148)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 149

```
1        A.  Total, maybe 20, 30, 40,000 altogether we have
2    given him.  I'm not sure.
3        Q.  Was it all given out of your wife's account?
4        A.  Yes.
5        MS. SAROFSKY:  Object to form.
6    BY MS. DYSON:
7        Q.  But you gave it to him, correct?
8        A.  No, I didn't --
9        MS. SAROFSKY:  Object to form.
10       THE WITNESS:  I didn't give him all the money,
11   no.
12   BY MS. DYSON:
13       Q.  I'm sorry?
14       A.  What I gave him, I don't -- I really don't
15   know what I gave him.  Maybe out me -- him asking me,
16   maybe a couple thousand, a few thousand.  The rest was
17   from my wife.
18       Q.  And did he repay that money?
19       MS. SAROFSKY:  Object to form.
20       MS. DYSON:  The money I gave, yes, he repaid.
21   BY MS. DYSON:
22       Q.  And so you're saying that he asked both you
23   and your wife for money?
24       MS. SAROFSKY:  Object to form.
25       THE WITNESS:  I know my wife gave him money.
```

Page 150

```
1    I don't know.  You know, he asked me directly, yes,
2    so obviously, he asked my wife also.  And I know
3    there might have been a couple times my wife gave
4    him cash, because when he asked me for money and I
5    mentioned it to her, she had mentioned that she
6    gave him money maybe a week prior in cash, a couple
7    hundred dollars in cash at times, and I was
8    questioning whether -- I questioned him what are
9    you doing with the money.
10   BY MS. DYSON:
11       Q.  And what was his response?
12       MS. SAROFSKY:  Object to form.
13       THE WITNESS:  He had bills with his son and
14   his wife who lived in Tampa.
15   BY MS. DYSON:
16       Q.  Did you object to any of the money that was
17   given to him, this 30 or $40,000 that you're saying?
18       A.  No.
19       Q.  Was there an expectation that the money would
20   be repaid?
21       A.  Of course.
22       Q.  Was there any documentation of it?
23       A.  No, ma'am, not that I'm aware of.
24       Q.  What was the expectation in terms of the
25   repayment?
```

Page 151

```
1        MS. SAROFSKY:  Object to form.
2        THE WITNESS:  That he was a friend.  He would
3    pay it back.  He paid everything I gave him back.
4    BY MS. DYSON:
5        Q.  And did you ask him to repay any of the money
6    that was given to him by your wife?
7        MS. SAROFSKY:  Object to form.
8        THE WITNESS:  I'm not sure if I even asked
9    him.  It got to the point -- I'm not sure what he
10   owed, what he didn't owe, what he paid.  To me it
11   was irrelevant.  He was -- I considered him a dear
12   friend.  When I let somebody into my home, they --
13   you know, I feel I was close with him.
14   BY MS. DYSON:
15       Q.  Did you witness any interactions between
16   Mr. Soto and Ms. Santana with respect to work?
17       MS. SAROFSKY:  Object to form.
18       THE WITNESS:  I don't know what you're leading
19   to as far as interactions.
20   BY MS. DYSON:
21       Q.  Did you watch them work together?
22       MS. SAROFSKY:  Object to form.
23   BY MS. DYSON:
24       Q.  Did you ever see them work together?
25       A.  Well, when I'd go to the office everybody
```

Page 152

```
1    would be there, so, like, no work specifically.  You
2    know, there's different forms of work.  I mean, just
3    everybody around at events, yeah, I saw them together.
4        Q.  Did you ever witness Mr. Soto engage in any
5    inappropriate conduct?
6        A.  Absolutely not.
7        MS. SAROFSKY:  Object to form.
8    BY MS. DYSON:
9        Q.  Were you aware that your wife had a cell phone
10   for work?
11       MS. SAROFSKY:  Object to form.
12       THE WITNESS:  Yes.
13   BY MS. DYSON:
14       Q.  Did you ever use that cell phone?
15       MS. SAROFSKY:  Object to form.
16       THE WITNESS:  No, ma'am, I did not.
17   BY MS. DYSON:
18       Q.  Have you ever accessed her e-mail on that cell
19   phone?
20       MS. SAROFSKY:  Object to form.
21       THE WITNESS:  No, ma'am, I did not.
22   BY MS. DYSON:
23       Q.  Have you ever reviewed her e-mail or text
24   messages on that phone?
25       MS. SAROFSKY:  Object to form.
```

Page 153

1    THE WITNESS: No, ma'am, I have not.
2  BY MS. DYSON:
3    Q.  Were you aware that your wife used a work
4  laptop for work at Telemundo Network?
5    MS. SAROFSKY: Object to form.
6    THE WITNESS: Yes, ma'am.
7  BY MS. DYSON:
8    Q.  And have you ever accessed her e-mail on that
9  laptop?
10    MS. SAROFSKY: Object to form.
11    THE WITNESS: No, ma'am.
12  BY MS. DYSON:
13    Q.  Have you ever logged into the work network at
14  Telemundo Network?
15    MS. SAROFSKY: Object to form.
16    THE WITNESS: No, ma'am.
17  BY MS. DYSON:
18    Q.  Do you have the ability to log into the
19  network?
20    MS. SAROFSKY: Object to form.
21    THE WITNESS: No, ma'am.
22  BY MS. DYSON:
23    Q.  Did your wife ever give you her password or
24  credentials to be able to access the Telemundo network?
25    MS. SAROFSKY: Object to form.

Page 154

1    THE WITNESS: No, ma'am.
2  BY MS. DYSON:
3    Q.  Did you ever access or direct someone else to
4  access the Telemundo network?
5    MS. SAROFSKY: Object to form.
6    THE WITNESS: No, ma'am.
7  BY MS. DYSON:
8    Q.  Do you have any knowledge of any individual
9  who has access to Telemundo network using your wife's
10  password and credentials?
11    MS. SAROFSKY: Object to form.
12    THE WITNESS: No, ma'am.
13  BY MS. DYSON:
14    Q.  Do you have any knowledge of anyone accessing
15  the network in an unauthorized manner?
16    MS. DYSON: Object to form.
17    THE WITNESS: No, ma'am.
18  BY MS. DYSON:
19    Q.  Where you friends with Louis Roldan?
20    MS. SAROFSKY: Object to form.
21    THE WITNESS: No, I didn't know Louis Roldan.
22  We were acquaintances, I would say.  I did not get
23  a chance to know him.
24  BY MS. DYSON:
25    Q.  And how is it that you were acquaintances with

Page 155

1  Mr. Roldan?
2    MS. SAROFSKY: Object to form.
3    THE WITNESS: We might have been at one
4  engagement they had at the station, because I used
5  to go to all the events, but most I ever said to
6  him was hello, how are you, and that was it.  It
7  was -- it wasn't like with Alex Sanchez.
8  BY MS. DYSON:
9    Q.  Did you ever communicate with Mr. Roldan
10  directly?
11    MS. SAROFSKY: Object to form.
12    THE WITNESS: No, ma'am.
13  BY MS. DYSON:
14    Q.  Other than saying hello?
15    A.  No, ma'am.
16    Q.  Did you ever communicate with him
17  electronically, by e-mail, text message, otherwise?
18    MS. SAROFSKY: Object to form.
19    THE WITNESS: No, ma'am.
20  BY MS. DYSON:
21    Q.  I'm going to show you what is marked as
22  Exhibit 25. This is exhibit 61 from yesterday.  Do you
23  recognize this document?
24    (Defendants' Exhibit 25 marked for identification.)
25    A.  Yes, I do.

Page 156

1    Q.  What is it?
2    A.  It was a text message that I sent over to -- I
3  don't know if it was his -- if they are separated, but
4  it was -- I know at one time it was Luis' wife.
5    Q.  Why did you send this text message to Luis --
6  well, first, Luis is Luis Roldan, right?
7    A.  Luis Roldan, yes, I apologize.
8    Q.  That's okay.  Why did you send this text
9  message to Ms. Roldan's wife?
10    MS. SAROFSKY: Object to form.
11    THE WITNESS: At that time, we were trying --
12  with the case.  Like I mentioned prior, John Dill
13  had me acting as a paralegal for him because the
14  lack of his funds to help move on our case
15  properly.  I reached out to her.  As you see, it
16  said, "Good morning.  So sorry but we should talk."
17  Because I felt maybe hell has no fury as a woman
18  scorned, that she might give us impeachment
19  material, come to trial, testify, and give us
20  information against her former husband or current
21  husband.
22  BY MS. DYSON:
23    Q.  So Mr. Roldan's wife was Sandra Cuba -- is
24  Sandra Cuba, correct?
25    MS. SAROFSKY: Object to form.

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 157

1      THE WITNESS: If that's her name, correct.
2  BY MS. DYSON:
3      Q.  How is it that you got her phone number?
4      A.  I searched Google, and I found it.
5      Q.  And when is it that you sent this text
6  message?
7      A.  Pretty sure it was -- I don't know the exact
8  date, but it was Friday or Saturday morning at 9:06 a.m.
9      Q.  And was this immediately before the trial was
10  to begin in your personal injury action?
11      A.  Yes, that was after we picked the jury and the
12  attorney received the witness list later that evening,
13  on that Friday, and you know, was looking, trying to get
14  impeachment material that would impeach him.
15      Q.  And so you knew Mr. Roldan was going to
16  testify at that trial?
17      A.  Yes, ma'am.
18      MS. SAROFSKY: Object to form.
19  BY MS. DYSON:
20      Q.  And you knew that he was going to testify
21  adverse to you at that trial, correct?
22      MS. SAROFSKY: Object to form.
23      THE WITNESS: I can't answer how he was going
24  to testify, but I was taking a precaution.
25  BY MS. DYSON:

Page 158

1      Q.  And what precaution was that that you were
2  taking?
3      MS. SAROFSKY: Object to form.
4      THE WITNESS: Trying to get impeachment
5  material.
6  BY MS. DYSON:
7      Q.  And what impeachment material were you trying
8  to get by sending this text message to his wife?
9      MS. SAROFSKY: Object to form.
10      THE WITNESS: I was looking to sit down with
11  her, have Dill sit down with her if she was willing
12  to talk to him, and ask about his infidelities, if
13  she was aware of them, and whatever other
14  information she would have against her husband that
15  could impeach him.
16  BY MS. DYSON:
17      Q.  And what would any infidelities have in terms
18  of his testimony in your lawsuit?
19      MS. SAROFSKY: Object to form.
20      THE WITNESS: Show his character.
21  BY MS. DYSON:
22      Q.  And did Ms. Cuba respond to this e-mail?
23      MS. SAROFSKY: Object to form.
24      THE WITNESS: This text messages, yes, she
25  did.

Page 159

1  BY MS. DYSON:
2      Q.  You sent her an e-mail too, correct?
3      A.  I'm not sure if an e-mail -- yes, I'm pretty
4  sure an e-mail did go out.
5      Q.  I'll show you what's marked as Exhibit 26.
6      (Defendants' Exhibit 26 marked for identification.)
7      MS. SAROFSKY: And that was 62 yesterday?
8      MS. DYSON: That was 62.
9  BY MS. DYSON:
10      Q.  Do you recognize Exhibit 26?
11      A.  It's a screen shot of it looks like an e-mail,
12  but it's on text, so there's nothing there, but it is a
13  screen shot forwarded.
14      Q.  Did you send the e-mail below from Dominick
15  Russo to Dominick Cicale?
16      A.  Yes, more than likely I did, yes.
17      Q.  And did you send that e-mail from Dominic
18  Russo to Sandrahcuba@yahoo.com?
19      A.  If it's there, yes.  If -- you know, you could
20  show me the e-mail.
21      Q.  Do you see the e-mail on this page?
22      A.  Yes, yes, I do but it's blank.
23      Q.  Do you know if this e-mail forwarded an
24  attachment?
25      MS. SAROFSKY: Object to form.

Page 160

1      THE WITNESS: I don't know but I'm sure it
2  did.
3  BY MS. DYSON:
4      Q.  And was the attachment the same picture that's
5  in Exhibit 25?
6      A.  I'm sure it was.  I wasn't sure whether it was
7  her e-mail or her phone number at that time.  I was just
8  reaching out trying to see how I could get in touch with
9  her to try to have her speak with the attorneys and try
10  to get impeachment material, if need be, against her
11  husband, former husband.
12      Q.  And you only sent this text message and this
13  e-mail after you saw that Mr. Roldan was listed on the
14  witness list, correct?
15      MS. SAROFSKY: Object to form.
16      THE WITNESS: Yes.  The lawyer had me working
17  on various things even, getting the jury pool.  He
18  asked me to call the courts, get the jury pool for
19  him, so we could go over all the potential jurors.
20  He had me doing a lot of the work that I shouldn't
21  have been doing as his client.
22  BY MS. DYSON:
23      Q.  This picture that you sent to Ms. Cuba, where
24  did you get that picture?
25      MS. SAROFSKY: Object to form.

Page 161

1    THE WITNESS: I'm not sure. It probably came
2  from one of the -- maybe their Facebook page or one
3  of the gallery photos, but I did crop it with them.
4  I'm pretty sure there was other people in the
5  photo.
6  BY MS. DYSON:
7    Q. And why is it that you cropped this picture?
8    MS. SAROFSKY: Object to form.
9    THE WITNESS: At that time, maybe to show her,
10  like, look at them two together. I -- you know,
11  again, I sent it to her. We were trying to get
12  impeachment material and to have her come to the
13  trial, and that's what I had texted my attorney
14  after doing so.
15  BY MS. DYSON:
16    Q. I'm sorry, what? You texted your attorney
17  what?
18    A. Well, that's attorney-client privilege.
19    MS. SAROFSKY: I was just going to advise you
20  not to reveal any privileged communications between
21  you and your counsel.
22  BY MS. DYSON:
23    Q. Okay. Then what is it -- why did you
24  reference texting your attorney?
25    MS. SAROFSKY: Object to form.

Page 162

1    THE WITNESS: Attorney-client privilege. I'm
2  not answering it.
3  BY MS. DYSON:
4    Q. Okay. Well, after you sent this text message,
5  did you send a text message to your attorney?
6    A. Again, whatever I sent to my attorney is
7  attorney-client privilege.
8    Q. The fact that you communicated with him is
9  not. So did you send a text message to John Dill after
10  you sent this text message to Ms. Cuba?
11    MS. SAROFSKY: Object to form. You can
12  answer.
13    THE WITNESS: Yes, I did send a text message.
14  BY MS. DYSON:
15    Q. And did you speak to Mr. Dill?
16    MS. SAROFSKY: Object to form. You can
17  answer.
18    THE WITNESS: No.
19  BY MS. DYSON:
20    Q. And so in sending this text message to
21  Ms. Cuba and cropping the picture the way you did, you
22  were trying to make it look like Mr. Roldan was having
23  an affair with the person depicted in this photo?
24    MS. SAROFSKY: Object to form.
25    THE WITNESS: Yes.

Page 163

1  BY MS. DYSON:
2    Q. And did this -- so Ms. Cuba, she responds to
3  the text message saying, "Who is this," correct?
4    A. That's correct.
5    MS. SAROFSKY: Object to form.
6  BY MS. DYSON:
7    Q. Is there any other communication with her?
8    A. No, ma'am.
9    Q. And are you aware that Mr. Dill has stated in
10  a hearing in open court that this --
11    MS. SAROFSKY: Object to form.
12    Q. -- sending -- I haven't even asked the
13  question yet. That sending this e-mail and text message
14  was witness intimidation?
15    MS. SAROFSKY: Object to form.
16    THE WITNESS: Am I aware?
17  BY MS. DYSON:
18    Q. Yes.
19    A. Yes.
20    Q. And you're also aware that Mr. Roldan didn't
21  support you and your wife's claims in the personal
22  injury action, correct?
23    MS. DYSON: Object to form.
24    THE WITNESS: I'm not aware of what he was
25  supportive of.

Page 164

1  BY MS. DYSON:
2    Q. You didn't recall his deposition being taken
3  in the personal injury?
4    MS. SAROFSKY: Object to form.
5    THE WITNESS: I know it was taken, but I
6  really don't recall what he was -- I do recall he
7  really had nothing good to say about my wife.
8  BY MS. DYSON:
9    Q. And you recall that he was listed as a defense
10  witness on the trial witness list, correct?
11    A. Yes, that evening I recall that, yes.
12    Q. I will show you what is marked as Exhibit 27.
13  (Defendants' Exhibit 27 marked for identification.)
14    Q. Do you recognize this document, sir?
15    A. Yes, ma'am.
16    Q. Is this the subpoena that you received to come
17  today, correct?
18    A. Yes, ma'am, that's correct.
19    Q. And in the request for documents in number
20  one, it asks for any documents or communications that
21  you've had with Mr. Roldan. Do you have any
22  documentation of communications with Mr. Roldan?
23    MS. SAROFSKY: Object to form.
24    THE WITNESS: No, ma'am, I do not.
25  BY MS. DYSON:

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 165

1    Q.  And the second, it asks you for documentation
2   regarding correspondence, communications, and
3   conversations with Ms. Cuba.  Do you have documentation
4   of communication that you had with Ms. Cuba?
5        MS. SAROFSKY:  Object to form.
6        THE WITNESS:  Right now, you're asking?
7   BY MS. DYSON:
8    Q.  Yes, do you have in your possession, not that
9   you brought them today.  Do you have documents, does it
10  exist --
11   A.  Right.
12   Q.  -- documentation that you have?
13   A.  Yes, what I've sent her.  Obviously, I didn't
14  erase anything.
15   Q.  And other than what's in Exhibits 25 and 26,
16  is there any other communications?
17   A.  No.
18       MS. SAROFSKY:  Object to form.
19       THE WITNESS:  I'm not sure, but whatever I
20  have, I didn't erase anything.
21  BY MS. DYSON:
22   Q.  And did Ms. Cuba, other than responding,
23  "Who's this," did you have any conversations with her
24  with respect to the text message in Exhibit 25?
25       MS. SAROFSKY:  Object to form.

Page 166

1        THE WITNESS:  No, ma'am.
2   BY MS. DYSON:
3    Q.  And did Ms. Cuba respond to your e-mail in
4   Exhibit 26?
5        MS. SAROFSKY:  Object to form.
6        THE WITNESS:  Best of my knowledge, there was
7   no response.  I'm not sure.
8   BY MS. DYSON:
9    Q.  And on Exhibit 27 in category number three, it
10  asks for any communications or correspondence with
11  individuals on the initial disclosures.
12       MS. SAROFSKY:  Object to form.
13  BY MS. DYSON:
14   Q.  Do you have any communications with Anibal
15  Soto?
16       MS. SAROFSKY:  Object to form.
17       THE WITNESS:  Yes.
18  BY MS. DYSON:
19   Q.  Do you have any communications with Leslie Sierra?
20       MS. SAROFSKY:  Object to form.
21       THE WITNESS:  No, not that I'm aware of.
22  BY MS. DYSON:
23   Q.  Did you have any communications with Michael
24  Chico?
25       MS. SAROFSKY:  Object to form.

Page 167

1        THE WITNESS:  Don't recall that name.
2   BY MS. DYSON:
3    Q.  Did you have any communications with Patty
4   Lewis?
5        MS. SAROFSKY:  Object to form.
6        THE WITNESS:  Don't recall that name.
7   BY MS. DYSON:
8    Q.  Did you have any communications with Alex
9   Sanchez?
10       MS. SAROFSKY:  Object to form.
11       THE WITNESS:  Yes.
12  BY MS. DYSON:
13   Q.  Did you have any communications with Normand
14  Levy?
15       MS. SAROFSKY:  Object to form.
16       THE WITNESS:  Not sure.
17  BY MS. DYSON:
18   Q.  Did you have any communications with Olga
19  Aymat?
20       MS. SAROFSKY:  Object to form.
21       THE WITNESS:  Not sure.
22  BY MS. DYSON:
23   Q.  Did you have any communications with Sofia
24  Jaca?
25       MS. SAROFSKY:  Object to form.

Page 168

1        THE WITNESS:  Not sure.
2   BY MS. DYSON:
3    Q.  Did you have any communications with Eduardo
4   Echenique.  I'm sure I'm mispronouncing his name.  He's
5   on page 4 of the --
6    A.  Yes, I see.  Yes.
7        MS. SAROFSKY:  Object to form.
8        THE WITNESS:  Yes.
9   BY MS. DYSON:
10   Q.  What types of communications would you have
11  with him?
12       MS. SAROFSKY:  Object to form.
13       THE WITNESS:  How are you doing, Happy
14  Birthday, Merry Christmas, Happy Thanksgiving,
15  how's the dog.
16  BY MS. DYSON:
17   Q.  Is he a friend of yours?
18       MS. SAROFSKY:  Object to form.
19       THE WITNESS:  Acquaintance.
20  BY MS. DYSON:
21   Q.  Did you have any communications about
22  Telemundo Network?
23       MS. SAROFSKY:  Object to form.
24       THE WITNESS:  No.
25  BY MS. DYSON:

42 (Pages 165 to 168)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 169

1          Q.   Did you have any communications with Bianca
2     Diaz?
3               MS. SAROFSKY:  Object to form.
4               THE WITNESS:  Yes.
5     BY MS. DYSON:
6          Q.   And what type of communications did you have
7     with Ms. Diaz.
8          A.   Same thing, how you doing, you know.
9          Q.   Is she -- is Ms. Diaz a friend of yours?
10              MS. SAROFSKY:  Object to form.
11              THE WITNESS:  Acquaintance.
12    BY MS. DYSON:
13         Q.   Did you have any communications with Toni
14    Scavone?
15              MS. SAROFSKY:  Object to form.
16              THE WITNESS:  I'm not sure.
17    BY MS. DYSON:
18         Q.   Did you have any communications with Valeska
19    Gill?
20              MS. SAROFSKY:  Object to form.
21              THE WITNESS:  Yes, I think so, yes.
22    BY MS. DYSON:
23         Q.   And what type of communications did you have
24    with Ms. Gill?
25              MS. SAROFSKY:  Object to form.

Page 170

1               THE WITNESS:  How are you, how are you doing,
2     congratulations, just -- Merry Christmas.
3     BY MS. DYSON:
4          Q.   Did you have a communications about Telemundo
5     Network with Ms. Gill?
6               MS. SAROFSKY:  Object to form.
7               THE WITNESS:  I'm not sure.
8     BY MS. DYSON:
9          Q.   Was Ms. Gill a friend of yours or is a friend
10    of yours?
11         A.   Acquaintance.
12         Q.   Did you have any communications with Jesus
13    Collado?
14              MS. SAROFSKY:  Object to form.
15              THE WITNESS:  I'm not sure.
16    BY MS. DYSON:
17         Q.   Did you have communications with David
18    Degranreid?
19              MS. SAROFSKY:  Object to form.
20              THE WITNESS:  I'm not sure.
21    BY MS. DYSON:
22         Q.   Did you have any communications with Grace
23    Negron?
24         A.   I'm not sure.
25         Q.   Did you have any communications with Joseph

Page 171

1     Prusa?
2               THE WITNESS:  I'm not sure.
3               MS. SAROFSKY:  Object to form.  Sorry.
4     BY MS. DYSON:
5          Q.   Did you have any communications with Heather
6     Chiasson?
7               MS. SAROFSKY:  Object to form.
8               THE WITNESS:  I'm not sure, no.
9     BY MS. DYSON:
10         Q.   Other than your attorney, did you communicate
11    with anyone about this subpoena that was served on you?
12              MS. SAROFSKY:  Object to form.
13              THE WITNESS:  No, you asked me that earlier
14    and I answered it.
15    BY MS. DYSON:
16         Q.   I asked you about the deposition.  I was
17    asking -- I'm asking about the subpoena.
18         A.   Okay.  Whoa, no.
19         Q.   Okay.  Did you have any communications with --
20    other that your attorney, about this lawsuit?
21              MS. SAROFSKY:  Object to form.
22              THE WITNESS:  Could you repeat that, please?
23    BY MS. DYSON:
24         Q.   Sure.  Have you had any communications with
25    any individual other than your attorney about this

Page 172

1     lawsuit?
2          A.   About this lawsuit, no.
3          Q.   Do you have any documents in your possession
4     that were created, maintained, kept or appearing in any
5     file in or on any electronic system used by the
6     defendants?
7               MS. SAROFSKY:  Object to form.
8               THE WITNESS:  I'm not sure.
9     BY MS. DYSON:
10         Q.   At the time that you sent exhibits --
11         A.   Oh, I apologize.  The question before that you
12    asked about did I mention anything about the lawsuit?
13         Q.   Did you have any communications with any
14    individual other than your attorneys about this lawsuit?
15         A.   Yes.
16         Q.   Who is it that you communicated with?
17         A.   Yehuda Caploon.
18         Q.   What communications did you have with Yehuda
19    Caploon about this lawsuit?
20              MS. SAROFSKY:  Object to form.
21              THE WITNESS:  Yehuda Caploon had -- has a
22    relationship with Armstrong Williams and just
23    asking him -- mentioning to him what type of --
24    that's just disgusting what went on at the
25    organization and how NBC is allowing it.

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 173

1    BY MS. DYSON:
2        Q.   Who is Armstrong Williams?
3            MS. SAROFSKY:  Object to form.
4            THE WITNESS:  Supposedly, he's one of the --
5    he owns a bunch of NBC stations.
6    BY MS. DYSON:
7        Q.   So you discussed the lawsuit with Yehuda
8    Caploon who discussed it with Armstrong Williams?
9        A.   No, I didn't discuss the lawsuit --
10           MS. SAROFSKY:  Object to form.
11           THE WITNESS:  I discussed what was out there
12   in the documentation that was filed with the
13   lawsuit, so.
14   BY MS. DYSON:
15       Q.   What do you mean by that?
16       A.   I forward --
17           MS. SAROFSKY:  Object to form.  You can answer
18   to the extent that you are capable.
19           THE WITNESS:  I sent him the documentation
20   that was in public record and telling him this is a
21   disgrace what's going on.
22   BY MS. DYSON:
23       Q.   What documentation do you mean?
24           MS. SAROFSKY:  Object to form.
25           THE WITNESS:  The lawsuit that was filed.

Page 174

1    BY MS. DYSON:
2        Q.   The Complaint?
3        A.   The Complaint, if that's what it was, yes.
4        Q.   And when was it that you had that
5    communication?
6        A.   Whenever it was filed a year ago that it was
7    made public, the Complaint, six months ago, more than
8    that.
9            MS. SAROFSKY:  Object to form.
10           THE WITNESS:  Whenever it was --
11   BY MS. DYSON:
12       Q.   What you sent, the Exhibits 25 and 26, at the
13   time that you sent that, that was this year, correct?
14       A.   Yes, ma'am.
15       Q.   Do you remember the date that the trial had
16   started in the personal injury action?
17           MS. SAROFSKY:  Object to form.
18           THE WITNESS:  We picked the jury, it was a
19   Friday, and this was on a Saturday, Saturday
20   morning.  I don't know the exact date.  I think it
21   was maybe June, June 12th.  I'm not sure of the
22   exact date.
23   BY MS. DYSON:
24       Q.   And at the time that you sent the text message
25   and the e-mail message, you understood that Mr. Roldan

Page 175

1    was going to be a witness in this action too, correct?
2            MS. SAROFSKY:  Asked and answered.
3            THE WITNESS:  Yes.
4            MS. DYSON:  Let's take a break.
5            (Recess.)
6    BY MS. DYSON:
7        Q.   Do you know who Leslie Sierra is?
8        A.   Yes, I do.
9        Q.   And have you spoken to her before?
10       A.   Hello, goodbye, how are you.  Just normal --
11   nothing intense or detailed that I can recall.
12       Q.   Do you know Michael Chico is?
13           MS. SAROFSKY:  Object to form.
14           THE WITNESS:  Not familiar with the name.
15   BY MS. DYSON:
16       Q.   Do know who Patty Lewis is?
17           MS. SAROFSKY:  Object to form.
18           THE WITNESS:  I'm not familiar with the name.
19   BY MS. DYSON:
20       Q.   Do you know who Normand Levy is?
21           MS. SAROFSKY:  Object to form.
22           THE WITNESS:  Yes, I do.
23   BY MS. DYSON:
24       Q.   And have you spoken to him before?
25       A.   Yes, I have.

Page 176

1        Q.   And what type of conversations have you had
2    with him?
3        A.   How are you, how have you been doing.  I knew
4    him prior to Telemundo.
5        Q.   And how is it that you know him prior to
6    Telemundo?
7        A.   At one of the events, my wife had introduced
8    me to.
9        Q.   Do you know who Olga Aymat is?
10           MS. SAROFSKY:  Object to form.
11           THE WITNESS:  Yes, I do.
12   BY MS. DYSON:
13       Q.   And have you had any communications with her?
14       A.   Just conversations of -- you know, just small
15   talk.
16           MS. SAROFSKY:  Object to form.
17   BY MS. DYSON:
18       Q.   And Sofia Jaca, do you know who that is?
19           MS. SAROFSKY:  Object to form.
20           THE WITNESS:  I think so.  I'm not sure.
21   BY MS. DYSON:
22       Q.   Do you know if you've had any conversations
23   with her?
24       A.   If I do, it was small talk.
25       Q.   Do you know who David Degraffenreid?

44  (Pages 173 to 176)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 177

| 1 | MS. SAROFSKY: Object to form. |
| 2 | THE WITNESS: I'm not sure. |
| 3 | MS. SAROFSKY: Can you spell that name? |
| 4 | MS. DYSON: D-E-G-R-A-F-F-E-N-R-E-I-D. |
| 5 | BY MS. DYSON: |
| 6 | Q. Does that help you at all, me spelling the |
| 7 | name? |
| 8 | A. No, I -- |
| 9 | MS. SAROFSKY: D-R-A-F-F-E-N- |
| 10 | MS. DYSON: R-E-I-D. |
| 11 | MS. SAROFSKY: Thank you. Sorry. |
| 12 | BY MS. DYSON: |
| 13 | Q. You testified you don't know who that is? |
| 14 | A. I'm not sure if I do or don't. If anything, |
| 15 | it was small talk. |
| 16 | Q. Do you know who Jesus Collado is? |
| 17 | MS. SAROFSKY: Object to form. |
| 18 | THE WITNESS: I'm not sure of that person. |
| 19 | BY MS. DYSON: |
| 20 | Q. Do you know who Grace Negron is? |
| 21 | MS. SAROFSKY: Object to form. |
| 22 | THE WITNESS: If it's the Grace I'm thinking, |
| 23 | yes. |
| 24 | BY MS. DYSON: |
| 25 | Q. And who is the Grace you're think of? How do |

Page 178

| 1 | you know her? |
| 2 | A. She has red hair. |
| 3 | Q. In what way do you know her? |
| 4 | A. At Telemundo. Just at social events, casual |
| 5 | talk, small talk. |
| 6 | Q. Do you know who Joseph Prusa is? |
| 7 | MS. SAROFSKY: Object to form. |
| 8 | THE WITNESS: I'm not sure of the name. If |
| 9 | anything, it would be small talk if I did. |
| 10 | BY MS. DYSON: |
| 11 | Q. And Heather Chiasson, do know who that is? |
| 12 | MS. SAROFSKY: Object to form. |
| 13 | THE WITNESS: Doesn't -- the name, no. |
| 14 | BY MS. DYSON: |
| 15 | Q. So is there anything that you need to change |
| 16 | or revise with respect to your testimony today? |
| 17 | MS. SAROFSKY: Object to form. |
| 18 | THE WITNESS: That I'm aware of. I answered |
| 19 | to the best of my ability and my recollection. |
| 20 | MS. DYSON: I have no further questions. |
| 21 | MS. SAROFSKY: I don't have any questions. |
| 22 | THE COURT REPORTER: Read or waive? |
| 23 | MS. SAROFSKY: Read, yes. |
| 24 | THE COURT REPORTER: Are you ordering? |
| 25 | MS. DYSON: Yes. |

Page 179

| 1 | THE COURT REPORTER: Copy? |
| 2 | MS. SAROFSKY: Yes. |
| 3 | (Deposition concluded at 1:08 p.m.) |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 180

| 1 | CERTIFICATE OF OATH |
| 2 | STATE OF FLORIDA |
| 3 | COUNTY OF ORANGE |
| 4 | I, Deborah Londos, Court Reporter, and Notary |
| 5 | Public in and for the State of Florida at large, hereby |
| 6 | certify that the witness named herein appeared before me |
| 7 | on September 23, 2021, produced a Florida Driver's |
| 8 | License, and was duly sworn. |
| 9 | WITNESS my hand and official seal this 23rd |
| 10 | day of September, 2021. |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | _DEBORAH LONDOS_____ |
| 18 | DEBORAH LONDOS |
| 19 | NOTARY PUBLIC - STATE OF FLORIDA |
| 20 | MY COMMISSION NO. HH 36966 |
| 21 | EXPIRES: 08/26/2024 |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

45 (Pages 177 to 180)

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 181

1      CERTIFICATE OF REPORTER
2   STATE OF FLORIDA
3   COUNTY OF ORANGE
4        I, Deborah Londos, Court Reporter, certify
5   that I was authorized to and did verbatim report the
6   examination of the witness named herein; that a review
7   of the transcript was requested; and that the foregoing
8   transcript is a true record of my verbatim record.
9        I FURTHER CERTIFY that I am not a relative,
10  employee, attorney, or counsel of any of the parties,
11  nor am I a relative or employee of any of the parties'
12  attorney or counsel connected with the action, nor am I
13  financially interested in the outcome of this action.
14       Dated this 2nd day of October 2021, at
15  Orlando, Orlando County, Florida.
16
17
18
19        DEBORAH LONDOS_____
20        Deborah Londos
          Court Reporter
21
22
23
24
25

Page 182

1          ANTHEM REPORTING
           101 SOUTH FRANKLIN STREET, SUITE 101
2          TAMPA, FL 33602
3   October 2, 2021
    MAHRA SAROFSKY, ESQUIRE
4   Slusher & Rosenblum, P.A.
    444 W. Railroad Avenue, Suite 470
5   West Palm Beach, Florida 33401
6
7   IN RE: SANTANA vs. TELEMUNDO NETWORK, ET AL
8   Dear MS. SAROFSKY,
9   This letter is to advise you that the transcript of your
    client, DOMINICK CICALE, taken in the above-styled case
10  on September 23, 2021, has been completed and is
    awaiting his reading and signing.
11
12  Please have him contact our office at (813) 272-2720 to
    make arrangements to read and sign his deposition
13  transcript. Our office hours are 9:00 a.m. to 5:00
    p.m., Monday through Friday.
14
15  If the transcript is not signed by the witness in 30
    days after this letter has been furnished, we will then
16  process the transcript without a signed errata page. If
    your client wishes to waive her signature, please have
    her sign her name at the bottom of this letter and
17  return it to our office at 101 South Franklin Street,
    Suite 101, Tampa, FL 33602.
18
19  Your prompt attention to this matter is appreciated.
20      Sincerely,
21      Deborah Londos, Court Reporter
22
23  I do hereby waive my right to read and sign.
24  _____
25  DOMINICK CICALE

Page 183

1      ERRATA SHEET
2   DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES ON THIS PAGE
3   SANTANA vs. TELEMUNDO NETWORK, ET AL
4
5   CASE NO.: 6:28-CV-1157-ORL-78LRH
    DEPOSITION OF: DOMINICK CICALE
6   TAKEN:  September 23, 2021
7
8   PAGE #/LINE #    CHANGE         REASON
9
10
11
12
13
14
15
16
17
18
19
20  Under penalties of perjury, I declare that I have read
    the foregoing document and that the facts stated in it
21  are true.
22
23  -------------------------   -----------
    DOMINICK CICALE              Date
24
25

1ed1556e-144b-432d-9d78-0daf17239fe6

Page 1

IN THE CIRCUIT COURT, NINTH JUDICIAL CIRCUIT,
IN AND FOR ORANGE COUNTY, FLORIDA

CASE NO.:   2017-CA-003664-O

DOMINICK CICALE AND
MATILDE SANTANA,

        Plaintiffs,

vs.

COLSTAR TRANSPORTATION SERVICES, INC.,

        Defendant.

_____/

DEPOSITION OF:      DOMINICK CICALE

DATE:               WEDNESDAY, FEBRUARY 19, 2020

TIME:               10:31 A.M. - 11:07 A.M.

PLACE:              JOHN W. DILL, P.A.
                    941 WEST MORSE BOULEVARD
                    SUITE 100
                    WINTER PARK, FLORIDA 32789
STENOGRAPHICALLY
REPORTED BY:        ANNIE M. ZUCCARELLI





302841

Page 2

```
 1    A P P E A R A N C E S:
 2    JOHN W. DILL, ESQUIRE
      OF: JOHN W. DILL, P.A.
 3        941 West Morse Boulevard
          Suite 100
 4        Winter Park, Florida 32789
          (321) 214-4799
 5        John@johnwdill.com
          APPEARING ON BEHALF OF THE PLAINTIFFS
 6
      JOHN M. BRINGARDNER, ESQUIRE
 7    OF: LUKS, SANTANIELLO, PETRILLO & COHEN
          255 South Orange Avenue
 8        Suite 750
          Orlando, Florida 32801
 9        (407) 540-9170
          Jbringardner@insurancedefense.net
10        APPEARING ON BEHALF OF THE DEFENDANT
11    ALSO PRESENT:
12    Matilde Santana - Plaintiff
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 3

1                    I N D E X

2    TESTIMONY OF DOMINICK CICALE

3    EXAMINATION BY MR. BRINGARDNER.......................04

4    CERTIFICATE OF OATH..................................34

5    CERTIFICATE OF DEPOSITION TRANSCRIPT.................35

6

7                    INDEX OF EXHIBITS

8    DEFENDANT'S EXHIBITS

9

10                   (NONE MARKED)

11

12

13

14                   ------

15             S T I P U L A T I O N

16       It is hereby stipulated and agreed by and between

17   the counsel for the respective parties and the deponent

18   that the reading and signing of the deposition

19   transcript be waived.

20                   ------

21

22

23

24

25



Page 4

```
 1                   P R O C E E D I N G S

 2                      * * * * * * * * *

 3           COURT REPORTER:  Would you raise your right

 4      hand, please?

 5           Do you swear or affirm that the testimony

 6      you're about to give in this case is the truth, the

 7      whole truth and nothing but the truth?

 8           THE WITNESS:  I do.

 9                          EXAMINATION

10  BY MR. BRINGARDNER:

11      Q.   Mr. Cicale, my name is John Bringardner, I

12  represent Colestar Bus.  I introduced myself a few

13  minutes ago.  This is a follow-up deposition, just an

14  update since your last deposition, it's been a bit of a

15  time since then.

16      A.   Yes.

17      Q.   So I hope to get us in and out of here quickly.

18  I'm going to talk, primarily, about some medical

19  appointments that you've had or treatments, since your

20  last deposition, and I have that as September of 2017,

21  so I've got a list of things to help you remember that.

22      A.   Okay.

23      Q.   And then some other follow-up questions just

24  about your current medical condition and stuff like

25  that.
```



302844

Page 5

1    A.   Okay.

2    Q.   So very similar to what we did last time, if

3    there's any question that you don't understand, I'll

4    rephrase it for us, okay?

5    A.   Thank you, sir.

6    Q.   Excellent.  Let me ask you, why don't we just

7    start off with you describing your general health today.

8    How are you doing?

9    A.   My health today, the surgeries were successful.

10   I have my good days and bad days, more good than bad.  I

11   started going back to the gym, working out.  I do have a

12   lot of limitations and there are activities that I can

13   no longer do, which I used to love doing all the time.

14   But, overall, I have to say the procedures were

15   successful.

16   Q.   Why don't you tell us about some of the things

17   that you used to be able to do that you can no longer

18   do.

19   A.   I used to love jogging.  Probably about four or

20   five days a week, I would jog five miles a day, prior.

21   Playing basketball, can't do that anymore, the jumping.

22   The doctors advise that I stay away from jogging and

23   basketball because of the pounding where the fusion was

24   in my lower back.

25        Neck limitations, my neck is pretty good, as



Page 6

1    far as -- at times, it will get stiff, but other than

2    that, I'm fairly happy with the procedures.

3         Q.   Is there anything that you've seen that causes

4    or precipitates your neck to become stiff?

5         A.   No, I haven't pinpointed anything,

6    specifically.  Again, even at the gym, I watch, I'm not

7    lifting as heavy as I used to lift.  So I'm pretty

8    careful, especially in the gym.

9              But there might be some mornings when I wake up

10   or if I'm driving for a long period of time, and it

11   doesn't occur all the time, periodically, so but, like I

12   said, overall, I'm happy.

13        Q.   Glad to hear that.

14        A.   Thank you.

15        Q.   How frequently do you wake up and feel that

16   stiffness in your neck?

17        A.   I don't know, maybe, a couple of times a month.

18   I haven't really analyzed it that way or taken notice to

19   give you an accurate answer.

20        Q.   That's fine.  Would it be fair to say that, on

21   a general basis, about two or three times a month, you

22   notice stiffness?

23        A.   I'd say probably so, if that.  Like I said, I

24   haven't been -- I didn't clock it that way.

25        Q.   Sure.  I understand that.  I'm just trying to



Page 7

1   get a general feel for that.  In terms of your lower

2   back, have you had any numbness, pain, stiffness, in

3   your lower back?

4       A.   I do get sometimes burning sensation around my

5   hip area, or the other day, I think it was my right side

6   that was tight, but the following day, it lets up.

7   After a few days, I'm back to normal.

8       Q.   Do you do any stretching or anything like that

9   to help with it?

10      A.   No, I'll stretch -- not really stretch, but,

11  you know, just move around a little bit.  I'll try to

12  rest when I know, maybe I overdid it the day before.  So

13  I'll just try to relax to take the burn away or just to

14  relieve the pressure, I guess, you call it.

15      Q.   Okay.  And, again, how frequently do you notice

16  that in a month?

17      A.   Again, maybe once, twice, if that.

18      Q.   I'm going to go through a list of different

19  procedures that you've had since your last deposition

20  and what I'm looking for, basically, anything that you

21  may remember about that particular treatment, if you

22  were told anything that was going on or anything like

23  that, very broad questions, okay?

24      A.   Okay.

25      Q.   So in January of 2018, I think, Dr. Thomas sent



302847

Page 8

1    you for an MRI of your back; do you remember going for

2    that?

3         A.   If it was after the procedure, yes.

4         Q.   Okay.  Actually, it's before the procedure, so

5    I know that you had one before and one after.  So before

6    the procedure, do you remember talking to Dr. Thomas, at

7    all, about what he found on the MRI?

8         A.   No, not really.  I know he just said that I

9    need surgery.

10        Q.   Leading up to the surgery, which was in April

11   of 2018, I know you had a couple of meetings with

12   Dr. Thomas.  What did he tell you was going on with your

13   back?

14        A.   Just that, I know from seeing the chiropractor,

15   he wasn't able to calm my lower back down.  He said I

16   was, basically, at -- best of my recollection, I was at

17   a point of no return, as far as him trying to relieve

18   the pain and pressure.

19             And Dr. Thomas felt the same way at that point,

20   that there was, basically, nothing else that could be

21   done, other than surgery.  I really didn't want a lumbar

22   fusion, because from what I was told, your discs that

23   are above and below, it deteriorates that much quicker,

24   because of the strain of the fusion.

25        Q.   So you knew you were going in for a one-level



Page 9

1    fusion of your lower back; is that what you understood?

2       A.   Yes, sir.  That's correct.

3       Q.   And did Dr. Thomas explain to you that one of

4    the consequences or potential consequences of this

5    surgery is that some of your other vertebra could

6    deteriorate quicker?

7       A.   Yes, he did.

8       Q.   Did he, at any time, tell you that he noticed

9    that there was a degenerative condition in your back

10   anywhere in your spine?

11      A.   I think he did, to the best of my recollection,

12   but I'm not sure.

13      Q.   Other than Dr. Thomas, did any other doctor

14   tell you that they noticed that you had a degenerative

15   condition in your spine?

16      A.   Again, I'm not too sure about that to answer it

17   accurately.

18      Q.   Well, let me give the you a timeframe, in July

19   of 2017, which was before your last deposition, I think

20   you had elbow surgery.

21      A.   Okay.

22      Q.   And then I think, at your last deposition, you

23   were -- I think you testified that you were still having

24   some problems with your elbow.  Have you continued to

25   have problems with your elbow?



Page 10

1      A.   Yes, sir.

2      Q.   Tell us about that.

3      A.   If I'm in the shower and I just let the hot

4   water hit me, usually I'll let it hit my back.  I'll

5   stand there for maybe about five to ten minutes and I'll

6   keep my arms behind my back.  When I bring them forward,

7   my left elbow and arm is numb.  I it takes, maybe, 30 or

8   40 seconds for, I guess, the blood or the numbness to go

9   away.  Every once in a while, I'll get phantom pain, it

10  feels like phantom pain.

11     Q.   Tell us about that.

12     A.   It's just like a nerve pain, you can feel it.

13  I do, once in a while, get numbness from my pinky area

14  to my wrist, but as Dr. Thomas explained, I saw another

15  doctor, Shapiro, who wanted to do the follow-up surgery.

16  Dr. Thomas advised me that he recommended that I do not

17  do the second surgery, because it could cause more harm

18  than good touching the nerve a second time, so I opted

19  not to have that surgery.

20     Q.   Okay.  Is it fair to say that the level of pain

21  or the discomfort that you have or the level that you

22  have, you felt it was better to live with that than have

23  surgery?

24     A.   Yes, definitely.  It's not even pain, I would

25  say discomfort once in a while.



Page 11

1    Q.    I think you mentioned Dr. Shapiro, he did

2  recommend some additional revision surgery, is that what

3  he called it?

4    A.    Yes, he did.  And Dr. Thomas, when I asked him

5  his opinion, he told me if it was him, he would not get

6  the surgery, as long as it's not painful, it's just

7  discomfort, because more than likely, I'm touching the

8  nerve a second time, it could definitely cause nerve

9  damage and numbness throughout, which --

10    Q.    Which you chose not to do?

11    A.    Yes.  And I appreciate his honesty with that.

12    Q.    I understand.  Following, I think, some of

13  these visits with Dr. Shapiro in April, you had the low

14  back surgery, the lumbar surgery?

15    A.    If it was April, yes, sir.  I'm not sure it was

16  April.

17    Q.    What do you remember about that surgery?

18    A.    I was at Celebration Florida Hospital, that's

19  the hospital.

20    Q.    Okay.

21    A.    Afterwards, I was in a lot of pain.  I,

22  basically, remained in bed for about six to eight weeks.

23  Pain medications.  I didn't get out of the bed and my

24  wife would joke with me, like, are you ever going to get

25  out of that bed?  And I was like, no.  I was more



302851

Page 12

1   fearful of the fusion not taking.  So I was very careful

2   to remain in bed and just let my body heal itself.

3       Q.   Was that Dr. Thomas' direction for you to stay

4   in bed until you felt like --

5       A.   Yes.  Take it very -- it was much different

6   than my neck surgery.  My neck surgery, he said, I want

7   you to move your neck like nothing happened, I don't

8   want you to lift weights or do anything strenuous, just

9   normal everyday moments.  My lower back, he was like, I

10  want you to rest.

11      Q.   So for a period of time of six to eight weeks,

12  you were in bed and then at some point in time, you

13  started going to physical therapy; is that right?

14      A.   Yes.

15      Q.   Tell us about that.

16      A.   It was pretty helpful, I would say.  Just

17  getting comfortable with my body again and the

18  movements.  At first, I was leery of the moments,

19  because, like I said, I wanted the fusion to adhere, and

20  they were like, no, go ahead.  They were telling me and

21  encouraging me to go ahead, that I'm not going to hurt

22  myself.

23      Q.   What type of things did they have you do during

24  physical therapy?

25      A.   They had me walk on a treadmill to warm up.



Page 13

1    They did a lot of stretching movements, massaging, band

2    movements, eventually.  They gradually worked me up.

3        Q.   Did you have any period of time, during the

4    time you were going to physical therapy, where you felt

5    like there was any additional pain that you should not

6    be experiencing to your back?

7        A.   I'm not really sure back then, but I'm sure I

8    had some days, maybe I overexerted in therapy, but,

9    overall, I'm very happy with the outcome of everything.

10       Q.   Okay.  In June, so this is after your physical

11   therapy or actually during your physical therapy, we set

12   up an appointment for you to see Dr. Halperin, our

13   doctor that looked at your elbow; do you remember that?

14       A.   Yes.

15       Q.   What do you remember about that visit with

16   Dr. Halperin?

17       A.   I think he checked my strength, range of

18   motion, tried touching me.  It's very sensitive in the

19   area of the elbow where if you tap it, I received like a

20   shock of pain, like if you hit your funny bone, but

21   that's, basically, it.  And he viewed me.  I'm pretty

22   sure we videotaped that, it was videotaped, that

23   examination.

24       Q.   Did he have any discussions with you about his

25   findings or what he thought was going on?



302853

Page 14

1    A.   I'm not sure.  I don't remember if he did or

2  didn't.

3    Q.   Okay.  And then I think, right after that,

4  there was another examination by one of our experts,

5  Dr. Goll; do you remember him?

6    A.   Yes.

7    Q.   Tell us what you am remember about your

8  examination with Dr. Goll.

9    A.   Well, I wouldn't call it an examination because

10  he never touched me.  He took X-rays, asked me a bunch

11  of questions.  I was there, maybe, about 45/50 minutes.

12      At the end, he left the room came back, asked

13  me more questions.  Best of my recollection, came back

14  in and then released me without examining me, physically

15  touching me.

16    Q.  Were you ever told that you were inadvertently

17  let go early, that he was expecting to do an examination

18  and there was --

19    A.   No, he let me go.

20    Q.   He let you go?

21    A.   Yes, he said we were done.  He was the one that

22  released me from the examination.

23    Q.   Was there anybody in the room when he told you

24  we're done?

25    A.   The video guy.



Page 15

1        Q.    Do you know if that was on the video?

2        A.    I'm not sure.  I didn't see the video.

3        Q.    What kind of questions do you remember him

4   asking you?

5        A.    I'm really not sure if he asked me about my

6   prior accident.  I'm not sure.  Just, I guess, general

7   questions about -- I don't want to answer something or

8   say something that I'm not too sure about.

9        Q.    That's fine.  And this is not a memory test or

10   anything else.

11        A.    Right.

12        Q.    That's all I want to know is what you know and

13   what you might be saying at trial, that's all I'm here

14   to find out.

15              Have you told us everything that you remember

16   about your visit with Dr. Goll?

17        A.    Can you repeat that?

18        Q.    Sure.  Right now, have you told us everything

19   you remember about your visit with Dr. Goll?

20        A.    Right now, pretty much, that's the best of my

21   recollection with Dr. Goll.

22        Q.    Okay.  And similar question, have you told us

23   everything about your visit with Dr. Halperin about your

24   elbow?

25        A.    That's the elbow?



Page 16

1    Q.   Yes.

2    A.   Yes.

3    Q.   Nothing that stands out that we haven't talked

4    about yet?

5    A.   To the best of my recollection, no.

6    Q.   There was a visit to Jewett Orthopaedic for

7    your ankle.

8    A.   Yes.

9    Q.   And you're not claiming that was due to the

10   accident?

11   A.   Not at all.

12   Q.   That was preexisting, you had some older

13   injuries beforehand?

14   A.   I don't know if it was preexisting.  I had

15   injuries in the past, but come to find out the ankle, it

16   was due to gout.

17   Q.   Okay.

18   A.   So come to find out, maybe about a year ago,

19   that I had the gout.

20   Q.   Right around the time or right before you went

21   to see the doctor at Jewett, I think you had finished up

22   your physical therapy and the physical therapist noted

23   that you were able to lift up to 100 pounds; do you

24   recall that?

25   A.   I don't recall, but it's probably --



Page 17

1      Q.   I'm sorry.  I misspoke.  Up to 40 pounds, you

2    were able to lift up to 40 pounds?

3      A.   Again, lift in what sense -- oh, with the

4    boxes?

5      Q.   Yes.

6      A.   Yes.

7      Q.   So they had you kind of lift weights from your

8    shin and kind of stand up; is that right?

9      A.   Well, it wasn't weights, they have a box.  I'm

10    not sure if it was weights or a box.  They had me do a

11    whole bunch of things, but that's probably correct, yes.

12      Q.   Okay.  And then you would walk with it, right?

13      A.   Yes.  They had me doing walking exercises with

14    weights, weights meaning a box.

15      Q.   I think they mentioned that you could carry

16    that weighted box about 100 yards; is that correct?

17      A.   If that's what they put in their report, that's

18    correct.

19      Q.   Okay.  Good.  There was -- and I'm

20    fast-forwarding through some of these things, because

21    some of these visits, the records speak for themselves.

22      A.   Okay.

23      Q.   In January of last year, it appears Dr. Thomas

24    sent you for an MRI of your neck and a CT of your neck;

25    do you remember that?



302857

Page 18

1    A.    January of last year, I'm not too sure.

2    Q.    Do you remember going back for another MRI?  I

3    know you've been through a lot of them, but I just

4    want --

5    A.    I know the last few I went for was probably to

6    check the hardware to make sure everything was in place.

7    Q.    So to your knowledge, you weren't going back

8    because there was some difficulty you were having, it

9    was more or less just to --

10   A.    I'm not sure to answer that correctly.  I might

11   have had discomfort where he just wanted to make sure

12   the hardware was secure and in place, but at this point,

13   it's been so far back, I'm not really sure.

14   Q.    I believe, either Dr. Thomas or the radiologist

15   noted that you already started going back to the gym

16   around this time; is that what you remember?

17   A.    Again, it's probably correct if that's what

18   they noted, but at some point, when I did start feeling

19   better, I started going back to the gym.

20   Q.    They mentioned, when you went back to the gym,

21   you started developing pain in your right clavicle; do

22   you remember that?

23   A.    Yes, I do.

24   Q.    Tell us about that.

25   A.    Well, now I have shoulder pain, I stopped going



Page 19

1   to the gym, so that could probably be it.  I was feeling

2   pain, I think it was on the other side of my neck, and

3   that's why he had the MRI done, he wanted to see if the

4   hardware was in place properly.

5        Q.   Did any doctor tell you that that pain in your

6   shoulder was related to the accident?

7        A.   No.

8        Q.   Did any of them tell you it was not related to

9   the accident?

10       A.   No.

11       Q.   So as far as you know --

12       A.   To the best --

13       Q.   -- you just had pain, you showed up, and they

14   did the test?

15       A.   Yes.  I wanted them to check.  That, I remember

16   now that you refreshed my memory with that.

17       Q.   The last visit that we have is a visit in

18   February to Dr. Thomas.  Do you recall, have you had any

19   other visits with any other doctors since February of

20   last year?

21       A.   Yes.

22       Q.   Tell us about that.

23       A.   I had visits from my foot where I found out it

24   was the gout.  I just had -- I told you I hurt my

25   shoulder.



302859

Page 20

1      Q.   Who are you seeing for your shoulder?

2      A.   Ross -- Reuss, I'm not sure of his name, he's

3   with Orlando Orthopaedic.

4           MR. DILL:  It's, R-E-U-S-S.

5   BY MR. BRINGARDNER:

6      Q.   You said that's at Orlando Orthopaedic?

7      A.   Yes.

8           MR. DILL:  The one down on Michigan, right?

9           THE WITNESS:  Yes.  Yes.

10  BY MR. BRINGARDNER:

11     Q.   Okay.  How many times have you gone to see him

12  for your shoulder?

13     A.   One time, I saw his assistant.  I spoke to him

14  on the phone after the MRI.

15     Q.   What did they tell you was wrong with your

16  shoulder?

17     A.   He says it's arthritic and he asked me if I had

18  injured it in the past.  He said I was too young for

19  shoulder replacement.  He asked me about dislocating it

20  in the past, I said, no.

21          I was very athletic in my younger years, so if

22  I did injure it, I didn't even realize it.  And then he

23  said he saw a lot of little things wrong, as far as

24  debris in my shoulder.

25          So he said if I wanted injections or he could



Page 21

1   go in a clean it up with a scope and if my tendons are

2   loose, it will tighten them up for me.  He said that's

3   probably what it is right now.

4        Q.   And have you had any injections for the

5   shoulder?

6        A.   No, sir.  I did not.

7        Q.   And as of today, have you had surgery to clean

8   up the shoulder debris?

9        A.   No.  We're actually scheduled the 12th of this

10  month.

11       Q.   Of February?

12       A.   Yes -- March.  I'm sorry.  12th of March.

13            MR. BRINGARDNER:  Can we go off the record for

14       just one second?

15            (Discussion off the record.)

16            MR. BRINGARDNER:  Back on the record.

17  BY MR. BRINGARDNER:

18       Q.   Mr. Cicale, at your last deposition, I think

19  there was some discussion about you were working off and

20  on, I guess, at DC Concepts when there was work --

21       A.   Yes, sir.

22       Q.   Have you had any other work since your last

23  deposition, with DC Concepts?

24       A.   Yes, I have.

25       Q.   Tell us about that.



Page 22

1      A.     Reviewing of contracts, going over small jobs,

2  putting in bids for jobs.  Nothing has really panned

3  out.

4      Q.     Have you received any jobs since September of

5  2017?

6      A.     Sure I did, to the best of my recollection.

7      Q.     Is that information that's reported on your

8  income tax?

9      A.     It should be, yes.

10     Q.     Okay.

11            MR. BRINGARDNER:  John, can we get those?

12            MR. DILL:  Yes.  We can go off.

13            (Discussion off the record.)

14            MR. BRINGARDNER:  We can go back on.

15  BY MR. BRINGARDNER:

16     Q.     So then we were talking, you had done some

17  small jobs with DC Concepts, no big jobs like the one

18  you had in Miami?

19     A.     Yes, no big jobs.

20     Q.     Other than working at DC Concepts, what other

21  work have you done for employment?

22     A.     Really, I don't make any money, it's my wife

23  who makes all the money.  Everything is in her name.

24  She takes care of me.

25     Q.     I think before we talked about a couple of



Page 23

1    things you were doing, there was an adult comic book

2    that you were working on?

3         A.   Yes.

4         Q.   Did that ever go forward?

5         A.   Just what I did back in 2013 or 2014.

6         Q.   But nothing since then?

7         A.   No.

8         Q.   And I think there was some other job interests

9    that you had or employment interests or business where

10   you were developing some medical pills or something like

11   that for --

12        A.   Yes, that never came to fruition.

13        Q.   Fair to say, other than DC Concepts, you really

14   haven't been gainfully employed since your last

15   deposition?

16        A.   That's correct.  I do things for other

17   companies, Watergen, which is an atmospheric water

18   project.

19        Q.   What do you with them?

20        A.   Try to get sales.  Try to get people to come

21   aboard to buy the machines, to show them the benefits of

22   it, but other than that, there's been no -- there's

23   tentative deals in place, but nothing solid.

24        Q.   And I know you mentioned that your wife is the

25   primary wage earner in your household?



Page 24

1    A.    Yes, she is.

2    Q.    Do you do household work around the house?

3    A.    Yes.  I'll help out around the house, that's

4    correct.

5    Q.    Tell us about that.

6    A.    I'll help with the laundry, with the dogs,

7    cleaning, folding clothes, helping out with her

8    granddaughter.

9    Q.    Any outdoor yardwork or anything like that?

10   A.    Yes.  I'll do yardwork.

11   Q.    I'm going to ask some specific questions just

12   about your day-to-day activities and tell us a little

13   bit about that.

14   A.    Sure.

15   Q.    Have you had any difficulties -- and all this

16   time period I'm going to be talking about is since your

17   last deposition in September of 2017, which was two and

18   a half years ago almost, until now.  This is a general

19   question, okay?

20   A.    Okay.

21   Q.    Have you had any difficulties with walking that

22   you've noticed?

23   A.    No.

24   Q.    How about with bending over?

25   A.    No, I'm pretty careful.  I'm happy with the



302864

Page 25

1    results with everything.  I really have no complaints.

2         Q.   Any difficulties with reaching up over your

3    head?

4         A.   I might be a little stiff, but no.  Other than

5    some stiffness -- I don't have the range of motion that

6    I used to have, as far as bending and reaching over my

7    head, but I'm satisfied with everything.

8         Q.   Okay.  How long are you able to sit at one

9    period of time before you have to get up and move

10   around?

11        A.   I can sit a while, but I have to constantly

12   cross my legs for comfort.  I really can't sit for a

13   long period of time with both my legs --

14        Q.   On the ground?

15        A.   On the ground, yes, sir.

16        Q.   And if you do sit for a long period of time

17   with both legs on the ground, what happens?

18        A.   It's just uncomfortable, so I cross them a lot.

19        Q.   Any difficulties with standing in place at one

20   point in time or standing in the same place?

21        A.   Not really.  Nothing I would say out of the

22   ordinary.

23        Q.   Any limitations with driving?

24        A.   I don't have limitations, but I do feel if I

25   drive down to Miami, at the end of the drive, my back,



Page 26

1    which I'm sure is pretty common, I'll have to get out

2    and stretch.  After I stretch for about, maybe

3    20 seconds, it just -- the knots go away, it's nothing.

4        Q.   Have you found that, since your last surgery

5    that you're able to do pretty much the day-to-day chores

6    and activities that you've wanted to do for your wife?

7        A.   Yes.

8        Q.   And this is sometimes an uncomfortable

9    question, but has it affected your intimacy and your

10   sexual relationship?

11       A.   These accidents, yes, it has.  Greatly.

12       Q.   Tell us how.

13       A.   From the pain pills to just our movements, it's

14   just, you know, different, I would say.

15       Q.   Would you say it's improved recently or has it

16   been the same since the accident?

17       A.   No, it's gotten better after the surgeries,

18   once I healed up, but it's still limited, but, you know.

19       Q.   I'm going to ask a series of questions about

20   different body parts and they're going to be all pretty

21   much the same, and some of these things, you already

22   mentioned some of it, but I just to make sure I covered

23   this.

24       A.   Sure.

25       Q.   In terms of neck pain, sitting here today, do



Page 27

1    you have any neck pain?

2        A.    No, sir.

3        Q.    Any limitation in range of motion that you have

4    with your neck?

5        A.    Just my side moments.   One side I can turn a

6    greater distance than the other.

7        Q.    Which side are you able to turn at a greater

8    distance?

9        A.    To my right.   To my left is --

10       Q.    You're demonstrating for me and I appreciate

11   it, but --

12       A.    I'm trying to figure it out.

13       Q.    So you're able to -- from your sensation,

14   you're able to turn further to your right?

15       A.    Yes, from what I feel, correct.

16       Q.    And you mentioned, occasionally, that you'll

17   have some stiffness?

18       A.    Yes.

19       Q.    Any burning or numbness?

20       A.    I'm not sure.   Right now, no, there might have

21   been, but nothing.

22       Q.    I know, at your last deposition, you mentioned

23   that there was some twitching in one of your arms.   Do

24   you have any problems with twitching in either of your

25   arms?



Page 28

1       A.    No, not anymore.

2       Q.    How about your back?  I think, again, you

3   mentioned two or three days a week, you'll have problems

4   with stiffness; is that right -- or not two --

5       A.    Right.  It's periodically.  Like I said, it's

6   around -- I didn't judge it or clock how many times, but

7   there's, some days, stiffness.  I have a lot more good

8   days than bad days and five to ten percent bad days, the

9   rest are good.

10      Q.    In terms of sitting here today, you don't have

11  any back pain today?

12      A.    No, sir.  I do not.

13      Q.    Have you noticed any limitation in the range of

14  motion of your back?

15      A.    I would say when I bend down, that would be a

16  limitation, but I really don't -- I didn't take notice

17  for that, because I tried not to bend as much as I used

18  to.  And when I do bend, I'm bending with my knees now,

19  I'm not bending over as you shouldn't be bending, you

20  know, that's what they say, the therapists.

21      Q.    Have you noticed any burning in your back?

22      A.    There are some days I'll have a burning

23  sensation, more or less on the sides.

24      Q.    When you say sides, can you show us what you're

25  talking about?



Page 29

1        A.    My lateral sides, lateral sides of my back.

2        Q.    Is it on both sides, right and left?

3        A.    I'm not sure to give you an accurate -- like,

4    they're far and few and between when I do have it.

5        Q.    Can you give us an idea of the frequency?   Once

6    a month?  Twice a month?

7        A.    Again, I didn't look to see.  Like I said, my

8    bad days are anywhere from five to ten percent, since I

9    started going back to the gym, working out again after

10   the surgeries.

11       Q.    Let's talk about your elbow -- and that was

12   your left elbow that you had the surgery on?

13       A.    Yes, sir.

14       Q.    Any pain in your left elbow today?

15       A.    No.

16       Q.    How frequently do you feel pain in the elbow?

17       A.    It's not pain, it's discomfort.  I say every

18   time in the shower.  Again, it's not pain or discomfort,

19   it's numbness.  When I have my arms behind my back and I

20   bring them forward, I feel the numbness in my arm.

21       Q.    Anything else that produces that same numbness

22   or similar numbness?

23       A.    Sometimes it just comes.  I'll feel it.  And

24   I'll just shake my arm out.  I'll do that a few times a

25   month, that I have to just shake it and it goes right



Page 30

1   away.

2        Q.    Have you noticed any stiffness in your elbow?

3        A.    No, I haven't noticed any stiffness.

4        Q.    Any tingling or twitching?

5        A.    Tingling, yes.  Numbness through -- by my wrist

6    and pinky area, but it's discomfort that I can live

7    with.

8        Q.    And I do want to follow-up just on the right

9    shoulder.  I think you mentioned you've been having

10   difficulties with your right shoulder, right?

11       A.    Yes.

12       Q.    How frequently does that happen?

13       A.    That's been bothering me pretty frequently.

14   I'd say every day with that.  It happened when I was in

15   church.

16       Q.    That's the injury that you've had that

17   Dr. Thomas has advised against surgery?

18       A.    No, the injury that I had was my elbow.

19       Q.    I'm sorry, yes.

20       A.    No, the right shoulder what happened about

21   three months ago was in church with my wife's

22   granddaughter.  I had my arm around her and when I went

23   to bring my arm back from around her, my shoulder came

24   out of my socket, dislocated it, I would say and ever

25   since then, I've been in pain.



Page 31

1     Q.    Have you sought medical attention for that when

2   it happened?

3     A.    That's when I -- yes.  Well, recently, maybe

4   about three to four weeks ago, that's when I went to

5   Orlando Orthopaedic, because it was just bothering --

6   not my strength, I still have my strength in my

7   shoulder.  When I go to play the radio in the car,

8   change the station, it's very painful.

9     Q.    And to your knowledge, the doctor has not

10   attributed that to this accident?

11    A.    No, not at all.

12    Q.    Okay.  Can you tell us a little bit, just

13   describe a typical day for you, getting up, through the

14   rest of your day?

15    A.    I'm up at about 3:00 a.m. in the morning, send

16   e-mails out, go back and forth with different clients

17   trying to get jobs, make sales.  That's it.

18          I'll make my wife coffee, bring her coffee in

19   bed.  Feed the animals.  And then throughout the day,

20   whatever meetings I have, I go to my meetings.  If the

21   grass needs to be cut, I'll cut the grass, rake and just

22   do regular chores around the house.

23    Q.    Okay.  And then do you and your wife,

24   typically, have dinner together?

25    A.    Yes, we do.



Page 32

1    Q.   Do you cook for her or does she cook for you?

2    A.   No, usually we'll go out to eat, the majority

3  of the time.

4    Q.   Tell us about your evenings.

5    A.   That's it.  Eat, come home, watch some TV, then

6  usually I fall asleep during the movie and she gets mad

7  at me.

8    Q.   I know what that's like.  This is a real broad

9  question, Mr. Cicale, but is there anything that we

10  haven't discussed that you feel would be helpful for me

11  to know, your health or the condition you're in?

12    A.   No, I'm pretty satisfied with everything, I

13  have no regrets.  I was extremely hesitant with my

14  lumbar fusion.  I really did not want to get operated on

15  with my lower back just because I know the damage it can

16  cause to the vertebras above and below.

17    Q.   But, in hindsight, you feel like it's been a

18  good procedure?

19    A.   Yes.  Yes, I'm happy with the results.  And I'm

20  glad I don't have that chronic pain every day, the

21  burning sensation.  I was, basically, crippled before

22  the procedure.

23         MR. BRINGARDNER:  That's all the questions I

24    have for you.

25         THE WITNESS:  Thank you.



302872

Page 33

1                    (The above proceedings concluded at 11:07 a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



302873

Page 34

1                          CERTIFICATE OF OATH

2

3    STATE OF FLORIDA:

4    COUNTY OF ORANGE:

5

6        I, ANNIE M. ZUCCARELLI, Notary Public, State of

7    Florida, do hereby certify that DOMINICK CICALE

8    personally appeared before me on February 19, 2020 and

9    was duly sworn.

10

11       Signed this 27th day of February, 2020.

12

13

14

15

16            _____

              ANNIE M. ZUCCARELLI

17            Notary Public, State of Florida

              My Commission No.:  GG320905

18            Expires:   4/08/2023

19

20

21

22

23

24

25



302874

Page 35

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA:

4    COUNTY OF ORANGE:

5

6        I, ANNIE M. ZUCCARELLI, Notary Public, State of

7    Florida, certify that I was authorized to and did

8    stenographically report the deposition of DOMINICK

9    CICALE; that a review of the transcript was not

10   requested; and that the foregoing transcript, pages 01

11   through 35, is a true and accurate record of my

12   stenographic notes.

13       I further certify that I am not a relative,

14   employee, or attorney, or counsel of any of the parties,

15   nor am I a relative or employee of any of the parties'

16   attorneys or counsel connected with the action, nor am I

17   financially interested in the action.

18

19       DATED this 27th day of February, 2020.

20

21

22       _____

         ANNIE M. ZUCCARELLI

23

24

25



Page 1

**A**

able 5:17 8:15
  16:23 17:2 25:8
  26:5 27:7,13,14
aboard 23:21
accident 15:6 16:10
  19:6,9 26:16
  31:10
accidents 26:11
accurate 6:19 29:3
  35:11
accurately 9:17
action 35:16,17
activities 5:12
  24:12 26:6
additional 11:2
  13:5
adhere 12:19
adult 23:1
advise 5:22
advised 10:16
  30:17
affirm 4:5
ago 4:13 16:18
  24:18 30:21 31:4
agreed 3:16
ahead 12:20,21
analyzed 6:18
animals 31:19
ankle 16:7,15
ANNIE 1:16 34:6
  34:16 35:6,22
answer 6:19 9:16
  15:7 18:10
anybody 14:23
anymore 5:21 28:1
appeared 34:8
APPEARING 2:5
  2:10
appears 17:23
appointment 13:12
appointments 4:19
appreciate 11:11
  27:10
April 8:10 11:13,15

11:16
area 7:5 10:13
  13:19 30:6
arm 10:7 29:20,24
  30:22,23
arms 10:6 27:23,25
  29:19
arthritic 20:17
asked 11:4 14:10
  14:12 15:5 20:17
  20:19
asking 15:4
asleep 32:6
assistant 20:13
athletic 20:21
atmospheric 23:17
attention 31:1
attorney 35:14
attorneys 35:16
attributed 31:10
authorized 35:7
Avenue 2:7
a.m 1:12,12 31:15
  33:1

**B**

back 5:11,24 7:2,3
  7:7 8:1,13,15 9:1
  9:9 10:4,6 11:14
  12:9 13:6,7 14:12
  14:13 18:2,7,13
  18:15,19,20 21:16
  22:14 23:5 25:25
  28:2,11,14,21
  29:1,9,19 30:23
  31:16 32:15
bad 5:10,10 28:8,8
  29:8
band 13:1
basically 7:20 8:16
  8:20 11:22 13:21
  32:21
basis 6:21
basketball 5:21,23
bed 11:22,23,25
  12:2,4,12 31:19

BEHALF 2:5,10
believe 18:14
bend 28:15,17,18
bending 24:24 25:6
  28:18,19,19
benefits 23:21
best 8:16 9:11
  14:13 15:20 16:5
  19:12 22:6
better 10:22 18:19
  26:17
bids 22:2
big 22:17,19
bit 4:14 7:11 24:13
  31:12
blood 10:8
body 12:2,17 26:20
bone 13:20
book 23:1
bothering 30:13
  31:5
Boulevard 1:14 2:3
box 17:9,10,14,16
boxes 17:4
bring 10:6 29:20
  30:23 31:18
Bringardner 2:6
  3:3 4:10,11 20:5
  20:10 21:13,16,17
  22:11,14,15 32:23
broad 7:23 32:8
bunch 14:10 17:11
burn 7:13
burning 7:4 27:19
  28:21,22 32:21
Bus 4:12
business 23:9
buy 23:21

**C**

C 2:1 4:1
call 7:14 14:9
called 11:3
calm 8:15
car 31:7
care 22:24

careful 6:8 12:1
  24:25
carry 17:15
case 1:2 4:6
cause 10:17 11:8
  32:16
causes 6:3
Celebration 11:18
CERTIFICATE
  3:4,5 34:1 35:1
certify 34:7 35:7,13
change 31:8
check 18:6 19:15
checked 13:17
chiropractor 8:14
chores 26:5 31:22
chose 11:10
chronic 32:20
church 30:15,21
Cicale 1:4,10 3:2
  4:11 21:18 32:9
  34:7 35:9
CIRCUIT 1:1,1
claiming 16:9
clavicle 18:21
clean 21:1,7
cleaning 24:7
clients 31:16
clock 6:24 28:6
clothes 24:7
coffee 31:18,18
COHEN 2:7
Colestar 4:12
COLSTAR 1:7
come 16:15,18
  23:20 32:5
comes 29:23
comfort 25:12
comfortable 12:17
comic 23:1
Commission 34:17
common 26:1
companies 23:17
complaints 25:1
Concepts 21:20,23
  22:17,20 23:13

concluded 33:1
condition 4:24 9:9
  9:15 32:11
connected 35:16
consequences 9:4,4
constantly 25:11
continued 9:24
contracts 22:1
cook 31:21
correct 9:2 17:11
  17:16,18 18:17
  23:16 24:4 27:15
correctly 18:10
counsel 3:17 35:14
  35:16
COUNTY 1:1 34:4
  35:4
couple 6:17 8:11
  22:25
COURT 1:1 4:3
covered 26:22
crippled 32:21
cross 25:12,18
CT 17:24
current 4:24
cut 31:21,21

**D**

D 3:1 4:1
damage 11:9 32:15
DATE 1:11
DATED 35:19
day 5:20 7:5,6,12
  30:14 31:13,14,19
  32:20 34:11 35:19
days 5:10,10,20 7:7
  13:8 28:3,7,8,8,8
  28:22 29:8
day-to-day 24:12
  26:5
DC 21:20,23 22:17
  22:20 23:13
deals 23:23
debris 20:24 21:8
Defendant 1:8 2:10
DEFENDANT'S



3:8
**definitely** 10:24
  11:8
**degenerative** 9:9
  9:14
**demonstrating**
  27:10
**deponent** 3:17
**deposition** 1:10 3:5
  3:18 4:13,14,20
  7:19 9:19,22
  21:18,23 23:15
  24:17 27:22 35:8
**describe** 31:13
**describing** 5:7
**deteriorate** 9:6
**deteriorates** 8:23
**developing** 18:21
  23:10
**different** 7:18 12:5
  26:14,20 31:16
**difficulties** 24:15
  24:21 25:2,19
  30:10
**difficulty** 18:8
**DILL** 1:13 2:2,2
  20:4,8 22:12
**dinner** 31:24
**direction** 12:3
**discomfort** 10:21
  10:25 11:7 18:11
  29:17,18 30:6
**discs** 8:22
**discussed** 32:10
**discussion** 21:15,19
  22:13
**discussions** 13:24
**dislocated** 30:24
**dislocating** 20:19
**distance** 27:6,8
**doctor** 9:13 10:15
  13:13 16:21 19:5
  31:9
**doctors** 5:22 19:19
**dogs** 24:6
**doing** 5:8,13 17:13

23:1
**DOMINICK** 1:4
  1:10 3:2 34:7 35:8
**Dr** 7:25 8:6,12,19
  9:3,13 10:14,16
  11:1,4,13 12:3
  13:12,16 14:5,8
  15:16,19,21,23
  17:23 18:14 19:18
  30:17
**drive** 25:25,25
**driving** 6:10 25:23
**due** 16:9,16
**duly** 34:9

**E**

**E** 2:1,1 3:1 4:1,1
**early** 14:17
**earner** 23:25
**eat** 32:2,5
**eight** 11:22 12:11
**either** 18:14 27:24
**elbow** 9:20,24,25
  10:7 13:13,19
  15:24,25 29:11,12
  29:14,16 30:2,18
**employed** 23:14
**employee** 35:14,15
**employment** 22:21
  23:9
**encouraging** 12:21
**especially** 6:8
**ESQUIRE** 2:2,6
**evenings** 32:4
**eventually** 13:2
**everyday** 12:9
**examination** 3:3
  4:9 13:23 14:4,8,9
  14:17,22
**examining** 14:14
**Excellent** 5:6
**exercises** 17:13
**EXHIBITS** 3:7,8
**expecting** 14:17
**experiencing** 13:6
**experts** 14:4

**Expires** 34:18
**explain** 9:3
**explained** 10:14
**extremely** 32:13
**e-mails** 31:16

**F**

**fair** 6:20 10:20
  23:13
**fairly** 6:2
**fall** 32:6
**far** 6:1 8:17 18:13
  19:11 20:23 25:6
  29:4
**fast-forwarding**
  17:20
**fearful** 12:1
**February** 1:11
  19:18,19 21:11
  34:8,11 35:19
**Feed** 31:19
**feel** 6:15 7:1 10:12
  25:24 27:15 29:16
  29:20,23 32:10,17
**feeling** 18:18 19:1
**feels** 10:10
**felt** 8:19 10:22 12:4
  13:4
**figure** 27:12
**financially** 35:17
**find** 15:14 16:15,18
**findings** 13:25
**fine** 6:20 15:9
**finished** 16:21
**first** 12:18
**five** 5:20,20 10:5
  28:8 29:8
**Florida** 1:1,15 2:4
  2:8 11:18 34:3,7
  34:17 35:3,7
**folding** 24:7
**following** 7:6 11:12
**follow-up** 4:13,23
  10:15 30:8
**foot** 19:23
**foregoing** 35:10

**forth** 31:16
**forward** 10:6 23:4
  29:20
**found** 8:7 19:23
  26:4
**four** 5:19 31:4
**frequency** 29:5
**frequently** 6:15
  7:15 29:16 30:12
  30:13
**fruition** 23:12
**funny** 13:20
**further** 27:14 35:13
**fusion** 5:23 8:22,24
  9:1 12:1,19 32:14

**G**

**G** 4:1
**gainfully** 23:14
**general** 5:7 6:21
  7:1 15:6 24:18
**getting** 12:17 31:13
**GG320905** 34:17
**give** 4:6 6:19 9:18
  29:3,5
**glad** 6:13 32:20
**go** 7:18 10:8 12:20
  12:21 14:17,19,20
  21:1,13 22:12,14
  23:4 26:3 31:7,16
  31:20 32:2
**goes** 29:25
**going** 4:18 5:11
  7:18,22 8:1,12,25
  11:24 12:13,21
  13:4,25 18:2,7,15
  18:19,25 22:1
  24:11,16 26:19,20
  29:9
**Goll** 14:5,8 15:16
  15:19,21
**good** 5:10,10,25
  10:18 17:19 28:7
  28:9 32:18
**gotten** 26:17
**gout** 16:16,19 19:24

**gradually** 13:2
**granddaughter**
  24:8 30:22
**grass** 31:21,21
**greater** 27:6,7
**Greatly** 26:11
**ground** 25:14,15,17
**guess** 7:14 10:8
  15:6 21:20
**guy** 14:25
**gym** 5:11 6:6,8
  18:15,19,20 19:1
  29:9

**H**

**half** 24:18
**Halperin** 13:12,16
  15:23
**hand** 4:4
**happen** 30:12
**happened** 12:7
  30:14,20 31:2
**happens** 25:17
**happy** 6:2,12 13:9
  24:25 32:19
**hardware** 18:6,12
  19:4
**harm** 10:17
**head** 25:3,7
**heal** 12:2
**healed** 26:18
**health** 5:7,9 32:11
**hear** 6:13
**heavy** 6:7
**help** 4:21 7:9 24:3,6
**helpful** 12:16 32:10
**helping** 24:7
**hesitant** 32:13
**hindsight** 32:17
**hip** 7:5
**hit** 10:4,4 13:20
**home** 32:5
**honesty** 11:11
**hope** 4:17
**hospital** 11:18,19
**hot** 10:3



**household** 23:25
24:2
**hurt** 12:21 19:24

**I**

**idea** 29:5
**improved** 26:15
**inadvertently**
14:16
**income** 22:8
**INDEX** 3:7
**information** 22:7
**injections** 20:25
21:4
**injure** 20:22
**injured** 20:18
**injuries** 16:13,15
**injury** 30:16,18
**interested** 35:17
**interests** 23:8,9
**intimacy** 26:9
**introduced** 4:12

**J**

**January** 7:25 17:23
18:1
**Jbringardner@i...**
2:9
**Jewett** 16:6,21
**job** 23:8
**jobs** 22:1,2,4,17,17
22:19 31:17
**jog** 5:20
**jogging** 5:19,22
**John** 1:13 2:2,2,6
4:11 22:11
**John@johnwdill....**
2:5
**joke** 11:24
**judge** 28:6
**JUDICIAL** 1:1
**July** 9:18
**jumping** 5:21
**June** 13:10

**K**

**keep** 10:6
**kind** 15:3 17:7,8
**knees** 28:18
**knew** 8:25
**knots** 26:3
**know** 6:17 7:11,12
8:5,8,11,14 15:1
15:12,12 16:14
18:3,5 19:11
23:24 26:14,18
27:22 28:20 32:8
32:11,15
**knowledge** 18:7
31:9

**L**

**L** 3:15
**lateral** 29:1,1
**laundry** 24:6
**Leading** 8:10
**leery** 12:18
**left** 10:7 14:12 27:9
29:2,12,14
**legs** 25:12,13,17
**Let's** 29:11
**level** 10:20,21
**lift** 6:7 12:8 16:23
17:2,3,7
**lifting** 6:7
**limitation** 27:3
28:13,16
**limitations** 5:12,25
25:23,24
**limited** 26:18
**list** 4:21 7:18
**little** 7:11 20:23
24:12 25:4 31:12
**live** 10:22 30:6
**long** 6:10 11:6 25:8
25:13,16
**longer** 5:13,17
**look** 29:7
**looked** 13:13
**looking** 7:20
**loose** 21:2
**lot** 5:12 11:21 13:1

18:3 20:23 25:18
28:7
**love** 5:13,19
**low** 11:13
**lower** 5:24 7:1,3
8:15 9:1 12:9
32:15
**LUKS** 2:7
**lumbar** 8:21 11:14
32:14

**M**

**M** 1:16 2:6 34:6,16
35:6,22
**machines** 23:21
**mad** 32:6
**majority** 32:2
**March** 21:12,12
**MARKED** 3:10
**massaging** 13:1
**Matilde** 1:4 2:12
**meaning** 17:14
**medical** 4:18,24
23:10 31:1
**medications** 11:23
**meetings** 8:11
31:20,20
**memory** 15:9 19:16
**mentioned** 11:1
17:15 18:20 23:24
26:22 27:16,22
28:3 30:9
**Miami** 22:18 25:25
**Michigan** 20:8
**miles** 5:20
**minutes** 4:13 10:5
14:11
**misspoke** 17:1
**moments** 12:9,18
27:5
**money** 22:22,23
**month** 6:17,21 7:16
21:10 29:6,6,25
**months** 30:21
**morning** 31:15
**mornings** 6:9

**Morse** 1:14 2:3
**motion** 13:18 25:5
27:3 28:14
**move** 7:11 12:7
25:9
**movements** 12:18
13:1,2 26:13
**movie** 32:6
**MRI** 8:1,7 17:24
18:2 19:3 20:14

**N**

**N** 2:1 3:1,15 4:1
**name** 4:11 20:2
22:23
**neck** 5:25,25 6:4,16
12:6,6,7 17:24,24
19:2 26:25 27:1,4
**need** 8:9
**needs** 31:21
**nerve** 10:12,18 11:8
11:8
**never** 14:10 23:12
**NINTH** 1:1
**normal** 7:7 12:9
**Notary** 34:6,17
35:6
**noted** 16:22 18:15
18:18
**notes** 35:12
**notice** 6:18,22 7:15
28:16
**noticed** 9:8,14
24:22 28:13,21
30:2,3
**numb** 10:7
**numbness** 7:2 10:8
10:13 11:9 27:19
29:19,20,21,22
30:5

**O**

**O** 3:15 4:1
**OATH** 3:4 34:1
**occasionally** 27:16
**occur** 6:11

**oh** 17:3
**okay** 4:22 5:1,4
7:15,23,24 8:4
9:21 10:20 11:20
13:10 14:3 15:22
16:17 17:12,19,22
20:11 22:10 24:19
24:20 25:8 31:12
31:23
**older** 16:12
**once** 7:17 10:9,13
10:25 26:18 29:5
**one-level** 8:25
**operated** 32:14
**opinion** 11:5
**opted** 10:18
**Orange** 1:1 2:7
34:4 35:4
**ordinary** 25:22
**Orlando** 2:8 20:3,6
31:5
**Orthopaedic** 16:6
20:3,6 31:5
**outcome** 13:9
**outdoor** 24:9
**overall** 5:14 6:12
13:9
**overdid** 7:12
**overexerted** 13:8

**P**

**P** 2:1,1 3:15 4:1
**pages** 35:10
**pain** 7:2 8:18 10:9
10:10,12,20,24
11:21,23 13:5,20
18:21,25 19:2,5
19:13 26:13,25
27:1 28:11 29:14
29:16,17,18 30:25
32:20
**painful** 11:6 31:8
**panned** 22:2
**Park** 1:15 2:4
**particular** 7:21
**parties** 3:17 35:14

35:15
parts 26:20
people 23:20
percent 28:8 29:8
period 6:10 12:11
 13:3 24:16 25:9
 25:13,16
periodically 6:11
 28:5
personally 34:8
PETRILLO 2:7
phantom 10:9,10
phone 20:14
physical 12:13,24
 13:4,10,11 16:22
 16:22
physically 14:14
pills 23:10 26:13
pinky 10:13 30:6
pinpointed 6:5
place 1:13 18:6,12
 19:4 23:23 25:19
 25:20
Plaintiff 2:12
Plaintiffs 1:5 2:5
play 31:7
Playing 5:21
please 4:4
point 8:17,19 12:12
 18:12,18 25:20
potential 9:4
pounding 5:23
pounds 16:23 17:1
 17:2
precipitates 6:4
preexisting 16:12
 16:14
PRESENT 2:11
pressure 7:14 8:18
pretty 5:25 6:7
 12:16 13:21 15:20
 24:25 26:1,5,20
 30:13 32:12
primarily 4:18
primary 23:25
prior 5:20 15:6

probably 5:19 6:23
 16:25 17:11 18:5
 18:17 19:1 21:3
problems 9:24,25
 27:24 28:3
procedure 8:3,4,6
 32:18,22
procedures 5:14
 6:2 7:19
proceedings 33:1
produces 29:21
project 23:18
properly 19:4
Public 34:6,17 35:6
put 17:17
putting 22:2
P.A 1:13 2:2

Q
question 5:3 15:22
 24:19 26:9 32:9
questions 4:23 7:23
 14:11,13 15:3,7
 24:11 26:19 32:23
quicker 8:23 9:6
quickly 4:17

R
R 2:1 4:1
radio 31:7
radiologist 18:14
raise 4:3
rake 31:21
range 13:17 25:5
 27:3 28:13
reaching 25:2,6
reading 3:18
real 32:8
realize 20:22
really 6:18 7:10 8:8
 8:21 13:7 15:5
 18:13 22:2,22
 23:13 25:1,12,21
 28:16 32:14
recall 16:24,25
 19:18

received 13:19 22:4
recollection 8:16
 9:11 14:13 15:21
 16:5 22:6
recommend 11:2
recommended
 10:16
record 21:13,15,16
 22:13 35:11
records 17:21
refreshed 19:16
regrets 32:13
regular 31:22
related 19:6,8
relationship 26:10
relative 35:13,15
relax 7:13
released 14:14,22
relieve 7:14 8:17
remain 12:2
remained 11:22
remember 4:21
 7:21 8:1,6 11:17
 13:13,15 14:1,5,7
 15:3,15,19 17:25
 18:2,16,22 19:15
repeat 15:17
rephrase 5:4
replacement 20:19
report 17:17 35:8
reported 1:16 22:7
REPORTER 4:3
 35:1
represent 4:12
requested 35:10
respective 3:17
rest 7:12 12:10 28:9
 31:14
results 25:1 32:19
return 8:17
Reuss 20:2
review 35:9
Reviewing 22:1
revision 11:2
right 4:3 7:5 12:13
 14:3 15:11,18,20

16:20,20 17:8,12
 18:21 20:8 21:3
 27:9,14,20 28:4,5
 29:2,25 30:8,10
 30:10,20
room 14:12,23
Ross 20:2
R-E-U-S-S 20:4

S
S 2:1 3:15 4:1
sales 23:20 31:17
Santana 1:4 2:12
SANTANIELLO
 2:7
satisfied 25:7 32:12
saw 10:14 20:13,23
saying 15:13
says 20:17
scheduled 21:9
scope 21:1
second 10:17,18
 11:8 21:14
seconds 10:8 26:3
secure 18:12
see 13:12 15:2
 16:21 19:3 20:11
 29:7
seeing 8:14 20:1
seen 6:3
send 31:15
sensation 7:4 27:13
 28:23 32:21
sense 17:3
sensitive 13:18
sent 7:25 17:24
September 4:20
 22:4 24:17
series 26:19
SERVICES 1:7
set 13:11
sexual 26:10
shake 29:24,25
Shapiro 10:15 11:1
 11:13
shin 17:8

shock 13:20
shoulder 18:25
 19:6,25 20:1,12
 20:16,19,24 21:5
 21:8 30:9,10,20
 30:23 31:7
show 23:21 28:24
showed 19:13
shower 10:3 29:18
side 7:5 19:2 27:5,5
 27:7
sides 28:23,24 29:1
 29:1,2
Signed 34:11
signing 3:18
similar 5:2 15:22
 29:22
sir 5:5 9:2 10:1
 11:15 21:6,21
 25:15 27:2 28:12
 29:13
sit 25:8,11,12,16
sitting 26:25 28:10
six 11:22 12:11
small 22:1,17
socket 30:24
solid 23:23
sorry 17:1 21:12
 30:19
sought 31:1
South 2:7
speak 17:21
specific 24:11
specifically 6:6
spine 9:10,15
spoke 20:13
stand 10:5 17:8
standing 25:19,20
stands 16:3
start 5:7 18:18
started 5:11 12:13
 18:15,19,21 29:9
State 34:3,6,17
 35:3,6
station 31:8
stay 5:22 12:3



stenographic 35:12
stenographically
  1:16 35:8
stiff 6:1,4 25:4
stiffness 6:16,22
  7:2 25:5 27:17
  28:4,7 30:2,3
stipulated 3:16
stopped 18:25
strain 8:24
strength 13:17 31:6
  31:6
strenuous 12:8
stretch 7:10,10
  26:2,2
stretching 7:8 13:1
stuff 4:24
successful 5:9,15
Suite 1:14 2:3,8
sure 6:25 9:12,16
  11:15 13:7,7,22
  14:1 15:2,5,6,8,18
  17:10 18:1,6,10
  18:11,13 20:2
  22:6 24:14 26:1
  26:22,24 27:20
  29:3
surgeries 5:9 26:17
  29:10
surgery 8:9,10,21
  9:5,20 10:15,17
  10:19,23 11:2,6
  11:14,14,17 12:6
  12:6 21:7 26:4
  29:12 30:17
swear 4:5
sworn 34:9

**T**

T 3:15,15
take 7:13 12:5
  28:16
taken 6:18
takes 10:7 22:24
talk 4:18 29:11
talked 16:3 22:25

talking 8:6 22:16
  24:16 28:25
tap 13:19
tax 22:8
tell 5:16 8:12 9:8,14
  10:2,11 12:15
  14:7 18:24 19:5,8
  19:22 20:15 21:25
  24:5,12 26:12
  31:12 32:4
telling 12:20
ten 10:5 28:8 29:8
tendons 21:1
tentative 23:23
terms 7:1 26:25
  28:10
test 15:9 19:14
testified 9:23
testimony 3:2 4:5
Thank 5:5 6:14
  32:25
therapist 16:22
therapists 28:20
therapy 12:13,24
  13:4,8,11,11
  16:22
things 4:21 5:16
  12:23 17:11,20
  20:23 23:1,16
  26:21
think 7:5,25 9:11
  9:19,22,23 11:1
  11:12 13:17 14:3
  16:21 17:15 19:2
  21:18 22:25 23:8
  28:2 30:9
Thomas 7:25 8:6
  8:12,19 9:3,13
  10:14,16 11:4
  12:3 17:23 18:14
  19:18 30:17
thought 13:25
three 6:21 28:3
  30:21 31:4
tight 7:6
tighten 21:2

time 1:12 4:15 5:2
  5:13 6:10,11 9:8
  10:18 11:8 12:11
  12:12 13:3,4
  16:20 18:16 20:13
  24:16 25:9,13,16
  25:20 29:18 32:3
timeframe 9:18
times 6:1,17,21
  20:11 28:6 29:24
tingling 30:4,5
today 5:7,9 21:7
  26:25 28:10,11
  29:14
told 7:22 8:22 11:5
  14:16,23 15:15,18
  15:22 19:24
touched 14:10
touching 10:18
  11:7 13:18 14:15
transcript 3:5,19
  35:9,10
TRANSPORTA...
  1:7
treadmill 12:25
treatment 7:21
treatments 4:19
trial 15:13
tried 13:18 28:17
true 35:11
truth 4:6,7,7
try 7:11,13 23:20
  23:20
trying 6:25 8:17
  27:12 31:17
turn 27:5,7,14
TV 32:5
twice 7:17 29:6
twitching 27:23,24
  30:4
two 6:21 24:17 28:3
  28:4
type 12:23
typical 31:13
typically 31:24

**U**

U 3:15
uncomfortable
  25:18 26:8
understand 5:3
  6:25 11:12
understood 9:1
update 4:14
usually 10:4 32:2,6

**V**

vertebra 9:5
vertebras 32:16
video 14:25 15:1,2
videotaped 13:22
  13:22
viewed 13:21
visit 13:15 15:16,19
  15:23 16:6 19:17
  19:17
visits 11:13 17:21
  19:19,23
vs 1:6

**W**

W 1:13 2:2,2
wage 23:25
waived 3:19
wake 6:9,15
walk 12:25 17:12
walking 17:13
  24:21
want 8:21 12:6,8,10
  15:7,12 18:4 30:8
  32:14
wanted 10:15 12:19
  18:11 19:3,15
  20:25 26:6
warm 12:25
wasn't 8:15 17:9
watch 6:6 32:5
water 10:4 23:17
Watergen 23:17
way 6:18,24 8:19
WEDNESDAY
  1:11

week 5:20 28:3
weeks 11:22 12:11
  31:4
weighted 17:16
weights 12:8 17:7,9
  17:10,14,14
went 16:20 18:5,20
  30:22 31:4
weren't 18:7
West 1:14 2:3
we'll 32:2
we're 14:24 21:9
wife 11:24 22:22
  23:24 26:6 31:18
  31:23
wife's 30:21
Winter 1:15 2:4
WITNESS 4:8 20:9
  32:25
work 21:20,22
  22:21 24:2
worked 13:2
working 5:11 21:19
  22:20 23:2 29:9
wouldn't 14:9
wrist 10:14 30:5
wrong 20:15,23

**X**

X 3:1
X-rays 14:10

**Y**

yards 17:16
yardwork 24:9,10
year 16:18 17:23
  18:1 19:20
years 20:21 24:18
young 20:18
younger 20:21

**Z**

ZUCCARELLI
  1:16 34:6,16 35:6
  35:22

**0**

**01** 35:10
**04** 3:3

**1**

**10:31** 1:12
**100** 1:14 2:3 16:23
 17:16
**11:07** 1:12 33:1
**12th** 21:9,12
**19** 1:11 34:8

**2**

**20** 26:3
**2013** 23:5
**2014** 23:5
**2017** 4:20 9:19 22:5
 24:17
**2017-CA-003664...**
 1:2
**2018** 7:25 8:11
**2020** 1:11 34:8,11
 35:19
**214-4799** 2:4
**255** 2:7
**27th** 34:11 35:19

**3**

**3:00** 31:15
**30** 10:7
**321** 2:4
**32789** 1:15 2:4
**32801** 2:8
**34** 3:4
**35** 3:5 35:11

**4**

**4/08/2023** 34:18
**40** 10:8 17:1,2
**407** 2:9
**45/50** 14:11

**5**

**540-9170** 2:9

**7**

**750** 2:8

**9**

**941** 1:14 2:3

MAGNA ➤
LEGAL SERVICES

302881

FLORIDA DEPARTMENT *of* STATE                                            DIVISION OF CORPORATIONS



Department of State  /  Division of Corporations  /  Search Records  /  Search by Officer/Registered Agent Name  /

# Detail by Officer/Registered Agent Name

Florida Profit Corporation
ALKALINE PET WATER INC.

**Filing Information**

| | |
|---|---|
| **Document Number** | P19000092120 |
| **FEI/EIN Number** | NONE |
| **Date Filed** | 12/05/2019 |
| **Effective Date** | 12/04/2019 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | ADMIN DISSOLUTION FOR ANNUAL REPORT |
| **Event Date Filed** | 09/25/2020 |
| **Event Effective Date** | NONE |

**Principal Address**

501 N ORLANDO AVE
SUITE 313-311
WINTER PARK, FL 32789

**Mailing Address**

501 N ORLANDO AVE
SUITE 313-311
WINTER PARK, FL 32789

**Registered Agent Name & Address**

RUSSO, DOMINICK
5019 FERNCREST DR.
WINTER PARK, FL 32792

**Officer/Director Detail**

**Name & Address**

Title P

WRIGHT, TONY
5002 FERNCREST DR.
WINTER PARK, FL 32792

Title VP

SANTANA, MATILDE



9/15/21, 3:46 PM                                                    Detail by Officer/Registered Agent Name

5019 FRENCREST DR.
WINTER PARK, FL 32792

**Annual Reports**

**No Annual Reports Filed**

**Document Images**

12/05/2019 -- Domestic Profit          View image in PDF format

Florida Department of State, Division of Corporations

# Electronic Articles of Incorporation
# For

P19000092120
FILED
**December 05, 2019**
**Sec. Of State**
ndmccleessam

ALKALINE PET WATER INC.

The undersigned incorporator, for the purpose of forming a Florida profit corporation, hereby adopts the following Articles of Incorporation:

## Article I

The name of the corporation is:

ALKALINE PET WATER INC.

## Article II

The principal place of business address:

501 N ORLANDO AVE
SUITE 313-311
WINTER PARK, FL.   32789

The mailing address of the corporation is:

501 N ORLANDO AVE
SUITE 313-311
WINTER PARK, FL.   32789

## Article III

The purpose for which this corporation is organized is:

ANY AND ALL LAWFUL BUSINESS. BOTTLING ALKALINE WATER FOR PETS.

## Article IV

The number of shares the corporation is authorized to issue is:

100

## Article V

The name and Florida street address of the registered agent is:

DOMINICK  RUSSO
5019 FERNCREST DR.
WINTER PARK, FL.   32792

I certify that I am familiar with and accept the responsibilities of registered agent.

Registered Agent Signature:   DOMINICK RUSSO

P19000092120
FILED
December 05, 2019
Sec. Of State
ndmccleessam

## Article VI

The name and address of the incorporator is:

TONY WRIGHT
5019 FERNCREST DR

WINTER PARK FLORIDA 32792

Electronic Signature of Incorporator:   TONY WRIGHT

I am the incorporator submitting these Articles of Incorporation and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.  I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of this corporation and every year thereafter to maintain "active" status.

## Article VII

The initial officer(s) and/or director(s) of the corporation is/are:

Title:   P
TONY  WRIGHT
5002 FERNCREST DR.
WINTER PARK, FL.   32792

Title:   VP
MATILDE  SANTANA
5019 FRENCREST DR.
WINTER PARK, FL.   32792

## Article VIII

The effective date for this corporation shall be:

12/04/2019

9/15/21, 3:41 PM                                    Detail by Officer/Registered Agent Name

FLORIDA DEPARTMENT of STATE                                          DIVISION OF CORPORATIONS



# Detail by Officer/Registered Agent Name

Florida Limited Liability Company
ATMOSPHERIC WATER, LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L19000172299 |
| **FEI/EIN Number** | NONE |
| **Date Filed** | 07/02/2019 |
| **Effective Date** | 07/02/2019 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | ADMIN DISSOLUTION FOR ANNUAL REPORT |
| **Event Date Filed** | 09/25/2020 |
| **Event Effective Date** | NONE |

**Principal Address**

501 N ORLANDO AVE
SUITE 313 311
WINTER PARK, FL 32789

**Mailing Address**

501 N ORLANDO AVE
SUITE 313 311
WINTER PARK, FL 32789

**Registered Agent Name & Address**

SANTANA, MATILDE
501 N ORLANDO AVE
SUITE 313 311
WINTER PARK, FL 32789

**Authorized Person(s) Detail**

**Name & Address**

Title MGR

SANTANA, MATILDE
501 N ORLANDO AVE SUITE 313 311
WINTER PARK, FL 32789-0

Title MGR

CERRUTO, TATIANA



△π EXHIBIT 3
Deponent Cicale
Date 9/23/2021 Rptr.
WWW.DEPOBOOK.COM

9/15/21, 3:41 PM                                      Detail by Officer/Registered Agent Name

121 S ORANGE AVE SUITE 1500
ORLANDO, FL 32801

**Annual Reports**

**No Annual Reports Filed**

**Document Images**

07/02/2019 -- Florida Limited Liability        View image in PDF format

Florida Department of State, Division of Corporations

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

L19000172299
FILED 8:00 AM
July 02, 2019
Sec. Of State
kepage

## Article I

The name of the Limited Liability Company is:

ATMOSPHERIC WATER, LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

501 N ORLANDO AVE
SUITE 313 311
WINTER PARK, FL.  32789

The mailing address of the Limited Liability Company is:

501 N ORLANDO AVE
SUITE 313 311
WINTER PARK, FL.  32789

## Article III

The name and Florida street address of the registered agent is:

MATILDE  SANTANA
501 N ORLANDO AVE
SUITE 313 311
WINTER PARK, FL.  32789

Having been named as registered agent and to accept service of process for the above stated limited
liability company at the place designated in this certificate, I hereby accept the appointment as registered
agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes
relating to the proper and complete performance of my duties, and I am familiar with and accept the
obligations of my position as registered agent.

Registered Agent Signature:   MATILDE SANTANA

## Article IV

The name and address of person(s) authorized to manage LLC:

L19000172299
FILED 8:00 AM
July 02, 2019
Sec. Of State
kepage

Title:  MGR
MATILDE  SANTANA
501 N ORLANDO AVE SUITE 313 311
WINTER PARK, FL.   327890

Title:  MGR
TATIANA  CERRUTO
121 S ORANGE AVE SUITE 1500
ORLANDO, FL.   32801

## Article V

The effective date for this Limited Liability Company shall be:

07/02/2019

Signature of member or an authorized representative

Electronic Signature: MATILDE SANTANA

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

9/15/21, 3:41 PM                                        Detail by Officer/Registered Agent Name

FLORIDA DEPARTMENT of STATE                                              DIVISION of CORPORATIONS



Department of State  /  Division of Corporations  /  Search Records  /  Search by Officer/Registered Agent Name  /

# Detail by Officer/Registered Agent Name

Florida Limited Liability Company
AURUM ENTERPRISES UNITED, LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L19000172282 |
| **FEI/EIN Number** | NONE |
| **Date Filed** | 07/02/2019 |
| **Effective Date** | 07/02/2019 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | ADMIN DISSOLUTION FOR ANNUAL REPORT |
| **Event Date Filed** | 09/25/2020 |
| **Event Effective Date** | NONE |

**Principal Address**

501 N ORLANDO AVE
SUITE 313 311
WINTER PARK, FL 32789

**Mailing Address**

501 N ORLANDO AVE
SUITE 313 311
WINTER PARK, FL 32789

**Registered Agent Name & Address**

SANTANA, MATILDE
501 N ORLANDO AVE
SUITE 313 311
WINTER PARK, FL 32789



**Authorized Person(s) Detail**

**Name & Address**

Title MGR

SANTANA, MATILDE
501 N ORLANDO AVE SUITE 313 311
WINTER PARK, FL 32789

Title MGR

CERRUTO, TATIANA

search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=OfficerRegisteredAgentName&directionType=CurrentList&searchNama…      1/3

Detail by Officer/Registered Agent Name

121 S ORANGE AVE SUITE 1500
ORLANDO, FL 32801

**Annual Reports**

**No Annual Reports Filed**

**Document Images**

07/02/2019 -- Florida Limited Liabiliy     View image in PDF format

Florida Department of State, Division of Corporations

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

L19000172282
FILED 8:00 AM
July 02, 2019
Sec. Of State
msimmons

## Article I

The name of the Limited Liability Company is:

AURUM ENTERPRISES UNITED, LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

501 N ORLANDO AVE
SUITE 313 311
WINTER PARK, FL.  32789

The mailing address of the Limited Liability Company is:

501 N ORLANDO AVE
SUITE 313 311
WINTER PARK, FL.  32789

## Article III

The name and Florida street address of the registered agent is:

MATILDE  SANTANA
501 N ORLANDO AVE
SUITE 313 311
WINTER PARK, FL.  32789

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:   MATILDE SANTANA

## Article IV

The name and address of person(s) authorized to manage LLC:

Title:  MGR
MATILDE  SANTANA
501 N ORLANDO AVE SUITE 313 311
WINTER PARK, FL.  32789

Title:  MGR
TATIANA  CERRUTO
121 S ORANGE AVE SUITE 1500
ORLANDO, FL.  32801

## Article V

The effective date for this Limited Liability Company shall be:

07/02/2019

Signature of member or an authorized representative

Electronic Signature: MATILDE SANTANA

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

L19000172282
FILED 8:00 AM
July 02, 2019
Sec. Of State
msimmons

9/15/21, 3:47 PM                                                    Detail by Officer/Registered Agent Name

FLORIDA DEPARTMENT of STATE                                                       DIVISION OF CORPORATIONS



Department of State  /  Division of Corporations  /  Search Records  /  Search by Officer/Registered Agent Name  /

# Detail by Officer/Registered Agent Name

Florida Limited Liability Company
CAPSULE CARE LLC

## Filing Information

**Document Number**      L16000220595
**FEI/EIN Number**       81-5191004
**Date Filed**           12/06/2016
**Effective Date**       12/06/2016
**State**                FL
**Status**               ACTIVE

## Principal Address

501 N. ORLANDO AVE.
SUITE 313-311
WINTER PARK, FL 32789

## Mailing Address

501 N. ORLANDO AVE.
SUITE 313-311
WINTER PARK, FL 32789

## Registered Agent Name & Address

Russo, Dominick
501 N. ORLANDO AVE.
SUITE 313-311
WINTER PARK, FL 32789

Name Changed: 06/26/2019

## Authorized Person(s) Detail

**Name & Address**

Title AR

SANTANA, MATILDE A
501 N. ORLANDO AVE. SUITE 313-311
WINTER PARK, FL 32789



Title Authorized Member

Link, Eric

9/15/21, 3:47 PM                                    Detail by Officer/Registered Agent Name

PO Box 4955
Winter Park, FL 32793

Title Authorized Member

Sanchez, Alejandro
15172 Newtonia St.
Winter Garden, FL 34787

**Annual Reports**

| Report Year | Filed Date |
|---|---|
| 2020 | 05/10/2020 |
| 2020 | 05/19/2020 |
| 2021 | 04/04/2021 |

**Document Images**

| | |
|---|---|
| 04/04/2021 -- ANNUAL REPORT | View image in PDF format |
| 05/22/2020 -- AMENDED ANNUAL REPORT | View image in PDF format |
| 05/19/2020 -- AMENDED ANNUAL REPORT | View image in PDF format |
| 05/10/2020 -- ANNUAL REPORT | View image in PDF format |
| 06/26/2019 -- ANNUAL REPORT | View image in PDF format |
| 04/30/2018 -- ANNUAL REPORT | View image in PDF format |
| 02/01/2017 -- ANNUAL REPORT | View image in PDF format |
| 12/06/2016 -- Florida Limited Liability | View image in PDF format |

Florida Department of State, Division of Corporations

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

L16000220595
FILED 8:00 AM
December 06, 2016
Sec. Of State
cgolden

## Article I

The name of the Limited Liability Company is:

CAPSULE CARE LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

501 N. ORLANDO AVE.
SUITE 313-311
WINTER PARK, FL.   32789

The mailing address of the Limited Liability Company is:

501 N. ORLANDO AVE.
SUITE 313-311
WINTER PARK, FL.   32789

## Article III

The name and Florida street address of the registered agent is:

ZIDNA  LEBRON
501 N. ORLANDO AVE.
SUITE 313-311
WINTER PARK, FL.   32789

Having been named as registered agent and to accept service of process for the above stated limited
liability company at the place designated in this certificate, I hereby accept the appointment as registered
agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes
relating to the proper and complete performance of my duties, and I am familiar with and accept the
obligations of my position as registered agent.

Registered Agent Signature:   ZIDNA LEBRON

## Article IV

The name and address of person(s) authorized to manage LLC:

L16000220595
FILED 8:00 AM
December 06, 2016
Sec. Of State
cgolden

    Title:  AR
    MATILDE A SANTANA
    501 N. ORLANDO AVE. SUITE 313-311
    WINTER PARK, FL.  32789

## Article V

The effective date for this Limited Liability Company shall be:

    12/06/2016

Signature of member or an authorized representative

Electronic Signature: ZIDNA LEBRON

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

## 2021  FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L16000220595

**Entity Name:** CAPSULE CARE LLC

**FILED**
**Apr 04, 2021**
**Secretary of State**
**5645735829CC**

**Current Principal  Place of Business:**

501 N. ORLANDO AVE.
SUITE 313-311
WINTER PARK,  FL  32789

**Current Mailing Address:**

501 N. ORLANDO AVE.
SUITE 313-311
WINTER PARK,  FL  32789  US

**FEI Number:** 81-5191004

**Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

RUSSO, DOMINICK
501 N. ORLANDO AVE.
SUITE 313-311
WINTER PARK, FL  32789  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:  DOMINICK RUSSO                                         04/04/2021
                          Electronic Signature of Registered Agent                                Date

**Authorized Person(s) Detail :**

| | | | | |
|---|---|---|---|---|
| Title | AR | | Title | AUTHORIZED MEMBER |
| Name | SANTANA, MATILDE A | | Name | LINK, ERIC |
| Address | 501 N. ORLANDO AVE. SUITE 313-311 | | Address | PO BOX 4955 |
| City-State-Zip: | WINTER PARK FL 32789 | | City-State-Zip: | WINTER PARK FL 32793 |

| | |
|---|---|
| Title | AUTHORIZED MEMBER |
| Name | SANCHEZ, ALEJANDRO |
| Address | 15172 NEWTONIA ST. |
| City-State-Zip: | WINTER GARDEN  FL  34787 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: MATILDE SANTANA                            AR                            04/04/2021
                      Electronic Signature of Signing Authorized Person(s) Detail                                              Date

9/15/21, 3:36 PM                                        Detail by Officer/Registered Agent Name

FLORIDA DEPARTMENT *of* STATE                                        DIVISION OF CORPORATIONS



# Detail by Officer/Registered Agent Name

Florida Limited Liability Company
CICALE FILES LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L14000169930 |
| **FEI/EIN Number** | 47-2217390 |
| **Date Filed** | 10/31/2014 |
| **Effective Date** | 10/31/2014 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | ADMIN DISSOLUTION FOR ANNUAL REPORT |
| **Event Date Filed** | 09/23/2016 |
| **Event Effective Date** | NONE |

**Principal Address**

501 N. ORLANDO AVE.
STE: 313-311
WINTER PARK, FL 32789

**Mailing Address**

501 N. ORLANDO AVE.
STE: 313-311
WINTER PARK, FL 32789

**Registered Agent Name & Address**

SANTANA, MATILDE
501 N. ORLANDO AVE.
STE: 313-311
WINTER PARK, FL 32789



**Authorized Person(s) Detail**

**Name & Address**

Title MGR

SANTANA, MATILDE
501 N. ORLANDO AVE. STE: 313-311
WINTER PARK, FL 32789

Title MGR

ED, LIEBER

9/15/21, 3:36 PM                                    Detail by Officer/Registered Agent Name

141 WOODMERE BLVD. APT 5G
WOODMERE,, NY 11598

Annual Reports

| Report Year | Filed Date |
|---|---|
| 2015 | 05/16/2015 |

Document Images

| | |
|---|---|
| 05/16/2015 -- ANNUAL REPORT | View image in PDF format |
| 10/31/2014 -- Florida Limited Liability | View image in PDF format |

Florida Department of State, Division of Corporations

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

L14000169930
FILED 8:00 AM
October 31, 2014
Sec. Of State
jdharris

## Article I

The name of the Limited Liability Company is:

CICALE FILES LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

501 N. ORLANDO AVE.
STE: 313-311
WINTER PARK, FL.   32789

The mailing address of the Limited Liability Company is:

501 N. ORLANDO AVE.
STE: 313-311
WINTER PARK, FL.   32789

## Article III

The name and Florida street address of the registered agent is:

MATILDE  SANTANA
501 N. ORLANDO AVE.
STE: 313-311
WINTER PARK, FL.   32789

Having been named as registered agent and to accept service of process for the above stated limited
liability company at the place designated in this certificate, I hereby accept the appointment as registered
agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes
relating to the proper and complete performance of my duties, and I am familiar with and accept the
obligations of my position as registered agent.

Registered Agent Signature:   MATILDE SANTANA

## Article IV

The name and address of person(s) authorized to manage LLC:

Title:  MGR
MATILDE  SANTANA
501 N. ORLANDO AVE. STE: 313-311
WINTER PARK, FL.  32789

Title:  MGR
LIEBER  ED
141 WOODMERE BLVD. APT 5G
WOODMERE,, NY.  11598

L14000169930
FILED 8:00 AM
October 31, 2014
Sec. Of State
jdharris

## Article V

The effective date for this Limited Liability Company shall be:

10/31/2014

### Signature of member or an authorized representative

Electronic Signature: MATILDE A SANTANA

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

9/15/21, 3:35 PM                                   Detail by Officer/Registered Agent Name

FLORIDA DEPARTMENT OF STATE                                        DIVISION OF CORPORATIONS



Department of State  /  Division of Corporations  /  Search Records  /  Search by Officer/Registered Agent Name  /

## Detail by Officer/Registered Agent Name

Florida Limited Liability Company

D.C. CONCEPTS CONSTRUCTION & DESIGN LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L14000106430 |
| **FEI/EIN Number** | 47-1261481 |
| **Date Filed** | 07/03/2014 |
| **Effective Date** | 07/04/2014 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | LC DISSOCIATION MEM |
| **Event Date Filed** | 12/08/2014 |
| **Event Effective Date** | NONE |

**Principal Address**

501 NORTH ORLANDO AVE.
STE: 313-311
WINTER PARK, FL 32789

**Mailing Address**

501 NORTH ORLANDO AVE.
STE: 313-311
WINTER PARK, FL 32789

**Registered Agent Name & Address**

Santana, Matilde
5019 FERNCREST DRIVE
WINTER PARK, FL 32792

Name Changed: 03/31/2020

**Authorized Person(s) Detail**

**Name & Address**

Title CEO

Santana, Matilde
501 NORTH ORLANDO AVE.
Suite 313-311
WINTER PARK, FL 32789



**Annual Reports**

9/15/21, 3:35 PM                                          Detail by Officer/Registered Agent Name

| Report Year | Filed Date |
|-------------|------------|
| 2020 | 02/13/2020 |
| 2020 | 03/31/2020 |
| 2021 | 03/24/2021 |

**Document Images**

| | |
|---|---|
| 03/24/2021 -- ANNUAL REPORT | View image in PDF format |
| 03/31/2020 -- AMENDED ANNUAL REPORT | View image in PDF format |
| 02/13/2020 -- ANNUAL REPORT | View image in PDF format |
| 02/12/2019 -- ANNUAL REPORT | View image in PDF format |
| 01/09/2018 -- ANNUAL REPORT | View image in PDF format |
| 04/28/2017 -- ANNUAL REPORT | View image in PDF format |
| 03/03/2016 -- ANNUAL REPORT | View image in PDF format |
| 05/16/2015 -- ANNUAL REPORT | View image in PDF format |
| 12/08/2014 -- CORLCDSMEM | View image in PDF format |
| 07/03/2014 -- Florida Limited Liability | View image in PDF format |

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

L14000106430
FILED 8:00 AM
July 03, 2014
Sec. Of State
jshivers

## Article I

The name of the Limited Liability Company is:

D.C. CONCEPTS CONSTRUCTION & DESIGN LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

501 NORTH ORLANDO AVE.
STE: 313-311
WINTER PARK, FL.   32789

The mailing address of the Limited Liability Company is:

501 NORTH ORLANDO AVE.
STE: 313-311
WINTER PARK, FL.   32789

## Article III

The name and Florida street address of the registered agent is:

MATILDE A SANTANA
5019 FERNCREST DRIVE
WINTER PARK, FL.   32792

Having been named as registered agent and to accept service of process for the above stated limited
liability company at the place designated in this certificate, I hereby accept the appointment as registered
agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes
relating to the proper and complete performance of my duties, and I am familiar with and accept the
obligations of my position as registered agent.

Registered Agent Signature:   MATILDE SANTANA

## Article IV

The name and address of person(s) authorized to manage LLC:

L14000106430
FILED 8:00 AM
July 03, 2014
Sec. Of State
jshivers

Title:  MGR
MATILDE A. SANTANA CEO
501 N. ORLANDO AVE. STE: 313-311
WINTER PARK, FL.  32789

Title:  AP
DOMINICK CICALE PRESIDENT
501 N. ORLANDO AVE. STE: 313-311
WINTER PARK, FL.  32789

## Article V

The effective date for this Limited Liability Company shall be:

07/04/2014

Signature of member or an authorized representative

Electronic Signature: MATILDE A SANTANA

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

## 2021 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L14000106430

**Entity Name:** D.C. CONCEPTS CONSTRUCTION & DESIGN LLC

**FILED**
**Mar 24, 2021**
**Secretary of State**
**3128475386CC**

**Current Principal Place of Business:**

501 NORTH ORLANDO AVE.
STE: 313-311
WINTER PARK, FL 32789

**Current Mailing Address:**

501 NORTH ORLANDO AVE.
STE: 313-311
WINTER PARK, FL 32789

**FEI Number:** 47-1261481                                **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

SANTANA, MATILDE
5019 FERNCREST DRIVE
WINTER PARK, FL 32792 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:   MATILDE SANTANA                                                      03/24/2021
            Electronic Signature of Registered Agent                                    Date

**Authorized Person(s) Detail :**

| | |
|---|---|
| Title | CEO |
| Name | SANTANA, MATILDE |
| Address | 501 NORTH ORLANDO AVE. |
| | SUITE 313-311 |
| City-State-Zip: | WINTER PARK FL 32789 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: MATILDE SANTANA                      CEO                      03/24/2021
            Electronic Signature of Signing Authorized Person(s) Detail                      Date

Form **1120S**

Department of the Treasury
Internal Revenue Service

## U.S. Income Tax Return for an S Corporation

► Do not file this form unless the corporation has filed or is attaching Form 2553 to elect to be an S corporation.
► Information about Form 1120S and its separate instructions is at *www.irs.gov/form1120s.*

OMB No. 1545-0123

**2016**

For calendar year 2016 or tax year beginning _____ , 2016, ending _____ , 20 ____

| | | |
|---|---|---|
| **A** S election effective date<br>01/01/2015 | **TYPE** | **Name**<br>D.C. CONCEPTS CONSTRUCTION & DESIGN LLC | **D** Employer identification number<br>47-1261481 |
| **B** Business activity code number (see instructions)<br>236200 | **OR**<br>**PRINT** | **Number, street, and room or suite no.** If a P.O. box, see instructions.<br>501 N ORLANDO AVENUE SUITE 313-311 | **E** Date incorporated<br>07/03/2014 |
| **C** Check if Sch. M-3 attached ☐ | | **City or town, state or province, country, and ZIP or foreign postal code**<br>WINTER PARK FL 32789 | **F** Total assets (see instructions)<br>$ 307,038. |

**G** Is the corporation electing to be an S corporation beginning with this tax year? ☐ Yes ☒ No   If "Yes," attach Form 2553 if not already filed
**H** Check if: **(1)** ☐ Final return  **(2)** ☐ Name change  **(3)** ☐ Address change  **(4)** ☐ Amended return  **(5)** ☐ S election termination or revocation
**I** Enter the number of shareholders who were shareholders during any part of the tax year . . . . . . . . . . . ► 1

**Caution:** Include **only** trade or business income and expenses on lines 1a through 21. See the instructions for more information.

### Income

| | | | |
|---|---|---|---|
| 1a | Gross receipts or sales . . . . . . . . . . | 1a | 851,216. | | |
| b | Returns and allowances . . . . . . . . . | 1b | 250. | | |
| c | Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . . . . | 1c | 850,966. |
| 2 | Cost of goods sold (attach Form 1125-A) . . . . . . . . . . . . . . | 2 | 500,367. |
| 3 | Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . . . . | 3 | 350,599. |
| 4 | Net gain (loss) from Form 4797, line 17 (attach Form 4797) . . . . . . . . | 4 | |
| 5 | Other income (loss) (see instructions—attach statement) . . . . . . . . | 5 | |
| 6 | **Total income (loss).** Add lines 3 through 5 . . . . . . . . . . ► | 6 | 350,599. |

### Deductions (see instructions for limitations)

| | | | |
|---|---|---|---|
| 7 | Compensation of officers (see instructions—attach Form 1125-E) . . . . . . | 7 | 44,000. |
| 8 | Salaries and wages (less employment credits) . . . . . . . . . . . | 8 | 36,978. |
| 9 | Repairs and maintenance . . . . . . . . . . . . . . . . . . . | 9 | |
| 10 | Bad debts . . . . . . . . . . . . . . . . . . . . . . . . | 10 | |
| 11 | Rents . . . . . . . . . . . . . . . . . . . . . . . . . | 11 | 3,168. |
| 12 | Taxes and licenses . . . . . . . . . . . . . . . . . . . . . | 12 | 8,633. |
| 13 | Interest . . . . . . . . . . . . . . . . . . . . . . . . . | 13 | |
| 14 | Depreciation not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | 14 | 2,300. |
| 15 | Depletion **(Do not deduct oil and gas depletion.)** . . . . . . . . . . | 15 | |
| 16 | Advertising . . . . . . . . . . . . . . . . . . . . . . . | 16 | |
| 17 | Pension, profit-sharing, etc., plans . . . . . . . . . . . . . . . | 17 | |
| 18 | Employee benefit programs . . . . . . . . . . . . . . . . . . | 18 | |
| 19 | Other deductions (attach statement)   See Statement . . . . . . . . | 19 | 162,129. |
| 20 | **Total deductions.** Add lines 7 through 19 . . . . . . . . . . . ► | 20 | 257,208. |
| 21 | **Ordinary business income (loss).** Subtract line 20 from line 6 . . . . . | 21 | 93,391. |

### Tax and Payments

| | | | |
|---|---|---|---|
| 22a | Excess net passive income or LIFO recapture tax (see instructions) . . | 22a | | | |
| b | Tax from Schedule D (Form 1120S) . . . . . . . . . | 22b | | | |
| c | Add lines 22a and 22b (see instructions for additional taxes) . . . . . . | 22c | |
| 23a | 2016 estimated tax payments and 2015 overpayment credited to 2016 | 23a | | | |
| b | Tax deposited with Form 7004 . . . . . . . . . . | 23b | | | |
| c | Credit for federal tax paid on fuels (attach Form 4136) . . | 23c | | | |
| d | Add lines 23a through 23c . . . . . . . . . . . . . . . . . | 23d | |
| 24 | Estimated tax penalty (see instructions). Check if Form 2220 is attached . . ► ☐ | 24 | |
| 25 | **Amount owed.** If line 23d is smaller than the total of lines 22c and 24, enter amount owed . | 25 | |
| 26 | **Overpayment.** If line 23d is larger than the total of lines 22c and 24, enter amount overpaid . | 26 | |
| 27 | Enter amount from line 26 **Credited to 2017 estimated tax** ► _____ **Refunded** ► | 27 | |

### Sign Here

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Signature of officer | Date | Title: PRESIDENT | May the IRS discuss this return<br>with the preparer shown below<br>(see instructions)? ☐ Yes ☒ No |

### Paid Preparer Use Only

| Print/Type preparer's name<br>RICHARD B WIGGINS III CPA | Preparer's signature<br>*Richard B Wiggins III CPA* | Date<br>7/24/17 | Check ☐ if<br>self-employed | PTIN<br>P01430587 |
| Firm's name ► *Wiggins & Company P.A.* | | | Firm's EIN ► 65-1547278 |
| Firm's address ► 550 N. Reo St. Tampa, FL | | | Phone no. 813-261-3050 |

For Paperwork Reduction Act Notice, see separate instructions.

BAA                    REV 04/04/17 TTW                    Form **1120S** (2016)



△π EXHIBIT 8
Deponent *Cicale*
Date *10/28/2021* Rptr. ___
WWW.DEPOBOOK.COM

302946

Form 1120S (2016)                                                                         Page **2**

**Schedule B**   **Other Information**  (see instructions)

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Check accounting method:   **a** ☒ Cash   **b** ☐ Accrual | | | |
| |       **c** ☐ Other (specify) ▶ | | | |
| 2 | See the instructions and enter the: | | | |
| | **a** Business activity ▶ CONSTRUCTION           **b** Product or service ▶ SERVICE | | | |
| 3 | At any time during the tax year, was any shareholder of the corporation a disregarded entity, a trust, an estate, or a nominee or similar person? If "Yes," attach Schedule B-1, Information on Certain Shareholders of an S Corporation  .  . | | | × |
| 4 | At the end of the tax year, did the corporation: | | | |
| **a** | Own directly 20% or more, or own, directly or indirectly, 50% or more of the total stock issued and outstanding of any foreign or domestic corporation? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (v) below . . . . . . . . . . . . | | | × |

| (i) Name of Corporation | (ii) Employer Identification Number (if any) | (iii) Country of Incorporation | (iv) Percentage of Stock Owned | (v) If Percentage in (iv) is 100%, Enter the Date (if any) a Qualified Subchapter S Subsidiary Election Was Made |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | | Yes | No |
|---|---|---|---|---|
| **b** | Own directly an interest of 20% or more, or own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital in any foreign or domestic partnership (including an entity treated as a partnership) or in the beneficial interest of a trust? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (v) below . . . | | | × |

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | | Yes | No |
|---|---|---|---|---|
| 5 a | At the end of the tax year, did the corporation have any outstanding shares of restricted stock? .  .  .  .  .  .  . | | | × |
| | If "Yes," complete lines (i) and (ii) below. | | | |
| | (i)    Total shares of restricted stock . . . . . . . . . . ▶ | | | |
| | (ii)   Total shares of non-restricted stock . . . . . . . . ▶ | | | |
| b | At the end of the tax year, did the corporation have any outstanding stock options, warrants, or similar instruments? . | | | × |
| | If "Yes," complete lines (i) and (ii) below. | | | |
| | (i)    Total shares of stock outstanding at the end of the tax year ▶ | | | |
| | (ii)   Total shares of stock outstanding if all instruments were executed ▶ | | | |
| 6 | Has this corporation filed, or is it required to file, **Form 8918**, Material Advisor Disclosure Statement, to provide information on any reportable transaction? . . . . . . . . . . . . . . . . . . . | | | × |
| 7 | Check this box if the corporation issued publicly offered debt instruments with original issue discount . . . ▶ ☐ | | | |
| | If checked, the corporation may have to file **Form 8281**, Information Return for Publicly Offered Original Issue Discount Instruments. | | | |
| 8 | If the corporation: **(a)** was a C corporation before it elected to be an S corporation **or** the corporation acquired an asset with a basis determined by reference to the basis of the asset (or the basis of any other property) in the hands of a C corporation **and (b)** has net unrealized built-in gain in excess of the net recognized built-in gain from prior years, enter the net unrealized built-in gain reduced by net recognized built-in gain from prior years (see instructions) . . . . . . . . . . . ▶ $ | | | |
| 9 | Enter the accumulated earnings and profits of the corporation at the end of the tax year. . . . $ | | | |
| 10 | Does the corporation satisfy **both** of the following conditions? | | | |
| a | The corporation's total receipts (see instructions) for the tax year were less than $250,000 . . . . . . . | | | |
| b | The corporation's total assets at the end of the tax year were less than $250,000 . . . . . . . . | | | × |
| | If "Yes," the corporation is not required to complete Schedules L and M-1. | | | |
| 11 | During the tax year, did the corporation have any non-shareholder debt that was canceled, was forgiven, or had the terms modified so as to reduce the principal amount of the debt? . . . . . . . . . . . | | | × |
| | If "Yes," enter the amount of principal reduction  $ | | | |
| 12 | During the tax year, was a qualified subchapter S subsidiary election terminated or revoked? If "Yes," see instructions . | | | × |
| 13 a | Did the corporation make any payments in 2016 that would require it to file Form(s) 1099? . . . . . | | | × |
| b | If "Yes," did the corporation file or will it file required Forms 1099? . . . . . . . . . . | | | |

BAA                                REV 04/04/17 TTW                                        Form **1120S** (2016)

Form 1120S (2016)  Page **3**

| Schedule K | | Shareholders' Pro Rata Share Items | | Total amount |
|---|---|---|---|---|
| **Income (Loss)** | 1 | Ordinary business income (loss) (page 1, line 21) | 1 | 93,391. |
| | 2 | Net rental real estate income (loss) (attach Form 8825) | 2 | |
| | 3a | Other gross rental income (loss) . . . . . . . 3a | | |
| | b | Expenses from other rental activities (attach statement) 3b | | |
| | c | Other net rental income (loss). Subtract line 3b from line 3a | 3c | |
| | 4 | Interest income | 4 | |
| | 5 | Dividends: a Ordinary dividends | 5a | |
| | | b Qualified dividends . . . . . 5b | | |
| | 6 | Royalties | 6 | |
| | 7 | Net short-term capital gain (loss) (attach Schedule D (Form 1120S)) | 7 | |
| | 8a | Net long-term capital gain (loss) (attach Schedule D (Form 1120S)) | 8a | |
| | b | Collectibles (28%) gain (loss) . . . . . 8b | | |
| | c | Unrecaptured section 1250 gain (attach statement) 8c | | |
| | 9 | Net section 1231 gain (loss) (attach Form 4797) | 9 | |
| | 10 | Other income (loss) (see instructions) . . . Type ▶ | 10 | |
| **Deductions** | 11 | Section 179 deduction (attach Form 4562) | 11 | |
| | 12a | Charitable contributions . . . . . Cash contribution (50%) | 12a | 250. |
| | b | Investment interest expense | 12b | |
| | c | Section 59(e)(2) expenditures **(1)** Type ▶ **(2)** Amount ▶ | 12c(2) | |
| | d | Other deductions (see instructions) . . . Type ▶ | 12d | |
| **Credits** | 13a | Low-income housing credit (section 42(j)(5)) | 13a | |
| | b | Low-income housing credit (other) | 13b | |
| | c | Qualified rehabilitation expenditures (rental real estate) (attach Form 3468, if applicable) | 13c | |
| | d | Other rental real estate credits (see instructions)  Type ▶ | 13d | |
| | e | Other rental credits (see instructions) . . . Type ▶ | 13e | |
| | f | Biofuel producer credit (attach Form 6478) | 13f | |
| | g | Other credits (see instructions) . . . . Type ▶ | 13g | |
| **Foreign Transactions** | 14a | Name of country or U.S. possession ▶ | | |
| | b | Gross income from all sources | 14b | |
| | c | Gross income sourced at shareholder level | 14c | |
| | | Foreign gross income sourced at corporate level | | |
| | d | Passive category | 14d | |
| | e | General category | 14e | |
| | f | Other (attach statement) | 14f | |
| | | Deductions allocated and apportioned at shareholder level | | |
| | g | Interest expense | 14g | |
| | h | Other | 14h | |
| | | Deductions allocated and apportioned at corporate level to foreign source income | | |
| | i | Passive category | 14i | |
| | j | General category | 14j | |
| | k | Other (attach statement) | 14k | |
| | | Other information | | |
| | l | Total foreign taxes (check one): ▶ ☐ Paid ☐ Accrued | 14l | |
| | m | Reduction in taxes available for credit (attach statement) | 14m | |
| | n | Other foreign tax information (attach statement) | | |
| **Alternative Minimum Tax (AMT) Items** | 15a | Post-1986 depreciation adjustment | 15a | |
| | b | Adjusted gain or loss | 15b | |
| | c | Depletion (other than oil and gas) | 15c | |
| | d | Oil, gas, and geothermal properties—gross income | 15d | |
| | e | Oil, gas, and geothermal properties—deductions | 15e | |
| | f | Other AMT items (attach statement) | 15f | |
| **Items Affecting Shareholder Basis** | 16a | Tax-exempt interest income | 16a | |
| | b | Other tax-exempt income | 16b | |
| | c | Nondeductible expenses | 16c | 494. |
| | d | Distributions (attach statement if required) (see instructions) | 16d | |
| | e | Repayment of loans from shareholders | 16e | |

BAA   REV 04/04/17 TTW   Form **1120S** (2016)

302948

Form 1120S (2016)      Page **4**

## Schedule K — Shareholders' Pro Rata Share Items (continued)

| | | | Total amount |
|---|---|---|---|
| **Other Information** | 17a | Investment income . . . . . . . . . . | **17a** | |
| | b | Investment expenses . . . . . . . . . | **17b** | |
| | c | Dividend distributions paid from accumulated earnings and profits . . . . . . . | **17c** | |
| | d | Other items and amounts (attach statement) | | |
| **Recon- ciliation** | 18 | **Income/loss reconciliation.** Combine the amounts on lines 1 through 10 in the far right column. From the result, subtract the sum of the amounts on lines 11 through 12d and 14l | **18** | 93,141. |

## Schedule L — Balance Sheets per Books

| | Assets | Beginning of tax year (a) | (b) | End of tax year (c) | (d) |
|---|---|---|---|---|---|
| 1 | Cash . . . . . . . . . | | 45,579. | | 51,825. |
| 2a | Trade notes and accounts receivable . . | | | | |
| b | Less allowance for bad debts . . . . . | ( ) | | ( ) | |
| 3 | Inventories . . . . . . | | 0. | | 0. |
| 4 | U.S. government obligations . . . . | | | | |
| 5 | Tax-exempt securities (see instructions) . | | | | |
| 6 | Other current assets (attach statement) Ln 6 St | | 0. | | 167,686. |
| 7 | Loans to shareholders . . . . . . | | | | |
| 8 | Mortgage and real estate loans . . . | | | | |
| 9 | Other investments (attach statement) . . | | | | |
| 10a | Buildings and other depreciable assets . . | 75,627. | | 15,095. | |
| b | Less accumulated depreciation . . . . | ( 0.) | 75,627. | ( 2,300.) | 12,795. |
| 11a | Depletable assets . . . . . . . | | | | |
| b | Less accumulated depletion . . . . . | ( ) | | ( ) | |
| 12 | Land (net of any amortization) . . . . | | | | 74,732. |
| 13a | Intangible assets (amortizable only) . . . | | | | |
| b | Less accumulated amortization . . . . | ( ) | | ( ) | |
| 14 | Other assets (attach statement) Ln 14 St | | 51,145. | | 0. |
| 15 | Total assets . . . . . . . . | | 172,351. | | 307,038. |
| | **Liabilities and Shareholders' Equity** | | | | |
| 16 | Accounts payable . . . . . . | | | | |
| 17 | Mortgages, notes, bonds payable in less than 1 year | | | | |
| 18 | Other current liabilities (attach statement) Ln 18 St | | 57,499. | | 0. |
| 19 | Loans from shareholders . . . . . | | | | 99,539. |
| 20 | Mortgages, notes, bonds payable in 1 year or more | | | | |
| 21 | Other liabilities (attach statement) . . . | | | | |
| 22 | Capital stock . . . . . . . . | | 162. | | 162. |
| 23 | Additional paid-in capital . . . . . | | | | |
| 24 | Retained earnings . . . . . . | | 114,690. | | 207,337. |
| 25 | Adjustments to shareholders' equity (attach statement) | | | | |
| 26 | Less cost of treasury stock . . . . . | | ( ) | | ( ) |
| 27 | Total liabilities and shareholders' equity . . | | 172,351. | | 307,038. |

BAA      REV 04/04/17 TTW      Form **1120S** (2016)

302949

Form 1120S (2016)                                                                                  Page **5**

## Schedule M-1   Reconciliation of Income (Loss) per Books With Income (Loss) per Return

**Note:** The corporation may be required to file Schedule M-3 (see instructions)

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | Net income (loss) per books | 92,647. | 5 | Income recorded on books this year not included on Schedule K, lines 1 through 10 (itemize): | | |
| 2 | Income included on Schedule K, lines 1, 2, 3c, 4, 5a, 6, 7, 8a, 9, and 10, not recorded on books this year (itemize): | | a | Tax-exempt interest $ _____ | | |
| 3 | Expenses recorded on books this year not included on Schedule K, lines 1 through 12 and 14l (itemize): | | 6 | Deductions included on Schedule K, lines 1 through 12 and 14l, not charged against book income this year (itemize): | | |
| a | Depreciation $ | | a | Depreciation $ _____ | | |
| b | Travel and entertainment $ _____ 494. | | | | | |
| | | 494. | 7 | Add lines 5 and 6 | | |
| 4 | Add lines 1 through 3 | 93,141. | 8 | Income (loss) (Schedule K, line 18). Line 4 less line 7 | | 93,141. |

## Schedule M-2   Analysis of Accumulated Adjustments Account, Other Adjustments Account, and Shareholders' Undistributed Taxable Income Previously Taxed (see instructions)

| | | (a) Accumulated adjustments account | (b) Other adjustments account | (c) Shareholders' undistributed taxable income previously taxed |
|---|---|---|---|---|
| 1 | Balance at beginning of tax year | 114,690. | | |
| 2 | Ordinary income from page 1, line 21 | 93,391. | | |
| 3 | Other additions | | | |
| 4 | Loss from page 1, line 21 | ( ) | | |
| 5 | Other reductions  See M-2 Line 5 Stmt | ( 744. ) | ( ) | |
| 6 | Combine lines 1 through 5 | 207,337. | | |
| 7 | Distributions other than dividend distributions | | | |
| 8 | Balance at end of tax year. Subtract line 7 from line 6 | 207,337. | | |

BAA                                                   REV 04/04/17 TTW                                              Form **1120S** (2016)

302950

| Form 1120S Schedule L | Other Assets | 2016 |
|---|---|---|

| Name | Employer ID Number |
|---|---|
| D.C. CONCEPTS CONSTRUCTION & DESIGN LLC | 47-1261481 |

**Note:** The expanding tables below will **not** print with the S corporation's tax return if the box is checked below Question 10, Schedule B, Form 1120S, page 2, to suspend the calculations of Schedules L and M-1.

| Other Current Assets: | Beginning of tax year | End of tax year |
|---|---|---|
| EMPLOYEE ADVANCES | 0. | 10,850. |
| LOAN RECEIVABLE AFFILIATE | 0. | 156,836. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total to Form 1120S, Schedule L, line 6** ▶ | 0. | 167,686. |

| Other Investments: | Beginning of tax year | End of tax year |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total to Form 1120S, Schedule L, line 9** ▶ | | |

| Other Assets: | Beginning of tax year | End of tax year |
|---|---|---|
| LOAN TO STOCKHOLDER | 51,145. | 0. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total to Form 1120S, Schedule L, line 14** ▶ | 51,145. | 0. |

SPSW1601.SCR  09/14/16

302951

| Form 1120S<br>Schedule L | **Other Liabilities**<br>and Adjustments to Shareholders' Equity | **2016** |
|---|---|---|

| Name<br>D.C. CONCEPTS CONSTRUCTION & DESIGN LLC | Employer ID Number<br>47-1261481 |
|---|---|

**Note:** The expanding tables below will **not** print with the S corporation's tax return if the box is checked below Question 10, Schedule B, Form 1120S, page 2, to suspend the calculations of Schedules L and M-1.

| Other Current Liabilities: | Beginning of<br>tax year | End of<br>tax year |
|---|---|---|
| LOANS FROM STOCKHOLDER | 45,000. | 0. |
| LOANS | 10,500. | 0. |
| PAYROLL LIABILITIES | 1,999. | 0. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| Total to Form 1120S, Schedule L, line 18 . . . . . . . . . . . . . ▶ | 57,499. | 0. |

| Other Liabilities: | Beginning of<br>tax year | End of<br>tax year |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| Total to Form 1120S, Schedule L, line 21 . . . . . . . . . . . . . ▶ | | |

| Adjustments to Shareholders' Equity: | Beginning of<br>tax year | End of<br>tax year |
|---|---|---|
| | | |
| | | |
| | | |
| Total to Form 1120S, Schedule L, line 25 . . . . . . . . . . . . . ▶ | | |

SPSW1701.SCR  09/14/16

302952

D.C. CONCEPTS CONSTRUCTION & DESIGN LLC                47-1261481                1

## Additional information from your 2016 US Form 1120S: Income Tax Return for S Corp Tax Return

**Form 1120S: S-Corporation Tax Return**
**Other Deductions**

Continuation Statement

| Description | Amount |
|---|---|
| MEALS AND ENTERTAINMENT (50%) | 495. |
| VEHICLE EXPENSE | 24,425. |
| MACHINERY OIL AND FUEL | 1,985. |
| BANK CHARGES | 1,304. |
| CONSULTING FEES | 27,828. |
| DUES AND SUBSCRIPTIONS | 80. |
| EQUIPMENT RENTALS | 28,890. |
| BUSINESS GIFTS | 2,500. |
| INSURANCE EXPENSES | 14,647. |
| INTERNET ACCESS FEES | 145. |
| LEGAL AND PROFESSIONAL FEES | 17,813. |
| MEDICAL EXPENSE | 7,850. |
| OFFICE EXPENSE | 630. |
| OUTSIDE SERVICES | 22,680. |
| PAYROLL PROCESSING FEES | 904. |
| POSTAGE | 7,105. |
| TELEPHONE | 1,236. |
| TRAVEL EXPENSE | 213. |
| WASTE REMOVAL FEES | 1,399. |
| **Total** | 162,129. |

**Form 1120S: S-Corporation Tax Return**
**M-2 Line 5, Other Reductions**

Continuation Statement

| Description | AAA Amount | OAA Amount |
|---|---|---|
| CHARITABLE CONTRIBUTIONS | 250. | |
| MEALS AND ENTERTAINMENT | 494. | |
| **Total** | 744. | |

**Form 1125-A: Cost of Goods Sold**
**Other Costs Statement**

Continuation Statement

| Other Cost | Other Amount |
|---|---|
| MATERIAL AND SUPPLIES | 286,617 |
| COSTS OF LAND CLEARING | 20,000 |
| COSTS OF GRADING AND HAULING | 193,750 |
| **Total** | 500,367 |

302953

Form **1125-A**

(Rev. October 2016)

Department of the Treasury
Internal Revenue Service

## Cost of Goods Sold

▶ Attach to Form 1120, 1120-C, 1120-F, 1120S, 1065, or 1065-B.
▶ Information about Form 1125-A and its instructions is at *www.irs.gov/form1125a.*

OMB No. 1545-0123

| Name | Employer identification number |
|---|---|
| D.C. CONCEPTS CONSTRUCTION & DESIGN LLC | 47-1261481 |

| | | | |
|---|---|---|---|
| 1 | Inventory at beginning of year | 1 | 0 |
| 2 | Purchases | 2 | |
| 3 | Cost of labor | 3 | |
| 4 | Additional section 263A costs (attach schedule) | 4 | |
| 5 | Other costs (attach schedule) . . . See Statement | 5 | 500,367 |
| 6 | **Total.** Add lines 1 through 5 | 6 | 500,367 |
| 7 | Inventory at end of year | 7 | 0 |
| 8 | **Cost of goods sold.** Subtract line 7 from line 6. Enter here and on Form 1120, page 1, line 2 or the appropriate line of your tax return. See instructions | 8 | 500,367 |

**9a** Check all methods used for valuing closing inventory:

    (i) ☒ Cost

    (ii) ☐ Lower of cost or market

    (iii) ☐ Other (Specify method used and attach explanation.) ▶ _____

**b** Check if there was a writedown of subnormal goods . . . . . . . . . . . . . . . . ▶ ☐

**c** Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) . . . ▶ ☐

**d** If the LIFO inventory method was used for this tax year, enter amount of closing inventory computed under LIFO | **9d** |

**e** If property is produced or acquired for resale, do the rules of section 263A apply to the entity? See instructions . . ☐ Yes ☒ No

**f** Was there any change in determining quantities, cost, or valuations between opening and closing inventory? If "Yes," attach explanation . . . . . . . . . . . . . . . . . . . ☐ Yes ☒ No

---

Section references are to the Internal Revenue Code unless otherwise noted.

## General Instructions

### Purpose of Form

Use Form 1125-A to calculate and deduct cost of goods sold for certain entities.

### Who Must File

Filers of Form 1120, 1120-C, 1120-F, 1120S, 1065, or 1065-B, must complete and attach Form 1125-A if the applicable entity reports a deduction for cost of goods sold.

### Inventories

Generally, inventories are required at the beginning and end of each tax year if the production, purchase, or sale of merchandise is an income-producing factor. See Regulations section 1.471-1. If inventories are required, you generally must use an accrual method of accounting for sales and purchases of inventory items.

**Exception for certain taxpayers.** If you are a qualifying taxpayer or a qualifying small business taxpayer (defined below), you can adopt or change your accounting method to account for inventoriable items in the same manner as materials and supplies that are not incidental.

Under this accounting method, inventory costs for raw materials purchased for use in producing finished goods and merchandise purchased for resale are deductible in the year the finished goods or merchandise are sold (but not before the year you paid for the raw materials or merchandise, if you are also using the cash method).

If you account for inventoriable items in the same manner as materials and supplies that are not incidental, you can currently deduct expenditures for direct labor and all indirect costs that would otherwise be included in inventory costs. See the instructions for lines 2 and 7.

For additional guidance on this method of accounting, see Pub. 538, Accounting Periods and Methods. For guidance on adopting or changing to this method of accounting, see Form 3115, Application for Change in Accounting Method, and its instructions.

**Qualifying taxpayer.** A qualifying taxpayer is a taxpayer that, (a) for each prior tax year ending after December 16, 1998, has average annual gross receipts of $1 million or less for the 3 prior tax years, and (b) its business is not a tax shelter (as defined in section 448(d)(3)). See Rev. Proc. 2001-10, 2001-2 I.R.B. 272.

**Qualifying small business taxpayer.** A qualifying small business taxpayer is a taxpayer that, (a) for each prior tax year

ending on or after December 31, 2000, has average annual gross receipts of $10 million or less for the 3 prior tax years, (b) whose principal business activity is not an ineligible activity, and (c) whose business is not a tax shelter (as defined in section 448 (d)(3)). See Rev. Proc. 2002-28, 2002-18 I.R.B. 815.

**Uniform capitalization rules.** The uniform capitalization rules of section 263A generally require you to capitalize, or include in inventory, certain costs incurred in connection with the following.

• The production of real property and tangible personal property held in inventory or held for sale in the ordinary course of business.

• Real property or personal property (tangible and intangible) acquired for resale.

• The production of real property and tangible personal property by a corporation for use in its trade or business or in an activity engaged in for profit.

See the discussion on section 263A uniform capitalization rules in the instructions for your tax return before completing Form 1125-A. Also see Regulations sections 1.263A-1 through 1.263A-3. See Regulations section 1.263A-4 for rules for property produced in a farming business.

---

For Paperwork Reduction Act Notice, see instructions.
BAA
REV 02/10/17 TTW
Form **1125-A** (Rev. 10-2016)

302954

Form **1125-E**
(Rev. October 2016)
Department of the Treasury
Internal Revenue Service

## Compensation of Officers

▶ Attach to Form 1120, 1120-C, 1120-F, 1120-REIT, 1120-RIC, or 1120S.
▶ Information about Form 1125-E and its separate instructions is at *www.irs.gov/form1125e.*

OMB No. 1545-0123

Name
D.C. CONCEPTS CONSTRUCTION & DESIGN LLC

Employer identification number
47-1261481

**Note:** Complete Form 1125-E only if total receipts are $500,000 or more. See instructions for definition of total receipts.

| (a) Name of officer | (b) Social security number (see instructions) | (c) Percent of time devoted to business | Percent of stock owned | | (f) Amount of compensation |
|---|---|---|---|---|---|
| | | | (d) Common | (e) Preferred | |
| 1 MATILDE SANTANA | -4743 | 100% | 100% | % | 44,000. |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |

| | | | |
|---|---|---|---|
| 2 | Total compensation of officers . . . . . . . . . . . . . . | 2 | 44,000. |
| 3 | Compensation of officers claimed on Form 1125-A or elsewhere on return . . . . . . . . | 3 | |
| 4 | Subtract line 3 from line 2. Enter the result here and on Form 1120, page 1, line 12 or the appropriate line of your tax return . . . . . . . . . . . . . . . . | 4 | 44,000. |

For Paperwork Reduction Act Notice, see separate instructions.
BAA

REV 02/09/17 TTW

Form **1125-E** (Rev. 10-2016)

302955

Form **4562**

Department of the Treasury
Internal Revenue Service  (99)

## Depreciation and Amortization
### (Including Information on Listed Property)
► Attach to your tax return.
► Information about Form 4562 and its separate instructions is at *www.irs.gov/form4562*.

OMB No. 1545-0172

**2016**

Attachment
Sequence No. **179**

| Name(s) shown on return | Business or activity to which this form relates | Identifying number |
|---|---|---|
| D.C. CONCEPTS CONSTRUCTION & DESIGN LLC | Form 1120S Line 21 | 47-1261481 |

**Part I** Election To Expense Certain Property Under Section 179
**Note:** *If you have any listed property, complete Part V before you complete Part I.*

| | | | |
|---|---|---|---|
| 1 | Maximum amount (see instructions) | 1 | 500,000. |
| 2 | Total cost of section 179 property placed in service (see instructions) | 2 | |
| 3 | Threshold cost of section 179 property before reduction in limitation (see instructions) | 3 | 2,010,000. |
| 4 | Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0- | 4 | |
| 5 | Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see instructions | 5 | |

| 6 | (a) Description of property | (b) Cost (business use only) | (c) Elected cost |
|---|---|---|---|
| | | | |
| | | | |

| | | | |
|---|---|---|---|
| 7 | Listed property. Enter the amount from line 29 . . . . . . . .   | 7 | |
| 8 | Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7 | 8 | |
| 9 | Tentative deduction. Enter the **smaller** of line 5 or line 8 | 9 | |
| 10 | Carryover of disallowed deduction from line 13 of your 2015 Form 4562 | 10 | |
| 11 | Business income limitation. Enter the smaller of business income (not less than zero) or line 5 (see instructions) | 11 | |
| 12 | Section 179 expense deduction. Add lines 9 and 10, but don't enter more than line 11 | 12 | |
| 13 | Carryover of disallowed deduction to 2017. Add lines 9 and 10, less line 12 ► | 13 | |

**Note:** *Don't use Part II or Part III below for listed property. Instead, use Part V.*

**Part II** Special Depreciation Allowance and Other Depreciation (Don't include listed property.) (See instructions.)

| | | | |
|---|---|---|---|
| 14 | Special depreciation allowance for qualified property (other than listed property) placed in service during the tax year (see instructions) | 14 | |
| 15 | Property subject to section 168(f)(1) election | 15 | |
| 16 | Other depreciation (including ACRS) | 16 | |

**Part III** MACRS Depreciation (Don't include listed property.) (See instructions.)

**Section A**

| | | | |
|---|---|---|---|
| 17 | MACRS deductions for assets placed in service in tax years beginning before 2016 | 17 | |
| 18 | If you are electing to group any assets placed in service during the tax year into one or more general asset accounts, check here ► ☐ | | |

**Section B—Assets Placed in Service During 2016 Tax Year Using the General Depreciation System**

| (a) Classification of property | (b) Month and year placed in service | (c) Basis for depreciation (business/investment use only—see instructions) | (d) Recovery period | (e) Convention | (f) Method | (g) Depreciation deduction |
|---|---|---|---|---|---|---|
| 19a   3-year property | | | | | | |
| b   5-year property | | | | | | |
| c   7-year property | | 12,595. | 7.0 YRS | HY | MACRS | 1,800. |
| d   10-year property | | | | | | |
| e   15-year property | | | | | | |
| f   20-year property | | | | | | |
| g   25-year property | | | 25 yrs. | | S/L | |
| h   Residential rental property | | | 27.5 yrs. | MM | S/L | |
| | | | 27.5 yrs. | MM | S/L | |
| i   Nonresidential real property | | | 39 yrs. | MM | S/L | |
| | | | | MM | S/L | |

**Section C—Assets Placed in Service During 2016 Tax Year Using the Alternative Depreciation System**

| | | | | | | |
|---|---|---|---|---|---|---|
| 20a  Class life | | | | | S/L | |
| b  12-year | | | 12 yrs. | | S/L | |
| c  40-year | | | 40 yrs. | MM | S/L | |

**Part IV** Summary (See instructions.)

| | | | |
|---|---|---|---|
| 21 | Listed property. Enter amount from line 28 | 21 | 500. |
| 22 | **Total.** Add amounts from line 12, lines 14 through 17, lines 19 and 20 in column (g), and line 21. Enter here and on the appropriate lines of your return. Partnerships and S corporations—see instructions | 22 | 2,300. |
| 23 | For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs | 23 | |

For Paperwork Reduction Act Notice, see separate instructions. **BAA**

REV 02/17/17 TTW

Form **4562** (2016)

302956

Form 4562 (2016)                                                                                          Page **2**

**Part V**   **Listed Property** (Include automobiles, certain other vehicles, certain aircraft, certain computers, and property used for entertainment, recreation, or amusement.)

> **Note:** For any vehicle for which you are using the standard mileage rate or deducting lease expense, complete **only** 24a, 24b, columns (a) through (c) of Section A, all of Section B, and Section C if applicable.

**Section A—Depreciation and Other Information (Caution:** See the instructions for limits for passenger automobiles.**)**

| 24a Do you have evidence to support the business/investment use claimed? | ☒ Yes ☐ No | 24b If "Yes," is the evidence written? | ☒ Yes ☐ No |
|---|---|---|---|

| (a) Type of property (list vehicles first) | (b) Date placed in service | (c) Business/ investment use percentage | (d) Cost or other basis | (e) Basis for depreciation (business/investment use only) | (f) Recovery period | (g) Method/ Convention | (h) Depreciation deduction | (i) Elected section 179 cost |
|---|---|---|---|---|---|---|---|---|
| 25 Special depreciation allowance for qualified listed property placed in service during the tax year and used more than 50% in a qualified business use (see instructions) . | | | | | | 25 | | |
| 26 Property used more than 50% in a qualified business use: | | | | | | | | |
| TRUCK | 04/30/2016 | 100.00 % | 2,500. | 2,500. | 5.00 | MACRS/HY | 500. | |
| | | % | | | | | | |
| | | % | | | | | | |
| 27 Property used 50% or less in a qualified business use: | | | | | | | | |
| | | % | | | | S/L – | | |
| | | % | | | | S/L – | | |
| | | % | | | | S/L – | | |
| 28 Add amounts in column (h), lines 25 through 27. Enter here and on line 21, page 1 . | | | | | 28 | | 500. | |
| 29 Add amounts in column (i), line 26. Enter here and on line 7, page 1 . . . . . . . . . | | | | | | 29 | | |

**Section B—Information on Use of Vehicles**

Complete this section for vehicles used by a sole proprietor, partner, or other "more than 5% owner," or related person. If you provided vehicles to your employees, first answer the questions in Section C to see if you meet an exception to completing this section for those vehicles.

| | (a) Vehicle 1 | | (b) Vehicle 2 | | (c) Vehicle 3 | | (d) Vehicle 4 | | (e) Vehicle 5 | | (f) Vehicle 6 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 Total business/investment miles driven during the year (**don't** include commuting miles) . | | | | | | | | | | | | |
| 31 Total commuting miles driven during the year | | | | | | | | | | | | |
| 32 Total other personal (noncommuting) miles driven | | | | | | | | | | | | |
| 33 Total miles driven during the year. Add lines 30 through 32 . . . . . . | | | | | | | | | | | | |
| 34 Was the vehicle available for personal use during off-duty hours? . . . . | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 35 Was the vehicle used primarily by a more than 5% owner or related person? . . | | | | | | | | | | | | |
| 36 Is another vehicle available for personal use? | | | | | | | | | | | | |

**Section C—Questions for Employers Who Provide Vehicles for Use by Their Employees**

Answer these questions to determine if you meet an exception to completing Section B for vehicles used by employees who **aren't** more than 5% owners or related persons (see instructions).

| | | Yes | No |
|---|---|---|---|
| 37 Do you maintain a written policy statement that prohibits all personal use of vehicles, including commuting, by your employees? . . . . . . . . . . . . . . . . . . . . . . . . . . | | | |
| 38 Do you maintain a written policy statement that prohibits personal use of vehicles, except commuting, by your employees? See the instructions for vehicles used by corporate officers, directors, or 1% or more owners . | | | |
| 39 Do you treat all use of vehicles by employees as personal use? . . . . . . . . . . . . | | | |
| 40 Do you provide more than five vehicles to your employees, obtain information from your employees about the use of the vehicles, and retain the information received? . . . . . . . . . . . . | | | |
| 41 Do you meet the requirements concerning qualified automobile demonstration use? (See instructions.) . | | | |

> **Note:** If your answer to 37, 38, 39, 40, or 41 is "Yes," don't complete Section B for the covered vehicles.

**Part VI**   **Amortization**

| (a) Description of costs | (b) Date amortization begins | (c) Amortizable amount | (d) Code section | (e) Amortization period or percentage | (f) Amortization for this year |
|---|---|---|---|---|---|
| 42 Amortization of costs that begins during your 2016 tax year (see instructions): | | | | | |
| | | | | | |
| | | | | | |
| 43 Amortization of costs that began before your 2016 tax year . . . . . . . . . | | | | 43 | |
| 44 **Total.** Add amounts in column (f). See the instructions for where to report . . . . . . . | | | | 44 | |

302957

671113

| ☐ Final K-1 | ☐ Amended K-1 | OMB No. 1545-0123 |

**Schedule K-1**
**(Form 1120S)**
Department of the Treasury
Internal Revenue Service

**2016**

For calendar year 2016, or tax
year beginning _____, 2016
ending _____, 20 _____

**Shareholder's Share of Income, Deductions, Credits, etc.**

▶ See back of form and separate instructions.

| **Part I** | **Information About the Corporation** |

**A** Corporation's employer identification number
47-1261481

**B** Corporation's name, address, city, state, and ZIP code
D.C. CONCEPTS CONSTRUCTION & DESIGN LLC
501 N ORLANDO AVENUE SUITE 313-311
WINTER PARK, FL 32789

**C** IRS Center where corporation filed return
Cincinnati, OH 45999-0013

| **Part II** | **Information About the Shareholder** |

**D** Shareholder's identifying number
-4743

**E** Shareholder's name, address, city, state, and ZIP code
MATILDE SANTANA
5019 FERNCREST DRIVE
WINTER PARK, FL 32792

**F** Shareholder's percentage of stock
ownership for tax year . . . . . . . 100.00000 %

For IRS Use Only

| **Part III** | **Shareholder's Share of Current Year Income, Deductions, Credits, and Other Items** |
|---|---|
| 1 Ordinary business income (loss) 93,391. | 13 Credits |
| 2 Net rental real estate income (loss) | |
| 3 Other net rental income (loss) | |
| 4 Interest income | |
| 5a Ordinary dividends | |
| 5b Qualified dividends | 14 Foreign transactions |
| 6 Royalties | |
| 7 Net short-term capital gain (loss) | |
| 8a Net long-term capital gain (loss) | |
| 8b Collectibles (28%) gain (loss) | |
| 8c Unrecaptured section 1250 gain | |
| 9 Net section 1231 gain (loss) | |
| 10 Other income (loss) | 15 Alternative minimum tax (AMT) items |
| 11 Section 179 deduction | 16 Items affecting shareholder basis C 494. |
| 12 Other deductions A 250. | |
| | 17 Other information |
| * See attached statement for additional information. | |

For Paperwork Reduction Act Notice, see Instructions for Form 1120S.
BAA

REV 02/09/17 TTW

Schedule K-1 (Form 1120S) 2016

302958

**Form 1120S**

Department of the Treasury
Internal Revenue Service

## U.S. Income Tax Return for an S Corporation

▶ Do not file this form unless the corporation has filed or is attaching Form 2553 to elect to be an S corporation.
▶ Go to *www.irs.gov/Form1120S* for instructions and the latest information.

OMB No. 1545-0123

**2017**

For calendar year 2017 or tax year beginning _____ , 2017, ending _____ , 20 ____

| | | |
|---|---|---|
| **A** S election effective date 01/01/2015 | **TYPE OR PRINT** | **D** Employer identification number 47-1261481 |
| **B** Business activity code number (see instructions) 236200 | Name D.C. CONCEPTS CONSTRUCTION & DESIGN LLC | **E** Date incorporated 07/03/2014 |
| | Number, street, and room or suite no. If a P.O. box, see instructions. 501 N. ORLANDO AVENUE SUITE 313-311 | |
| **C** Check if Sch. M-3 attached ☐ | City or town, state or province, country, and ZIP or foreign postal code WINTER PARK FL 32789 | **F** Total assets (see instructions) $ 244,363. |

**G** Is the corporation electing to be an S corporation beginning with this tax year?  ☐ Yes  ☒ No   If "Yes," attach Form 2553 if not already filed

**H** Check if: **(1)** ☐ Final return  **(2)** ☐ Name change  **(3)** ☐ Address change  **(4)** ☐ Amended return  **(5)** ☐ S election termination or revocation

**I** Enter the number of shareholders who were shareholders during any part of the tax year . . . . . . . . . . ▶ 1

**Caution:** Include **only** trade or business income and expenses on lines 1a through 21. See the instructions for more information.

### Income

| | | | | |
|---|---|---|---|---|
| 1a | Gross receipts or sales . . . . . . . . . . | 1a | 16,176. | |
| b | Returns and allowances . . . . . . . . . . | 1b | 0. | |
| c | Balance. Subtract line 1b from line 1a . . . . . . . . . . | | | 1c | 16,176. |
| 2 | Cost of goods sold (attach Form 1125-A) . . . . . . . . . . | | | 2 | |
| 3 | Gross profit. Subtract line 2 from line 1c . . . . . . . . . . | | | 3 | 16,176. |
| 4 | Net gain (loss) from Form 4797, line 17 (attach Form 4797) . . . . . . . . . . | | | 4 | |
| 5 | Other income (loss) (see instructions—attach statement) . . . . . . . . . . | | | 5 | |
| 6 | **Total income (loss).** Add lines 3 through 5 . . . . . . . . . . ▶ | | | 6 | 16,176. |

### Deductions (see instructions for limitations)

| | | | |
|---|---|---|---|
| 7 | Compensation of officers (see instructions—attach Form 1125-E) . . . . . . . . . . | 7 | |
| 8 | Salaries and wages (less employment credits) . . . . . . . . . . | 8 | |
| 9 | Repairs and maintenance . . . . . . . . . . | 9 | |
| 10 | Bad debts . . . . . . . . . . | 10 | |
| 11 | Rents . . . . . . . . . . | 11 | |
| 12 | Taxes and licenses . . . . . . . . . . | 12 | |
| 13 | Interest . . . . . . . . . . | 13 | |
| 14 | Depreciation not claimed on Form 1125-A or elsewhere on return (attach Form 4562) . . . . . . . . . . | 14 | |
| 15 | Depletion **(Do not deduct oil and gas depletion.)** . . . . . . . . . . | 15 | |
| 16 | Advertising . . . . . . . . . . | 16 | |
| 17 | Pension, profit-sharing, etc., plans . . . . . . . . . . | 17 | |
| 18 | Employee benefit programs . . . . . . . . . . | 18 | |
| 19 | Other deductions (attach statement) . . . . . . . . . . | 19 | |
| 20 | **Total deductions.** Add lines 7 through 19 . . . . . . . . . . ▶ | 20 | |
| 21 | **Ordinary business income (loss).** Subtract line 20 from line 6 . . . . . . . . . . | 21 | 16,176. |

### Tax and Payments

| | | | | |
|---|---|---|---|---|
| 22a | Excess net passive income or LIFO recapture tax (see instructions) . . . | 22a | | |
| b | Tax from Schedule D (Form 1120S) . . . . . . . . . . | 22b | | |
| c | Add lines 22a and 22b (see instructions for additional taxes) . . . . . . . . . . | | | 22c | |
| 23a | 2017 estimated tax payments and 2016 overpayment credited to 2017 | 23a | | |
| b | Tax deposited with Form 7004 . . . . . . . . . . | 23b | | |
| c | Credit for federal tax paid on fuels (attach Form 4136) . . . . . . | 23c | | |
| d | Add lines 23a through 23c . . . . . . . . . . | | | 23d | |
| 24 | Estimated tax penalty (see instructions). Check if Form 2220 is attached . . . . . . ▶ ☐ | | | 24 | |
| 25 | **Amount owed.** If line 23d is smaller than the total of lines 22c and 24, enter amount owed . . . | | | 25 | |
| 26 | **Overpayment.** If line 23d is larger than the total of lines 22c and 24, enter amount overpaid . . . | | | 26 | |
| 27 | Enter amount from line 26 **Credited to 2018 estimated tax ▶** _____ **Refunded ▶** | | | 27 | |

### Sign Here

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer _____  Date _____  Title PRESIDENT

May the IRS discuss this return with the preparer shown below (see instructions)? ☐ Yes ☒ No

### Paid Preparer Use Only

| | | |
|---|---|---|
| Print/Type preparer's name RICHARD B WIGGINS III CPA | Preparer's signature *Richard B. Wiggins III CPA* | Date 4/16/18 |
| Firm's name ▶ *Wiggins & Company* | | Check ☐ if self-employed  PTIN P01430837 |
| Firm's address ▶ 750 N. KEY ST. Tavares, FL | | Firm's EIN ▶ 65-1147279   Phone no. 813-361-5050 |

For Paperwork Reduction ... instructions. BAA    REV 12/26/17 TTBIZ  Form **1120S** (2017)

Δπ EXHIBIT 9
Deponent Cicale
Date 9/23/2021  Rptr. D
WWW.DEPOBOOK.COM

302936

Form 1120S (2017)                                                                                                      Page **2**

| **Schedule B** | **Other Information** (see instructions) | | | | Yes | No |
|---|---|---|---|---|---|---|

**1** Check accounting method:  **a** ☒ Cash  **b** ☐ Accrual
   **c** ☐ Other (specify) ▶ - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**2** See the instructions and enter the:
 **a** Business activity ▶  CONSTRUCTION - - - - - - - -   **b** Product or service ▶ SERVICES - - - - - - - - - - -

**3** At any time during the tax year, was any shareholder of the corporation a disregarded entity, a trust, an estate, or a nominee or similar person? If "Yes," attach Schedule B-1, Information on Certain Shareholders of an S Corporation . .    | | × |

**4** At the end of the tax year, did the corporation:

 **a** Own directly 20% or more, or own, directly or indirectly, 50% or more of the total stock issued and outstanding of any foreign or domestic corporation? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (v) below . . . . . . . . . . . . . . . . . . . . . . . . . . .    | | × |

| (i) Name of Corporation | (ii) Employer Identification Number (if any) | (iii) Country of Incorporation | (iv) Percentage of Stock Owned | (v) If Percentage in (iv) is 100%, Enter the Date (if any) a Qualified Subchapter S Subsidiary Election Was Made |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

 **b** Own directly an interest of 20% or more, or own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital in any foreign or domestic partnership (including an entity treated as a partnership) or in the beneficial interest of a trust? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (v) below . . . . . . . . .    | | × |

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**5 a** At the end of the tax year, did the corporation have any outstanding shares of restricted stock? . . . . . . .    | | × |
   If "Yes," complete lines (i) and (ii) below.
   **(i)** Total shares of restricted stock. . . . . . . . . . ▶ - - - - - - - - - - - - - - - - - -
   **(ii)** Total shares of non-restricted stock . . . . . . . ▶ - - - - - - - - - - - - - - - - - -
 **b** At the end of the tax year, did the corporation have any outstanding stock options, warrants, or similar instruments? .    | | × |
   If "Yes," complete lines (i) and (ii) below.
   **(i)** Total shares of stock outstanding at the end of the tax year ▶ - - - - - - - - - - - - - - -
   **(ii)** Total shares of stock outstanding if all instruments were executed ▶ - - - - - - - - - - - - -

**6** Has this corporation filed, or is it required to file, **Form 8918**, Material Advisor Disclosure Statement, to provide information on any reportable transaction? . . . . . . . . . . . . . . . . . . . . . . .    | | × |

**7** Check this box if the corporation issued publicly offered debt instruments with original issue discount . . . . ▶ ☐
   If checked, the corporation may have to file **Form 8281**, Information Return for Publicly Offered Original Issue Discount Instruments.

**8** If the corporation: **(a)** was a C corporation before it elected to be an S corporation **or** the corporation acquired an asset with a basis determined by reference to the basis of the asset (or the basis of any other property) in the hands of a C corporation **and (b)** has net unrealized built-in gain in excess of the net recognized built-in gain from prior years, enter the net unrealized built-in gain reduced by net recognized built-in gain from prior years (see instructions) . . . . . . . . . . . . . . . . . . . . ▶ $ - - - - - - - - - - - -

**9** Enter the accumulated earnings and profits of the corporation at the end of the tax year.           $ - - - - - - - - - -

**10** Does the corporation satisfy **both** of the following conditions?
 **a** The corporation's total receipts (see instructions) for the tax year were less than $250,000 . . . . . . . .
 **b** The corporation's total assets at the end of the tax year were less than $250,000 . . . . . . . . . .    | × | |
   If "Yes," the corporation is not required to complete Schedules L and M-1.

**11** During the tax year, did the corporation have any non-shareholder debt that was canceled, was forgiven, or had the terms modified so as to reduce the principal amount of the debt? . . . . . . . . . . . . . . .    | | × |
   If "Yes," enter the amount of principal reduction  $ - - - - - - - - - - - - - - - -

**12** During the tax year, was a qualified subchapter S subsidiary election terminated or revoked? If "Yes," see instructions .    | | × |

**13 a** Did the corporation make any payments in 2017 that would require it to file Form(s) 1099? . . . . . . . .    | | × |
  **b** If "Yes," did the corporation file or will it file required Forms 1099? . . . . . . . . . . . . . . .    | | |

REV 12/26/17 TTBIZ                                                                                    Form **1120S** (2017)

302937

Form 1120S (2017)                                                                                     Page **3**

| Schedule K | Shareholders' Pro Rata Share Items | | | Total amount |
|---|---|---|---|---|
| **Income (Loss)** | 1 | Ordinary business income (loss) (page 1, line 21) . . . . . . . . | 1 | 16,176. |
| | 2 | Net rental real estate income (loss) (attach Form 8825) . . . . . | 2 | |
| | 3a | Other gross rental income (loss) . . . . . 3a | | |
| | b | Expenses from other rental activities (attach statement) . 3b | | |
| | c | Other net rental income (loss). Subtract line 3b from line 3a . . . | 3c | |
| | 4 | Interest income . . . . . . . . . . . . . . . | 4 | |
| | 5 | Dividends: a Ordinary dividends . . . . . . . . . . | 5a | |
| | | b Qualified dividends . . . . . 5b | | |
| | 6 | Royalties . . . . . . . . . . . . . . . . . | 6 | |
| | 7 | Net short-term capital gain (loss) (attach Schedule D (Form 1120S)) . | 7 | |
| | 8a | Net long-term capital gain (loss) (attach Schedule D (Form 1120S)) . | 8a | |
| | b | Collectibles (28%) gain (loss) . . . . . . 8b | | |
| | c | Unrecaptured section 1250 gain (attach statement) . . 8c | | |
| | 9 | Net section 1231 gain (loss) (attach Form 4797) . . . . . . . | 9 | |
| | 10 | Other income (loss) (see instructions) . . . Type ▶ | 10 | |
| **Deductions** | 11 | Section 179 deduction (attach Form 4562) . . . . . . . . . | 11 | |
| | 12a | Charitable contributions . . . . . . . . . . . . . . | 12a | |
| | b | Investment interest expense . . . . . . . . . . . . | 12b | |
| | c | Section 59(e)(2) expenditures **(1)** Type ▶ _____ **(2)** Amount ▶ | 12c(2) | |
| | d | Other deductions (see instructions) . . . . Type ▶ | 12d | |
| **Credits** | 13a | Low-income housing credit (section 42(j)(5)) . . . . . . . . | 13a | |
| | b | Low-income housing credit (other) . . . . . . . . . . | 13b | |
| | c | Qualified rehabilitation expenditures (rental real estate) (attach Form 3468, if applicable) . | 13c | |
| | d | Other rental real estate credits (see instructions)  Type ▶ | 13d | |
| | e | Other rental credits (see instructions) . . . Type ▶ | 13e | |
| | f | Biofuel producer credit (attach Form 6478) . . . . . . . . | 13f | |
| | g | Other credits (see instructions) . . . . . Type ▶ | 13g | |
| **Foreign Transactions** | 14a | Name of country or U.S. possession ▶ | | |
| | b | Gross income from all sources . . . . . . . . . . . | 14b | |
| | c | Gross income sourced at shareholder level . . . . . . . . | 14c | |
| | | Foreign gross income sourced at corporate level | | |
| | d | Passive category . . . . . . . . . . . . . . . | 14d | |
| | e | General category . . . . . . . . . . . . . . . | 14e | |
| | f | Other (attach statement) . . . . . . . . . . . . . | 14f | |
| | | Deductions allocated and apportioned at shareholder level | | |
| | g | Interest expense . . . . . . . . . . . . . . . | 14g | |
| | h | Other . . . . . . . . . . . . . . . . . . | 14h | |
| | | Deductions allocated and apportioned at corporate level to foreign source income | | |
| | i | Passive category . . . . . . . . . . . . . . . | 14i | |
| | j | General category . . . . . . . . . . . . . . . | 14j | |
| | k | Other (attach statement) . . . . . . . . . . . . . | 14k | |
| | | Other information | | |
| | l | Total foreign taxes (check one): ▶ ☐ Paid   ☐ Accrued | 14l | |
| | m | Reduction in taxes available for credit (attach statement) . . . . | 14m | |
| | n | Other foreign tax information (attach statement) | | |
| **Alternative Minimum Tax (AMT) Items** | 15a | Post-1986 depreciation adjustment . . . . . . . . . . | 15a | |
| | b | Adjusted gain or loss . . . . . . . . . . . . . . | 15b | |
| | c | Depletion (other than oil and gas) . . . . . . . . . . | 15c | |
| | d | Oil, gas, and geothermal properties—gross income . . . . . | 15d | |
| | e | Oil, gas, and geothermal properties—deductions . . . . . . | 15e | |
| | f | Other AMT items (attach statement) . . . . . . . . . . | 15f | |
| **Items Affecting Shareholder Basis** | 16a | Tax-exempt interest income . . . . . . . . . . . . | 16a | |
| | b | Other tax-exempt income . . . . . . . . . . . . . | 16b | |
| | c | Nondeductible expenses . . . . . . . . . . . . . | 16c | |
| | d | Distributions (attach statement if required) (see instructions) . . . | 16d | |
| | e | Repayment of loans from shareholders . . . . . . . . . | 16e | |

REV 12/28/17 TTBIZ                                                                      Form **1120S** (2017)

Form 1120S (2017)

Page **4**

| Schedule K | Shareholders' Pro Rata Share Items (continued) | | | Total amount | |
|---|---|---|---|---|---|
| **Other information** | 17a | Investment income | 17a | | |
| | b | Investment expenses | 17b | | |
| | c | Dividend distributions paid from accumulated earnings and profits | 17c | | |
| | d | Other items and amounts (attach statement) | | | |
| **Recon-ciliation** | 18 | **Income/loss reconciliation.** Combine the amounts on lines 1 through 10 in the far right column. From the result, subtract the sum of the amounts on lines 11 through 12d and 14l | 18 | 16,176. | |

| Schedule L | | Balance Sheets per Books | Beginning of tax year | | End of tax year | |
|---|---|---|---|---|---|---|
| | | **Assets** | (a) | (b) | (c) | (d) |
| 1 | | Cash | | 51,825. | | 0. |
| 2a | | Trade notes and accounts receivable | | | | |
| | b | Less allowance for bad debts | ( ) | | ( ) | |
| 3 | | Inventories | | | | |
| 4 | | U.S. government obligations | | | | |
| 5 | | Tax-exempt securities (see instructions) | | | | |
| 6 | | Other current assets (attach statement) Ln 6 St | | 167,686. | | 156,836. |
| 7 | | Loans to shareholders | | | | |
| 8 | | Mortgage and real estate loans | | | | |
| 9 | | Other investments (attach statement) | | | | |
| 10a | | Buildings and other depreciable assets | 15,095. | | 15,095. | |
| | b | Less accumulated depreciation | ( 2,300.) | 12,795. | ( 2,300.) | 12,795. |
| 11a | | Depletable assets | | | | |
| | b | Less accumulated depletion | ( ) | | ( ) | |
| 12 | | Land (net of any amortization) | | 74,732. | | 74,732. |
| 13a | | Intangible assets (amortizable only) | | | | |
| | b | Less accumulated amortization | ( ) | | ( ) | |
| 14 | | Other assets (attach statement) | | | | |
| 15 | | Total assets | | 307,038. | | 244,363. |
| | | **Liabilities and Shareholders' Equity** | | | | |
| 16 | | Accounts payable | | | | |
| 17 | | Mortgages, notes, bonds payable in less than 1 year | | | | |
| 18 | | Other current liabilities (attach statement) Ln 18 St | | 0. | | 2,171. |
| 19 | | Loans from shareholders | | 99,539. | | 18,517. |
| 20 | | Mortgages, notes, bonds payable in 1 year or more | | | | |
| 21 | | Other liabilities (attach statement) | | | | |
| 22 | | Capital stock | | 162. | | 162. |
| 23 | | Additional paid-in capital | | | | |
| 24 | | Retained earnings | | 207,337. | | 223,513. |
| 25 | | Adjustments to shareholders' equity (attach statement) | | | | |
| 26 | | Less cost of treasury stock | | ( ) | | ( ) |
| 27 | | Total liabilities and shareholders' equity | | 307,038. | | 244,363. |

REV 12/26/17 TTBIZ

Form **1120S** (2017)

302939

Form 1120S (2017)                                                                                                    Page **5**

| **Schedule M-1** | **Reconciliation of Income (Loss) per Books With Income (Loss) per Return** |
|---|---|
| | **Note:** The corporation may be required to file Schedule M-3 (see instructions) |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | Net income (loss) per books . . . . . | 16,176. | 5 | Income recorded on books this year not included on Schedule K, lines 1 through 10 (itemize): | | |
| 2 | Income included on Schedule K, lines 1, 2, 3c, 4, 5a, 6, 7, 8a, 9, and 10, not recorded on books this year (itemize) _____ | | a | Tax-exempt interest $ _____ | | |
| 3 | Expenses recorded on books this year not included on Schedule K, lines 1 through 12 and 14l (itemize): | | 6 | Deductions included on Schedule K, lines 1 through 12 and 14l, not charged against book income this year (itemize): | | |
| a | Depreciation $ _____ | | a | Depreciation $ _____ | | |
| b | Travel and entertainment $ _____ | | | | | |
| | | | 7 | Add lines 5 and 6 . . . . . | | |
| 4 | Add lines 1 through 3 . . . . . . . | 16,176. | 8 | Income (loss) (Schedule K, line 18). Line 4 less line 7 | | 16,176. |

| **Schedule M-2** | **Analysis of Accumulated Adjustments Account, Other Adjustments Account, and Shareholders' Undistributed Taxable Income Previously Taxed** (see instructions) |
|---|---|

| | | (a) Accumulated adjustments account | (b) Other adjustments account | (c) Shareholders' undistributed taxable income previously taxed |
|---|---|---|---|---|
| 1 | Balance at beginning of tax year . . . . . | 207,337. | 0. | 0. |
| 2 | Ordinary income from page 1, line 21 . . . | 16,176. | | |
| 3 | Other additions . . . . . . . . . . | | | |
| 4 | Loss from page 1, line 21 . . . . . . . | ( ) | | |
| 5 | Other reductions . . . . . . . . . . | ( ) | ( ) | |
| 6 | Combine lines 1 through 5 . . . . . . . | 223,513. | 0. | 0. |
| 7 | Distributions other than dividend distributions | | | |
| 8 | Balance at end of tax year. Subtract line 7 from line 6 | 223,513. | 0. | 0. |

REV 12/28/17 TTBIZ                                                                                      Form **1120S** (2017)

302940

| Form 1120S<br>Schedule L | Other Assets | 2017 |
|---|---|---|

| Name<br>D.C. CONCEPTS CONSTRUCTION & DESIGN LLC | Employer ID Number<br>47-1261481 |
|---|---|

| Other Current Assets: | Beginning of<br>tax year | End of<br>tax year |
|---|---|---|
| EMPLOYEE ADVANCES | 10,850. | 0. |
| LOAN RECEIVABLE-AFFILIATE | 156,836. | 156,836. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total to Form 1120S, Schedule L, line 6** ............... ► | 167,686. | 156,836. |

| Other Investments: | Beginning of<br>tax year | End of<br>tax year |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total to Form 1120S, Schedule L, line 9** ............... ► | | |

| Other Assets: | Beginning of<br>tax year | End of<br>tax year |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total to Form 1120S, Schedule L, line 14** ............. ► | | |

302941

| Form 1120S<br>Schedule L | **Other Liabilities**<br>and Adjustments to Shareholders' Equity | **2017** |
|---|---|---|

| Name<br>D.C. CONCEPTS CONSTRUCTION & DESIGN LLC | Employer ID Number<br>47-1261481 |
|---|---|

| **Other Current Liabilities:** | Beginning of<br>tax year | End of<br>tax year |
|---|---|---|
| CASH OVERDRAFT | 0. | 2,171. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total to Form 1120S, Schedule L, line 18** . . . . . . . . . . . . . ► | 0. | 2,171. |

| **Other Liabilities:** | Beginning of<br>tax year | End of<br>tax year |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total to Form 1120S, Schedule L, line 21** . . . . . . . . . . . . . ► | | |

| **Adjustments to Shareholders' Equity:** | Beginning of<br>tax year | End of<br>tax year |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| **Total to Form 1120S, Schedule L, line 25** . . . . . . . . . . . . . ► | | |

SPSW1701.SCR  09/18/17

302942

671117

| Schedule K-1<br>(Form 1120S)<br>Department of the Treasury<br>Internal Revenue Service | **20**17<br>For calendar year 2017, or tax year | **Part III** Shareholder's Share of Current Year Income,<br>Deductions, Credits, and Other Items |
|---|---|---|

☐ Final K-1   ☐ Amended K-1   OMB No. 1545-0123

beginning __ / __ / 2017   ending __ / __ / __

### Shareholder's Share of Income, Deductions, Credits, etc.
▶ See back of form and separate instructions.

| | |
|---|---|
| **Part I** Information About the Corporation | |

**A** Corporation's employer identification number
47-1261481

**B** Corporation's name, address, city, state, and ZIP code
D.C. CONCEPTS CONSTRUCTION & DESIGN LLC

501 N. ORLANDO AVENUE SUITE 313-311
WINTER PARK, FL 32789

**C** IRS Center where corporation filed return
Cincinnati, OH  45999-0013

| | |
|---|---|
| **Part II** Information About the Shareholder | |

**D** Shareholder's identifying number
-4743

**E** Shareholder's name, address, city, state, and ZIP code
MATILDE SANTANA
5019 FERNCREST DRIVE
WINTER PARK, FL 32792

**F** Shareholder's percentage of stock
ownership for tax year . . . . . . . __100.00000__ %

For IRS Use Only

Part III columns:

| # | Description | Amount | # | Description |
|---|---|---|---|---|
| 1 | Ordinary business income (loss) | 16,176. | 13 | Credits |
| 2 | Net rental real estate income (loss) | | | |
| 3 | Other net rental income (loss) | | | |
| 4 | Interest income | | | |
| 5a | Ordinary dividends | | | |
| 5b | Qualified dividends | | 14 | Foreign transactions |
| 6 | Royalties | | | |
| 7 | Net short-term capital gain (loss) | | | |
| 8a | Net long-term capital gain (loss) | | | |
| 8b | Collectibles (28%) gain (loss) | | | |
| 8c | Unrecaptured section 1250 gain | | | |
| 9 | Net section 1231 gain (loss) | | | |
| 10 | Other income (loss) | | 15 | Alternative minimum tax (AMT) items |
| 11 | Section 179 deduction | | 16 | Items affecting shareholder basis |
| 12 | Other deductions | | | |
| | | | 17 | Other information |

* See attached statement for additional information.

For Paperwork Reduction Act Notice, see the Instructions for Form 1120S.   www.irs.gov/Form1120S   Schedule K-1 (Form 1120S) 2017
BAA   REV 12/13/17 TTBIZ

302943

**Form 7004**
(Rev. December 2017)
Department of the Treasury
Internal Revenue Service

## Application for Automatic Extension of Time To File Certain Business Income Tax, Information, and Other Returns
▶ File a separate application for each return.
▶ Go to *www.irs.gov/Form7004* for instructions and the latest information.

OMB No. 1545-0233

**Print or Type**

| Name | Identifying number |
|---|---|
| D.C. CONCEPTS CONSTRUCTION & DESIGN LLC | 47-1261481 |

Number, street, and room or suite no. (If P.O. box, see instructions.)
501 N. ORLANDO AVENUE SUITE 313-311

City, town, state, and ZIP code (If a foreign address, enter city, province or state, and country (follow the country's practice for entering postal code)).
WINTER PARK FL 32789

**Note:** File request for extension by the due date of the return. See instructions before completing this form.

**Part I    Automatic Extension for Certain Business Income Tax, Information, and Other Returns.** See instructions.

1   Enter the form code for the return listed below that this application is for . . . . . . . . . . . . . . .  ☐2☐5

| Application Is For: | Form Code | Application Is For: | Form Code |
|---|---|---|---|
| Form 706-GS(D) | 01 | Form 1120-ND | 19 |
| Form 706-GS(T) | 02 | Form 1120-ND (section 4951 taxes) | 20 |
| Form 1041 (bankruptcy estate only) | 03 | Form 1120-PC | 21 |
| Form 1041 (estate other than a bankruptcy estate) | 04 | Form 1120-POL | 22 |
| Form 1041 (trust) | 05 | Form 1120-REIT | 23 |
| Form 1041-N | 06 | Form 1120-RIC | 24 |
| Form 1041-QFT | 07 | Form 1120S | 25 |
| Form 1042 | 08 | Form 1120-SF | 26 |
| Form 1065 | 09 | Form 3520-A | 27 |
| Form 1065-B | 10 | Form 8612 | 28 |
| Form 1066 | 11 | Form 8613 | 29 |
| Form 1120 | 12 | Form 8725 | 30 |
| Form 1120-C | 34 | Form 8804 | 31 |
| Form 1120-F | 15 | Form 8831 | 32 |
| Form 1120-FSC | 16 | Form 8876 | 33 |
| Form 1120-H | 17 | Form 8924 | 35 |
| Form 1120-L | 18 | Form 8928 | 36 |

**Part II    All Filers Must Complete This Part**

2   If the organization is a foreign corporation that does not have an office or place of business in the United States, check here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

3   If the organization is a corporation and is the common parent of a group that intends to file a consolidated return, check here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐
    If checked, attach a statement listing the name, address, and employer identification number (EIN) for each member covered by this application.

4   If the organization is a corporation or partnership that qualifies under Regulations section 1.6081-5, check here . ▶ ☐

5a  The application is for calendar year 2017, or tax year beginning _____, 20___, and ending _____, 20___

b   **Short tax year.** If this tax year is less than 12 months, check the reason:  ☐ Initial return  ☐ Final return
    ☐ Change in accounting period  ☐ Consolidated return to be filed  ☐ Other (see instructions—attach explanation)

| | | | |
|---|---|---|---|
| 6 | Tentative total tax . . . . . . . . . . | **6** | 0 |
| 7 | **Total** payments and credits (see instructions) . . . . . . . . | **7** | 0 |
| 8 | **Balance due.** Subtract line 7 from line 6 (see instructions) . . . . . . . . . | **8** | 0 |

**For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.**

BAA

Form **7004** (Rev. 12-2017)

REV 04/03/18 TTBIZ

TSBDCC 9:55 AM

Form **1120S**

Department of the Treasury
Internal Revenue Service

**U.S. Income Tax Return for an S Corporation**

▶ Do not file this form unless the corporation has filed or is
attaching Form 2553 to elect to be an S corporation.
▶ Go to *www.irs.gov/Form1120S* for instructions and the latest information.

OMB No. 1545-0123

**2018**

For calendar year 2018 or tax year beginning _____ , ending _____

| | | |
|---|---|---|
| **A** S election effective date 01/01/15 | **Name** D.C. CONCEPTS CONST. & DESIGN LLC | **D** Employer identification number 47-1261481 |
| **B** Business activity code number (see instructions) 236200 | TYPE | **E** Date incorporated 07/03/2014 |
| **C** Check if Sch. M-3 attached ☐ | OR PRINT  Number, street, and room or suite no. If a P.O. box, see instructions. 501 N ORLANDO AVE, STE 313-311  City or town, state or province, country, and ZIP or foreign postal code WINTER PARK     FL 32789 | **F** Total assets (see instructions) $ 264,862 |

**G** Is the corporation electing to be an S corporation beginning with this tax year?  ☐ Yes  ☒ No  If "Yes," attach Form 2553 if not already filed

**H** Check if: **(1)** ☐ Final return  **(2)** ☐ Name change  **(3)** ☐ Address change  **(4)** ☐ Amended return  **(5)** ☐ S election termination or revocation

**I** Enter the number of shareholders who were shareholders during any part of the tax year ▶ **1**

**Caution:** Include only trade or business income and expenses on lines 1a through 21. See the instructions for more information.

| | | | |
|---|---|---|---|
| **Income** | **1a** Gross receipts or sales | **1a** 1,432,176 | |
| | **b** Returns and allowances | **1b** | |
| | **c** Balance. Subtract line 1b from line 1a | **1c** | 1,432,176 |
| | **2** Cost of goods sold (attach Form 1125-A) | **2** | 1,079,503 |
| | **3** Gross profit. Subtract line 2 from line 1c | **3** | 352,673 |
| | **4** Net gain (loss) from Form 4797, line 17 (attach Form 4797) | **4** | |
| | **5** Other income (loss) (see instructions—attach statement) | **5** | |
| | **6** Total income (loss). Add lines 3 through 5 ▶ | **6** | 352,673 |
| **Deductions (see instructions for limitations)** | **7** Compensation of officers (see instructions—attach Form 1125-E) | **7** | |
| | **8** Salaries and wages (less employment credits) | **8** | |
| | **9** Repairs and maintenance | **9** | |
| | **10** Bad debts | **10** | |
| | **11** Rents | **11** | 12,500 |
| | **12** Taxes and licenses | **12** | 3,658 |
| | **13** Interest (see instructions) | **13** | |
| | **14** Depreciation not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | **14** | 5,118 |
| | **15** Depletion (Do not deduct oil and gas depletion.) | **15** | |
| | **16** Advertising | **16** | 498 |
| | **17** Pension, profit-sharing, etc., plans | **17** | |
| | **18** Employee benefit programs | **18** | |
| | **19** Other deductions (attach statement)  See Stmt 1 | **19** | 310,400 |
| | **20** Total deductions. Add lines 7 through 19 ▶ | **20** | 332,174 |
| | **21** Ordinary business income (loss). Subtract line 20 from line 6 | **21** | 20,499 |
| **Tax** | **22a** Excess net passive income or LIFO recapture tax (see instructions) | **22a** | |
| | **b** Tax from Schedule D (Form 1120S) | **22b** | |
| | **c** Add lines 22a and 22b (see instructions for additional taxes) | **22c** | |
| | **23a** 2018 estimated tax payments and 2017 overpayment credited to 2018 | **23a** | |
| | **b** Tax deposited with Form 7004 | **23b** | |
| | **c** Credit for federal tax paid on fuels (attach Form 4136) | **23c** | |
| | **d** Refundable credit from Form 8827, line 8c | **23d** | |
| | **e** Add lines 23a through 23d | **23e** | |
| | **24** Estimated tax penalty (see instructions). Check if Form 2220 is attached ▶ ☐ | **24** | |
| | **25** Amount owed. If line 23e is smaller than the total of lines 22c and 24, enter amount owed | **25** | |
| | **26** Overpayment. If line 23e is larger than the total of lines 22c and 24, enter amount overpaid | **26** | |
| | **27** Enter amount from line 26: Credited to 2019 estimated tax ▶ _____ Refunded ▶ | **27** | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Signature of officer | Date | Title |
|---|---|---|

May the IRS discuss this return with the preparer shown below (see instructions)?  ☒ Yes  ☐ No

**Paid Preparer Use Only**

| | | | | |
|---|---|---|---|---|
| Print/Type preparer's name Herb Slusher | Preparer's signature | Date | Check ☐ if self-employed | PTIN P00172748 |
| Firm's name ▶ TAXSAVE CONSULTANTS, INC. | | | Firm's EIN ▶ 65-0212888 | |
| Firm's address ▶ 4310 Sheridan Street, Suite  Hollywood, FL 3 | | | Phone no. 954-961-1040 | |

For Paperwork Reduction Act Notice, see separate instructions.

Form **1120S** (2018)

Δπ EXHIBIT 10  Deponent Cicale  Date 7/29/21 Rptr ___  WWW.DEPOBOOK.COM

302924

TSBDCC 9:55 AM

Form 1120S (2018)   **D.C. CONCEPTS CONST. & DESIGN LLC   47-1261481**   Page **2**

## Schedule B   Other Information (see instructions)

| | | Yes | No |
|---|---|---|---|
| **1** | Check accounting method:   a ☒ Cash   b ☐ Accrual | | |
| | c ☐ Other (specify) ▶ ............................................................... | | |
| **2** | See the instructions and enter the: | | |
| | **a** Business activity ▶ **CONSTRUCTION**   **b** Product or service ▶ **SERVICE** | | |
| **3** | At any time during the tax year, was any shareholder of the corporation a disregarded entity, a trust, an estate, or a nominee or similar person? If "Yes," attach Schedule B-1, Information on Certain Shareholders of an S Corporation | | X |
| **4** | At the end of the tax year, did the corporation: | | |
| | **a** Own directly 20% or more, or own, directly or indirectly, 50% or more of the total stock issued and outstanding of any foreign or domestic corporation? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (v) below ..................................................................................... | | X |

| (i) Name of Corporation | (ii) Employer Identification Number (if any) | (iii) Country of Incorporation | (iv) Percentage of Stock Owned | (v) If Percentage in (iv) is 100%, Enter the Date (if any) a Qualified Subchapter S Subsidiary Election Was Made |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | Yes | No |
|---|---|---|---|
| | **b** Own directly an interest of 20% or more, or own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital in any foreign or domestic partnership (including an entity treated as a partnership) or in the beneficial interest of a trust? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (v) below | | X |

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | Yes | No |
|---|---|---|---|
| **5 a** | At the end of the tax year, did the corporation have any outstanding shares of restricted stock? ......................... | | X |
| | If "Yes," complete lines (i) and (ii) below. | | |
| | **(i)** Total shares of restricted stock ................................. ▶ | | |
| | **(ii)** Total shares of non-restricted stock ................................. ▶ | | |
| **b** | At the end of the tax year, did the corporation have any outstanding stock options, warrants, or similar instruments? ... | | X |
| | If "Yes," complete lines (i) and (ii) below. | | |
| | **(i)** Total shares of stock outstanding at the end of the tax year ................................. ▶ | | |
| | **(ii)** Total shares of stock outstanding if all instruments were executed ................................. ▶ $ | | |
| **6** | Has this corporation filed, or is it required to file, **Form 8918**, Material Advisor Disclosure Statement, to provide information on any reportable transaction? ......................................................................... | | X |
| **7** | Check this box if the corporation issued publicly offered debt instruments with original issue discount ................ ▶ ☐ | | |
| | If checked, the corporation may have to file **Form 8281**, Information Return for Publicly Offered Original Issue Discount Instruments. | | |
| **8** | If the corporation: **(a)** was a C corporation before it elected to be an S corporation or the corporation acquired an asset with a basis determined by reference to the basis of the asset (or the basis of any other property) in the hands of a C corporation **and (b)** has net unrealized built-in gain in excess of the net recognized built-in gain from prior years, enter the net unrealized built-in gain reduced by net recognized built-in gain from prior years (see instructions) .................................................................................................................. | | |
| **9** | Did the corporation have an election under section 163(j) for any real property trade or business or any farming business in effect during the tax year? See instructions ......................................................................... | | X |
| **0** | Does the corporation satisfy one of the following conditions and the corporation doesn't own a pass-through entity with current year, or prior year carryover, excess business interest expense? See instructions ............................... | X | |
| **a** | The corporation's aggregate average annual gross receipts (determined under section 448(c)) for the 3 tax years preceding the current tax year don't exceed $25 million, and the corporation isn't a tax shelter; or | | |
| **b** | The corporation only has business interest expense from (1) an electing real property trade or business, (2) an electing farming business, or (3) certain utility businesses under section 163(j)(7). | | |
| | If "No," complete and attach Form 8990. | | |
| | Does the corporation satisfy both of the following conditions? | | |
| **a** | The corporation's total receipts (see instructions) for the tax year were less than $250,000 ............................... | | X |
| **b** | The corporation's total assets at the end of the tax year were less than $250,000 ......................................... | | X |
| | If "Yes," the corporation is not required to complete Schedules L and M-1. | | |

A   Form **1120S** (2018)

**302925**

TSBDCC 9:55-AM

Form 1120S (2018)  **D.C. CONCEPTS CONST. & DESIGN LLC**  47-1261481  Page **3**

| Schedule B   Other Information (see instructions) (continued) | | Yes | No |
|---|---|---|---|
| 12 | During the tax year, did the corporation have any non-shareholder debt that was canceled, was forgiven, or had the terms modified so as to reduce the principal amount of the debt? ................ | | X |
| | If "Yes," enter the amount of principal reduction .............. ▶ $ | | |
| 13 | During the tax year, was a qualified subchapter S subsidiary election terminated or revoked? If "Yes," see instructions ...... | | X |
| 14a | Did the corporation make any payments in 2018 that would require it to file Form(s) 1099? ....... | | X |
| b | If "Yes," did the corporation file or will it file required Forms 1099? ............... | | |
| 15 | Is the corporation attaching Form 8996 to certify as a Qualified Opportunity Fund? .......... | | X |
| | If "Yes," enter the amount from Form 8996, line 13 .............. ▶ $ | | |

| Schedule K   Shareholders' Pro Rata Share Items | | | Total amount |
|---|---|---|---|
| **Income (Loss)** | 1 | Ordinary business income (loss) (page 1, line 21) ................ | 1 | 20,499 |
| | 2 | Net rental real estate income (loss) (attach Form 8825) ............ | 2 | |
| | 3a | Other gross rental income (loss) .......... | 3a | | |
| | b | Expenses from other rental activities (attach statement) ... | 3b | | |
| | c | Other net rental income (loss). Subtract line 3b from line 3a ...... | 3c | |
| | 4 | Interest income ................... | 4 | |
| | 5 | Dividends: a Ordinary dividends ............. | 5a | |
| | | b Qualified dividends ........... | 5b | | |
| | 6 | Royalties ..................... | 6 | |
| | 7 | Net short-term capital gain (loss) (attach Schedule D (Form 1120S)) ...... | 7 | |
| | 8a | Net long-term capital gain (loss) (attach Schedule D (Form 1120S)) ...... | 8a | |
| | b | Collectibles (28%) gain (loss) .......... | 8b | | |
| | c | Unrecaptured section 1250 gain (attach statement) ..... | 8c | | |
| | 9 | Net section 1231 gain (loss) (attach Form 4797) ........... | 9 | |
| | 10 | Other income (loss) (see instructions) .......... Type ▶ | 10 | |
| **Deductions** | 11 | Section 179 deduction (attach Form 4562) ............. | 11 | |
| | 12a | Charitable contributions .............. | 12a | |
| | b | Investment interest expense ............... | 12b | |
| | c | Section 59(e)(2) expenditures  (1) Type ▶          (2) Amount ▶ | 12c(2) | |
| | d | Other deductions (see instructions)            Type ▶ | 12d | |
| **Credits** | 13a | Low-income housing credit (section 42(j)(5)) ........... | 13a | |
| | b | Low-income housing credit (other) ............ | 13b | |
| | c | Qualified rehabilitation expenditures (rental real estate) (attach Form 3468, if applicable) | 13c | |
| | d | Other rental real estate credits (see instructions)   Type ▶ | 13d | |
| | e | Other rental credits (see instructions)          Type ▶ | 13e | |
| | f | Biofuel producer credit (attach Form 6478) ........... | 13f | |
| | g | Other credits (see instructions)                Type ▶ | 13g | |
| **Foreign Transactions** | 14a | Name of country or U.S. possession ▶ | | |
| | b | Gross income from all sources ............. | 14b | |
| | c | Gross income sourced at shareholder level .......... | 14c | |
| | | Foreign gross income sourced at corporate level | | |
| | d | Section 951A category .............. | 14d | |
| | e | Foreign branch category .............. | 14e | |
| | f | Passive category ................. | 14f | |
| | g | General category ................. | 14g | |
| | h | Other (attach statement) ............. | 14h | |
| | | Deductions allocated and apportioned at shareholder level | | |
| | i | Interest expense .................. | 14i | |
| | j | Other ..................... | 14j | |
| | | Deductions allocated and apportioned at corporate level to foreign source income | | |
| | k | Section 951A category .............. | 14k | |
| | l | Foreign branch category .............. | 14l | |
| | m | Passive category ................. | 14m | |
| | n | General category ................. | 14n | |
| | o | Other (attach statement) ............. | 14o | |
| | | Other information | | |
| | p | Total foreign taxes (check one): ▶ ☐ Paid  ☐ Accrued | 14p | |
| | q | Reduction in taxes available for credit (attach statement) ........ | 14q | |
| | r | Other foreign tax information (attach statement) | | |

Form **1120S** (2018)

**302926**

T-SBDCC 9:55 AM

**Form 1120S (2018)**  D.C. CONCEPTS CONST. & DESIGN LLC  47-1261481  Page **4**

## Schedule K  Shareholders' Pro Rata Share Items (continued)

| | | | Total amount |
|---|---|---|---|
| **Alternative Minimum Tax (AMT) Items** | 15a Post-1986 depreciation adjustment | 15a | 2,703 |
| | b Adjusted gain or loss | 15b | |
| | c Depletion (other than oil and gas) | 15c | |
| | d Oil, gas, and geothermal properties – gross income | 15d | |
| | e Oil, gas, and geothermal properties – deductions | 15e | |
| | f Other AMT items (attach statement) | 15f | |
| **Items Affecting Shareholder Basis** | 16a Tax-exempt interest income | 16a | |
| | b Other tax-exempt income | 16b | |
| | c Nondeductible expenses | 16c | |
| | d Distributions (attach statement if required) (see instructions) | 16d | |
| | e Repayment of loans from shareholders | 16e | |
| **Other Information** | 17a Investment income | 17a | |
| | b Investment expenses | 17b | |
| | c Dividend distributions paid from accumulated earnings and profits | 17c | |
| | d Other items and amounts (attach statement)   See Statement 2 | | |
| **Reconciliation** | 18 **Income/loss reconciliation.** Combine the amounts on lines 1 through 10 in the far right column. From the result, subtract the sum of the amounts on lines 11 through 12d and 14p | 18 | 20,499 |

## Schedule L  Balance Sheets per Books

| | Assets | Beginning of tax year (a) | Beginning of tax year (b) | End of tax year (c) | End of tax year (d) |
|---|---|---|---|---|---|
| 1 | Cash | | 0 | | 25,617 |
| 2a | Trade notes and accounts receivable | | | | |
| b | Less allowance for bad debts | ( | ) | ( | ) |
| 3 | Inventories | | | | |
| 4 | U.S. government obligations | | | | |
| 5 | Tax-exempt securities (see instructions) | | | | |
| 6 | Other current assets (attach statement)  Stmt 3 | | 156,836 | | 156,836 |
| 7 | Loans to shareholders | | | | |
| 8 | Mortgage and real estate loans | | | | |
| 9 | Other investments (attach statement) | | | | |
| 10a | Buildings and other depreciable assets | 15,095 | | 15,095 | |
| b | Less accumulated depreciation | ( 2,300 ) | 12,795 | ( 7,418 ) | 7,677 |
| 11a | Depletable assets | | | | |
| b | Less accumulated depletion | ( | ) | ( | ) |
| 12 | Land (net of any amortization) | | 74,732 | | 74,732 |
| 13a | Intangible assets (amortizable only) | | | | |
| b | Less accumulated amortization | ( | ) | ( | ) |
| 14 | Other assets (attach statement) | | | | |
| 15 | Total assets | | 244,363 | | 264,862 |
| | **Liabilities and Shareholders' Equity** | | | | |
| 16 | Accounts payable | | | | |
| 17 | Mortgages, notes, bonds payable in less than 1 year | | | | |
| 18 | Other current liabilities (attach statement) | | | | |
| 19 | Loans from shareholders | | 20,688 | | 20,688 |
| 20 | Mortgages, notes, bonds payable in 1 year or more | | | | |
| 21 | Other liabilities (attach statement) | | | | |
| 22 | Capital stock | | 162 | | 162 |
| 23 | Additional paid-in capital | | | | |
| 24 | Retained earnings | | 223,513 | | 244,012 |
| 25 | Adjustments to shareholders' equity (attach statement) | | | | |
| 26 | Less cost of treasury stock | | ( ) | | ( ) |
| 27 | Total liabilities and shareholders' equity | | 244,363 | | 264,862 |

Form **1120S** (2018)

TSBDCC 9:55 AM

Form 1120S (2018)   **D.C. CONCEPTS CONST. & DESIGN LLC   47-1261481**                                    Page 5

**Schedule M-1   Reconciliation of Income (Loss) per Books With Income (Loss) per Return**

Note: The corporation may be required to file Schedule M-3 (see instructions)

| | | | | | |
|---|---|---|---|---|---|
| 1 | Net income (loss) per books | 20,499 | 5 | Income recorded on books this year not included on Schedule K, lines 1 through 10 (itemize): | |
| 2 | Income included on Schedule K, lines 1, 2, 3c, 4, 5a, 6, 7, 8a, 9, and 10, not recorded on books this year (itemize): | | a | Tax-exempt interest  $ | |
| 3 | Expenses recorded on books this year not included on Schedule K, lines 1 through 12 and 14p (itemize): | | 6 | Deductions included on Schedule K, lines 1 through 12 and 14p, not charged against book income this year (itemize): | |
| a | Depreciation  $ | | a | Depreciation  $ | |
| b | Travel and entertainment  $ | | | | |
| | | | 7 | Add lines 5 and 6 | |
| 4 | Add lines 1 through 3 | 20,499 | 8 | Income (loss) (Schedule K, line 18). Line 4 less line 7 | 20,499 |

**Schedule M-2   Analysis of Accumulated Adjustments Account, Shareholders' Undistributed Taxable Income Previously Taxed, Accumulated Earnings and Profits, and Other Adjustments Account**
(see instructions)

| | | (a) Accumulated adjustments account | (b) Shareholders' undistributed taxable income previously taxed | (c) Accumulated earnings and profits | (d) Other adjustments account |
|---|---|---|---|---|---|
| 1 | Balance at beginning of tax year | 223,513 | | | |
| 2 | Ordinary income from page 1, line 21 | 20,499 | | | |
| 3 | Other additions | | | | |
| 4 | Loss from page 1, line 21 | ( | | | |
| 5 | Other reductions | ( | | | ( ) |
| 6 | Combine lines 1 through 5 | 244,012 | | | |
| 7 | Distributions | | | | |
| 8 | Balance at end of tax year. Subtract line 7 from line 6 | 244,012 | | | |

Form **1120S** (2018)

302928

TSBDCC 9:55 AM

Form **1125-A**
(Rev. November 2018)
Department of the Treasury
Internal Revenue Service

## Cost of Goods Sold

▶ Attach to Form 1120, 1120-C, 1120-F, 1120S, or 1065.
▶ Go to *www.irs.gov/Form1125A* for the latest information.

OMB No. 1545-0123

| Name | Employer identification number |
|---|---|
| D.C. CONCEPTS CONST. & DESIGN LLC | 47-1261481 |

| | | | |
|---|---|---|---:|
| 1 | Inventory at beginning of year | 1 | |
| 2 | Purchases | 2 | 842,132 |
| 3 | Cost of labor | 3 | |
| 4 | Additional section 263A costs (attach schedule) | 4 | |
| 5 | Other costs (attach schedule)                                     Stmt 4 | 5 | 237,371 |
| 6 | **Total.** Add lines 1 through 5 | 6 | 1,079,503 |
| 7 | Inventory at end of year | 7 | |
| 8 | **Cost of goods sold.** Subtract line 7 from line 6. Enter here and on Form 1120, page 1, line 2 or the appropriate line of your tax return. See instructions | 8 | 1,079,503 |

9a  Check all methods used for valuing closing inventory:
   (i) ☐ Cost
   (ii) ☐ Lower of cost or market
   (iii) ☐ Other (Specify method used and attach explanation.) ▶

b  Check if there was a writedown of subnormal goods ........................................................ ▶ ☐

c  Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) ............. ▶ ☐

d  If the LIFO inventory method was used for this tax year, enter amount of closing inventory computed under LIFO ........ | 9d | |

e  If property is produced or acquired for resale, do the rules of section 263A apply to the entity? See instructions ...... ☐ Yes ☒ No

f  Was there any change in determining quantities, cost, or valuations between opening and closing inventory? If "Yes," attach explanation ........................................................................... ☐ Yes ☒ No

For Paperwork Reduction Act Notice, see instructions.

Form **1125-A** (Rev. 11-2018)

**302929**

TSBDCC 9:55 AM

671118

| Schedule K-1 | 2018 |
|---|---|
| (Form 1120S) | For calendar year 2018, or tax year |

☐ Final K-1    ☐ Amended K-1    OMB No. 1545-0123

Department of the Treasury
Internal Revenue Service

beginning _____   ending _____

## Shareholder's Share of Income, Deductions, Credits, etc.  ▶ See back of form and separate instructions.

**Part I    Information About the Corporation**

A  Corporation's employer identification number
47-1261481

B  Corporation's name, address, city, state, and ZIP code

D.C. CONCEPTS CONST. & DESIGN LLC

501 N ORLANDO AVE, STE 313-311
WINTER PARK          FL 32789

C  IRS Center where corporation filed return
Ogden, UT  84201

**Part II    Information About the Shareholder**

D  Shareholder's identifying number
·6630

E  Shareholder's name, address, city, state, and ZIP code

DOMINICK PETER CICALE
5019 FERNCREST DRIVE

WINTER PARK        FL 32792

F  Shareholder's percentage of stock
ownership for tax year ............ 100.000000 %

**Part III    Shareholder's Share of Current Year Income, Deductions, Credits, and Other Items**

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) 20,499 | 13 | Credits |
| 2 | Net rental real estate income (loss) | | |
| 3 | Other net rental income (loss) | | |
| 4 | Interest income | | |
| 5a | Ordinary dividends | | |
| 5b | Qualified dividends | 14 | Foreign transactions |
| 6 | Royalties | | |
| 7 | Net short-term capital gain (loss) | | |
| 8a | Net long-term capital gain (loss) | | |
| 8b | Collectibles (28%) gain (loss) | | |
| 8c | Unrecaptured section 1250 gain | | |
| 9 | Net section 1231 gain (loss) | | |
| 10 | Other income (loss) A | 15 | Alternative minimum tax (AMT) items 2,703 |
| 11 | Section 179 deduction | 16 | Items affecting shareholder basis |
| 12 | Other deductions | | |
| | | 17 | Other information |
| | | V* | 20,499 |
| | | X* | 15,095 |

* See attached statement for additional information.

For IRS Use Only

r Paperwork Reduction Act Notice, see the Instructions for Form 1120S.    www.irs.gov/Form1120S    Schedule K-1 (Form 1120S) 2018

A

302930

TSBDCC 9:55 AM

| Form **1120S** | **Section 199A Information Worksheet** | **2018** |
|---|---|---|
| | For calendar year 2018 or tax year beginning _____, ending _____ | |

| Name | Employer Identification Number |
|---|---|
| D.C. CONCEPTS CONST. & DESIGN LLC | 47-1261481 |

**Activity Description**

Column A .......... Page 1 Activity
Column B .......... _____
Column C .......... _____
Column D .......... _____
Column E .......... _____

| | Column A | Column B | Column C | Column D | Column E |
|---|---|---|---|---|---|
| Specified service business | No | | | | |
| Ordinary business income (loss) | 20,499 | | | | |
| Net rental real estate income (loss) | | | | | |
| Other net rental income (loss) | | | | | |
| Royalties | | | | | |
| Section 199A income | 20,499 | | | | |
| | | | | | |
| Section 199A W-2 wages | | | | | |
| Section 199A unadjusted basis | 15,095 | | | | |

**Other Information:**
QBI allocable to cooperative pmts received
W-2 wages allocable to qualified payments
Cooperative QPAI deduction to patron

302931

TSBDCC  D.C. CONCEPTS CONST. & DESIGN LLC                          9:55 AM
47-1261481                        **Federal Statements**
FYE: 12/31/2018

### Statement 1 - Form 1120S, Page 1, Line 19 - Other Deductions

| Description | Amount |
|---|---|
| Auto Expense | $ 41,108 |
| Bank Charges | 2,455 |
| Dues and Subscriptions | 250 |
| Equipment Rental | 48,620 |
| Insurance | 26,651 |
| Legal and Accounting | 21,185 |
| Meetings and Seminars | 4,518 |
| Office Expense | 9,655 |
| Subcontractors | 146,833 |
| Telephone | 1,985 |
| Travel | 3,599 |
| Utilities | 3,541 |
| Total | $ 310,400 |

### Statement 2 - Form 1120S, Page 4, Schedule K, Line 17d - Other Items and Amounts

| Description | Amount |
|---|---|
| Section 199A Information - See Attached Wrk | |

### Statement 3 - Form 1120S, Page 4, Schedule L, Line 6 - Other Current Assets

| Description | Beginning of Year | End of Year |
|---|---|---|
| Loans Receivable | $ 156,836 | $ 156,836 |
| Total | $ 156,836 | $ 156,836 |

1-3

TSBDCC  D.C. CONCEPTS CONST. & DESIGN LLC
47-1261481
FYE: 12/31/2018

**Federal Statements**

9:55 AM

### Statement 4 - Form 1125-A, Line 5 - Other Costs

| Description | Amount |
|---|---|
| Supplies | $        3,341 |
| Cost of Sales - Grading & Hau | 220,566 |
| Freight | 13,464 |
| Total | $      237,371 |

4

TSBDCC 9:55 AM

| Form **1120S** Schedule K-1 | **Schedule K-1, Box 17 Codes V, W and X** **Shareholder's Section 199A  Information Worksheet** | **2018** |
|---|---|---|
| | For calendar year 2018 or tax year beginning                    , ending | |

| Name<br>D.C. CONCEPTS CONST.& DESIGN LLC<br>DOMINICK PETER CICALE | Taxpayer Identification Number<br>47-1261481<br>-6630 |
|---|---|

**Activity Description**

Column A  ..............  Page 1 Activity

Column B  ..............  _____

Column C  ..............  _____

Column D  ..............  _____

Column E  ..............  _____

|  | Column A | Column B | Column C | Column D | Column E | Total |
|---|---|---|---|---|---|---|
| Specified service business | No | | | | | |
| Ordinary business income (loss) | 20,499 | | | | | |
| Net rental real estate income (loss) | | | | | | |
| Other net rental income (loss) | | | | | | |
| Royalties | | | | | | |
| **17V** Section 199A income | 20,499 | | | | | 20,499 |
| | | | | | | |
| **17W** Section 199A W-2 wages | | | | | | |
| **17X** Section 199A unadjusted basis | 15,095 | | | | | 15,095 |

**Other Information:**

QBI allocable to cooperative pmts received

W-2 wages allocable to qualified payments

Cooperative QPAI deduction to patron

302934

TSBDCC 9:55 AM

Form **7004**
(Rev. December 2018)
Department of the Treasury
Internal Revenue Service

## Application for Automatic Extension of Time To File Certain Business Income Tax, Information, and Other Returns

▶ File a separate application for each return.
▶ Go to *www.irs.gov/Form7004* for instructions and the latest information.

OMB No. 1545-0233

**Print or Type**

Name
D.C. CONCEPTS CONST. & DESIGN LLC

Identifying number
47-1261481

Number, street, and room or suite no. (If P.O. box, see instructions.)
501 N ORLANDO AVE, STE 313-311

City, town, state, and ZIP code (If a foreign address, enter city, province or state, and country (follow the country's practice for entering postal code).)
WINTER PARK      FL 32789

**Note:** File request for extension by the due date of the return. See instructions before completing this form.

**Part I    Automatic Extension for Certain Business Income Tax, Information, and Other Returns.** See instructions.

1    Enter the form code for the return listed below that this application is for

| Application Is For: | Form Code | Application Is For: | Form Code |
|---|---|---|---|
| Form 706-GS(D) | 01 | Form 1120-ND (section 4951 taxes) | 20 |
| Form 706-GS(T) | 02 | Form 1120-PC | 21 |
| Form 1041 (bankruptcy estate only) | 03 | Form 1120-POL | 22 |
| Form 1041 (estate other than a bankruptcy estate) | 04 | Form 1120-REIT | 23 |
| Form 1041 (trust) | 05 | Form 1120-RIC | 24 |
| Form 1041-N | 06 | Form 1120S | 25 |
| Form 1041-QFT | 07 | Form 1120-SF | 26 |
| Form 1042 | 08 | Form 3520-A | 27 |
| Form 1065 | 09 | Form 8612 | 28 |
| Form 1066 | 11 | Form 8613 | 29 |
| Form 1120 | 12 | Form 8725 | 30 |
| Form 1120-C | 34 | Form 8804 | 31 |
| Form 1120-F | 15 | Form 8831 | 32 |
| Form 1120-FSC | 16 | Form 8876 | 33 |
| Form 1120-H | 17 | Form 8924 | 35 |
| Form 1120-L | 18 | Form 8928 | 36 |
| Form 1120-ND | 19 | | |

**Part II    All Filers Must Complete This Part**

2    If the organization is a foreign corporation that does not have an office or place of business in the United States, check here .............................................................................................. ▶ ☐

3    If the organization is a corporation and is the common parent of a group that intends to file a consolidated return, check here .............................................................................................. ▶ ☐
     If checked, attach a statement listing the name, address, and employer identification number (EIN) for each member covered by this application.

4    If the organization is a corporation or partnership that qualifies under Regulations section 1.6081-5, check here ......... ▶ ☐

5a   The application is for calendar year 20 ....., or tax year beginning ..............., and ending ...............

  b   Short tax year. If this tax year is less than 12 months, check the reason:   ☐ Initial return   ☐ Final return
      ☐ Change in accounting period   ☐ Consolidated return to be filed   ☐ Other (See instructions—attach explanation.)

| | | |
|---|---|---|
| 6    Tentative total tax ............................................................ | 6 | 0 |
| 7    Total payments and credits. See instructions ........................................ | 7 | 0 |
| 8    Balance due. Subtract line 7 from line 6. See instructions ........................... | 8 | 0 |

or Privacy Act and Paperwork Reduction Act Notice, see separate instructions.

Form **7004** (Rev. 12-2018)

A

302935

FLORIDA DEPARTMENT of STATE                                                    DIVISION of CORPORATIONS



Department of State / Division of Corporations / Search Records / Search by Officer/Registered Agent Name /

# Detail by Officer/Registered Agent Name

Florida Limited Liability Company
DC CONCEPTS DEVELOPMENT LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L18000118486 |
| **FEI/EIN Number** | 81-4123377 |
| **Date Filed** | 05/11/2018 |
| **State** | FL |
| **Status** | ACTIVE |

**Principal Address**

2109 BREWSTER CT.
ORLANDO, FL 32833

**Mailing Address**

2109 BREWSTER CT.
ORLANDO, FL 32833

**Registered Agent Name & Address**

UNITED STATES CORPORATION AGENTS, INC.
5575 S. SEMORAN BLVD
SUITE 36
ORLANDO, FL 32822

Address Changed: 07/15/2019

**Authorized Person(s) Detail**

**Name & Address**

Title AMBR

BAILEY-ARCHIE, TRISHA
2109 BREWSTER CT.
ORLANDO, FL 32833

Title AMBR

SANTANA, MATILDE
2109 BREWSTER CT.
ORLANDO, FL 32833

Title AMBR



π EXHIBIT 11
Deponent Circle
Date 9/22/2021 Rptr
WWW.DEPOBOOK.COM

9/15/21, 3:38 PM
Detail by Officer/Registered Agent Name

ARCHIE, ONRIQUE
2109 BREWSTER CT.
ORLANDO, FL 32833

Title MGR

SANTANA, MATILDE
2109 BREWSTER CT.
ORLANDO, FL 32833

**Annual Reports**

| Report Year | Filed Date |
|---|---|
| 2019 | 01/18/2019 |
| 2020 | 01/16/2020 |

**Document Images**

| | |
|---|---|
| 01/16/2020 -- ANNUAL REPORT | View image in PDF format |
| 01/18/2019 -- ANNUAL REPORT | View image in PDF format |
| 05/11/2018 -- Florida Limited Liability | View image in PDF format |

Florida Department of State, Division of Corporations

# Electronic Articles of Organization
## For
## Florida Limited Liability Company

L18000118486
FILED 8:00 AM
May 11, 2018
Sec. Of State
kpcardwell

## Article I

The name of the Limited Liability Company is:

DC CONCEPTS DEVELOPMENT LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

2109 BREWSTER CT.
ORLANDO, FL. US  32833

The mailing address of the Limited Liability Company is:

2109 BREWSTER CT.
ORLANDO, FL. US  32833

## Article III

The name and Florida street address of the registered agent is:

UNITED STATES CORPORATION AGENTS, INC.
13302 WINDING OAK COURT
A
TAMPA, FL.  33612

Having been named as registered agent and to accept service of process for the above stated limited
liability company at the place designated in this certificate, I hereby accept the appointment as registered
agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes
relating to the proper and complete performance of my duties, and I am familiar with and accept the
obligations of my position as registered agent.

Registered Agent Signature:   CHEYENNE MOSELEY, US CORP. AGENTS

## Article IV

**L18000118486**
**FILED 8:00 AM**
**May 11, 2018**
**Sec. Of State**
**kpcardwell**

The name and address of person(s) authorized to manage LLC:

Title:  AMBR
TRISHA  BAILEY-ARCHIE
2109 BREWSTER CT.
ORLANDO, FL.  32833 US

Title:  AMBR
MATILDE  SANTANA
2109 BREWSTER CT.
ORLANDO, FL.  32833 US

Title:  AMBR
ONRIQUE  ARCHIE
2109 BREWSTER CT.
ORLANDO, FL.  32833 US

Title:  MGR
MATILDE  SANTANA
2109 BREWSTER CT.
ORLANDO, FL.  32833  US

Signature of member or an authorized representative

Electronic Signature: CHEYENNE MOSELEY, LEGALZOOM.COM, INC.

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

## 2020  FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L18000118486

**Entity Name:** DC CONCEPTS DEVELOPMENT LLC

**FILED**
**Jan 16, 2020**
**Secretary of State**
**5136505383CC**

**Current Principal  Place of Business:**

2109 BREWSTER CT.
ORLANDO, FL  32833

**Current Mailing Address:**

2109 BREWSTER CT.
ORLANDO, FL  32833  US

**FEI Number:** 81-4123377                                    **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

UNITED STATES CORPORATION AGENTS, INC.
5575 S. SEMORAN BLVD
SUITE 36
ORLANDO, FL  32822  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:

_____
          Electronic Signature of Registered Agent                                                                                  Date

**Authorized Person(s) Detail :**

| | | | | |
|---|---|---|---|---|
| Title | AMBR | | Title | AMBR |
| Name | BAILEY-ARCHIE, TRISHA | | Name | SANTANA, MATILDE |
| Address | 2109 BREWSTER CT. | | Address | 2109 BREWSTER CT. |
| City-State-Zip: | ORLANDO FL 32833 | | City-State-Zip: | ORLANDO FL 32833 |
| | | | | |
| Title | AMBR | | Title | MGR |
| Name | ARCHIE, ONRIQUE | | Name | SANTANA, MATILDE |
| Address | 2109 BREWSTER CT. | | Address | 2109 BREWSTER CT. |
| City-State-Zip: | ORLANDO FL 32833 | | City-State-Zip: | ORLANDO FL 32833 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: TRISHA BAILEY-ARCHIE                      SECRETARY              01/16/2020
_____
    Electronic Signature of Signing Authorized Person(s) Detail                                                            Date

9/15/21, 3:36 PM                                    Detail by Officer/Registered Agent Name



FLORIDA DEPARTMENT OF STATE                                    DIVISION OF CORPORATIONS

Department of State  /  Division of Corporations  /  Search Records  /  Search by Officer/Registered Agent Name  /

# Detail by Officer/Registered Agent Name

Florida Limited Liability Company
D.C. CONCEPTS LIMITED LIABILITY COMPANY

**Filing Information**

| | |
|---|---|
| **Document Number** | L15000133522 |
| **FEI/EIN Number** | N/A |
| **Date Filed** | 08/05/2015 |
| **Effective Date** | 07/30/2015 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | REINSTATEMENT |
| **Event Date Filed** | 01/15/2019 |

**Principal Address**

501 N. ORLANDO AVE.
STE: 313-311
WINTER PARK, FL 32789

**Mailing Address**

501 N. ORLANDO AVE.
STE: 313-311
WINTER PARK, FL 32789

**Registered Agent Name & Address**

Russo, Dominick
501 N. ORLANDO AVE.
STE: 313-311
WINTER PARK, FL 32789



Name Changed: 02/12/2019

**Authorized Person(s) Detail**

**Name & Address**

Title MGR

Santana, Matilde
501 N. ORLANDO AVE.
Suite 313-311
WINTER PARK, FL 32789

**Annual Reports**

9/15/21, 3:36 PM                                     Detail by Officer/Registered Agent Name

| Report Year | Filed Date |
|---|---|
| 2019 | 01/15/2019 |
| 2020 | 05/09/2020 |
| 2021 | 04/04/2021 |

**Document Images**

| | |
|---|---|
| 04/04/2021 -- ANNUAL REPORT | View image in PDF format |
| 05/09/2020 -- ANNUAL REPORT | View image in PDF format |
| 02/12/2019 -- AMENDED ANNUAL REPORT | View image in PDF format |
| 01/15/2019 -- REINSTATEMENT | View image in PDF format |
| 04/28/2017 -- ANNUAL REPORT | View image in PDF format |
| 03/04/2016 -- ANNUAL REPORT | View image in PDF format |
| 08/05/2015 -- Florida Limited Liability | View image in PDF format |

Florida Department of State, Division of Corporations

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

L15000133522
FILED 8:00 AM
August 05, 2015
Sec. Of State
tburch

## Article I

The name of the Limited Liability Company is:

D.C. CONCEPTS LIMITED LIABILITY COMPANY

## Article II

The street address of the principal office of the Limited Liability Company is:

501 N. ORLANDO AVE.
STE: 313-311
WINTER PARK, FL.   32789

The mailing address of the Limited Liability Company is:

501 N. ORLANDO AVE.
STE: 313-311
WINTER PARK, FL.   32789

## Article III

The name and Florida street address of the registered agent is:

MATILDE A SANTANA
501 N. ORLANDO AVE.
STE: 313-311
WINTER PARK, FL.   32789

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:   MATILDE SANTANA

## Article IV

The name and address of person(s) authorized to manage LLC:

Title:  MGR
MATILDE A SANTANA
501 N. ORLANDO AVE. STE: 313-311
WINTER PARK, FL.  32789

**L15000133522
FILED 8:00 AM
August 05, 2015
Sec. Of State
tburch**

## Article V

The effective date for this Limited Liability Company shall be:

07/30/2015

Signature of member or an authorized representative

Electronic Signature: MATILDE A SANTANA

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

## 2021  FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L15000133522

**Entity Name:** D.C. CONCEPTS LIMITED LIABILITY COMPANY

**FILED**
**Apr 04, 2021**
**Secretary of State**
**5330230401CC**

**Current Principal  Place of Business:**

501 N. ORLANDO AVE.
STE: 313-311
WINTER PARK,  FL  32789

**Current Mailing Address:**

501 N. ORLANDO AVE.
STE: 313-311
WINTER PARK,  FL  32789

**FEI Number: NOT APPLICABLE**                          **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

RUSSO, DOMINICK
501 N. ORLANDO AVE.
STE: 313-311
WINTER PARK, FL  32789  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:   DOMINICK RUSSO                                                    04/04/2021

_____          _____
Electronic Signature of Registered Agent                                                        Date

**Authorized Person(s) Detail :**

| | |
|---|---|
| Title | MGR |
| Name | SANTANA, MATILDE |
| Address | 501 N. ORLANDO AVE.
SUITE 313-311 |
| City-State-Zip: | WINTER PARK FL 32789 |

.

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: MATILDE SANTANA                                    MGR                    04/04/2021

_____          _____
Electronic Signature of Signing Authorized Person(s) Detail                                    Date

FLORIDA DEPARTMENT *of* STATE                                    DIVISION OF CORPORATIONS



Department of State / Division of Corporations / Search Records / Search by Officer/Registered Agent Name /

## Detail by Officer/Registered Agent Name

Florida Profit Corporation
DC VIDEO COM, INC.

**Filing Information**

| | |
|---|---|
| **Document Number** | P06000027933 |
| **FEI/EIN Number** | 20-4381381 |
| **Date Filed** | 02/23/2006 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | ADMIN DISSOLUTION FOR ANNUAL REPORT |
| **Event Date Filed** | 09/25/2009 |
| **Event Effective Date** | NONE |

**Principal Address**

5019 FERNCREST DR.
WINTER PARK, FL 32792

**Mailing Address**

5019 FERNCREST DR.
WINTER PARK, FL 32792

**Registered Agent Name & Address**

SANTANA, MATILDE
5019 FERNCREST DR.
WINTER PARK, FL 32792

**Officer/Director Detail**

**Name & Address**

Title P

SANTANA, MATILDE
5019 FERNCREST DR.
WINTER PARK, FL 32792

Title V

VILLARROEL, OMAR
676 NEWBURYPORT AVE.
ALTAMONTE SPRINGS, FL 32701

Title T



EXHIBIT 13
Deponent Cicale
Date 9/22/2021 Rptr. SV
WWW.DEPOBOOK.COM

9/15/21, 3:46 PM                                   Detail by Officer/Registered Agent Name

VILLARROEL, MAGNO
676 NEWBURYPORT AVE.
ALTAMONTE SPRINGS, FL 32701

Title S

VILLARROEL, EDWARD
676 NEWBURYPORT AVE.
ALTAMONTE SPRINGS, FL 32701

Title D

VILLARROEL, HENRY
676 NEWBURYPORT AVE.
ALTAMONTE SPRINGS, FL 32701

Title D

VILLARROEL, LIRIO
676 NEWBURYPORT AVE.
ALTAMONTE SPRINGS, FL 32701

**Annual Reports**

| Report Year | Filed Date |
|-------------|------------|
| 2007        | 04/17/2007 |
| 2008        | 07/31/2008 |

**Document Images**

| | |
|---|---|
| 07/31/2008 -- ANNUAL REPORT | View image in PDF format |
| 04/17/2007 -- ANNUAL REPORT | View image in PDF format |
| 02/23/2006 -- Domestic Profit | View image in PDF format |

P06000027933

(Requestor's Name)

(Address)

(Address)

(City/State/Zip/Phone #)

☐ PICK-UP      ☐ WAIT      ☐ MAIL

(Business Entity Name)

(Document Number)

Certified Copies _____   Certificates of Status _____

Special Instructions to Filing Officer:

Office Use Only



700066473777

02/23/06--01013--003   **78.75

FILED
06 FEB 23 PM 12: 41
SECRETARY OF STATE
TALLAHASSEE FLORIDA

# TRANSMITTAL LETTER

Department of State
Division of Corporations
P. O. Box 6327
Tallahassee, FL 32314

SUBJECT: _____ DC VIDEO COM, INC. _____

(PROPOSED CORPORATE NAME – MUST INCLUDE SUFFIX)

Enclosed are an original and one (1) copy of the articles of incorporation and a check for:

| ☐ $70.00 Filing Fee | ☑ $78.75 Filing Fee & Certificate of Status | ☐ $78.75 Filing Fee & Certified Copy | ☐ $87.50 Filing Fee, Certified Copy & Certificate of Status |
|---|---|---|---|

**ADDITIONAL COPY REQUIRED**

FROM: _____ Lancaster Tax Service, Inc. _____

Name (Printed or typed)

_____ 705 W Lancaster Rd _____

Address

_____ Orlando, FL 32809 _____

City, State & Zip

_____ 407-857-5229 _____

Daytime Telephone number

**NOTE: Please provide the original and one copy of the articles.**

## ARTICLES OF INCORPORATION

In compliance with Chapter 607 and/or Chapter 621, F.S. (Profit)

*FILED*

*06  FEB 23  PM 12: 41*

*SECRETARY OF STATE*
*TALLAHASSEE, FLORIDA*

### *ARTICLE I      NAME*

The name of the corporation shall be:

DC VIDEO COM, INC.

### *ARTICLE II      PRINCIPAL OFFICE*

The principal place of business/mailing address is:

5019 Ferncrest Drive
Winter Park Florida 32792

### *ARTICLE III      PURPOSE*

The purpose for which the corporation is organized is:

Entertainment and any legal purpose

### *ARTICLE IV      SHARES*

The number of shares of stock is:

10000 at par value of $1.00 each

### *ARTICLE V      INITIAL OFFICERS AND/OR DIRECTORS*

List name(s), address(es) and specific title(s):

| | | |
|---|---|---|
| Santana,Matilde Pres. | Villarroel,Omar V-Pres | Address for Pres., V-Pre., Sec. and Diectors is as |
| 5019 Ferncrest Dr | Villarroel,Magno Tres | |
| Winter Park FL 32792 | Villarroel,Edward Sec | 676 Newburyport Ave |
| | Villarroel,Henry   Dir | Altamonte Spgs, Florida 32701 |
| | Villarroel,Lirio   Dir | |

### *ARTICLE VI      REGISTERED AGENT*

The **name and Florida street address** of the registered agent is:

Santana, Matilde
5019 Ferncrest Dr
Winter Park  Fl 32792

### *ARTICLE VII      INCORPORATOR*

The **name and address** of the Incorporator is:

Santana, Matilde
5019 Ferncrest Dr
Winter Park, Fl 32792

**************************************************************************

*Having been named as registered agent to accept service of process for the above stated corporation at the place designated in this*
*certificate, I am familiar with and accept the appointment as registered agent and agree to act in this capacity*

| | |
|---|---|
| *Matilde Santana* | 02/02/2006 |
| Signature/Registered Agent | Date |
| *Matilde Santana* | 02/02/2006 |
| Signature/Incorporator | Date |

9/15/21, 3:39 PM
Detail by Officer/Registered Agent Name



FLORIDA DEPARTMENT of STATE                                    DIVISION OF CORPORATIONS

Department of State  /  Division of Corporations  /  Search Records  /  Search by Officer/Registered Agent Name  /

# Detail by Officer/Registered Agent Name

Florida Limited Liability Company
FIRST OPTION SERVICES, LLC

Filing Information

| | |
|---|---|
| **Document Number** | L18000195327 |
| **FEI/EIN Number** | 83-1597410 |
| **Date Filed** | 08/15/2018 |
| **Effective Date** | 08/15/2018 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | REINSTATEMENT |
| **Event Date Filed** | 05/04/2020 |

Principal Address

7501 CITRUS AVENUE
UNIT 1327
GOLDENROD, FL 32733

Mailing Address

7501 CITRUS AVENUE
UNIT 1327
GOLDENROD, FL 32733

Registered Agent Name & Address

Dominick, Russo
1404 NORTH RONALD REAGAN BLVD
SUITE 1120
LONGWOOD, FL 32750

Name Changed: 05/04/2020

Authorized Person(s) Detail

**Name & Address**

Title AMBR

LANE, MICHAEL D
PO BOX 1328
GOLDENROD, FL 32733

Title AMBR



Δπ EXHIBIT 14
Deponent Cicale
Date 9/23/2021 Rptr. 88
WWW.DEPOBOOK.COM

search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=OfficerRegisteredAgentName&directionType=CurrentList&searchName...    1/2

Detail by Officer/Registered Agent Name

SANTANA, MATILDE
5019 FERNCREST DRIVE
WINTER PARK, FL 32792

Title AMBR

GRENALD, JULIAN
2578 ENTERPRISE ROAD, SUITE 188
ORANGE CITY, FL 32763

**Annual Reports**

| Report Year | Filed Date |
| --- | --- |
| 2019 | 05/04/2020 |
| 2020 | 05/04/2020 |
| 2021 | 04/07/2021 |

**Document Images**

| | |
| --- | --- |
| 04/07/2021 -- ANNUAL REPORT | View image in PDF format |
| 05/04/2020 -- REINSTATEMENT | View image in PDF format |
| 08/15/2018 -- Florida Limited Liability | View image in PDF format |

# Electronic Articles of Organization
## For
## Florida Limited Liability Company

L18000195327
FILED 8:00 AM
August 15, 2018
Sec. Of State
cmwood

## Article I

The name of the Limited Liability Company is:

FIRST OPTION SERVICES, LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

7501 CITRUS AVENUE
UNIT 1327
GOLDENROD, FL. US  32733

The mailing address of the Limited Liability Company is:

7501 CITRUS AVENUE
UNIT 1327
GOLDENROD, FL. US  32733

## Article III

The name and Florida street address of the registered agent is:

GREEN SOLUTIONS ACCOUNTING FIRM, INC
1404 NORTH RONALD REAGAN BLVD
SUITE 1120
LONGWOOD, FL.  32750

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:  NATHAN GREEN

## Article IV

The name and address of person(s) authorized to manage LLC:

L18000195327
FILED 8:00 AM
**August 15, 2018**
Sec. Of State
cmwood

Title:  AMBR
MICHAEL D LANE
PO BOX 1328
GOLDENROD, FL.  32733  US

Title:  AMBR
MATILDE  SANTANA
5019 FERNCREST DRIVE
WINTER PARK, FL.  32792  US

Title:  AMBR
JULIAN  GRENALD
2578 ENTERPRISE ROAD, SUITE 188
ORANGE CITY, FL.  32763  US

## Article V

The effective date for this Limited Liability Company shall be:

08/15/2018

Signature of member or an authorized representative

Electronic Signature: MICHAEL LANE

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

## 2021  FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L18000195327

**Entity Name:** FIRST OPTION SERVICES, LLC

**FILED**
**Apr 07, 2021**
**Secretary of State**
**1000392325CC**

**Current Principal  Place of Business:**

7501 CITRUS AVENUE
UNIT 1327
GOLDENROD,  FL  32733

**Current Mailing Address:**

7501 CITRUS AVENUE
UNIT 1327
GOLDENROD,  FL  32733  US

**FEI Number: 83-1597410**                                    **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

DOMINICK, RUSSO
1404 NORTH RONALD REAGAN BLVD
SUITE 1120
LONGWOOD, FL  32750  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:   **DOMINICK RUSSO**                                              04/07/2021

Electronic Signature of Registered Agent                                Date

**Authorized Person(s) Detail :**

| | | | | |
|---|---|---|---|---|
| Title | AMBR | | Title | AMBR |
| Name | LANE, MICHAEL D | | Name | SANTANA, MATILDE |
| Address | PO BOX 1328 | | Address | 5019 FERNCREST DRIVE |
| City-State-Zip: | GOLDENROD  FL  32733 | | City-State-Zip: | WINTER PARK FL  32792 |

| | |
|---|---|
| Title | AMBR |
| Name | GRENALD, JULIAN |
| Address | 2578 ENTERPRISE ROAD, SUITE 188 |
| City-State-Zip: | ORANGE CITY  FL  32763 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: MICHAEL LANE                                    AMBR                     04/07/2021

Electronic Signature of Signing Authorized Person(s) Detail                                Date

FLORIDA DEPARTMENT of STATE                                      DIVISION OF CORPORATIONS



Department of State  /  Division of Corporations  /  Search Records  /  Search by Officer/Registered Agent Name  /

# Detail by Officer/Registered Agent Name

Florida Limited Liability Company
PRICED RIGHT LAND DEVELOPMENT LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L16000161302 |
| **FEI/EIN Number** | NONE |
| **Date Filed** | 08/29/2016 |
| **Effective Date** | 08/28/2016 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | ADMIN DISSOLUTION FOR ANNUAL REPORT |
| **Event Date Filed** | 09/22/2017 |
| **Event Effective Date** | NONE |

**Principal Address**

501 N. ORLANDO AVE.
STE: 313-311
WINTER PARK, FL 32789

**Mailing Address**

501 N. ORLANDO AVE.
STE: 313-311
WINTER PARK, FL 32789

**Registered Agent Name & Address**

LEBRON, AMY
501 N. ORLANDO AVE.
SUITE 313-311
WINTER PARK, FL 32789

**Authorized Person(s) Detail**

**Name & Address**

**Title MGR**

SANTANA, MATILDE
501 N. ORLANDO AVE. STE: 313-311
WINTER PARK, FL 32789



**Annual Reports**

**No Annual Reports Filed**

9/15/21, 3:37 PM                                        Detail by Officer/Registered Agent Name

**Document Images**

08/29/2016 -- Florida Limited Liability          View image in PDF format

Florida Department of State, Division of Corporations

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

L16000161302
FILED 8:00 AM
August 29, 2016
Sec. Of State
jafason

## Article I

The name of the Limited Liability Company is:

PRICED RIGHT LAND DEVELOPMENT LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

501 N. ORLANDO AVE.
STE: 313-311
WINTER PARK, FL.   32789

The mailing address of the Limited Liability Company is:

501 N. ORLANDO AVE.
STE: 313-311
WINTER PARK, FL.   32789

## Article III

The name and Florida street address of the registered agent is:

AMY  LEBRON
501 N. ORLANDO AVE.
SUITE 313-311
WINTER PARK, FL.   32789

Having been named as registered agent and to accept service of process for the above stated limited
liability company at the place designated in this certificate, I hereby accept the appointment as registered
agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes
relating to the proper and complete performance of my duties, and I am familiar with and accept the
obligations of my position as registered agent.

Registered Agent Signature:   AMY LEBRON

## Article IV

The name and address of person(s) authorized to manage LLC:

Title:  MGR
MATILDE  SANTANA
501 N. ORLANDO AVE. STE: 313-311
WINTER PARK, FL.  32789

L16000161302
**FILED 8:00 AM**
**August 29, 2016**
**Sec. Of State**
jafason

## Article V

The effective date for this Limited Liability Company shall be:

08/28/2016

Signature of member or an authorized representative

Electronic Signature: AMY LEBRON

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

9/15/21, 3:40 PM                                    Detail by Officer/Registered Agent Name

FLORIDA DEPARTMENT *of* STATE                                    DIVISION OF CORPORATIONS



Department of State  /  Division of Corporations  /  Search Records  /  Search by Officer/Registered Agent Name  /

# Detail by Officer/Registered Agent Name

Florida Limited Liability Company
SIERRA LEONE WATERGEN LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L19000147284 |
| **FEI/EIN Number** | NONE |
| **Date Filed** | 06/03/2019 |
| **Effective Date** | 06/03/2019 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | ADMIN DISSOLUTION FOR ANNUAL REPORT |
| **Event Date Filed** | 09/25/2020 |
| **Event Effective Date** | NONE |

**Principal Address**

501 N. ORLANDO AVE
SUITE 313 311
WINTER PARK, FL 32789

**Mailing Address**

501 N. ORLANDO AVE
SUITE 313 311
WINTER PARK, FL 32789

**Registered Agent Name & Address**

SANTANA, MATILDE
501 N ORLANDO AVE
SUITE 313 311
WINTER PARK, FL 32789

**Authorized Person(s) Detail**

**Name & Address**

Title MGR

SANTANA, MATILDE
501 N ORLANDO AVE
WINTER PARK, FL 32789



△π EXHIBIT 6
Deponent Cicale
Date 9/23/2021 Rptr
WWW.DEPOBOOK.COM

**Annual Reports**

**No Annual Reports Filed**

9/15/21, 3:40 PM                                                    Detail by Officer/Registered Agent Name

**Document Images**

06/03/2019 -- Florida Limited Liability          View image in PDF format

Florida Department of State, Division of Corporations

search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=OfficerRegisteredAgentName&directionType=CurrentList&searchName

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

L19000147284
FILED 8:00 AM
June 03, 2019
Sec. Of State
crico

## Article I

The name of the Limited Liability Company is:

SIERRA LEONE WATERGEN LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

501 N. ORLANDO AVE
SUITE 313 311
WINTER PARK, FL.   32789

The mailing address of the Limited Liability Company is:

501 N. ORLANDO AVE
SUITE 313 311
WINTER PARK, FL.   32789

## Article III

The name and Florida street address of the registered agent is:

MATILDE  SANTANA
501 N ORLANDO AVE
SUITE 313 311
WINTER PARK, FL.   32789

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:   MATILDE SANTANA

## Article IV

The name and address of person(s) authorized to manage LLC:

L19000147284
FILED 8:00 AM
June 03, 2019
Sec. Of State
crico

Title:  MGR
MATILDE  SANTANA
501 N ORLANDO AVE
WINTER PARK, FL.  32789

## Article V

The effective date for this Limited Liability Company shall be:

06/03/2019

Signature of member or an authorized representative

Electronic Signature: MATILDE SANTANA

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

9/15/21, 3:39 PM                                    Detail by Officer/Registered Agent Name

FLORIDA DEPARTMENT of STATE                                                DIVISION OF CORPORATIONS



Department of State  /  Division of Corporations  /  Search Records  /  Search by Officer/Registered Agent Name  /

## Detail by Officer/Registered Agent Name

Florida Limited Liability Company
SL WATERGEN PLLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L19000114543 |
| **FEI/EIN Number** | NONE |
| **Date Filed** | 04/26/2019 |
| **Effective Date** | 04/26/2019 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | VOLUNTARY DISSOLUTION |
| **Event Date Filed** | 02/28/2020 |
| **Event Effective Date** | 02/28/2020 |

**Principal Address**

501 N. ORLANDO AVE.
SUITE 313-311
WINTER PARK, FL 32789

**Mailing Address**

501 N. ORLANDO AVE.
SUITE 313-311
WINTER PARK, FL 32789

**Registered Agent Name & Address**

RUSSO, DOMINICK
5019 FERNCREST DR.
WINTER PARK, FL 32792

**Authorized Person(s) Detail**

**Name & Address**

Title MGR

SANTANA, MATILDE
501 N. ORLANDO AVE SUITE 313-311
WINTER PARK, FL 32789

Title MGR

BOXTED, MICHAEL



9/15/21, 3:39 PM                                     Detail by Officer/Registered Agent Name

501 N. ORLANDO AVE SUITE 313 311
WINTER PARK, FL 32789

**Annual Reports**

**No Annual Reports Filed**

**Document Images**

| | |
|---|---|
| 02/28/2020 -- VOLUNTARY DISSOLUTION | View image in PDF format |
| 04/26/2019 -- Florida Limited Liability | View image in PDF format |

Florida Department of State, Division of Corporations

# Electronic Articles of Organization
## For
## Florida Limited Liability Company

L19000114543
FILED 8:00 AM
April 26, 2019
Sec. Of State
mdconway

## Article I

The name of the Limited Liability Company is:

SL WATERGEN PLLC

## Article II

The street address of the principal office of the Limited Liability Company is:

501 N. ORLANDO AVE.
SUITE 313-311
WINTER PARK, FL.   32789

The mailing address of the Limited Liability Company is:

501 N. ORLANDO AVE.
SUITE 313-311
WINTER PARK, FL.   32789

## Article III

The name and Florida street address of the registered agent is:

DOMINICK  RUSSO
5019 FERNCREST DR.
WINTER PARK, FL.   32792

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:   DOMINICK RUSSO

## Article IV

The name and address of person(s) authorized to manage LLC:

L19000114543
FILED 8:00 AM
April 26, 2019
Sec. Of State
mdconway

  Title:  MGR
  MATILDE  SANTANA
  501 N. ORLANDO AVE SUITE 313-311
  WINTER PARK, FL.   32789

  Title:  MGR
  MICHAEL  BOXTED
  501 N. ORLANDO AVE SUITE 313 311
  WINTER PARK, FL.   32789

## Article V

The effective date for this Limited Liability Company shall be:

  04/26/2019

Signature of member or an authorized representative

Electronic Signature: MATILDE SANTANA

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

**FILED**
**Feb 28, 2020**
**Secretary of State**

# ARTICLES OF DISSOLUTION

Pursuant to section 605.0707, Florida Statutes, this Florida limited liability company submits the following Articles of Dissolution:

The name of the limited liability company as currently filed with the Florida Department of State:

SL WATERGEN PLLC

The document number of the limited liability company: L19000114543

The file date of the articles of organization: April 26, 2019

The effective date of the dissolution if not effective on the date of filing: February 28, 2020

A description of occurance that resulted in the limited liability company's dissolution:

TRADEMARK INFRINGEMENT

The name and address of the person appointed to wind up the company's activities and affairs:

DOMINICK RUSSO
501 N ORLANDO AVE SUITE 313 311
WINTER PARK, FL  32789

I/we submit this document and affirm that the facts stated herein are true.  I/we am/are aware that any false information submitted in a document to the Department of State constitutes a third degree felony as provided for in section 817.155, Florida Statutes.

Signature:   DOMINICK RUSSO

Electronic Signature of authorized person

# Detail by Entity Name

Florida Limited Liability Company
VETTED LEGAL LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L21000203471 |
| **FEI/EIN Number** | NONE |
| **Date Filed** | 05/03/2021 |
| **Effective Date** | 05/01/2021 |
| **State** | FL |
| **Status** | ACTIVE |

**Principal Address**

501 N ORLANDO AVE
SUITE 313-311
WINTER PARK, FL 32789

**Mailing Address**

501 N ORLANDO AVE
SUITE 313-311
WINTER PARK, FL 32789

**Registered Agent Name & Address**

RUSSO, DOMINICK
5019 FERNCREST DR
WINTER PARK, FL 32792

**Authorized Person(s) Detail**

**Name & Address**

Title MGR

SANTANA, MATILDE
5002 FERNCREST DR
WINTER PARK, FL 32792



**Annual Reports**

**No Annual Reports Filed**

**Document Images**

05/03/2021 -- Florida Limited Liability | View image in PDF format

2/2

FLORIDA DEPARTMENT *of* STATE                                                                    DIVISION OF CORPORATIONS



Department of State   /   Division of Corporations   /   Search Records   /   Search by Entity Name   /

# Electronic Articles of Organization
### For
# Florida Limited Liability Company

L21000203471
FILED 8:00 AM
May 03, 2021
Sec. Of State
pbarrington

## Article I

The name of the Limited Liability Company is:

VETTED LEGAL LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

501 N ORLANDO AVE
SUITE 313-311
WINTER PARK, FL.  32789

The mailing address of the Limited Liability Company is:

501 N ORLANDO AVE
SUITE 313-311
WINTER PARK, FL.  32789

## Article III

The name and Florida street address of the registered agent is:

DOMINICK  RUSSO
5019 FERNCREST DR
WINTER PARK, FL.  32792

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:   DOMINICK RUSSO



## Article IV

The name and address of person(s) authorized to manage LLC:

L21000203471
FILED 8:00 AM
May 03, 2021
Sec. Of State
pbarrington

Title:  MGR
MATILDE  SANTANA
5002 FERNCREST DR
WINTER PARK, FL.  32792

## Article V

The effective date for this Limited Liability Company shall be:

05/01/2021

Signature of member or an authorized representative

Electronic Signature: DOMINICK RSSO

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

9/15/21, 3:41 PM                                    Detail by Officer/Registered Agent Name

FLORIDA DEPARTMENT *of* STATE                                              DIVISION OF CORPORATIONS



Department of State  /  Division of Corporations  /  Search Records  /  Search by Officer/Registered Agent Name  /

# Detail by Officer/Registered Agent Name

Florida Limited Liability Company
VETTED LEGAL CONSULTANTS LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L21000202646 |
| **FEI/EIN Number** | NONE |
| **Date Filed** | 04/30/2021 |
| **Effective Date** | 04/30/2021 |
| **State** | FL |
| **Status** | ACTIVE |

**Principal Address**

501 N ORLANDO AVE
SUITE 313-311
WINTER PARK, FL 32789

**Mailing Address**

501 N ORLANDO AVE
SUITE 313-311
WINTER PARK, FL 32789

**Registered Agent Name & Address**

RUSSO, DOMINICK
5019 FERNCREST DR
WINTER PARK, FL 32792

**Authorized Person(s) Detail**

**Name & Address**

Title MGR

SANTANA, MATILDE
5002 FERNCREST DR
WINTER PARK, FL 32792

**Annual Reports**

**No Annual Reports Filed**



**Document Images**

04/30/2021 -- Florida Limited Liability      View image in PDF format

Detail by Officer/Registered Agent Name

Florida Department of State, Division of Corporations

# Electronic Articles of Organization
## For
## Florida Limited Liability Company

L21000202646
FILED 8:00 AM
April 30, 2021
Sec. Of State

## Article I

The name of the Limited Liability Company is:

VETTED LEGAL CONSULTANTS LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

501 N ORLANDO AVE
SUITE 313-311
WINTER PARK, FL.   32789

The mailing address of the Limited Liability Company is:

501 N ORLANDO AVE
SUITE 313-311
WINTER PARK, FL.   32789

## Article III

The name and Florida street address of the registered agent is:

DOMINICK  RUSSO
5019 FERNCREST DR
WINTER PARK, FL.   32792

Having been named as registered agent and to accept service of process for the above stated limited
liability company at the place designated in this certificate, I hereby accept the appointment as registered
agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes
relating to the proper and complete performance of my duties, and I am familiar with and accept the
obligations of my position as registered agent.

Registered Agent Signature:   DOMINICK RUSSO

## Article IV

The name and address of person(s) authorized to manage LLC:

Title:  MGR
MATILDE  SANTANA
5002 FERNCREST DR
WINTER PARK, FL.  32792

L21000202646
FILED 8:00 AM
April 30, 2021
Sec. Of State

## Article V

The effective date for this Limited Liability Company shall be:

04/30/2021

Signature of member or an authorized representative

Electronic Signature: DOMINICK RUSSO

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

# Electronic Articles of Incorporation
## For

LATINO LADIES INS. CORP.

P13000092946
FILED
November 14, 2013
Sec. Of State
jbryan

The undersigned incorporator, for the purpose of forming a Florida profit corporation, hereby adopts the following Articles of Incorporation:

## Article I

The name of the corporation is:

LATINO LADIES INS. CORP.

## Article II

The principal place of business address:

1490 FELTON STREET
DELTONA, FL.   32725

The mailing address of the corporation is:

1490 FELTON STREET
DELTONA, FL.   32725

## Article III

The purpose for which this corporation is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The number of shares the corporation is authorized to issue is:

100

## Article V

The name and Florida street address of the registered agent is:

ANTHONY  SUAREZ
517 W. COLONIAL DRIVE
ORLANDO, FL.   32804

I certify that I am familiar with and accept the responsibilities of registered agent.

Registered Agent Signature:   ANTHONY SUAREZ

P13000092946
FILED
November 14, 2013
Sec. Of State
jbryan

## Article VI

The name and address of the incorporator is:

AIDA MONEL
1490 FELTON STREET

DELTONA, FL 32725

Electronic Signature of Incorporator:   AIDA MONEL

I am the incorporator submitting these Articles of Incorporation and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.  I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of this corporation and every year thereafter to maintain "active" status.

## Article VII

The initial officer(s) and/or director(s) of the corporation is/are:

Title:  P
AIDA  MONEL
1490 FELTON STREET
DELTONA, FL.  32725

Title:  VP
MATILDE  SANTANA
1490 FELTON STREET
DELTONA, FL.  32725

## Article VIII

The effective date for this corporation shall be:

11/14/2013



FLORIDA DEPARTMENT *of* STATE                                    DIVISION OF CORPORATIONS

Department of State  /  Division of Corporations  /  Search Records  /  Search by Officer/Registered Agent Name  /

# Detail by Officer/Registered Agent Name

Florida Profit Corporation
PATIENT PRIORITY FIRST, INC.

**Filing Information**

**Document Number**      P18000078781
**FEI/EIN Number**       83-2185213
**Date Filed**           09/18/2018
**State**                FL
**Status**               ACTIVE

**Principal Address**

501 N. ORLANDO AVE.
SUITE 313-311
WINTER PARK, FL 32789

**Mailing Address**

501 N. ORLANDO AVE.
SUITE 313-311
WINTER PARK, FL 32789

**Registered Agent Name & Address**

SLUSHER, JEREMY E
444 W. Railroad Avenue
SUITE 470
WEST PALM BEACH, FL 33401

Address Changed: 02/18/2019

**Officer/Director Detail**

**Name & Address**

Title CFO

Russo, Dominick
501 N. ORLANDO AVE., SUITE 313-311
WINTER PARK, FL 32789

Title Director

Cicale, Linda
501 N. ORLANDO AVE.
SUITE 313-311



WINTER PARK, FL 32789

Title CEO

Egan, Mark
2272 Las Fuentes Drive
Port Orange, FL 32129

Title Director

Mitchell-Egan, Robin Kaye
2272 Las Fuentes Drive
Port Orange, FL 32129

### Annual Reports

| Report Year | Filed Date |
|---|---|
| 2020 | 01/29/2020 |
| 2020 | 04/21/2020 |
| 2021 | 04/04/2021 |

### Document Images

| | |
|---|---|
| 04/04/2021 -- ANNUAL REPORT | View image in PDF format |
| 08/13/2020 -- AMENDED ANNUAL REPORT | View image in PDF format |
| 04/21/2020 -- AMENDED ANNUAL REPORT | View image in PDF format |
| 01/29/2020 -- ANNUAL REPORT | View image in PDF format |
| 02/18/2019 -- AMENDED ANNUAL REPORT | View image in PDF format |
| 02/12/2019 -- ANNUAL REPORT | View image in PDF format |
| 09/18/2018 -- Domestic Profit | View image in PDF format |

Florida Department of State, Division of Corporations

# Electronic Articles of Incorporation For

P18000078781
FILED
September 18, 2018
Sec. Of State
tscott

PATIENT PRIORITY FIRST, INC.

The undersigned incorporator, for the purpose of forming a Florida profit corporation, hereby adopts the following Articles of Incorporation:

## Article I

The name of the corporation is:

PATIENT PRIORITY FIRST, INC.

## Article II

The principal place of business address:

501 N. ORLANDO AVE.
SUITE 313-311
WINTER PARK, FL. US  32789

The mailing address of the corporation is:

501 N. ORLANDO AVE.
SUITE 313-311
WINTER PARK, FL. US  32789

## Article III

The purpose for which this corporation is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The number of shares the corporation is authorized to issue is:

500

## Article V

The name and Florida street address of the registered agent is:

JEREMY E SLUSHER
324 DATURA STREET
SUITE 324
WEST PALM BEACH, FL.  33401

I certify that I am familiar with and accept the responsibilities of registered agent.

Registered Agent Signature:   JEREMY E. SLUSHER

P18000078781
FILED
September 18, 2018
Sec. Of State
tscott

## Article VI

The name and address of the incorporator is:

MATILDE SANTANA
501 N. ORLANDO AVE.
SUITE 313-311
WINTER PARK, FL 32789

Electronic Signature of Incorporator:   MATILDE SANTANA

I am the incorporator submitting these Articles of Incorporation and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.  I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of this corporation and every year thereafter to maintain "active" status.

## Article VII

The initial officer(s) and/or director(s) of the corporation is/are:

Title:  PST
MATILDE  SANTANA
501 N. ORLANDO AVE., SUITE 313-311
WINTER PARK, FL.   32789  US

## 2021 FLORIDA PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# P18000078781

**Entity Name:** PATIENT PRIORITY FIRST, INC.

**FILED**
**Apr 04, 2021**
**Secretary of State**
**6888069636CC**

**Current Principal Place of Business:**

501 N. ORLANDO AVE.
SUITE 313-311
WINTER PARK, FL 32789

**Current Mailing Address:**

501 N. ORLANDO AVE.
SUITE 313-311
WINTER PARK, FL 32789 US

**FEI Number:** 83-2185213                    **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

SLUSHER, JEREMY E
444 W. RAILROAD AVENUE
SUITE 470
WEST PALM BEACH, FL 33401 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____

Electronic Signature of Registered Agent                                                        Date

**Officer/Director Detail :**

| | | | | |
|---|---|---|---|---|
| Title | CFO | | Title | DIRECTOR |
| Name | RUSSO, DOMINICK | | Name | CICALE, LINDA |
| Address | 501 N. ORLANDO AVE., SUITE 313-311 | | Address | 501 N. ORLANDO AVE. SUITE 313-311 |
| City-State-Zip: | WINTER PARK FL 32789 | | City-State-Zip: | WINTER PARK FL 32789 |
| Title | CEO | | Title | DIRECTOR |
| Name | EGAN, MARK | | Name | MITCHELL-EGAN, ROBIN KAYE |
| Address | 2272 LAS FUENTES DRIVE | | Address | 2272 LAS FUENTES DRIVE |
| City-State-Zip: | PORT ORANGE FL 32129 | | City-State-Zip: | PORT ORANGE FL 32129 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: DOMINICK RUSSO                              CFO                              04/04/2021

Electronic Signature of Signing Officer/Director Detail                                                        Date

9/22/21, 12:37 PM          DBPR - SANTANA, MATILDE; Doing Business As: D.C. CONCEPTS CONSTRUCTION & DESIGN LLC, Construction Financial ...

12:37:18 PM 9/22/2021

## Licensee Details

### Licensee Information

| | |
|---|---|
| Name: | **SANTANA, MATILDE** (Primary Name) |
| | **D.C. CONCEPTS CONSTRUCTION & DESIGN LLC** (DBA Name) |
| Main Address: | **5019 FERNCREST DR** |
| | **WINTER PARK  Florida  32792** |
| County: | **ORANGE** |

License Mailing:

| | |
|---|---|
| LicenseLocation: | **501 NORTH ORLANDO AVE** |
| | **SUITE 313-311** |
| | **WINTER PARK  FL  32789** |
| County: | **ORANGE** |

### License Information

| | |
|---|---|
| License Type: | **Construction Financial Officer** |
| Rank: | **Fin Officer** |
| License Number: | **FRO8813** |
| Status: | **Current** |
| Licensure Date: | **05/14/2018** |
| Expires: | |

**Special Qualifications**          **Qualification Effective**

**Alternate Names**

**View Related License Information**

**View License Complaint**

**2601 Blair Stone Road, Tallahassee FL 32399** :: Email: **Customer Contact Center** :: Customer Contact Center: 850.487.1395

The State of Florida is an AA/EEO employer. **Copyright 2007–2010 State of Florida. Privacy Statement**

Under Florida law, email addresses are public records. If you do not want your email address released in response to a public-records request, do not send electronic mail to this entity. Instead,
contact the office by phone or by traditional mail. If you have any questions, please contact 850.487.1395. *Pursuant to Section 455.275(1), Florida Statutes, effective October 1, 2012, licensees
licensed under Chapter 455, F.S. must provide the Department with an email address if they have one. The emails provided may be used for official communication with the licensee. However email
addresses are public record. If you do not wish to supply a personal address, please provide the Department with an email address which can be made available to the public.



11874

**Form 668 (Y)(c)**
(Rev. February 2004)

Department of the Treasury - Internal Revenue Service

# Notice of Federal Tax Lien

| Area: | Serial Number | For Optional Use by Recording Office |
|---|---|---|
| SMALL BUSINESS/SELF EMPLOYED AREA #1 | | |
| Lien Unit Phone: (800) 913-6050 | 695443910 | |

**As provided by section 6321, 6322, and 6323 of the Internal Revenue Code, we are giving a notice that taxes (including interest and penalties) have been assessed against the following-named taxpayer. We have made a demand for payment of this liability, but it remains unpaid. Therefore, there is a lien in favor of the United States on all property and rights to property belonging to this taxpayer for the amount of these taxes, and additional penalties, interest, and costs that may accrue.**

Name of Taxpayer DOMINICK P CICALE

Residence  1730 MULFORD AVE APT 17N
BRONX, NY 10461-4355

23195

FILED

SEP 1 3 2010

ROCKLAND COUNTY
CLERK'S OFFICE

**IMPORTANT RELEASE INFORMATION:** For each assessment listed below, unless notice of the lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

Δπ EXHIBIT 23
Deponent Cicale
Date 9/23/2021 Rptr
(www.tspossd.com)

| Kind of Tax (a) | Tax Period Ending (b) | Identifying Number (c) | Date of Assessment (d) | Last Day for Refiling (e) | Unpaid Balance of Assessment (f) |
|---|---|---|---|---|---|
| 1040 | 12/31/2002 | XXX-XX-6630 | 08/28/2006 | 09/27/2016 | 406211.29 |

2021
eSearch | Document Details

Rockland County NY - DONNA G SILBERMAN COUNTY CLERK

Gray-Robinson P.A.

Document Details

| Instr Number | Book/Page | Index Type | Kind | Description | File Date | Images | Amount |
|---|---|---|---|---|---|---|---|
| 2010-00032727 | | LAND RECORDS | FEDERAL TAX LIEN | 1730 MULFORD AVE APT 17N | 09/13/2010 | 2 pages | |

| Returned To | Address | Address (2) | City | State | ZIP |
|---|---|---|---|---|---|
| IRS | | | | | |

| GRANTORS | Address | Address (2) | City | State | ZIP | GRANTEES | Address | Address (2) | City | State | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| UNITED STATES/695443910 | | | | | | DOMINICK P CICALE | | | | | |

## REFERENCES

| | Index | File Date | Instr Date | Kind | GRANTORS | GRANTEES | Description | Instr Number | Book/Page | Ref | Amount | Images |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | LAN | | | | | | | 0-00023195 | | | | |
| | Index | File Date | Instr Date | Kind | GRANTORS | GRANTEES | Description | Instr Number | Book/Page | Ref | Amount | Images |

© 2007 - 2021 Cott Systems, Inc.
Version 1.7.18.32

Section Block and Lot references are **NOT VERIFIED** by the
County Clerk's Office and may be incorrect. Contact the
Town/Village Assessor's Office for accurate information.

For Questions Related to Data or Images, you may contact
the Clerk's Office during business hours at 845-638-5221.

For Website Technical Support, please contact via email:
support@cottsystems.com or phone: 800-588-2688.

Normal Technical Support Business Hours are: 7:00AM EST
- 6:00PM EST.

Form **1065**

Department of the Treasury
Internal Revenue Service

## U.S. Return of Partnership Income

For calendar year 2016, or tax year beginning _____, 2016,
ending _____ , 20 ___ .
► Information about Form 1065 and its separate instructions is at *www.irs.gov/form1065*.

OMB No. 1545-0123

**2016**

| | | |
|---|---|---|
| **A** Principal business activity<br>AIR AND HEATING | Name of partnership<br>STR8 HEAT LLC | **D** Employer identification no.<br>81-2686692 |
| **B** Principal product or service<br>AIR AND HEATING | Number, street, and room or suite number. If a P.O. box, see the instructions.<br>501 NORTH ORLANDO AVENUE SUITE 313-311 | **E** Date business started<br>05/13/16 |
| **C** Business code number<br>238220 | City or town, state or province, country, and ZIP or foreign postal code<br>WINTER PARK          FL 32789 | **F** Total assets (see the instrs)<br>$            1,541. |

Type or Print

**G** Check applicable boxes: **(1)** [X] Initial return **(2)** [ ] Final return **(3)** [ ] Name change **(4)** [ ] Address change **(5)** [ ] Amended return
**(6)** [ ] Technical termination — also check (1) or (2)

**H** Check accounting method: **(1)** [X] Cash **(2)** [ ] Accrual **(3)** [ ] Other (specify) ►_____

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ► _ _ _ _ _ _ _ _ _ 2

**J** Check if Schedules C and M-3 are attached . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [ ]

**Caution.** *Include only trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.*

| | | | |
|---|---|---|---:|
| **I N C O M E** | **1 a** Gross receipts or sales . . . . . . . . . . . . . . . . . . . | **1a** | 0. |
| | **b** Returns and allowances . . . . . . . . . . . . . . . . . . | **1b** | |
| | **c** Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . . . | **1c** | 0. |
| | **2** Cost of goods sold (attach Form 1125-A) . . . . . . . . . . . | **2** | 7,350. |
| | **3** Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . | **3** | -7,350. |
| | **4** Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) | **4** | |
| | **5** Net farm profit (loss) (attach Schedule F (Form 1040)) . . . . . . | **5** | |
| | **6** Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) . . | **6** | |
| | **7** Other income (loss) (attach statement) | **7** | |
| | **8** **Total income (loss).** Combine lines 3 through 7 . . . . . . . . | **8** | -7,350. |
| **D E D U C T I O N S** (SEE INSTRS FOR LIMITATIONS) | **9** Salaries and wages (other than to partners) (less employment credits) . . | **9** | |
| | **10** Guaranteed payments to partners . . . . . . . . . . . . . | **10** | |
| | **11** Repairs and maintenance . . . . . . . . . . . . . . . . | **11** | |
| | **12** Bad debts . . . . . . . . . . . . . . . . . . . . | **12** | |
| | **13** Rent . . . . . . . . . . . . . . . . . . . . . . | **13** | |
| | **14** Taxes and licenses . . . . . . . . . . . . . . . . . | **14** | |
| | **15** Interest . . . . . . . . . . . . . . . . . . . . . | **15** | 5,000. |
| | **16a** Depreciation (if required, attach Form 4562) . . . **16a** | | |
| | **b** Less depreciation reported on Form 1125-A and elsewhere on return **16b** | **16c** | |
| | **17** Depletion (**Do not deduct oil and gas depletion.**) . . . . . . | **17** | |
| | **18** Retirement plans, etc . . . . . . . . . . . . . . . . | **18** | |
| | **19** Employee benefit programs . . . . . . . . . . . . . . | **19** | |
| | **20** Other deductions (attach statement) . . . . . . . . . STMT | **20** | 6,109. |
| | **21** **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 . . . | **21** | 11,109. |
| | **22** **Ordinary business income (loss).** Subtract line 21 from line 8 . . . | **22** | -18,459. |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than general partner or limited liability company member manager) is based on all information of which preparer has any knowledge.

► _____
Signature of general partner or limited liability company member manager

► _____
Date

May the IRS discuss this return with the preparer shown below (see instrs)? [ ] Yes [X] No

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | | |
|---|---|---|---|---|
| RICHARD B WIGGINS III CPA | *Richard B Wiggins III CPA* | 7/24/17 | Check [ ] if self-employed | PTIN<br>P01430387 |
| Firm's name ► WIGGINS & COMPANY | | | Firm's EIN ► 65-1147278 | |
| Firm's address ► 550 N REO ST. TAMPA, FL 33609 | | | Phone no. 813-261-5050 | |

**BAA For Paperwork Reduction Act Notice, see separate instructions.**

PTPA0112 01/06/17

Form **1065** (2016)

△π **EXHIBIT** 24
Deponent Cicale
Date 9/26/2024 Rptr BV
WWW.DEPOBOOK.COM

302959

Form 1065 (2016)   STR8 HEAT LLC                                              81-2686692                    Page **2**

| Schedule B | Other Information | | |
|---|---|---|---|
| | | **Yes** | **No** |
| **1** | What type of entity is filing this return? Check the applicable box: | | |
| **a** | ☐ Domestic general partnership   **b** ☐ Domestic limited partnership | | |
| **c** | ☒ Domestic limited liability company   **d** ☐ Domestic limited liability partnership | | |
| **e** | ☐ Foreign partnership   **f** ☐ Other ▶ | | |
| **2** | At any time during the tax year, was any partner in the partnership a disregarded entity, a partnership (including an entity treated as a partnership), a trust, an S corporation, an estate (other than an estate of a deceased partner), or a nominee or similar person? | | X |
| **3** | At the end of the tax year: | | |
| **a** | Did any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, or tax-exempt organization, or any foreign government own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership? For rules of constructive ownership, see instructions. If 'Yes,' attach Schedule B-1, Information on Partners Owning 50% or More of the Partnership | | X |
| **b** | Did any individual or estate own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership? For rules of constructive ownership, see instructions. If 'Yes,' attach Schedule B-1, Information on Partners Owning 50% or More of the Partnership | X | |
| **4** | At the end of the tax year, did the partnership: | | |
| **a** | Own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of stock entitled to vote of any foreign or domestic corporation? For rules of constructive ownership, see instructions. If 'Yes,' complete (i) through (iv) below | | X |

| (i) Name of Corporation | (ii) Employer Identification Number (if any) | (iii) Country of Incorporation | (iv) Percentage Owned in Voting Stock |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| **b** | Own directly an interest of 20% or more, or own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital in any foreign or domestic partnership (including an entity treated as a partnership) or in the beneficial interest of a trust? For rules of constructive ownership, see instructions. If 'Yes,' complete (i) through (v) below | | | | X |

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | **Yes** | **No** |
|---|---|---|---|
| **5** | Did the partnership file Form 8893, Election of Partnership Level Tax Treatment, or an election statement under section 6231(a)(1)(B)(ii) for partnership-level tax treatment, that is in effect for this tax year? See Form 8893 for more details | | X |
| **6** | Does the partnership satisfy **all four** of the following conditions? | | |
| **a** | The partnership's total receipts for the tax year were less than $250,000. | | |
| **b** | The partnership's total assets at the end of the tax year were less than $1 million. | | |
| **c** | Schedules K-1 are filed with the return and furnished to the partners on or before the due date (including extensions) for the partnership return. | | |
| **d** | The partnership is not filing and is not required to file Schedule M-3 | X | |
| | If 'Yes,' the partnership is not required to complete Schedules L, M-1, and M-2; Item F on page 1 of Form 1065; or Item L on Schedule K-1. | | |
| **7** | Is this partnership a publicly traded partnership as defined in section 469(k)(2)? | | X |
| **8** | During the tax year, did the partnership have any debt that was cancelled, was forgiven, or had the terms modified so as to reduce the principal amount of the debt? | | X |
| **9** | Has this partnership filed, or is it required to file, Form 8918, Material Advisor Disclosure Statement, to provide information on any reportable transaction? | | X |
| **10** | At any time during calendar year 2016, did the partnership have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? See the instructions for exceptions and filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). If 'Yes,' enter the name of the foreign country.  ▶ | | X |

PTPA0112 01/06/17                                                                              Form **1065** (2016)

302960

Form 1065 (2016)   STR8 HEAT LLC                                              81-2686692                        Page **3**

| Schedule B | Other Information *(continued)* | Yes | No |
|---|---|---|---|

| | | Yes | No |
|---|---|---|---|
| 11 | At any time during the tax year, did the partnership receive a distribution from, or was it the grantor of, or transferor to, a foreign trust? If 'Yes,' the partnership may have to file Form 3520, Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts. See instructions | | X |
| 12a | Is the partnership making, or had it previously made (and not revoked), a section 754 election? | | X |
| | See instructions for details regarding a section 754 election. | | |
| b | Did the partnership make for this tax year an optional basis adjustment under section 743(b) or 734(b)? If 'Yes,' attach a statement showing the computation and allocation of the basis adjustment. See instructions | | X |
| c | Is the partnership required to adjust the basis of partnership assets under section 743(b) or 734(b) because of a substantial built-in loss (as defined under section 743(d)) or substantial basis reduction (as defined under section 734(d))? If 'Yes,' attach a statement showing the computation and allocation of the basis adjustment. See instructions | | X |
| 13 | Check this box if, during the current or prior tax year, the partnership distributed any property received in a like-kind exchange or contributed such property to another entity (other than disregarded entities wholly owned by the partnership throughout the tax year) ▶ ☐ | | |
| 14 | At any time during the tax year, did the partnership distribute to any partner a tenancy-in-common or other undivided interest in partnership property? | | X |
| 15 | If the partnership is required to file Form 8858, Information Return of U.S. Persons With Respect To Foreign Disregarded Entities, enter the number of Forms 8858 attached. See instructions ▶ | | |
| 16 | Does the partnership have any foreign partners? If 'Yes,' enter the number of Forms 8805, Foreign Partner's Information Statement of Section 1446 Withholding Tax, filed for this partnership. ▶ | | X |
| 17 | Enter the number of Forms 8865, Return of U.S. Persons With Respect to Certain Foreign Partnerships, attached to this return. ▶ | | |
| 18a | Did you make any payments in 2016 that would require you to file Form(s) 1099? See instructions | X | |
| b | If 'Yes,' did you or will you file required Form(s) 1099? | X | |
| 19 | Enter the number of Form(s) 5471, Information Return of U.S. Persons With Respect To Certain Foreign Corporations, attached to this return. ▶ | | |
| 20 | Enter the number of partners that are foreign governments under section 892. ▶ | | |
| 21 | During the partnership's tax year, did the partnership make any payments that would require it to file Form 1042 and 1042-S under chapter 3 (sections 1441 through 1464) or chapter 4 (sections 1471 through 1474)? | | X |
| 22 | Was the partnership a specified domestic entity required to file Form 8938 for the tax year (See the Instructions for Form 8938)? | | X |

**Designation of Tax Matters Partner** (see instructions)

Enter below the general partner or member-manager designated as the tax matters partner (TMP) for the tax year of this return:

| Name of designated TMP ▶ | DOMINICK CICALE | Identifying number of TMP ▶ | -6630 |
|---|---|---|---|
| If the TMP is an entity, name of TMP representative ▶ | | Phone number of TMP ▶ | |
| Address of designated TMP ▶ | 501 N ORLANDO AVENUE, SUITE 313-311 WINTER PARK , FL 32789 | | |

PTPA0112  01/06/17                                                         Form **1065** (2016)

302961

| Form 1065 (2016) STR8 HEAT LLC | 81-2686692 | Page **4** |
|---|---|---|

| Schedule K | Partners' Distributive Share Items | | Total amount |
|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| **Income (Loss)** | **1** Ordinary business income (loss) (page 1, line 22) | | **1** | -18,459. |
| | **2** Net rental real estate income (loss) (attach Form 8825) | | **2** | |
| | **3 a** Other gross rental income (loss) | **3a** | | |
| | **b** Expenses from other rental activities (attach stmt) | **3b** | | |
| | **c** Other net rental income (loss). Subtract line 3b from line 3a | | **3 c** | |
| | **4** Guaranteed payments | | **4** | |
| | **5** Interest income | | **5** | |
| | **6** Dividends: **a** Ordinary dividends | | **6 a** | |
| | **b** Qualified dividends | **6b** | | |
| | **7** Royalties | | **7** | |
| | **8** Net short-term capital gain (loss) (attach Schedule D (Form 1065)) | | **8** | |
| | **9 a** Net long-term capital gain (loss) (attach Schedule D (Form 1065)) | | **9 a** | |
| | **b** Collectibles (28%) gain (loss) | **9b** | | |
| | **c** Unrecaptured section 1250 gain (attach statement) | **9c** | | |
| | **10** Net section 1231 gain (loss) (attach Form 4797) | | **10** | |
| | **11** Other income (loss) (see instructions)    Type ▶ | | **11** | |
| **Deductions** | **12** Section 179 deduction (attach Form 4562) | | **12** | |
| | **13 a** Contributions | | **13a** | |
| | **b** Investment interest expense | | **13b** | |
| | **c** Section 59(e)(2) expenditures: **(1)** Type ▶ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ **(2)** Amount ▶ | | **13 c (2)** | |
| | **d** Other deductions (see instructions)   Type ▶ | | **13d** | |
| **Self-Employment** | **14 a** Net earnings (loss) from self-employment | | **14 a** | -18,459. |
| | **b** Gross farming or fishing income | | **14 b** | |
| | **c** Gross nonfarm income | | **14 c** | -7,350. |
| **Credits** | **15 a** Low-income housing credit (section 42(j)(5)) | | **15 a** | |
| | **b** Low-income housing credit (other) | | **15 b** | |
| | **c** Qualified rehabilitation expenditures (rental real estate) (attach Form 3468, if applicable) | | **15 c** | |
| | **d** Other rental real estate credits (see instructions)    Type ▶ _ _ _ _ _ _ _ _ _ | | **15 d** | |
| | **e** Other rental credits (see instructions)    Type ▶ _ _ _ _ _ _ _ _ _ | | **15 e** | |
| | **f** Other credits (see instructions)    Type ▶ _ _ _ _ _ _ _ _ _ | | **15 f** | |
| **Foreign Transactions** | **16 a** Name of country or U.S. possession ▶ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | |
| | **b** Gross income from all sources | | **16 b** | |
| | **c** Gross income sourced at partner level | | **16 c** | |
| | Foreign gross income sourced at partnership level | | | |
| | **d** Passive category ▶ _ _ _ _ _ _ _ **e** General category ▶ _ _ _ _ _ _ _ **f** Other ▶ | | **16 f** | |
| | Deductions allocated and apportioned at partner level | | | |
| | **g** Interest expense ▶ _ _ _ _ _ _ _ **h** Other ▶ | | **16 h** | |
| | Deductions allocated and apportioned at partnership level to foreign source income | | | |
| | **i** Passive category ▶ _ _ _ _ _ _ _ **j** General category ▶ _ _ _ _ _ _ _ **k** Other ▶ | | **16 k** | |
| | **l** Total foreign taxes (check one): ▶ Paid ☐ Accrued ☐ | | **16 l** | |
| | **m** Reduction in taxes available for credit (attach statement) | | **16 m** | |
| | **n** Other foreign tax information (attach statement) | | | |
| **Alternative Minimum Tax (AMT) Items** | **17 a** Post-1986 depreciation adjustment | | **17 a** | |
| | **b** Adjusted gain or loss | | **17 b** | |
| | **c** Depletion (other than oil and gas) | | **17 c** | |
| | **d** Oil, gas, and geothermal properties — gross income | | **17 d** | |
| | **e** Oil, gas, and geothermal properties — deductions | | **17 e** | |
| | **f** Other AMT items (attach stmt) | | **17 f** | |
| **Other Information** | **18 a** Tax-exempt interest income | | **18 a** | |
| | **b** Other tax-exempt income | | **18 b** | |
| | **c** Nondeductible expenses | | **18 c** | |
| | **19 a** Distributions of cash and marketable securities | | **19 a** | |
| | **b** Distributions of other property | | **19 b** | |
| | **20 a** Investment income | | **20 a** | |
| | **b** Investment expenses | | **20 b** | |
| | **c** Other items and amounts (attach stmt) | | | |

| BAA | | Form **1065** (2016) |
|---|---|---|

Form 1065 (2016)   STR8 HEAT LLC                                                81-2686692                        Page **5**

## Analysis of Net Income (Loss)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | Net income (loss). Combine Schedule K, lines 1 through 11. From the result, subtract the sum of Schedule K, lines 12 through 13d, and 16l | | | | | **1** | | -18,459. |

| 2 | Analysis by partner type: | (i) Corporate | (ii) Individual (active) | (iii) Individual (passive) | (iv) Partnership | (v) Exempt Organization | (vi) Nominee/Other |
|---|---|---|---|---|---|---|---|
| a | General partners | | | | | | |
| b | Limited partners | | -18,459. | | | | |

## Schedule L | Balance Sheets per Books

| | Assets | Beginning of tax year (a) | (b) | End of tax year (c) | (d) |
|---|---|---|---|---|---|
| 1 | Cash | | 0. | | 541. |
| 2a | Trade notes and accounts receivable | | | | |
| b | Less allowance for bad debts | | | | |
| 3 | Inventories | | 0. | | 0. |
| 4 | U.S. government obligations | | | | |
| 5 | Tax-exempt securities | | | | |
| 6 | Other current assets (attach stmt) . Ln 6 Stmt | | 0. | | 1,000. |
| 7a | Loans to partners (or persons related to partners) | | | | |
| b | Mortgage and real estate loans | | | | |
| 8 | Other investments (attach stmt) | | | | |
| 9a | Buildings and other depreciable assets | | | | |
| b | Less accumulated depreciation | | | | |
| 10a | Depletable assets | | | | |
| b | Less accumulated depletion | | | | |
| 11 | Land (net of any amortization) | | | | |
| 12a | Intangible assets (amortizable only) | | | | |
| b | Less accumulated amortization | | | | |
| 13 | Other assets (attach stmt) | | | | |
| 14 | Total assets | | 0. | | 1,541. |
| | **Liabilities and Capital** | | | | |
| 15 | Accounts payable | | 0. | | |
| 16 | Mortgages, notes, bonds payable in less than 1 year | | | | |
| 17 | Other current liabilities (attach stmt) | | | | |
| 18 | All nonrecourse loans | | | | |
| 19a | Loans from partners (or persons related to partners) | | | | |
| b | Mortgages, notes, bonds payable in 1 year or more | | | | |
| 20 | Other liabilities (attach stmt) | | | | |
| 21 | Partners' capital accounts | | 0. | | 1,541. |
| 22 | Total liabilities and capital | | 0. | | 1,541. |

## Schedule M-1 | Reconciliation of Income (Loss) per Books With Income (Loss) per Return
**Note.** The partnership may be required to file Schedule M-3 (see instructions).

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | Net income (loss) per books | -18,459. | 6 | Income recorded on books this year not included on Schedule K, lines 1 through 11 (itemize): | | |
| 2 | Income included on Schedule K, lines 1, 2, 3c, 5, 6a, 7, 8, 9a, 10, and 11, not recorded on books this year (itemize): | | a | Tax-exempt interest . $ | | |
| | | | 7 | Deductions included on Schedule K, lines 1 through 13d, and 16l, not charged against book income this year (itemize): | | |
| 3 | Guaranteed pmts (other than health insurance) | | a | Depreciation . . . $ | | |
| 4 | Expenses recorded on books this year not included on Schedule K, lines 1 through 13d, and 16l (itemize): | | | | | |
| a | Depreciation . . . $ | | | | | |
| b | Travel and entertainment . . . $ | | 8 | Add lines 6 and 7 | | |
| | | | 9 | Income (loss) (Analysis of Net Income (Loss), line 1). Subtract line 8 from line 5 | | -18,459. |
| 5 | Add lines 1 through 4 | -18,459. | | | | |

## Schedule M-2 | Analysis of Partners' Capital Accounts

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | Balance at beginning of year | 0. | 6 | Distributions: a Cash | | |
| 2 | Capital contributed: a Cash | 20,000. | | b Property | | |
| | b Property | | 7 | Other decreases (itemize): | | |
| 3 | Net income (loss) per books | -18,459. | | | | |
| 4 | Other increases (itemize): | | | | | |
| | | | 8 | Add lines 6 and 7 | | |
| 5 | Add lines 1 through 4 | 1,541. | 9 | Balance at end of year. Subtract line 8 from line 5 | | 1,541. |

PTPA0134  08/25/16                                                                            Form **1065** (2016)

302963

STR8 HEAT LLC   81-2686692                                                                    1

Form 1065, Line 20
**Other deductions**

| | |
|---|---:|
| BANK CHARGES | 39. |
| OUTSIDE SERVICES | 6,070. |

| | |
|---|---:|
| Total | 6,109. |

Form 1065, Schedule L, Line 6
**Other Current Assets**

| Other Current Assets: | Beginning of tax year | End of tax year |
|---|---:|---:|
| EMPLOYEE LOAN RECEIVABLE | 0. | 1,000. |
| Total | 0. | 1,000. |

Form 1125, Line 5
**Other Costs Statement**

| | |
|---|---:|
| MATERIALS AND SUPPLIES | 7,350. |
| Total | 7,350. |

Form **1125-A**
(Rev October 2016)
Department of the Treasury
Internal Revenue Service

## Cost of Goods Sold

► Attach to Form 1120, 1120-C, 1120-F, 1120S, 1065, or 1065-B.
► Information about Form 1125-A and its instructions is at *www.irs.gov/form1125a.*

OMB No. 1545-0123

| Name | Employer identification number |
|---|---|
| STR8 HEAT LLC | 81-2686692 |

| | | | |
|---|---|---|---:|
| 1 | Inventory at beginning of year | **1** | 0. |
| 2 | Purchases | **2** | |
| 3 | Cost of labor | **3** | |
| 4 | Additional section 263A costs (attach schedule) | **4** | |
| 5 | Other costs (attach schedule) . . . STMT | **5** | 7,350. |
| 6 | **Total.** Add lines 1 through 5 | **6** | 7,350. |
| 7 | Inventory at end of year | **7** | 0. |
| 8 | **Cost of goods sold.** Subtract line 7 from line 6. Enter here and on Form 1120, page 1, line 2 or the appropriate line of your tax return. See instructions | **8** | 7,350. |

**9a** Check all methods used for valuing closing inventory:

    **(i)** [X] Cost

    **(ii)** [ ] Lower of cost or market

    **(iii)** [ ] Other (Specify method used and attach explanation) . . . ► _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

  **b** Check if there was a writedown of subnormal goods . . . . . . . . . . . . . . . . . . . . . ► [ ]

  **c** Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) . . . . . . . . . . . . . ► [ ]

  **d** If the LIFO inventory method was used for this tax year, enter amount of closing inventory computed under LIFO . . . . . . . . . . . . **9d** | |

  **e** If property is produced or acquired for resale, do the rules of section 263A apply to the entity? See instructions . . . . . . . . [ ] Yes [X] No

  **f** Was there any change in determining quantities, cost, or valuations between opening and closing inventory? If 'Yes,' attach explanation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [ ] Yes [X] No

BAA  **For Paperwork Reduction Act Notice, see instructions.**                    Form **1125-A** (Rev 10-2016)

**SCHEDULE B-1**
(Form 1065)
(Rev. December 2011)
Department of the Treasury
Internal Revenue Service

## Information on Partners Owning 50% or More of the Partnership
► Attach to Form 1065. See instructions.

OMB No. 1545-0099

| Name of partnership | Employer Identification number (EIN) |
|---|---|
| STR8 HEAT LLC | 81-2686692 |

**Part I** Entities Owning 50% or More of the Partnership (Form 1065, Schedule B, Question 3a)

Complete columns (i) through (v) below for any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, tax-exempt organization, or any foreign government that owns, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership (see instructions).

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Part II** Individuals or Estates Owning 50% or More of the Partnership (Form 1065, Schedule B, Question 3b)

Complete columns (i) through (iv) below for any individual or estate that owns, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership (see instructions).

| (i) Name of Individual or Estate | (ii) Identifying Number (if any) | (iii) Country of Citizenship (see instructions) | (iv) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|
| DOMINICK CICALE | -6630 | US | 50.0000 |
| JHOVANNI SANTANA | -5577 | US | 50.0000 |
| | | | |
| | | | |
| | | | |

BAA For Paperwork Reduction Act Notice, see the Instructions for Form 1065.

Schedule B-1 (Form 1065) (12-2011)

PTPA1301   06/27/11

302966

651113

☐ Final K-1    ☐ Amended K-1          OMB No. 1545-0123

**Schedule K-1**
**(Form 1065)**

**2016**

For calendar year 2016, or tax

Department of the Treasury
Internal Revenue Service

year beginning _____ , 2016

ending _____

**Partner's Share of Income, Deductions,**
**Credits, etc.**          ► See separate instructions.

| **Part III** | **Partner's Share of Current Year Income,** |
| | **Deductions, Credits, and Other Items** |

| 1 | Ordinary business income (loss) | 15 | Credits |
| | -9,229. | | |

| 2 | Net rental real estate income (loss) | | |

| 3 | Other net rental income (loss) | 16 | Foreign transactions |

| 4 | Guaranteed payments | | |

| 5 | Interest income | | |

| 6a | Ordinary dividends | | |

| 6b | Qualified dividends | | |

| 7 | Royalties | | |

| 8 | Net short-term capital gain (loss) | | |

| 9a | Net long-term capital gain (loss) | 17 | Alternative minimum tax (AMT) items |

| 9b | Collectibles (28%) gain (loss) | | |

| 9c | Unrecaptured section 1250 gain | | |

| 10 | Net section 1231 gain (loss) | 18 | Tax-exempt income and nondeductible expenses |

| 11 | Other income (loss) | | |

---

**Part I   Information About the Partnership**

A  Partnership's employer identification number
81-2686692

B  Partnership's name, address, city, state, and ZIP code
STR8 HEAT LLC
501 NORTH ORLANDO AVENUE SUITE 313-311
WINTER PARK , FL 32789

C  IRS Center where partnership filed return
CINCINNATI, OH

D  ☐ Check if this is a publicly traded partnership (PTP)

**Part II   Information About the Partner**

E  Partner's identifying number
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

F  Partner's name, address, city, state, and ZIP code
DOMINICK CICALE
501 N ORLANDO AVENUE
SUITE 313-311
WINTER PARK , FL 32789

G  ☒ General partner or LLC          ☐ Limited partner or other
     member-manager                          LLC member

H  ☒ Domestic partner          ☐ Foreign partner

I1  What type of entity is this partner? . . . . INDIVIDUAL

I2  If this partner is a retirement plan (IRA/SEP/Keogh/etc.),
    check here . . . . . . . . . . . . . . . ☐

J  Partner's share of profit, loss, and capital (see instructions):

| | **Beginning** | **Ending** |
| Profit | 50.00000 % | 50.00000 % |
| Loss | 50.00000 % | 50.00000 % |
| Capital | 50.00000 % | 50.00000 % |

K  Partner's share of liabilities at year end:

Nonrecourse . . . . . . . . . . . $ _____
Qualified nonrecourse financing  . . . . $ _____
Recourse . . . . . . . . . . . $ _____

L  Partner's capital account analysis:

Beginning capital account . . . . $ _____0.
Capital contributed during the year . . . $ ___10,000.
Current year increase (decrease) . . . . . $ ___-9,229.
Withdrawals & distributions . . . . . $ _____
Ending capital account . . . . . . . . $ _____771.

☒ Tax basis    ☐ GAAP    ☐ Section 704(b) book
☐ Other (explain)

M  Did the partner contribute property with a built-in gain or loss?
☐ Yes    ☒ No
If 'Yes', attach statement (see instructions)

| 12 | Section 179 deduction | 19 | Distributions |

| 13 | Other deductions | | |

| | | 20 | Other information |

| 14 | Self-employment earnings (loss) | | |
| A | -9,229. | | |
| C | -3,675. | | |

*See attached statement for additional information.

F
O
R

I
R
S

U
S
E

O
N
L
Y

---

BAA  For Paperwork Reduction Act Notice, see Instructions for Form 1065.

Schedule K-1 (Form 1065) 2016

PTPA0312   08/26/16

302967

| | | | | |
|---|---|---|---|---|
| ☐ Final K-1 | | ☐ Amended K-1 | | 651113 |

OMB No. 1545-0123

**Schedule K-1**
**(Form 1065)**

Department of the Treasury
Internal Revenue Service

**2016**

For calendar year 2016, or tax
year beginning _____ , 2016
ending _____ ,

**Partner's Share of Income, Deductions, Credits, etc.**    ► See separate instructions.

| Part III | Partner's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| | | |
|---|---|---|
| 1 | Ordinary business income (loss) | 15 Credits |
| | -9,230. | |
| 2 | Net rental real estate income (loss) | |
| 3 | Other net rental income (loss) | 16 Foreign transactions |
| 4 | Guaranteed payments | |
| 5 | Interest income | |
| 6a | Ordinary dividends | |
| 6b | Qualified dividends | |
| 7 | Royalties | |
| 8 | Net short-term capital gain (loss) | |
| 9a | Net long-term capital gain (loss) | 17 Alternative minimum tax (AMT) items |
| 9b | Collectibles (28%) gain (loss) | |
| 9c | Unrecaptured section 1250 gain | |
| 10 | Net section 1231 gain (loss) | 18 Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | |
| | | 19 Distributions |
| 12 | Section 179 deduction | |
| 13 | Other deductions | 20 Other information |
| 14 | Self-employment earnings (loss) | |
| A | -9,230. | |
| C | -3,675. | |

\*See attached statement for additional information.

| Part I | Information About the Partnership |
|---|---|

**A** Partnership's employer identification number
81-2686692

**B** Partnership's name, address, city, state, and ZIP code
STR8 HEAT LLC
501 NORTH ORLANDO AVENUE SUITE 313-311
WINTER PARK , FL 32789

**C** IRS Center where partnership filed return
CINCINNATI, OH

**D** ☐ Check if this is a publicly traded partnership (PTP)

| Part II | Information About the Partner |
|---|---|

**E** Partner's identifying number
·5577

**F** Partner's name, address, city, state, and ZIP code
JHOVANNI SANTANA
501 NORTH ORLANDO AVENUE
SUITE 313-311
WINTER PARK, FL 32789

**G** ☒ General partner or LLC member-manager    ☐ Limited partner or other LLC member

**H** ☒ Domestic partner    ☐ Foreign partner

**I1** What type of entity is this partner? . . . . INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here . . . . . . . . . . . ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 50.00000 % | 50.00000 % |
| Loss | 50.00000 % | 50.00000 % |
| Capital | 50.00000 % | 50.00000 % |

**K** Partner's share of liabilities at year end:

| | | |
|---|---|---|
| Nonrecourse . . . . . . . . . . . . . | $ | |
| Qualified nonrecourse financing . . . . | $ | |
| Recourse . . . . . . . . . . . . . | $ | |

**L** Partner's capital account analysis:

| | | |
|---|---|---|
| Beginning capital account . . . . . . . | $ | 0. |
| Capital contributed during the year . . . | $ | 10,000. |
| Current year increase (decrease) . . . . | $ | -9,230. |
| Withdrawals & distributions . . . . . . | $ | ( ) |
| Ending capital account . . . . . . . . | $ | 770. |

☒ Tax basis    ☐ GAAP    ☐ Section 704(b) book
☐ Other (explain)

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes    ☒ No
If 'Yes', attach statement (see instructions)

F
O
R

I
R
S

U
S
E

O
N
L
Y

**BAA   For Paperwork Reduction Act Notice, see Instructions for Form 1065.**        Schedule K-1 (Form 1065) 2016

PTPA0312   08/26/16

302968



000516



10:12

< Inbox                                        ∧  ∨

**DR**  **Dominick Russo**                    9:10 AM
        To: sandrahcuba@yahoo.com >

## Fw: Screenshot 2021-06-12 at 8.52.15 AM

Confidentiality Warning: This e-mail contains information intended only for the use of the individual or entity named above. If the reader of this e-mail is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, any dissemination, publication or copying of this e-mail is strictly prohibited. The sender does not accept any responsibility for any loss, disruption or damage to your data or computer system that may occur while using data contained in, or transmitted with, this e-mail. If you have received this e-mail in error, please immediately notify us by return e-mail. Thank you.-

----- Forwarded Message -----
**From:** Dominick Russo <dominick@patientpriorityfirst.com>
**To:** Dominick Cicale <domc3667@yahoo.com>
**Sent:** Saturday, June 12, 2021, 08:52:55 AM EDT
**Subject:** Screenshot 2021-06-12 at 8.52.15 AM

Δπ EXHIBIT 26
Deponent Cicale
Date 9/3/21 Rptr
WWW.DEPOBOOK.COM

000515

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MATILDE SANTANA,

     Plaintiff,

v.                         CASE NO. 6:20-CV-1157-ORL-78LRH

TELEMUNDO NETWORK GROUP
LLC, NBCUNIVERSAL MEDIA,
LLC, and COMCAST CORPORATION,

     Defendants.

_____/

## SUBPOENA DUCES TECUM WITH DEPOSITION

TO:   Dominick Cicale
       5019 Ferncrest Drive
       Winter Park, Florida 32792-9212

YOU ARE HEREBY COMMANDED to appear before a person authorized by law to take depositions, on **Thursday, September 23, 2021, beginning at 9:30 a.m., at GrayRobinson, P.A., 301 E. Pine Street, Suite 1400, Orlando, Florida 32801,** for the taking of your deposition, by oral examination, in the above-styled cause and to have with you at said time and place the following documents, electronically-stored information, or objects:

1.   Documents reflecting correspondence, communications, conversations, email, voice or text messages, phone calls, postings, or messages using any form of social media or any website with Luis Roldan.

2.   Documents reflecting correspondence, communications, conversations, email, voice or text messages, phone calls, postings, or messages using any form of social media or any website with Sandra Cuba.



3.  Documents reflecting correspondence, communications, conversations, email, voice or text messages, phone calls, postings, or messages using any form of social media or any website with any individual identified in Plaintiff's Rule 26(a)(1) Initial Disclosures (attached as Exhibit A).

4.  Documents reflecting correspondence, communications, conversations, email, voice or text messages, phone calls, postings, or messages using any form of social media or any website with any individual (other than your attorney) regarding this subpoena.

5.  Documents reflecting correspondence, communications, conversations, email, voice or text messages, phone calls, postings, or messages using any form of social media or any website with any individual (other than your attorney) regarding this lawsuit.

6.  Documents created, maintained, routinely kept, or appearing in any file or in or on any electronic system used by Defendants which you possess or have obtained, including any policies, records, e-mail messages, or other documents.

*Rule 45*

*(d) PROTECTING A PERSON SUBJECT TO A SUBPOENA; ENFORCEMENT.*

*(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.*

*(2) Command to Produce Materials or Permit Inspection.*

*(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.*

*(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the*

2

*earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:*

> *(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.*
>
> *(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.*

*(3) Quashing or Modifying a Subpoena.*

> *(A) When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:*
>
> *(i) fails to allow a reasonable time to comply;*
>
> *(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);*
>
> *(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or*
>
> *(iv) subjects a person to undue burden.*

> *(B) When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:*
>
> > *(i) disclosing a trade secret or other confidential research, development, or commercial information; or*
> >
> > *(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.*

> *(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:*
>
> > *(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and*
> >
> > *(ii) ensures that the subpoenaed person will be reasonably compensated.*

*(e) DUTIES IN RESPONDING TO A SUBPOENA.*

> *(1) Producing Documents or Electronically Stored Information.*

*These procedures apply to producing documents or electronically stored information:*

*(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.*

*(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.*

*(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.*

*(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.*

*(2) Claiming Privilege or Protection.*

*(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:*

*(i) expressly make the claim; and*
*(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.*

*(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present*

4

*the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.*

*(f) Transferring a Subpoena-Related Motion. When the court where compliance is required did not issue the subpoena, it may transfer a motion under this rule to the issuing court if the person subject to the subpoena consents or if the court finds exceptional circumstances. Then, if the attorney for a person subject to a subpoena is authorized to practice in the court where the motion was made, the attorney may file papers and appear on the motion as an officer of the issuing court. To enforce its order, the issuing court may transfer the order to the court where the motion was made.*

*(g) CONTEMPT. The court for the district where compliance is required — and also, after a motion is transferred, the issuing court - may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.*

If you fail to furnish the records as provided above or fail to object to this subpoena, you may be in contempt of Court. You are subpoenaed by the attorney whose name appears on this subpoena and unless excused from this subpoena by the attorney or the Court, you shall respond to this subpoena as directed.

DATED: September 17, 2021.

Respectfully submitted,

GRAYROBINSON, P.A.
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887

By: _____
Marlene Quintana, B.C.S.
Florida Bar No. 88358
marlene.quintana@gray-robinson.com

Gregory Hearing
Florida Bar No. 817790
gregory.hearing@gray-robinson.com

5

Sacha Dyson
Florida Bar No. 509191
sacha.dyson@gray-robinson.com
Kevin Sullivan
Florida Bar No. 1003812
kevin.sullivan@gray-robinson.com
GRAYROBINSON, P.A.
401 East Jackson Street, Suite 2700
Post Office Box 3324 (33601-3324)
Tampa, Florida 33602
Telephone:   (813) 273-5000
Facsimile:  (813) 273- 5145

Ryan Waters, Esquire
Florida Bar No. 73619
ryan.waters@universalorlando.com
1000 Universal Studios Plaza
Suite 100
Orlando, FL 32819
Telephone:  (407) 224-2449

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via Electronic and US Mail on this 7th day of September, 2021, to the following:

Jeremy E. Slusher, Esq.
Mahra Sarofsky, Esq.
Slusher & Rosenblum, P.A.
444 W. Railroad Avenue, Suite 470
West Palm Beach, FL  33401
ATTORNEYS FOR PLAINTIFF

By:_____
                Attorney

6

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

MATILDE SANTANA, an individual,

        Plaintiff,

v.

TELEMUNDO NETWORK GROUP LLC,
a Delaware limited liability company;
NBCUNIVERSAL MEDIA, LLC, a
Delaware limited liability company; and
COMCAST CORPORATION, a
Pennsylvania corporation,

        Defendants.

_____/

CASE NO.: 6:20-cv-1157-Orl-78LRH

## PLAINTIFFS' RULE 26(a)(1)(A) INITIAL DISCLOSURES

## INTRODUCTORY COMMENTS

Plaintiff, MATILDE SANTANA, an individual (the "Plaintiff" or "Ms. Santana"), hereby makes the following initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1)(A). Plaintiffs make these disclosures based upon information available to her pursuant to the investigation that Plaintiff has been able to conduct to date. Plaintiff has not yet conducted formal discovery in this matter. These disclosures reflect Plaintiff's current understanding, belief and knowledge. While Plaintiff and her counsel have investigated sources of information immediately available to them, Plaintiff and her counsel have not yet had sufficient opportunity to interview all persons who have, or may have knowledge of the facts relevant to this lawsuit or reviewed all documents which refer or relate to such facts. As discovery in this lawsuit continues, additional information, persons and documents may become known to Plaintiff and her counsel. These Initial Disclosure are, therefore, without prejudice to Plaintiff's right to

**EXHIBIT A**

amend her responses or to offer further or different evidence, documents or information that may come to Plaintiff's attention after these disclosures.

Plaintiff submits these Initial Disclosures without waiver of any applicable privilege or protection and reserves the right to object to the admissibility at trial of any information contained in or derived from these Initial Disclosures. Plaintiff further reserves the right to rely upon the individuals identified in these Initial Disclosures for subjects other than those identified herein in response to any disclosure, evidence or testimony proffered by the defendants.

## INITIAL DISCLOSURES
### Rule 26(a)(1)(A)(i):

> Provide the name, and if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.

### Rule 26(a)(1)(A)(i) Disclosure:

The following are persons likely to have discoverable information that may support Plaintiffs' claims:

1.    All current and former employees and/or agents of each of the defendants and their related corporations or entities, who had any involvement with or have any knowledge of Plaintiff's claims and the incidents set forth in the Complaint, and the defendants' handling of Plaintiff's claims, including:

   a.   Corporate Representative, TELEMUNDO NETWORK GROUP LLC, a Delaware limited liability company ("Telemundo"), c/o GRAYROBINSON, P.A. 333 S.E. 2nd Avenue, Suite 3200, Miami, Florida 33131;

   b.   Corporate Representative, NBCUNIVERSAL MEDIA, LLC, a Delaware limited liability company ("NBC") c/o GRAYROBINSON, P.A. 333 S.E. 2nd Avenue, Suite 3200, Miami, Florida 33131;

    c.   Corporate Representative, COMCAST CORPORATION, a Pennsylvania corporation ("Comcast") c/o GRAYROBINSON, P.A. 333 S.E. 2nd Avenue, Suite 3200, Miami, Florida 33131;

    d.   Anibal Soto, National Sales Manager of Telemundo, Orlando, who also has knowledge of his own actions towards Plaintiff and other employees, c/o GRAYROBINSON, P.A. 333 S.E. 2nd Avenue, Suite 3200, Miami, Florida 33131;

    e.   Luis Roldan, Former General Manager of Telemundo, Orlando, who also has knowledge of his own actions towards Plaintiff and other employees c/o GRAYROBINSON, P.A. 333 S.E. 2nd Avenue, Suite 3200, Miami, Florida 33131;

    f.   Leslie Sierrs, Human Resources, who also has knowledge of Plaintiff's complaints to human resources, and the improper disclosures of information provided in confidence, c/o GRAYROBINSON, P.A. 333 S.E. 2nd Avenue, Suite 3200, Miami, Florida 33131;

    g.   Michael Chico, executive Vice President of NBC Universal, who has knowledge of certain events related to the neglect and mismanagement of Ms. Santana's clients in her absence as he was copied on various emails, c/o GRAYROBINSON, P.A. 333 S.E. 2nd Avenue, Suite 3200, Miami, Florida 33131;

    h.   Patti Lewis, representative from the Golf Channel, which along with Telemundo, is owned and controlled by NBC, who has knowledge of the internal investigation conducted by the companies, c/o GRAYROBINSON, P.A. 333 S.E. 2nd Avenue, Suite 3200, Miami, Florida 33131;

    i.   Alex Sanchez, former General Manager of Telemundo, Orlando , who has knowledge of the persons involved, telephone unknown, address unknown;

    j.   Normand Levy, Sales Manager of Telemundo, Orlando, who has knowledge of various incidents, including without limitation, Mr. Roldan's remarks of August 26, 2019, c/o GRAYROBINSON, P.A. 333 S.E. 2nd Avenue, Suite 3200, Miami, Florida 33131.

2.    All current and former employees who had any involvement with or have any knowledge of Plaintiff's claims and the incidents set forth in the Complaint, and the defendants' handling of Plaintiff's claims, or otherwise had firsthand knowledge of other inappropriate actions of Mr. Soto or Mr. Roldan, including:

a.      Matilde Santana, Former Account Executive for Telemundo, Orlando, c/o the undersigned office.

Ms. Santana has knowledge of all the issues set forth in the Complaint, including without limitation, the unacceptable and toxic comments and actions that contribute to the misogynistic and sexually inappropriate hostile environment in the workplace, her performance and the neglect of her clients during her absence by Mr. Soto and Mr. Roldan including their poor work and poor responses to clients' concerns, and the retaliation against her in response to her claims and concerns.

b.      Olga Aymat, News Anchor of Telemundo, Orlando, c/o GRAYROBINSON, P.A. 333 S.E. 2nd Avenue, Suite 3200, Miami, Florida 33131

Ms. Aymat was made aware of the investigation regarding Ms. Santana's claims despite not having been identified as a person with knowledge germane to the claims and may have additional information regarding sexual harassment issues in the news department.

c.      Sofia Jaca, Former News Producer of Telemundo, Orlando, 215-839-5585, address unknown

Ms. Jaca was made aware of the investigation regarding Ms. Santana's claims despite not having been identified as a person with knowledge germane to the claims and may have information regarding sexual harassment issues in the news department.

d.      Eduardo Echinique, Former Account Executive of Telemundo, Orlando, 407-452-9378, address unknown

Mr. Echinique has witnessed multiple inappropriate interactions between Mr. Soto and the women in the office, specifically including Ms. Santana and Bianca Diaz. Mr. Echinique was retaliated against because he was unwilling to support the false narrative being advanced in opposition to Ms. Santana's claims, and he is no longer employed by the defendants.

e.      Bianca Diaz, Account Executive, c/o GRAYROBINSON, P.A. 333 S.E. 2nd Avenue, Suite 3200, Miami, Florida 33131

Ms. Diaz has been the subject of multiple unwanted advances at the hands of Mr. Soto as well as having witnessed his advances towards others. Ms. Diaz has awareness and experience with the unacceptable and toxic comments and actions that contribute to the misogynistic and sexually inappropriate hostile environment in the workplace.

4

    f.      Toni Scavone, Credit and Collections Manager, c/o GRAYROBINSON, P.A. 333 S.E. 2nd Avenue, Suite 3200, Miami, Florida 33131

Ms. Scavone has witnessed the purposeful neglect of Ms. Santana's clients as well as the unacceptable and toxic comments and actions that contribute to the misogynistic and sexually inappropriate hostile environment in the workplace.

    g.      Valeska Gil, Investigative Reporter, c/o GRAYROBINSON, P.A. 333 S.E. 2nd Avenue, Suite 3200, Miami, Florida 33131

Has experienced unwanted advances and inappropriate behavior from both Mr. Roldan and Mr. Soto, as well as improper threats of retaliation. Ms. Gil has awareness and experience with the unacceptable and toxic comments and actions that contribute to the misogynistic and sexually inappropriate hostile environment in the workplace.

    h.      Jesus Collado, Former IT Professional, 407-572-3021, address unknown

Has information regarding the unacceptable and toxic comments and actions that contribute to the misogynistic and sexually inappropriate hostile environment in the workplace as well retaliatory actions against Ms. Santana. He was the subject of retaliatory actions because he was unwilling to support the false narrative being advanced in opposition to Ms. Santana's claims.

    i.      Grace Negron, Office Manager c/o GRAYROBINSON, P.A. 333 S.E. 2nd Avenue, Suite 3200, Miami, Florida 33131

Ms. Negron has information regarding the unacceptable and toxic comments and actions that contribute to the misogynistic and sexually inappropriate hostile environment in the workplace and, specifically, information regarding the fact that Human Resources does not behave impartially.

3.    Joseph Prusa, Client, 787-647-3392, address unknown

Has information regarding Ms. Santana's performance and the neglect of Ms. Santana's clients during her absence including the poor work of Mr. Soto and Mr. Roldan's poor response to a client's concerns, and the inappropriate statements and disparagement of Ms. Santana following her claims against Telemundo.

4.    Heather Chiasson of MediaSource Worldwide, Client, 813.259.9396. 813.259.1511, 777 South Harbour Island Boulevard. Suite 145. Tampa, FL. 33602

Has information regarding Ms. Santana's performance and regarding the neglect of Ms. Santana's clients during her absence including the poor work of Mr. Soto and Mr. Roldan's poor response to a client's concerns.

5.   All experts retained for purposes of testimony at trial; not yet determined.

6.   All persons and entities identified in the Defendants' disclosures.

7.   Records custodians for any documents produced or obtained related to this matter.

8.   All persons or entities who can substantiate any and all of the claims or allegations set forth in Plaintiffs' Complaint.

**Rule 26(a)(1)(A)(ii):**

Provide a copy – or description by category and location – of all documents, electronically stored information, and tangible things that disclosing party has in its possession, custody or control it may use to support its claims or defenses, unless the use would be solely for impeachment.

**Rule 26(a)(1)(A)(ii) Disclosure:**

Plaintiffs hereby disclose the following categories of documents*:

1.   Letters, email and correspondence between the undersigned office and the defendants related to Ms. Santana;

2.   Letters from Advanced Orthopedics regarding the medical condition of Ms. Santana;

3.   Equal Employment Opportunity Policy;

4.   EEOC Charge, digitally signed on October 28, 2019;

5.   Spreadsheet. Copies will be provided to the defendants;

6.   Emails regarding the inadequate servicing and mishandling of Ms. Santana's clients during Ms. Santana's absence, including failures to communicate, advertisement campaigns that were not run, and rampant billing errors;

7.   Text messages between Mr. Soto and Ms. Santana containing inappropriate comments;

8.      Copies of checks (redacted) evidencing loans demanded by Mr. Soto (which were never repaid);

9.      Documents and evidentiary materials in support of the disclosures below;

10.     All documents and evidentiary materials disclosed by the Defendants; and

11.     Any and all further documents discovered or obtained during discovery related to this matter.

\* To the extent not already produced or otherwise protected or privileged, these documents will be made available for inspection and copying at a mutually convenient time and place.

## Rule 26(a)(1)(A)(iii):

Provide the computation of each category of damages claimed by the disclosing party – who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material unless privilege or protected from disclosure on which each computation is based, including materials bearing the nature and extent of injuries suffered.

### Rule 26(a)(1)(A)(iii) Disclosure:

Plaintiff claims as compensatory damages, the amounts that would have been paid to her or on her behalf from the date the defendants caused a loss in her renumeration through the date of Ms. Santana's projected retirement, as approximated herein, subject to adjustments and more specific calculations as discovery ensues:\*

(a)     Lost Income at approximately $250,000.00 per year, for an approximated amount of $2,250,000.00;

(b)     Lost Insurance Benefits (including contributions for family health and life insurance) at approximately $700.00 per month for an approximated amount of $75,600.00;

(c)     Lost 401k contribution benefits in the amount of $18,500 per year for an approximated amount of $166,500.00; and

(d)     Mental anguish, loss of dignity, and any other intangible injuries in an amount to be determined by the trier of fact.

These amounts do not include interest which continues to accrue, all attorneys' fees and costs of the instant lawsuit, which are ongoing and thereby as yet undetermined, and punitive damages in an amount to be determined by the trier of fact.

\* To the extent not already produced or protected or privileged, documents in support will be made available for inspection and copying at a mutually convenient time and place.

**Rule 26(a)(1)(A)(iv):**

> Provide for inspection and copying as under Rule 34 any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

> **Rule 26(a)(1)(A)(iv) Disclosure:**

Although it is believed that each of the defendants carries insurance policies that may offer coverage in some manner for the claims at issue, at this time, Ms. Santana does not have any specific information regarding any such policies.

Respectfully submitted,

/s/ *Mahra Sarofsky*
Mahra Sarofsky, Esq.
Florida Bar No. 33637
mcs@slusherandrosenblum.com
Jeremy E. Slusher, Esq.
Florida Bar No. 145769
jes@slusherandrosenblum.com
**SLUSHER & ROSENBLUM P.A.**
444 W. Railroad Avenue, Suite 470
West Palm Beach, FL 33401
Telephone:(561) 814-2020
Facsimile:    (561) 557-4598
*Attorneys for Plaintiff, Matilde Santana*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic mail on this 9th day of October, 2020 on all counsel or parties of record.

By: /s/ *Mahra Sarofsky* _____

Jeremy E. Slusher, Esq.
Florida Bar No. 145769
jes@slusherandrosenblum.com

Mahra C. Sarofsky, Esq.
Florida Bar No. 33637
mcs@slusherandrosenblum.com